## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
-------------------------------------------------- X
LINDA UNGERLEIDER,                                  :
                                                    :   CIVIL ACTION NO.:
          Plaintiff                                 :   3:02CV659(AVC)
                                                    :
     v.                                             :
                                                    :
FLEET   MORTGAGE   GROUP   OF                       :
FLEET BANK [sic],                                   :
                                                    :
          Defendant                                 :   NOVEMBER 10, 2003
-------------------------------------------------- X
```

## <u>MEMORANDUM OF LAW</u>
## <u>IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Defendant Washington Mutual Bank FA, as successor in interest by operation of law to

Washington Mutual Home Loans, Inc., the successor by merger to Fleet Mortgage Corporation

("FMG"), hereby submits its Memorandum of Law in Support of Defendant's Motion for Summary

Judgment.  Plaintiff, Linda Ungerleider, makes five basic claims in this case:  (1) constructive discharge

on account of her religion and disability; (2) religious discrimination; (3) disability discrimination; (4)

failure to accommodate disability; and (5) retaliation for taking a medical leave of absence.  However,

the undisputed facts show, <u>inter alia</u>, that:  (1) plaintiff was not constructively discharged because the

matters alleged by plaintiff do not rise to a sufficiently serious level such that a reasonable person would

have felt compelled to resign; (2) the issues and concerns regarding plaintiff's performance and

unacceptable treatment of fellow employees were unrelated to her religion and indeed predated any

awareness of her religion; (3) the issues and concerns regarding plaintiff's performance and

unacceptable treatment of fellow employees were unrelated to her disability and indeed predated any

assertion of disability[1]; (4) FMG reasonably accommodated plaintiff's disability, albeit not in the precise manner demanded by her; and (5) plaintiff's retaliation claim is time-barred.  For the reasons set forth more fully below, judgment as a matter of law should be granted as to each claim asserted by plaintiff.

## I.    SUMMARY OF FACTS

Plaintiff commenced her employment with FMG, then a wholly-owned subsidiary of Fleet Financial Group ("FFG"), as a mortgage loan originator on December 5, 1994.  (See Defendant's Local. Rule 56(c)(1) Statement, hereinafter referred to as (Facts) ¶ 1).  Commencing on December 1, 1995, plaintiff began reporting to Kevin Moran, Sales Manager, who had joined FMG upon FFG's merger with Shawmut National Bank.  (Facts ¶ 3).  As is clear from the performance review Moran issued to plaintiff on February 15, 1996, rating plaintiff's overall performance as "Needs Improvement," plaintiff had done little to endear herself to Moran during the first months they had worked together.  (Facts ¶¶ 4-5).  His comments in that review and plaintiff's utter refusal to acknowledge the validity of same foretell the difficult and rocky relationship that would exist between the two of them until plaintiff's voluntary resignation on May 24, 2000.  (Facts ¶¶ 4-6).  It is highly significant that at the time Moran issued this review plaintiff had not and did not claim to be disabled.  Nor, to plaintiff's belief, did Moran know that she was Jewish.  (Facts ¶¶ 7, 9).  Thus, there is no reason to believe that this first review reflected anything other than Moran's genuine assessment of plaintiff and her performance.

The next annual review that Moran prepared in February 1997 showed some slight improvement in plaintiff's performance, but continued to rate plaintiff low in numerous areas, including Communications, Judgment/Decision Making and Work Relations.  (Facts ¶¶ 11).  In response, once again refusing to accept responsibility for her actions, plaintiff lambasted the

---

[1]    While it is likely that plaintiff is not a "qualified individual with a disability" because, among other reasons, there is no evidence that the back injuries allegedly comprising her disability substantially limit her from performing one or more major life activity, for purpose of this motion for summary judgment only FMG will assume that plaintiff is disabled within the meaning of the ADA.

personnel within FMG's Processing Department and lashed out personally at Moran. (Facts ¶ 12). Another issue arose later that year -- a heated exchange between plaintiff and another employee in a Fleet Bank branch -- that prompted Moran to issue plaintiff a Step #2 – Counsel.[2] (Facts ¶ 14-18). Not surprisingly, plaintiff has denied any wrongdoing. (Facts ¶ 16).

In early December 1999, plaintiff sent an e-mail to an FMG senior manager at least two levels above Moran complaining bitterly about two FMG loan processor employees. (Facts ¶ 25). When senior management asked for Moran's input, he explained that plaintiff had been a difficult employee for some time and that, in his view, her e-mail had violated FMG's policies on conflict resolution. (Facts ¶ 26). Senior management thereafter directed Moran to prepare a formal counsel for plaintiff. (Facts ¶ 27). At or about this time, there were other issues going on as well. For example, one of plaintiff's co-workers had forwarded to Moran an e-mail from plaintiff in which she had expressed very negative views about Moran. (Facts ¶ 23). The Processing Department, seemingly frustrated with plaintiff's complaints about its level of service, compiled an e-mail reflecting errors plaintiff had committed. (Facts ¶ 28). Plaintiff sent an e-mail to Moran in which she disparagingly referred to one of her co-workers as "Ms. Born Again." (Facts ¶ 32). When, in response to that e-mail, Moran expressed concern about the tone of plaintiff's e-mail, she denied that it had been improper. (Facts ¶ 32).

Accordingly, in consultation with Human Resources, it was decided that Moran would address plaintiff's ongoing performance and conduct issues by issuing a verbal counsel on professionalism, communication, work relations and attendance at meetings. (Facts ¶ 27, 33). Before, however, Moran could meet with plaintiff to issue the counsel, she commenced a medical leave of absence due to a prior back injury.[3] (Facts ¶ 34).

---

[2]     As indicated by its title, a Step #2 – Counsel, was the second step in FMG's progressive discipline process. The third step was a Step #3 – Reprimand. (Facts ¶ 14).

[3]     This was plaintiff's second leave of absence while at FMG. According to plaintiff, she had injured her back in April 1996 while lifting a "suitcase" containing FMG computer equipment and manuals. (Facts ¶ 21). On

Sometime in February 2000, plaintiff accepted a mortgage loan referral from Barbara Tartaglio, a Senior Business Banking Specialist in Fleet Bank's Orange branch where plaintiff maintained an office.[4]  (Facts ¶¶ 36-39).  A customer was seeking a mortgage on a new home.  (Facts ¶ 40).  In March 2000, Tartaglio contacted Moran to inform her that the customer had called her very upset about his interactions with plaintiff and that he wanted to speak directly to Moran about the matter.  (Facts ¶ 40). Tartaglio further informed Moran that when she attempted to speak to plaintiff about the customer's concerns, plaintiff became heated and accused Tartaglio of taking the customer's side because she had a "personal relationship" with the customer.  (Facts ¶ 40).  Moran spoke directly with the customer and to plaintiff to obtain their respective accounts of what had transpired.[5]  (Facts ¶ 40).  The customer related other aspects of his business dealings with plaintiff, including plaintiff's suggestion to the customer that his wife help out more and asking for a referral to a lawyer so that she could sue her "bastard" boss. (Facts ¶ 40).  After this incident, Cindi Norris, manager of the Orange branch, contacted Moran to request that a different loan officer be assigned to the branch.[6]  (Facts ¶ 48).

Based on these additional issues, Moran, in consultation with Human Resources, prepared a Step #2 – Counsel (the "2000 Counsel") to issue to plaintiff upon her return.  (Facts ¶ 52).  Lest plaintiff unwittingly show up at the Orange branch, Moran presented the Counsel to plaintiff and informed her of

---

June 10, 1999, plaintiff commenced her first leave of absence purportedly due to the injury she had sustained years earlier, and returned two months later in August 1999.  (Facts ¶ 21).

[4]        Plaintiff claims that this mortgage application was taken during a small window in which she had briefly returned to work during her medical leave, although that claim is highly suspect.  (Facts ¶ 39).

[5]        As was related to Moran, the source of the customer's discontent, primarily had to do with the fact that he had run into difficulties with his mortgage application because his current home had not yet sold.  A dispute arose over whether he had informed plaintiff that his home had sold.  (Facts ¶ 40).  In addition to speaking with the customer, Moran spoke to Tartaglio who stated that she had been a party to discussions with plaintiff in which they had discussed the fact that this customer's current home had not yet been sold.  (Facts ¶ 42).  Thus, either Tartaglio and the customer were lying about plaintiff or vice-versa.  Moran concluded that more likely than not it was plaintiff who had created this problem and was now denying responsibility as she had done on prior occassions.  (Facts ¶ 40-42).

[6]        At the time, FMG and Fleet Bank were affiliated entities both owned by FFG.  (Facts ¶ 2).  FMG loan officers were assigned to cover various bank branches within their territories.  Branches would refer loan inquiries to the loan officer assigned to their branch.  However, FMG loan officers generally served at the pleasure of the branch manager.  If a branch manager requested a different loan officer, Moran would have little choice but to comply. (Facts ¶ 37, 38).

the branch reassignment promptly upon her return.  (Facts ¶ 62).  Needless to say, plaintiff disputed each

and every aspect of the 2000 Counsel, including any attendance or loan quality issues, and denied any

wrongdoing or unprofessional conduct in her dealings with Tartaglio or the customer or anyone else for

that matter.  (Facts ¶ 62).  She offered motives to explain why they would have misrepresented their

interactions with plaintiff, none of which involved religion, disability, or other protected basis.  (Facts ¶

65).  Within a couple of weeks of receiving the 2000 Counsel, plaintiff left a voice mail message for

Paquin in which she stated that she was going to have to leave the company.  (Facts ¶ 75).

Despite Moran's directive that plaintiff not communicate with employees in the Orange branch

about the matter, Moran learned from a Senior Vice President that plaintiff had gone into the branch and

threatened to "sue" Norris and Tartaglio.  (Facts ¶ 70).  Similarly, plaintiff disobeyed Moran's orders

that she turn her branch keys into him and went to the Orange branch a second time, this time with her

son, to remove her belongings. (Facts ¶ 72).  In the meantime, Moran's written communications

demonstrate that he continued to treat plaintiff in a professional, civil manner and had even asked Norris

to reconsider her decision about the Orange branch (which she declined to do).  (Facts ¶ 68).  Moran

patiently responded to plaintiff's numerous inquiries and explanations about the issues contained in the

2000 Counsel.[7] (Facts ¶ 50).

Plaintiff elevated her concerns with the 2000 Counsel to Paquin and Jonathan Frazza, Regional

Vice President of Production.  (Facts ¶ 78).  Although plaintiff claimed that Moran was unfairly

harassing her, she did not mention any belief that her religion or disability played any role in this

harassment. (Facts ¶ 80).   Paquin commenced a comprehensive and thorough review of the issues

identified in the 2000 Counsel that included interviews with at least seventeen different employees.

---

[7]        In trying to explain away one of the past issues cited in the 2000 Counsel in which an African American
manager had requested that plaintiff be reassigned from her branch, plaintiff characterized the situation as one
"Afro. American" branch manager preferring to have another "Afro. American" loan officer.  Once again, plaintiff's
choice of words were utterly inappropriate and she refused to consider even for a moment that any fault lay with her.
(Facts ¶ 73).

Paquin and Frazza ultimately concluded that the 2000 Counsel was justified and found no evidence to substantiate plaintiff's claims of harassment.  (Facts ¶¶ 56, 57).

On May 17, 2000, plaintiff sent an e-mail to Paquin in which she stated that she would be resigning her employment upon the completion of Paquin's review of the 2000 Counsel.  (Facts ¶ 84).  She sent another e-mail on May 19, 2000, stating that she would not work one more minute under Moran.  (Facts ¶ 85).  On May 24, 2000, Paquin and Frazza met with plaintiff.  they informed her that they had found no support for her claim that Moran had harassed her or treated her unprofessionally.  (Facts ¶ 86).  They also informed her that the 2000 Counsel would not be removed from her personnel file and then accepted her resignation.  (Facts ¶ 86).  Plaintiff walked out of the meeting, only to return stating that she hated the company and that she was glad this had happened. (Facts ¶ 87).

## II.    PROCEDURAL BACKGROUND

On June 9, 2000, plaintiff filed a complaint of discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), which was dual-filed with the Equal Employment Opportunity Commission ("EEOC").  (Facts ¶ 91).  The Affidavit of Illegal Discrimination, CHRO Form 103, did not include a claim of constructive discharge.  (Facts ¶ 91).  Thereafter, on April 10, 2002, after obtaining a release to sue, plaintiff filed this lawsuit in federal district court.

On June 24, 2002, FMG filed a Motion For an Order to Stay Proceeding and Compel Arbitration of Plaintiff's Claims ("Motion to Compel") based upon the arbitration provision contained within plaintiff's Fleet Mortgage Group, Inc. Fleet Mortgage Corporation 2000 Outside Loan Officer Compensation Plan ("2000 Compensation Plan").  Plaintiff objected to FMG's Motion to Compel on many grounds that included that her signature on the 2000 Compensation Plan had been forged and that she could not afford the costs of arbitration.  See August 26, 2002 Affidavit of Linda Ungerleider ("Affidavit"), ¶¶ 8, 26-27 attached to plaintiff's August 28, 2002 Memorandum of Law in Opposition to

the Defendant's Motion to Compel Arbitration or in the Alternative, To Conduct Limited Discovery.

Based upon plaintiff's vigorous opposition and statements contained in her Affidavit and to avoid

incurring significant attorney's fees litigating the arbitrability of plaintiff's claims, on October 11, 2002,

FMG voluntarily withdrew its Motion to Compel.[8]

On June 26, 2003, plaintiff filed an Amended Complaint in this action (the "Amended

Complaint"), alleging, that she had been discriminated against in the terms and conditions of her

employment and constructively discharged on the basis of her religion (Jewish) in violation of Title VII

of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-1, et seq. ("Title VII") and an alleged disability

(back injury), in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. (the

"ADA").[9]  She also claimed that FMG had failed to provide reasonable accommodations in accordance

with the ADA and that it had retaliated against her for exercising her rights under the Family Medical

Leave Act, 29 U.S.C. §§ 2601 et seq. (the "FMLA").  On July 14, 2003, FMG filed its Answer and

Affirmative Defenses.  The period for conducting discovery has concluded and this case is ripe for

summary adjudication.

## III.    SUMMARY OF ARGUMENT

Plaintiff claim that Moran levied unwarranted criticism on her due to her religion and her

alleged disability, and that FMG failed to provide her a reasonable accommodation for her

alleged disability, which purportedly ultimately led to her constructive discharge from FMG in

---

[8]    In the course of this lawsuit, FMG has come to learn that certain statements contained in the affidavit that plaintiff submitted to this Court in support of her opposition to the Motion to Compel were not true.  For example, despite having sworn to the Court that her signature had been forged, plaintiff readily agreed during her deposition that the signature appearing on the 2000 Commission Plan was hers.  (Pl. Dep. at 15-16).  To support her claims of inability to pay the costs of arbitration, plaintiff had sworn in her affidavit that she had been let go from one of her post-FMG positions for economic reasons along with three others at the company.  (Affidavit, ¶ 10).  However, the manager who had terminated her from that job testified at his deposition that she had been terminated strictly for performance reasons and that plaintiff had never been told that it was for economic reasons.  (Garofalo Aff., Exh. C).  When confronted with these inconsistencies during her deposition, plaintiff denied understanding that the Affidavit she had submitted to the Court was under oath, claiming that her attorney at the time, Gary Phelan, had only sent her the last page to sign and had never explained that she was under oath.  (Pl. Dep. at 519).

[9]    Plaintiff opted not to pursue the claims of age and gender discrimination that were included in her administrative complaint filed with the CHRO.  (Facts ¶ 91).

May 2000.  However, as discussed below, plaintiff's claims, which are entirely conclusory in nature, fail as a matter of law.

As a preliminary matter, plaintiff's claim that she was constructively discharged from FMG on account of her religion and disability fail as a matter of law.  First, this Count lacks jurisdiction to consider this claim due to plaintiff's failure to include it as part of her administrative complaint.  Second, plaintiff testified that her primary reason for resigning was FMG's purported failure to accommodate her alleged disability and that, had it provided her with a desktop computer, she would not have resigned when she did.  (Facts ¶ 94).  However, FMG fully complied with its obligations to make reasonable accommodations and, moreover, even if it had not, there is no evidence that FMG deliberately acted in a manner to force plaintiff to resign. Third, the purported "harassment" was nothing more than Moran's reasonable reaction to her conduct.  Finally, plaintiff has failed to establish any nexus between any alleged conduct of FMG and her religion or disability.

Plaintiff cannot establish even a prima facie case of religion or disability discrimination because she was not subject to an adverse employment action.  Moreover, any alleged adverse action of FMG did not occur under circumstances giving rise to an inference of discrimination.  In fact, plaintiff testified that Moran issued her a highly critical performance review months before he learned that she was Jewish or that she had suffered a disabling injury.  Asked why Moran and she had a poor relationship from the outset, plaintiff invariably responded with explanations such as, "he just didn't like me," "I can't speak [to] what motivates Kevin for sure," and "I don't know, I can't give an answer of why he did what he did."  (Facts ¶ 95).  Plaintiff even volunteered that Moran's dislike of her could have been driven by her willingness to go around Moran or over his head or that he favored loan officers with whom he had previously worked while at Shawmut.  In fact, the initial directive in late 1999 to

commence disciplinary action against plaintiff came to Moran from an FMG senior manager.  Plaintiff

has presented no admissible evidence that this individual was biased against her, much less that he even

had knowledge of her religion or disability.  Finally, although plaintiff may disagree with Moran's

criticisms of her conduct and performance, there is no evidence upon which a reasonable juror could

find that he did not genuinely believe the contents of the 2000 Counsel.

Plaintiff's claim that FMG failed to accommodate her lifting restriction upon her return

from medical leave in April 2000 also fails as matter of law.  It is undisputed that, in response to

her requests, FMG had taken steps to procure a desktop computer for plaintiff so she did not

have to carry her company issued laptop computer to and from work.  In the meantime, however,

as an interim accommodation, she could leave her laptop at home and take mortgage applications

by hand.

Plaintiff's FMLA claim is time-barred because she did not file the Amended Complaint

asserting same within the applicable statute of limitations for non-willful FMLA violations and

she has failed to plead or present evidence that any alleged violations were willful within the

meaning of FMLA.

## IV.    LEGAL ARGUMENT

### A.    Standard on Summary Judgment

Summary judgment shall enter if there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  "[T]he mere

existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no genuine

issue of material fact … Factual disputes that are irrelevant or unnecessary will not be counted."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986). The substantive law of the

matter identifies which facts are material.  Id. "Only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary judgment. " Id.  The moving party has the initial burden of demonstrating that there is no genuine issue of material fact to be decided.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). As to any issue on which the moving party does not have the ultimate burden of proof, the moving party may satisfy its burden by showing "that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

If the moving party satisfies its burden with respect to summary judgment, "the burden shifts to the nonmovant to proffer evidence demonstrating that a trial is required because a disputed issue of material fact exists."  Weg v. Macchiarola, 995 F.2d 15, 18 (2nd Cir. 1993).  To do so, the nonmoving party must set forth specific material facts indicating there is a genuine issue of fact for trial.  Fed. R. Civ. P. 56(e).  To combat summary judgment, "[t]he plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based on whole or in part on discrimination."  Id. at * 15-16.  "Merely colorable" evidence is not a sufficient basis opposing summary judgment.  Anderson, 477 U.S. at 249-50.  In an employment suit, "when an employer provides convincing evidence that its conduct and plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer."  Davila v. The City of New York, et al., 99 Civ. 1885 (RNB) (AJP), 2000 U.S. Dist. LEXIS 17012, *15 (S.D.N.Y., Nov. 20, 2000).[10]

The Second Circuit has held that summary judgment is appropriate in certain discrimination cases, regardless of the fact that such cases may involve state of mind or intent. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985) cert. denied 474 U.S. 829 (1985) ("the salutary purposes of summary

---

[10]    A copy of each cited unpublished decision is attached hereto in the Appendix of Unpublished Decisions.

judgment--avoiding protracted, expensive and harassing trials--apply no less to discrimination cases than to commercial or other areas of litigation").  Based upon the undisputed facts in this case, FMG is entitled to summary judgment on each of plaintiff's claims as a matter of law.

**B.    Plaintiff's Claim That She Was Constructively Discharged From FMG Fails as a Matter of Law**

Against the backdrop set forth above, FMG shall address plaintiff's claims, starting with her claim that she was constructively discharge on account of her religion and disability as alleged in Counts One and Two of the Amended Complaint.  For the reasons discussed below, this claim fails as a matter of law.

**1.    Plaintiff Failed to Exhaust Administrative Remedies**

Before filing a lawsuit in federal court asserting claims under Title VII or the ADA, a plaintiff must first exhaust her administrative agencies by filing a charge of discrimination with the appropriate administrative agency.  Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 82-83 (2d Cir. 2001); 42 U.S.C. § 2000e-5; 42 U.S.C. § 12117.  Although plaintiff had already resigned her employment when she filed her complaint with the CHRO, plaintiff did not claim in CHRO Form 103-Affidavit of Illegal Discrimination that she had been constructively discharged from FMG.  (Facts ¶ 91).  Plaintiff readily admitted that she did not intend to make such a claim at the time she filed her administrative complaint and does not recall having ever amended her administrative complaint to add a claim of constructive discharge at a later time.  (Facts ¶ 91).  As such, this Court lacks jurisdiction to consider plaintiff's claim of constructive discharge.  See, e.g., Holtz v. Rockefeller & Co., Inc., 258 F.3d at 82-83; Harewood v. Beth Isr. Med. Ctr., 02 Civ. 5511 (HB), 2003 U.S. Dist. LEXIS 10002, *11-12 (S.D.N.Y., June 12, 2003) (plaintiff failed to exhaust retaliation claim when she did not allege facts setting forth such a claim and did not indicate so on her charge's cover sheet); Javier v. Beiersdorf, Inc., Civil No.

11

3:01cv458(AVC), 2002 U.S. Dist. LEXIS 8731 at * 16-17 (D. Conn., April 11, 2002) (plaintiff must exhaust administrative remedies in discrimination cases).[11]

> ## 2.     No Reasonable Person Would Have Felt Compelled to Resign Under These Circumstances

Even if this Court had jurisdiction to consider plaintiff's claim of constructive discharge, the record in this case is devoid of evidence even approaching the exacting standard for proving same.  An employee who has resigned her employment can sustain a claim of constructive discharge only when her employer intentionally created a work atmosphere so intolerable that she was forced to quit involuntarily.  Kirsch v. Fleet St., Ltd., 148 F.3d 149, 161 (2d Cir. 1998); Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 89 (2d Cir. 1996).  The Second Circuit has adopted a heightened standard for constructive discharge that requires a showing that the employer deliberately made the working conditions so intolerable so as to force the employee to resign.  See Stetson v. NYNEX Serv. Co., 995 F.2d 355, 361 (2d Cir. 1993); Arnold v. United International Video Stores, 3:93cv1976 (AVC) 1994 U.S. Dist. LEXIS 20770 at * 15-16 (D. Conn., Aug. 17, 1994).  Working conditions are intolerable only when, viewed as a whole, they are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Chertkova, 92 F.3d at 89.

When asked to identify all bases for her claim of constrictive discharge, plaintiff stated essentially that she resigned because FMG had failed to provide her with a desktop and she had been "harassed" by Moran upon her return from leave, including being issued a "false written warning."  Pl. Dep., at 304-05.

---

[11]     As this Court has stated, the "failure to exhaust administrative remedies permits a court to dismiss the action because no subject matter jurisdiction exists ... This is especially true where Congress has designed an extensive administrative procedure to protect the interests of potential plaintiffs. Failure to follow administrative procedures in pursuing a claim of discrimination forecloses access to judicial relief."  Javier v. Beiersdorf, Inc., 2002 U.S. Dist. LEXIS 8731, at * 19.

Plaintiff testified that had FMG accommodated her request for a desktop computer, she would not have resigned when she did.  (Facts ¶ 92,94).  It is undisputed, however, that FMG was in the process of obtaining a desktop computer for her and that, in the interim, it had permitted her to leave her laptop at home, take paper mortgage applications and then electronically upload them from home.  (Facts ¶ 58).  The undisputed evidence shows that Moran had been in contact with the appropriate personnel within FMG in an effort to obtain such a desktop for plaintiff.  (Facts ¶ 56).  As Moran testified during his deposition:

> I believe at the time, Fleet was looking at finding a solution and an accommodation.  I believe that the time, there was a recommendation to Linda to conduct business by keeping her laptop stationary, which I believe we recommended would be at her home and/or at another Fleet location that we would provide to her.  And that . . . accommodation would be on an interim basis until such time as we could fully research and ideally implement a PC in an office that would make sense, in terms of her geographic territory.

(See Deposition of Kevin Moran, hereinafter "Moran Dep., at 131," excerpts of which are attached to Garofalo Aff., Exh. B.

This accommodation enabled plaintiff to perform the essential functions of her job without exceeding the lifting restrictions imposed by her physicians.  As Moran testified:

> Loan officers do not use their laptops when they meet face-to-face with clients.  The overwhelming majority, they meet with a customer and take a handwritten application, which they use as a reference; and they would then, typically, then input the information into the laptop and upload it.

(Moran Dep. at 133).  He further testified that "it wasn't a requirement [that loan officers carry their laptops].  The requirement was just to get the job done.  They did not have to carry the laptop with them."  (Moran Dep. at 133).  Plaintiff essentially conceded as much when she testified that she generally only needed to carry her laptop to and from work each day.[12]  (Facts ¶ 60).

---

[12]     Responding to questioning about why plaintiff did not simply leave her laptop at her branch office rather than carrying it home each night, plaintiff testified that she needed her laptop at home in the evenings in order to remain a "top producer."  (Facts ¶ 60).  She also acknowledged, however, that there was nothing to prevent her from staying at the branch after hours to do her work or returning in the evening to do work other than the fact that

A brief delay in obtaining plaintiff's first choice of accommodation, particularly given the time being devoted to other issues involving plaintiff and the fact that she was in the process of establishing a new office location, can hardly be viewed as unreasonable.  See Terrell v. USAir, 132 F.3d 621, 627-628 (11th Cir. 1998) (three month delay in providing employee with drop keyboard not unreasonable, particularly because employee had access to drop key board and was not required to type when access was not available); Hartsfield v. Miami Dade Court, 90 F. Supp. 2d 1363, 1371-73 (S.D. Fla. 2000) (granting summary judgment for employer despite ten month delay in providing special equipment and training; plaintiff had received some other accommodation and had suffered no adverse employment action);  Davis v. York Int'l, Inc., Am. Disabilities Ca. (BNA) 1810, 1816 (D. Md. 1993) (three-month delay in installing special equipment not unreasonable); Powers v. Polygram Holding, 40 F. Supp. 2d 195, 202 (S.D.N.Y. 1999 (three week delay in granting request for reduced hours not unreasonable); compare Worthington v. City of New Haven, 994 F. Supp. 111, 113-14 (D. Conn. 1997) (two year delay in providing requested accommodation unreasonable).

Indeed, plaintiff knew that the desktop would not be available upon her return.  She agreed to this accommodation until "hopefully a PC is available at a future date."  (Facts ¶ 61). Even if plaintiff had not agreed to this particular accommodation, "the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." 29 C.F.R. §1630, appendix.  In other words, the ADA "does not require the employer to provide every accommodation the disabled employee may request, so long as the accommodation provided is reasonable." Fink v. New York City Dep't of Personnel, 53 F.3d

_____

she had a husband and child at home.  (Facts ¶ 60).  This too would have alleviated the need to carry a laptop to and from work.

565, 567 (2d Cir. 1995); see also Gronne v. Apple Bank for Savings, 1 Fed. Appx. 64, 67 (2d

Cir. 2001). Plaintiff has failed to offer evidence that FMG's interim accommodation was

unreasonable or that, with it, she was unable to perform the essential functions of her job. Fink,

53 F.3d at 567; see also 29 CFR §1630.16, appendix ("[n]o specific form of accommodation is

guaranteed for all individuals with a particular disability").

 If upon returning to work plaintiff had discovered that the accommodation she had

previously agreed to was inadequate, she was obliged to bring this to the attention of FMG. See

Adams v. Rochester Gen. Hosp., 977 F. Supp. 226, 235 (D. Conn. 1997)("[i]t is an employee's

burden to inform his employer not only of his alleged disability but also about his need for

assistance and to suggest a reasonable accommodation") citing Borkowski v. Valley Cent.

School Dist., 63 F.3d 131, 139-141 (2d Cir. 1995). Yet, there is no evidence, including within the

abundance of written correspondence from plaintiff following her return from medical leave, that

plaintiff ever informed FMG of her alleged dissatisfaction. (Facts ¶ 93).

 Despite her failure to raise her this with FMG, plaintiff testified that she would not have

resigned when she did had FMG merely provided her with a desktop computer. (Facts ¶¶ 92,

94). This testimony is fatal to her claim of constructive discharge. First, an employee is not free

to resign and claim constructive discharge without first having explored less drastic alternatives.

See Larkin v. Town of W. Hartford, 891 F. Supp. 719, 728-29 (D. Conn. 1995) (reasonable

employee will thoroughly explore alternative avenues before concluding resignation is only

option), aff'd, 101 F.3d 109 (2d Cir. 1996); Williams v. City of Kansas City, 223 F.3d 749, 754

(8th Cir. 2000) ("[i]t is difficult to find an employee's resignation objectively reasonable and

subject an employer to liability for constructive discharge when the employee quits without

giving her employer a chance to fix the problem"); see also EEOC v. Sears, Roebucks & Co.,

233 F.3d 432, 441 (7th Cir. 2000) ("unless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress").  Second, even if FMG had failed to fulfill its obligations under the law, a mere failure to accommodate a disability standing alone cannot substantiate a claim of constructive discharge.  To hold otherwise would "convert every failure to accommodate under the [ADA] into a potential claim for constructive discharge."  Johnson v. Shalala, 991 F.2d 126, 131 (4th Cir. 1993) (even though employer's accommodation attempts fell well short of requirements of Rehabilitation Act, this failure did not constitute evidence that the employer intended that employee quit).  Rather, a plaintiff "must present some evidence that the employer intentionally sought to drive her from her position."  Id. at 132.  This plaintiff has failed to do.  Thus, to the extent her entire claim for resigning when she did rests upon FMG's purported failure to accommodate her disability, her claim of constructive discharge fails as a matter of law.

In light of plaintiff's testimony she would not have resigned when she did had FMG provided her with a desktop, there is no need for this Court even to reach Moran's alleged harassment as a fact supporting plaintiff's claim of constructive discharge.  (Facts ¶ 92).  Nonetheless, both in an abundance of caution and because Moran's alleged harassment is relevant to the other aspects of plaintiff's discrimination claims, FMG will analyze this assertion.

During her deposition, plaintiff was asked to identify specific instances of harassment that prompted her resignation.  First plaintiff claimed that Moran continually threatened to terminate her employment.  (Pl. Dep. at 304).  However, plaintiff admitted that these "threats" only happened three times following her return from medical leave in April 2000, once when Moran delivered the 2000 Counsel and stated that she would be terminated if she did not improve, the 2000 Counsel itself which reiterated that failure to improve could result in

termination and once when Moran purportedly advised plaintiff that her employment would be terminated if she did not vacate the Orange branch following his instruction that she do so.[13]  (Pl. Dep. at 308-311).  As Moran testified, "I believe the stage we were at, at the time that Linda returned to work, was to address what we felt were issues that needed to be addressed, to develop a plan to get back on the right track, and to encourage her to be successful at Fleet."  (Moran Dep. at 130).  Far from harassment that could be viewed as evidence of an intent to force plaintiff to resign, Moran was merely implementing the initial steps of progressive discipline by putting plaintiff on notice of areas in need of improvement and informing her of the consequences of continued nonperformance.

Second, plaintiff testified that Moran "harassed" her by issuing the 2000 Counsel. Plaintiff's reliance upon the 2000 Counsel itself as evidence of harassment to support her constructive discharge claim is misplaced.  See, e.g.,  Weeks v. New York State (Div. of Parole), 273 F.3d 76, 85 (2d Cir. 2001) ("a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action"); Stembridge v. City of N.Y., 88 F. Supp. 2d 276, 283 (S.D.N.Y. 2000) (receipt of a written reprimand warning that repetition of improper behavior could result in disciplinary action was not an adverse employment action); see also discussion infra at 23-25.

Moreover, as discussed infra at pp. 31-32, although plaintiff may disagree with the substance of the 2000 Counsel, she has not presented evidence demonstrating that Moran did not genuinely believe the content of the Counsel when he issued it nor the information from Tartaglio, the mortgage loan customer and others.  See Spence v. Maryland Casualty Co., 995 F.2d 1147, 1156 (2d Cir. 1993) (evidence that the employee disagreed with the employer's

---

[13]    Moran did not instruct plaintiff to vacate the Orange branch (i.e., remove her belongings), just that she turn in the keys to the branch.  (Facts ¶ 34).

criticisms cannot support claim of constructive discharge); Stetson v. NYNEX Serv. Co., 995

F.2d at 361 (plaintiff cannot establish constructive discharge by showing that he was displeased

with assignments and/or quality of work was unfairly criticized); see also Mauro v. Southern

New England Telephone, 46 F. Supp. 2d 181, 186 (D. Conn, 1999) ("[a] claim of constructive

discharge does not result from evidence that the employee disagreed with the employer's

criticisms of her work, that he did not receive a raise, or that he preferred not to continue

working for that employer").  Moreover, to the extent plaintiff will inevitably seek to cast doubt

on the validity of the criticisms, "[a]n employer is only responsible for employment decisions

based on information available to it … ." Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 725 (2d

Cir. 1994).[14]

Plaintiff next cites the removal of the Orange branch and the failure to replace it with a

new branch as evidence of Moran's purported harassment.  It is, however, undisputed that it was

Norris who asked Moran to assign a different loan officer to the branch.  (Facts ¶ 48).  Moran,

who did ask Norris to reconsider, had little choice but to accede to her request.  (Facts ¶¶ 38, 48).

That FMG did not provide plaintiff with a new branch to replace the Orange branch is not, as

plaintiff claims, evidence of "harassment."  It was plaintiff's own unprofessional conducted that

caused her to lose the branch and, moreover, Moran had removed branches from other loan

officers and not replaced them with equivalent branches.  (Facts ¶ 69).  Further, even if plaintiff

had anticipated that the removal of the Orange branch and the lack of a replacement branch

would have led to intolerable working conditions, rather than quitting, she was obliged to stick it

out to see whether the anticipated environment did in fact materialize.  See, e.g., Garner v. Wal-

---

[14]     Indeed, three years earlier Moran had issued plaintiff a Counsel that she had vigorously disputed, yet she had not felt compelled to resign at that time (nor was she terminated despite similar language in that Counsel to the effect that further incidents could lead to termination).  (Facts ¶¶ 15, 16).

Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987) (part of an employee's obligation is not to assume the worse).

Plaintiff's final "fact" supporting her claim of intolerable harassment by Moran was the fact that the Fleet Bank branch that was to serve as her central office following the removal of the Orange branch had no elevator and required her to walk up two flights of stairs. (Pl. Dep. at 304-307). There is, however, no evidence to suggest that plaintiff ever expressed any concern about this branch, that she put FMG on notice or presented medical information that she was unable to climb stairs due to her alleged disability or that she sought any type of further accommodation. (Facts ¶ 77). Further, FMG did not force plaintiff to set up an office in this branch nor was plaintiff without other alternatives. (Facts ¶ 77).

Even accepting all of plaintiff's claims of failure to accommodate and harassment as true, there is insufficient evidence upon which a rational fact finder could find that Fleet had deliberately made conditions so intolerable that a reasonable person would have felt compelled to resign. Compare Kader v. Paper Software, 111 F.3d 337, 339 (2d Cir. 1997) (humiliation and stress of working under the direct supervision of a person who was conducting a sexual relationship with his wife, and in proximity to the new couple, held insufficient to create constructive discharge); Stetson v. NYNEX Serv. Co., 995 F.2d 355, 361 (2d Cir. 1993) (unfair criticisms, harsh supervisor, poor assignments and demotion not deemed constructive discharge); Martin v. Citibank, N.A., 762 F.2d 212, 221 (2d Cir. 1985) (supervisor's unnecessary announcement to coworkers that plaintiff had been polygraphed with respect to missing money at another branch of the bank, unfounded complaints as to plaintiff's attitude, and interference with plaintiff's ability to perform her duties insufficient to sustain constructive termination claim); see also Clowes v. Allegheny Valley Hospital, 991 F.2d 1159, 1162 (3d Cir. 1993) cert.

19

denied 510 U.S. 964 (1993) (evidence of hypercritical supervision fell well short of permitting an inference of constructive discharge, even if treatment was unfair and unwarranted).

Finally, a claim of constructive discharge is meaningless unless plaintiff could establish a nexus between the intolerable conditions and her protected class status. Durley v. APAC, Inc., 236 F.3d 651, 658 (11th Cir. 2000) (no causal link between actions creating intolerable working conditions and alleged discrimination); Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998) (no link between additional job responsibilities and any alleged protected activity). As discussed infra pp. 26-36, plaintiff has presented no credible evidence to support that any of FMG's actions were connected to her religion or disability and, as such, her claim of constructive discharge fails as a matter of law and this Court should grant summary judgment on plaintiff's claims of constructive discharge in Counts One and Two of the Amended Complaint.

### C.    Fleet is Entitled to Judgment on Plaintiff's Religious Discrimination Claim as a Matter of Law

In Count Two of the Amended Complaint, plaintiff claims that FMG discriminated against her on account of her religion. Absent direct evidence of discrimination, a plaintiff's claim of religious discrimination under Title VII is analyzed under the familiar three-step burden shifting analysis laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this analysis, plaintiff has the initial burden to establish a prima facie case of discrimination by showing that: (1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstance gave rise to an inference of discrimination. See McDonnell Douglas, 411 U.S. at 802. Soars v. University of New Haven, 154 F. Supp. 2d 365, 372 (D.Conn 2001).

If plaintiff succeeds in setting forth her prima facie case, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 452 (1981). Once the defendant sets forth such a reason, any presumption arising from the prima facie case evaporates. In order for the matter to continue, plaintiff must then come forward with evidence that the defendant's proffered reason is a mere pretext for unlawful discrimination. See Reeves, 530 U.S. at 146-49. Even if a plaintiff produces evidence sufficient to establish a prima facie case and to cast doubt on the employer's proffered reason for its actions, summary judgment is still appropriate when the evidence viewed as a whole would not permit a jury to conclude that discrimination had occurred. James v. New York Racing Ass'n, 233 F.3d 149 (2d Cir. 2000).

### 1. Plaintiff Cannot Establish a Prima Facie Case of Religious Discrimination.

Plaintiff cannot meet her burden to establish even a prima facie case of discrimination. She has failed to adduce evidence that she was subject to an adverse employment action and, moreover, the circumstances of any alleged adverse action do not give rise to an inference of discrimination.

### a. Plaintiff Did Not Suffer an Adverse Employment Action.

Although plaintiff presumably will claim that the adverse action supporting the third prong of the prima facie case was her alleged constructive discharge, as discussed supra at pp. 13-22, such claim fails as a matter of law. Thus, the only "adverse employment actions" plaintiff can seek to rely upon following her return from medical leave in April 2000 were Moran's

21

issuance of the 2000 Counsel and the reassignment of the Orange branch.[15]  However, neither

event constituted an adverse employment action within the meaning of the law.  As summarized

by the Second Circuit, an adverse action by an employer "is a 'materially adverse change in the

terms and conditions of employment.'"  Weeks v. New York State (Div. of Parole), 273 F.3d at

85, quoting Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000).

Sufficiently serious actions that might meet this standard include "termination of employment, a

demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of

benefits, significantly diminished material responsibilities, or other indices . . . unique to a

particular situation."  Id.  It must "affect[] employment in a way that is both detrimental and

substantial."  Id. at 87.  In Weeks, the Court concluded that the issuance of a "Notice of

Discipline" and a "Counseling Memo" and plaintiff's forcible transfer to another office among

other things, did not constitute "adverse action" for purposes of establishing a prima facie case of

discrimination.  With regard to the disciplinary action, the Court of Appeals observed the

absence of any facts from which a jury could infer that it had had any serious affect on her

working conditions, stating that "a criticism of an employee (which is part of training and

necessary to allow employees to develop, improve and avoid discipline) is not an adverse

employment action."  Id. at 86.  As to the allegation that the plaintiff in Weeks had been forced

to relocate to another office, the Court opined that no matter how unpleasant, the move had no

"tangible adverse effect . . . on the terms and conditions of [plaintiff's] employment."  Id. at 87.

     Similarly, in this case, there is no evidence that the 2000 Counsel had a material effect on

plaintiff's employment.  Plaintiff was compensated on a commission, not salary, basis.  (Facts ¶

64).  The Counsel did not, accordingly, have any impact on her compensation.  Although the

---

[15]     Plaintiff may also claim that she received a poor evaluation from Moran before she went out on medical leave in 2000, however for the reasons discussed, below, a poor evaluation is also not an "adverse employment action."

2000 Counsel provided that further disciplinary action could lead to termination, it is undisputed that plaintiff was not terminated.  In fact, the 2000 Counsel was only the second step in the progressive discipline process, the next would have been a Step #3 – Reprimand.  (Facts ¶ 14). Plaintiff knew that termination was not an inevitable consequence of receiving a Step #2 – Counsel because she had been issued one in 1997 and remained in FMG's employment some four years later.  (Facts ¶ 15).

Thus, as discussed above, the 2000 Counsel was merely one step in a progressive disciplinary process designed to avoid termination by putting employees on notice of their deficiencies.  Moran testified that "[t]he idea of the formal counsel is not to accuse our employees of being guilty of a particular behavior, it is to address a performance issue and then try to discuss [corrective] measures."  (Moran Dep. at 37).  He also testified that "I believe the stage we were at, at the time that [plaintiff] returned to work, was to address what we felt were issues that needed to be addressed, to develop a plan to get back on the right track, and to encourage her to be successful at Fleet."  (Moran Dep. at 130).  Under no circumstances could this step in the progressive discipline process be deemed to constitute a materially adverse change in the terms and conditions of plaintiff's employment.  See also Mathurin v. Skrivaneck, 00 Civ. 1762, 2003 U.S. Dist. LEXIS 10200 at *32-33 (S.D.N.Y., June 5, 2003) adopted by Mathurin v. Skrivaneck 00 Civ. 1762 (RMB)(MHD), 2003 U.S. Dist. LEXIS 11396 (S.D.N.Y., July 2, 2003)(counseling memos and notice of discipline did not constitute adverse employment action); Satterfield v. United Parcel Service, 00 Civ. 7190, 2003 U.S. Dist. LEXIS 17229 at *33, 34 (S.D.N.Y., Sept. 28, 2003) (issuance of verbal and written warnings, being placed on "Notice of Discharge" in the event of future violations of company policy and being escorted out of workplace by security not deemed adverse employment action).

Similarly, no reasonable jury could find that the removal of the Orange branch created a materially adverse change in the terms and conditions of plaintiff's employment. Although plaintiff may attempt to claim that she faced the prospect of reduced compensation due to a loss of referrals from the Orange branch, this concern was entirely speculative. First, this assertion is belied by the content of her own admission to another loan officer just months earlier that "we probably all get only a few deals a year from each branch". (Facts ¶ 23). Second, as Moran testified, "there was still a very viable opportunity [for plaintiff] with the remaining branches. In addition, . . . the number of branches that a loan officer has does not preclude them from all the various types of outside business developments at their disposal." (Moran Dep. at 130). To the extent plaintiff claims that the removal of the branch impacted her ability to meet with her customer base, as Moran explained, loan officers "would take applications normally where the customer requested that they meet which could be a bank branch, . . . the mortgage sales office [in Seymour], . . . the customer's home, . . . the customer's place of business, a realtor office . . . or other location." (Facts ¶ 57). Plaintiff was in the process of establishing a central office in Milford and also had other branches within her disposal as well. While it may have been less convenient for plaintiff to meet with customers at a different location, "not everything that makes an employee unhappy is an actionable adverse action." Markel v. Board of Regents of Univ. of Wis. Sys., 276 F.3d 906, 911 (7th Cir. 2002).

### b.     Any "Adverse Action" Did Not Occur Under Circumstances giving Rise to an Inference of Religious Discrimination.

Plaintiff has also failed to present evidence on the fourth prong of her prima facie case, namely, that the 2000 Counsel was issued or that the Orange branch was reassigned under circumstances giving rise to an inference of discrimination. Plaintiff's own testimony belies her conclusory assertions of unlawful religious discrimination. Plaintiff claims Moran first learned

that she was Jewish in October 1996 and then gave her a poor review in January 1997.  (Facts ¶¶ 5-7).  However, Moran actually prepared his first performance review of plaintiff, in which he rated her performance as "Needs Improvement" and cited numerous areas in need of improvement, some eight months before he allegedly learned she was Jewish.  (Id.)  That review identified the precise conduct issues outlined four years later in the 2000 Counsel.  (Facts ¶ 6). Furthermore, to the extent plaintiff contends Moran started treating her differently after he purportedly learned she was Jewish, her performance reviews steadily improved over the course of the next three annual performance reviews.  (Facts ¶ 11, 13, 19-20).  Plaintiff has offered no plausible reasons, much less admissible evidence, to explain this obvious flaw to her claim that Moran began treating her unfairly once he learned she was Jewish.  Indeed, plaintiff testified that she and Moran never had a good or friendly working relationship.  (Facts ¶ 4).

With regard to the removal of the Orange branch, the circumstances do not in any way suggest that plaintiff's religion was a factor.  On the contrary, the undisputed facts reveal that it was Norris, nor Moran, who requested that plaintiff be reassigned.  (Facts ¶ 48).  Plaintiff has offered no admissible evidence to suggest that Norris was motivated by any discriminatory animus against plaintiff on account of her religion.  Additionally, plaintiff admitted that Moran had removed branches from other loan officers whom she did not know to be Jewish and had not replaced them with equivalent branches.  (Facts ¶ 69).

Plaintiff undoubtedly will seek to rely upon four isolated remarks she claims Moran made during the course of her employment at FMG.[16]  However, plaintiff cannot recall when these alleged remarks occurred, has no record of these alleged remarks, has not clearly identified a

---

[16]     Plaintiff contends that during one FMG holiday party, Moran commented on the little Jewish girl singing Christmas carols, that he boasted about his grandfather who had allegedly been in the German war (which is not even true), that he once referred to a customer as a Johnny Maneshevitz and that he said that anyone who does not work on Good Friday must be an atheist.  Although these allegations must be taken as true for purposes of summary judgment, Moran has denied making any of these alleged statements.  (Pl. Dep. at 169-179).

witness to any of these alleged remarks and seems to have no specific recollection of ever having

complained about them.[17]  (Pl. Dep. at 185).  These alleged remarks, while referencing religion,

do not demonstrate that Moran held a discriminatory animus toward Jewish people.[18]

Furthermore, even if the comments were deemed to be anti-Semitic in nature, such stray remarks

do not constitute evidence of discrimination.  See Campbell v. Alliance Nat'l Inc., 107 F. Supp.

2d 234, 247 (S.D.N.Y. 2000) (isolated stray remark insufficient to establish racial animus and

defeat a motion for summary judgment).[19]  Further, there is no evidence that these alleged

remarks were made in temporal proximity nor that they were in any way connected to the

allegedly adverse employment actions at issue in this case.  As such, they are irrelevant and

cannot serve as a basis for an inference of discrimination.  See Morris v. New York City Dep't of

Sanitation, No. 99 Civ. 4367, 2003 U.S. Dist. LEXIS 5146, 2003 WL 1739009, at *20 (S.D.N.Y.

Apr. 2, 2003) ("stray remarks in the workplace, by themselves, and without a demonstrated

nexus to the complained of personnel actions, will not defeat the employer's motion for

summary judgment"); Tutko v. James River Paper Company, Inc., No. 3:96CV1256(AVC), 1998

U.S. Dist. LEXIS 20614 at *13 (D.Conn. 1998), citing Ezold v. Wolf, Block, Schorr, and Solis-

Cohen, 983 F.2d 509, 545 (3d Cir. 1992) ("[s]tray remarks by non-decision makers or by

---

[17]     Plaintiff testified that she believes she did mention Moran's alleged remarks once to Rachel Paquin during the 1996 or 1997 timeframe.  (Pl. Dep. at 185, 187).  Paquin, in turn, has no recollection of having received such complaint and believes, if she had, she would have investigated it in accordance with FMG policies.  (Facts, ¶ 81).  As plaintiff also testified, however, she may have only complained to Paquin about Moran's treatment of her in general.  It is highly significant that plaintiff did not bring up any alleged anti-Semitic remarks much less complain to Paquin that Moran was biased against her on account of her religion in connection with Paquin's review of the 2000 Counsel. (Facts ¶ 80).

[18]     Plaintiff did not see anything inappropriate with her references to one employee as "Miss Born Again" or another as an "Afro. American branch manager".

[19]     Courts in this Circuit have seen fit to grant and/or affirm summary judgment in cases with far more egregious remarks by decision makers than those alleged here.  See Woroski v. Nashua Corp., 31 F.3d 105, 108 (2d Cir. 1994) (affirming summary judgment in age discrimination case where decision maker allegedly said that the "salary work force [] was older, had been around too long, made too much money and enjoyed too many benefits"); Rinsler v. Sony Pictures Engm't, Inc., 02 Civ. 4096 (SAS), 2003 U.S. Dist. LEXIS 14754, *23-24 (S.D.N.Y., Aug. 22, 2003) (granting summary judgment in race discrimination cause despite comment that plaintiff "as a white person, could not be sensitive to black issues").

decision-makers unrelated to the decision process are rarely given weight, particularly if they were made temporally remote from the date of decision").

### 2. FMG has Offered Legitimate Non-Discriminatory Reasons for its Actions.

Even if plaintiff could establish the elements of a prima facie case, FMG has met its burden to articulate a legitimate reason for any alleged adverse employment action.  In particular, Moran issued the 2000 Counsel and reassigned the Orange Fleet Bank branch upon being presented with credible evidence from others that plaintiff had acted unprofessionally in interactions with co-workers and branch personnel.[20]  Throughout their years together, Moran had witnessed and documented plaintiff's histrionics and unprofessionalism in her dealings with Moran and with her co-workers.  Dating back to her first annual performance review from Moran and continuing through to the date of her resignation, plaintiff never accepted constructive criticism and denied any and all wrongdoing on her part.  (See, e.g., Facts ¶¶ 10, 12, 16).  Contrary to plaintiff's assertions, the undisputed evidence shows that Moran provided plaintiff with more than ample opportunity to dispute the content of the 2000 Counsel, but her familiar refrain that she was not to blame did not, in Moran's judgment, warrant rescission of the Counsel.  Although plaintiff may disagree that her conduct was unprofessional, she has admitted to engaging in certain conduct that Moran found problematic, including expressing her belief to Tartaglio that she had taken the customer's side because of a "personal relationship" with the customer, suggesting to the customer that his wife should help out more, referring to another loan officer as "Miss Born Again" and characterizing a Fleet Bank branch manager who had previously requested that plaintiff be removed from her branch merely as one "Afro. American"

---

[20]     The 2000 Counsel also raised issues with plaintiff's loan quality and attendance.  (Facts ¶ 62).

branch manager preferring to have an "Afro. American" loan officer.[21]  (Pl. Dep. at 484-485).

Furthermore, Paquin's interviews of approximately seventeen individuals substantiated the

validity of the 2000 Counsel.  (Facts ¶ 82).  Thus, FMG has articulated legitimate reasons for any

so-called adverse action.  See, e.g., Selenke v. Medical Imaging of Colo., 248 F.3d 1249, 1259

(10th Cir. 2001) (employee discharged for inciting conflicts with co-workers); Hoffman v. MCA,

Inc., 144 F.2d 1117, 1123-24 (7th Cir. 1998) (plaintiff discharged for making inappropriate

remarks at sales meeting and prior incidents of disruptive behavior); Manzer v. Diamond

Shamrock Chems. Co., 29 F.3d 1078, 1082 (6th Cir. 1994) (plaintiff discharged for being

argumentative, confrontational with co-workers and superiors and being generally considered

"obnoxious").[22]

3.     **No Rational Trier of Fact Could Find that Defendant's Proffered Reasons Were False, Much Less That The Real Reason Was Intentional Discrimination**

In defending a claim of discrimination, an employer need not be correct in taking the

action that it did; all that is required is that it genuinely believed that the action was warranted.

See Dister v. The Continental Group, Inc., 859 F.2d 1108, 1116 (2d Cir. 1988) (evidence that

employer made poor business decision generally insufficient to set forth genuine issue of

material fact; "reasons tendered need not be well advised, but merely truthful"); Graefenhain v.

Pabst Brewing Co., 827 F.2d 13, 20 (7th Cir.1987) ("A business decision need not be good or

even wise. It simply has to be nondiscriminatory …"), quoting Dister, 859 F.2d at 1116; see also

Cavuoto v. Oxford Health Plans, 3:99CV446(EBB), 2001 U.S. Dist. LEXIS 14357 at *11 (D.

Conn., June 13, 2001) (court cannot second guess the business decisions of defendant, even if

---

[21]      Plaintiff also admitted to conduct following the issuance of the 2000 Counsel that was improper, including disobeying Moran's directive that she not go to the Orange Bank branch alone and that she turn her key into him. (Pl. Dep. at 393).

[22]      In contrast to these cited cases, FMG did not even terminate plaintiff, it simply issue her a counsel.

they seem unjust or unfair); Mauro v. Southern New England Telephone, 46 F. Supp. 2d at 186 (summary judgment granted; business reason simply unsound, not discriminatory); Pugh v. City of Attica, 259 F.3d 619, 629 (7th Cir. 2001) ("[e]ven if the [employer's] action appears precipitous under the circumstances, we are not in a position to question the wisdom of a decision that was honestly made"); Roberts v. Separators, Inc., 172 F.3d 448, 453 (7th Cir. 1999) (it is insufficient for plaintiff to prove he did not make alleged statements that defendant thought amounted to bad attitude; plaintiff must prove that defendant did not honestly believe he had made them). Plaintiff has not presented any evidence upon which a jury could find that Moran did not genuinely believe that any alleged adverse actions were warranted under the circumstances.

Even if plaintiff could raise questions about the propriety of any aspect of the 2000 Counsel, the evidence as a whole would not permit a finding that plaintiff was subject to unlawful discrimination on account of her religion. Throughout her deposition, plaintiff testified in circular fashion that the evidence underlying her claim of discrimination was that Moran had treated her unfairly. (See, e.g., Pl. Dep. at 368-369.) However, at various times, plaintiff testified that it was possible that Moran simply did not like her. (Pl. Dep. at 160-62, 389). Plaintiff even offered other perfectly lawful reasons for his treatment, including that she (apparently unlike Moran) was "customer oriented" and went over Moran's head if he did not respond to her quickly enough and that he may have favored the loan officers with whom he had previously worked at Shawmut. (Pl. Dep. at 160-162, 196-197).

Plaintiff has likewise failed to offer relevant, admissible evidence that similarly situated non-Jewish employees were treated more favorably under similar circumstances. In fact, plaintiff testified that Moran had removed other individuals' branch offices, but that on at least

two occasions did not provide them with equal branches to make up for it. Plaintiff did not believe these individuals to be Jewish. (Pl. Dep. at 359-60, 362).

Based on the utter lack of evidence to substantiate her claim of religious discrimination, judgment should be granted on Count Two of the Amended Complaint as a matter of law.

### D. Fleet is Entitled to Judgment on Plaintiff's Disability Discrimination Claim as a Matter of Law

In Count One of the Amended Complaint, plaintiff claims that FMG discriminated against her on account of her disability in violation of the ADA. As with plaintiff's claims of religious discrimination, she has offered no admissible evidence demonstrating that any of FMG's actions were based on an alleged disability. Application of the same three-step burden shifting analysis discussed supra at p. 22, confirms that plaintiff cannot establish a prima facie case of disability discrimination and, even if she could, no rational jury could find that FMG's proffered reasons for its actions were a mere pretext for unlawful discrimination.

### 1. Plaintiff Cannot Establish a Prima Facie Case of Disability Discrimination.

As discussed supra at pp. 23-26, none of the alleged actions that plaintiff complains of amounted to an "adverse employment action" within the meaning of the law. Furthermore, the 2000 Counsel and the removal of the Orange branch did not occur under circumstances that, as a matter of law, give rise to an inference of discrimination.

As a preliminary matter, plaintiff testified that she sustained the injury that caused her to become disabled in or about April 1996 and that Moran did not learn of the injury until the following month. Yet, plaintiff testified that her relationship with Moran was strained from the outset, that he had never liked her or treated her well and acknowledged that Moran had given her a poor performance review that she had disputed even before she had suffered her purportedly disabling back injury. (Facts ¶¶ 4, 9, 95). She also cannot explain why, were Moran

inclined to discriminate against on the basis of her disability, his reviews of her performance would have improved for three consecutive years after he allegedly learned of her back injury. Moreover, according to plaintiff, at no time did Moran ever make any type of derogatory comments about her physical condition.

At her deposition plaintiff identified at least five FMG employees reporting to Moran whom she claims had sustained similar back injuries from lifting computer equipment, some of whom had allegedly been out of work due to their injuries or related surgeries. Yet, plaintiff readily admitted time and time again during her deposition that Moran treated these employees well, even promoting at least one of them. (Facts ¶ 96). Thus, plaintiff's own testimony belies any claim that Moran harbored animus against employees who suffered from disabilities or took medical leaves of absence.

The only evidence plaintiff appears to rely upon to support her claim of disability discrimination is the temporal proximity between her return from medical leave in April 2000 and the issuance of the 2000 Counsel and removal of the Orange branch. (Pl. Dep. at 463-463). However, the undisputed facts reveal that Moran was directed by a member of senior management[23] to prepare a counsel in December 1999 and that Moran had planned on meeting with plaintiff to orally counsel her about professionalism, communication, work relations and attendance at meetings before she went out on medical leave in January 2000. (Facts ¶ 33). The undisputed facts also reveal that, while plaintiff was on medical leave, Moran was advised of certain conduct, including her heated exchange with Tartaglio and the customer's dissatisfaction, that led him to conclude that a Step #2 – Counsel, rather than an oral counsel, was warranted. (Facts ¶ 62). Finally, as a direct result of plaintiff's conduct prior to her return from medical

---

[23]    Plaintiff has presented no evidence to suggest that this manager had any knowledge that plaintiff suffered from an alleged disability.

leave, Norris requested that Moran remove plaintiff as the loan office assigned to her branch.

(Facts ¶ 48). Under these circumstances, the mere temporal proximity between any alleged

adverse employment action and plaintiff's return from medical leave cannot give rise to an

inference of discrimination.

> ### 2.    FMG has Offered Legitimate Non-Discriminatory Reasons for its Actions.

As discussed <u>supra</u> at p. 29-30, FMG has met its burden to present evidence of its

legitimate, non-discriminatory reasons for issuing the 2000 Counsel and removing the Orange

branch, which are duly incorporated as if set forth in full herein.

> ### 3.    Plaintiff Has Failed to Present Credible Evidence that FMG's Proffered Reason is False or that the Real Reason is Unlawful Discrimination.

As discussed <u>supra</u> at pp. 30-32, plaintiff has failed to offer any competent evidence to

cast doubt on the veracity of FMG's stated reasons for its actions.  Instead, she seeks to rely

entirely upon her self-serving claims that she did nothing wrong and likely hopes to engage this

Court in the futile exercise of determining who was right and who was wrong about every detail

of every action that led FMG to commence the disciplinary process.  However, as discussed

<u>supra</u> at p. 31-32, the only question for this Court is whether plaintiff has presented sufficient

evidence upon which a reasonable jury could find that Moran did not honestly believe that the

facts and circumstances warranted the disciplinary actions that he took.  For all of the reasons

previously identified, FMG submits that she has not.

Finally, even if plaintiff could establish a prima facie case of disability discrimination and

show the existence of a material fact on whether FMG's proffered reasons were true, the totality

of evidence does not support a finding of unlawful disability discrimination.  Rather, the

evidence demonstrates that plaintiff had been a thorn in Moran's side since the very outset of

their working relationship.  It also shows that plaintiff clashed with any number of other

employees while working at FMG.  Plaintiff's own caustic e-mails reveal what Moran and others were forced to deal with on a day-to-day basis.  Yet, plaintiff continues to believe that at no time during the entirety of her employment did she ever comport herself unprofessionally.  (Pl. Dep. at  471-472,  483).  In light of the undisputed evidence demonstrating FMG's reasonableness and restraint in its dealings with plaintiff, that no rational jury would deliver a verdict for plaintiff on her claim of disability discrimination.

### E.     FMG is Entitled to Judgment on Plaintiff's Failure to Accommodate Claim Under the ADA as a Matter of Law

In Count One of the Amended Complaint, Plaintiff claims that FMG violated the ADA by failing to provide her with a desktop computer in addition to her laptop computer as an accommodation for her alleged disability.  The ADA requires employers to make reasonable accommodations for the known disabilities of its employees to enable them to perform the essential functions of their position.  42 U.S.C. § 12112, et seq.

To establish a prima facie case of failure to accommodate under the ADA, plaintiff must present evidence that (1) she was a disabled person within the meaning of the ADA; (2) FMG had notice of her disability; (3) with reasonable accommodation she could have performed the essential functions of her job; and (4) FMG refused to make such accommodations. Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6 (2d Cir. 1999).  As discussed supra at pp. 14-18, plaintiff has failed to present evidence that FMG failed to provide her with a reasonable accommodation to enable her to perform the essential functions of her position.  As such, her claim fails as a matter of law.

### F.     Fleet is Entitled to Judgment on Plaintiff's FMLA Claim as a Matter of Law Because The Claim is Time Barred and Plaintiff Cannot Establish Retaliation

In Count Three of the Amended Complaint, plaintiff claims FMG retaliated against her for taking a medical leave of absence pursuant to the FMLA.  This claim is, however, time-

barred because plaintiff has failed to plead, nor is there competent evidence to support, that FMG willfully violated the FMLA.

Generally, claims under the FMLA must be brought within two years of the alleged actionable event.  29 U.S.C. § 2617(c)(1).  Only when the conduct alleged constitutes a willful violation of the FMLA does a three-year statute of limitations apply.  29 U.S.C. § 2617(c)(2). Plaintiff did not file her FMLA claim within two years of May 24, 2000, the latest date any alleged FMLA violation could have occurred.  Thus, her only claim arising under the FMLA must be one for a willful violation.  However, the Amended Complaint does not allege, and plaintiff has not presented admissible evidence to support a finding, that FMG knew or showed reckless disregard to whether its conduct was prohibited by the FMLA as is required to state a cause of action for a willful violation of the FMLA. See McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988); Hanger v. Lake County, et al., Civil No. 011506 (RHK/RLE) 2002 U.S. Dist. LEXIS 25403 at *12-13 (D. Minn., Dec. 31, 2002); but see Nero v. Industrial Molding Corp., 167 F.3d 921, 929 (5th Cir. 1999) (declining to incorporate "reckless disregard" standard to establish willful violation).

It is undisputed that between 1999 and 2000, plaintiff was provided with far more leave time than is required under the FMLA[24] and there is no evidence to suggest that upon completion of her leaves she was not restored to her prior position.  Thus, her claim appears to be that she was willfully retaliated against for taking an FMLA leave.  Plaintiff testified, however, that as many as five other employees reporting to Moran had taken FMLA leaves and that, unlike her, none of them had been subjected to any adverse actions.  (Pl. Dep. at 467).  The evidence plaintiff has cited to support her claim that she was retaliated against for having taken a leave

---

[24]     Within a twelve month period, plaintiff took approximately twenty-four weeks of medical leave.  (See Amended Complaint).

under the FMLA is identical to that cited to support her claim of disability discrimination. Thus,

for the reasons discussed <u>supra</u> at pp. 31-36, plaintiff's claims arising under the FMLA fail as a

matter of law.

**V.    CONCLUSION**

For all of the foregoing reasons, Fleet respectfully requests that this Court grant its

Motion for Summary Judgment on all counts of the Amended Complaint.

Respectfully submitted,

THE DEFENDANT
WASHINGTON MUTUAL BANK, FA as
successor in interest by operation of law to
Washington Mutual Home Loans, Inc., the
successor by merger to Fleet Mortgage Corporation

By:    _____
Beverly W. Garofalo (ct11439)
Brown Raysman Millstein Felder
 & Steiner, LLP
CityPlace II, 10th Floor
185 Asylum Street
Hartford, CT  06103
(860) 275.6400

**<u>CERTIFICATION</u>**

This is to certify that on November 10, 2003, a true copy of the foregoing Memorandum
of Law in Support of Defendant's Motion for Summary Judgment was sent via first-class mail, postage
prepaid, to:

Ellen M. Telker, Esq.
564 Boston Post Road
Milford, CT  06460

_____
Beverly W. Garofalo

35