## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
------------------------------------------------- X
LINDA UNGERLEIDER,                               :
                                                 :    CIVIL ACTION NO.:
              Plaintiff                          :    3:02CV659(AVC)
                                                 :
       v.                                        :
                                                 :
FLEET  MORTGAGE  GROUP  OF                        :
FLEET BANK [sic],                                :
                                                 :
              Defendant                          :    NOVEMBER 10, 2003
------------------------------------------------- X
```

### LOCAL RULE 56(C)1 STATEMENT

In accordance with Local Rule of Civil Procedure 56(c)1, defendant Washington Mutual Bank FA, as successor in interest by operation of law to Washington Mutual Home Loans, Inc., the successor by merger to Fleet Mortgage Corporation ("FMG"), hereby submits each material fact as to which there is no genuine issue to be tried.

1.     FMG hired plaintiff Linda Ungerleider as a Loan Officer on December 5, 1994. (Amended Complaint of Linda Ungerleider dated April 9, 2003 (hereafter "Am. Compl."), ¶ 10; Affidavit of Kevin Moran (hereafter "Moran Aff."), ¶ 3, which is attached as Exhibit 1 hereto).

2.     At the time, FMG was a wholly-owned subsidiary of Fleet Financial Group ("FFG").  (Moran Aff., ¶ 24).

3.     Commencing on December 1, 1995, upon the merger of FFG and Shawmut National Bank, plaintiff began reporting to Kevin Moran, Sales Manager  ("Moran"), who became employed by FMG upon the merger.  (Moran Aff., ¶ 3).

4.    Plaintiff testified that they never had a good working relationship or a friendly relationship.  (Deposition of Linda Ungerleider (hereafter Pl. Dep.), at 194, 198, relevant excerpts of which are attached to the Affidavit of Beverly W. Garofalo (hereafter Garofalo Aff. ¶ 4, Ex A), which is attached as Exhibit 2 hereto)

5.    On or about February 15, 1996, Moran issued plaintiff a performance review in which he rated her overall performances as "Needs Improvement".  Employees in that category "do not fully meet major job requirements."  (Moran Aff. ¶ 4, Exh. 4; Pl. Dep. at 30-33).

6.    The review stated that:

Linda must also consistently promote constructive dialogue with her processing staff and sales associates.  Linda has been very critical of policies and procedures at FMG which has been disruptive to team building.  Linda must come to terms with her own need to become more knowledgeable of the fundamentals of her chosen profession and only by doing so will she close more loans with fewer problems and deliver the level of service required of a professional loan officer.

Moran Aff., Exh. 4.

7.    According to plaintiff, Moran did not learn plaintiff was Jewish until the fall of 1996, some eight (8) months after this review was signed.  (Pl. Dep. at 23, 30, 36).

8.    Plaintiff viewed the performance review as unfair, but she doesn't "know if he singled me out because I was Jewish, but I know that he singled me out for some reason." Plaintiff does not know whether Moran even knew she was Jewish at the time he issued the review and has no idea what motivated Moran to write the review.  (Pl. Dep. at 34-35, 39).

9.      According to plaintiff, she did not sustain the injury she contends gave rise to her alleged disability until April 1, 1996, and Moran did not learn of the injury until May 1996.  (Pl. Dep. at 204-205, 212).

10.     Plaintiff disputed the negative portions of the review in writing, including, stating that:

> "I do not agree with the '2' rating on team player as my frustrations with [processor] Robin Hanley and lack of management response to those problems made it impossible for me to not respond as I watched the realtor business slip away.  The file should note that everyone in the Shelton office that had Robin Hanley as their processor asked to have another processor and although I agree with not pointing fingers for all problems; had I had [processor] Paula Barnes who I have now, things would have been great."

(Moran Aff. ¶ 4, Exh. A).

11.     On or about February 13, 1997, Moran issued plaintiff a performance review that rated her overall performance as "Meets Expectations," an improvement from the prior review. He did, however, rate her performance as a "2 - Needs Improvement," in certain areas, including in Communications, Judgment/Decision Making and Work Relations.  (Moran Aff. ¶ 5, Exh. B).

12.     Plaintiff refused to sign the review and submitted a rebuttal, stating in part that:

> Regarding Work relationships.  I find it difficult to maintain complete disregard of a processing center that a. fails to return my calls, my customer calls, the closing attorney calls, over and over again, b. processing which does not send out commitment letters or status reports to me unless I make 5-10 calls requesting it. . . . I realized today for the first time that I mistakenly thought that I shouldn't expect empathy or compassion from this particular sales manager and that he works strictly [sic] based on business relationship [sic] and that I cannot voice any personal or honest opinion without being severely assessed."

(Moran Aff. ¶ 5, Exh. B).

13.     At her deposition, plaintiff testified that this review – issued after Moran purportedly learned that plaintiff was Jewish and had sustained a work-related injury – was "good" and "fair."  (Pl. Dep. at 199-200).

14.     On or about May 23, 1997, Moran issued plaintiff a Counsel – Step #2 (the "1997 Counsel"), which was the second step in FMG's progressive discipline process.  The third step, in the progressive discipline process would be a Reprimand – Step #3.  (Moran Aff. ¶ 6, Exh. C; Affidavit of Rachel Paquin (hereafter Paquin Aff.), ¶ 6, which is attached as Exhibit 3 hereto).

15.     The 1997Counsel stated as follows:

> Linda had a confrontation with Richard Evans of the training department on 5/22/97.  The incident occurred at the Orange CT office of Fleet Bank in front of customers and staff.  The incident involved shouting and verbal abuse regarding Richard and frustration with her laptop computer.

> Linda was given a rating of 2 on her last performance review in the category of work relations as she has difficulty in keeping her interpersonal communications with the SSC on a professional level.  Linda refused to sign the review, and stormed out of my office screaming and crying.

(Moran Aff., ¶ 6, Exh. C).

16.     Plaintiff has denied any wrongdoing in her conduct towards Evans, instead blaming him and coming up with a myriad of reasons, none of which were related to membership in a protected class, in an attempt to discredit Evans.  (Pl. Dep. at 158-161; 381, 486).

17.     Moran, however, had reviewed Evans' account of the incident and found it to be credible.  (Moran Aff., ¶ 6, 7, Exh. D).

18.     Along with the 1997 Counsel, Moran issued plaintiff a Developmental Action Plan, that included the following specific actions to be taken for improved performance: "No further such outbursts with fellow employees" and "[a] significant improvement in level of cooperation with management and ASC to resolve any issues around use of office automation and Compass deployment."  (Moran Aff. ¶ 6, Exh. C).

19.     On or about February 5, 1998,  Moran issued to plaintiff a performance review that rated her performance as "Exceeds Expectations," although she was only rated a "3 – Meets Expectations" in numerous areas, including Communications, Judgment/Decision Making, Quality and Work Relations.  (Moran Aff. ¶ 8, Exh. F).

20.     Similarly, on February 17, 1999, Moran issued plaintiff a performance review that rated her performance as "Exceeds Expectations," although, once again, she was only rated a "3 – Meets Expectations" in numerous areas, including Communications, Judgment/Decision Making, Quality and Work Relations.  (Moran Aff. ¶ 9, Exh. F).

21.     On or about June 10, 1999, plaintiff commenced a medical leave of absence due to a back injury she claims to have sustained more than three years earlier at FMG when, on or about April 1, 1996, she claims to have lifted a large suitcase that held a laptop computer and other related equipment and materials.  (Am. Compl., ¶¶ 17-18, 28).

22.     On or about September 17, 1999, Moran admonished plaintiff for preparing and distributing marketing materials that contained typos and incorrect information. The materials had not been reviewed by FMG's Marketing Department prior to plaintiff's distribution of same. Plaintiff acknowledged to Moran that she understood FMG's policies and that she had violated it, but, as reflected in Moran's contemporaneous handwritten notes, she replied, "I just did it,"

"I'm sales your [sic] corporate," and "I was a realtor you don't know how they think."  (Moran Aff. ¶ 11, Exh. G).

23.    On November 24, 1999, after Moran transferred Fleet Bank branch assignments among various loan officers, including plaintiff, to make branches available for new hires, plaintiff wrote an e-mail to another loan officer, who, in turn, forwarded it to Moran, that stated, in part:

> Is it me, or does it extra suck (excuse the language) that Kevin [Moran] took money out of our pockets and then e-mails a copy of it to us with Happy Thanksgiving attached?  Even though we probably all get only a few deals a year from each branch; it still doesn't help matters.  I guess that's all the thanks we get for working 14 hour days for 2 ½ years so he can swim in his new pool.  I'm not too bitter!!!! . . . Sorry for venting, but I am curious as to how you took the news.

(Moran Aff. ¶ 14, Exh. J).

24.    To plaintiff's knowledge, the recipient of this e-mail, Pierce Downey, also a loan officer, also had a branch removed at the same time as plaintiff.  Plaintiff testified that Downey was one of Moran's best friends.  (Pl. Dep. at 366).

25.    On December 6, 1999, plaintiff sent an e-mail to Michael Massella, Mortgage Production Senior Group Manager, who was at least two levels of management above Moran. She also copied Moran on the e-mail, which complained bitterly about the Central Processing Manager who, according to plaintiff, had stated that perhaps she should not be a loan officer anymore, and another loan processor.  Plaintiff's e-mail did acknowledge that Moran had acceded to her request that another processor be taken off of her pipeline and discussed in detail certain loans and questioned why another loan processor had been laid off.  (Moran Aff. ¶ 13, Exh. I).

26.    On December 6, 1999, Moran responded to an inquiry from Howard Ackerman, Mortgage Production Regional Manager, also a member of senior management, seeking Moran's input on the e-mail from plaintiff to Massella.  Moran responded, in part:

> This individual is an extremely difficult employee, I am confident that a candid conversation with Donna Dailey [Human Resources Manager], Rachel Paquin [Human Resources Business Partner I], or Mike Pulver [Mortgage Production Regional Manager],  will shed some light on this.  At issue:  [Plaintiff] was unhappy with her assigned processor Marc Grove.  We switched her to Ava Simonelli, her existing pipe which is minimal, is being worked by Marc. . . . I think it is probably best for Betsy to speak for herself regarding any accusations Linda has made regarding a recommended career change.  My personal feeling is that this employee is a loose cannon and in this instance has violated company policy as it pertains to conflict resolution.

(Moran Aff. ¶ 13, Exh. I).

27.    On December 6, 1999, Ackerman responded to Moran by instructing him to "work with HR on a formal counseling of this employee based on the company policy you reference.  I expect this to be completed with the next two business days."  (Moran Aff. ¶ 13, Exh. I).

28.    On December 9, 2000, Odette Marra, Central Processing Manager VI, prepared an e-mail outlining ongoing problems the processors had experienced with plaintiff.  Marra provided numerous specific examples of same, including a loan that plaintiff had electronically uploaded listing the property address as "123 I hate this, worthless, CT."  She also identified numerous other loans applications that plaintiff had uploaded with missing or incorrect information.  Marra stated that sometimes plaintiff "acknowledges that her issues may be tied to her medication, sometimes she says her issues are tied to having the worst sales manager and the worst operations support imaginable."  This e-mail, in turn, was forwarded to Rachel Paquin, Human Resources Business Partner I.  (Paquin Aff., ¶ 15, Exh. E).

29.    On December 9, 2000, Ava Simonelli, the new loan processor assigned to plaintiff's files, copied Moran on an e-mail to plaintiff in which she identified several incomplete areas in an application that plaintiff had electronically uploaded from the system and stated to plaintiff that "I find that our working relationship is new and I do not want to start off in the wrong direction, but I need you to do your job effectively, in order for me to do mine." (Moran Aff. ¶ 18, Exh. H).

30.    On December 16, 2000, Moran faxed to Donna Dailey, Human Resources Business Partner, approximately 20 pages of letters, memos, etc. that he had on file for plaintiff, including documentation of her continuous complaining about FMG that pre-dated his arrival at the company. He then expressed frustration about plaintiff's chronic displeasure with FMG and explained that "[w]ith every complaint I know I responded with an appropriate explanation, clarification or helped facilitate a change i.e., new processor etc. in an effort to address whatever her complaint of the moment was." (Moran Aff. ¶ 15, Exh. K).

31.    On December 31, 1999, Paquin followed up with Moran regarding a discussion they had had earlier in the month requesting that he "outline the issues with Linda and give some specific examples/dates of these unacceptable episodes you discussed." She stated that "[t]his outline will provide a basis for the discussion to ensure you capture the pieces that are crucial in this verbal counseling session" and that "[i]t is important to act on this immediately to avoid any further episodes." (Moran Aff., ¶ 16, Exh. L).

32.    On January 3, 2000, plaintiff sent Moran an e-mail complaining about another employee and referring to this employee, who plaintiff testified was a Christian, as "Ms. Born again." Mr. Moran informed plaintiff that he would speak to the employee about the situation,

8

but stated that "the content and tone of this communication are of concern to me" and asked to

discuss it with her.  Plaintiff responded by stating, in part, that her "new year's resolution is to

not let anyone in this company cause [her] undue stress" and that, with regard to her e-mail,

"[t]here is no tone, just facts."  During her deposition plaintiff continued to insist that the

reference to a co-worker as Ms. Born Again was not inappropriate.  (Moran Aff. ¶ 16, Exh. L; Pl.

Dep. at 146).

33.    On January 11, 2000, Paquin spoke with Moran about plaintiff.  Her

contemporaneous notes reflect that they agreed that Moran was "going to have a verbal w/

[plaintiff] regarding her professionalism/communication/work relations/attendance@meetings"

and that he would follow-up with Paquin with the results.  (Paquin Aff., ¶ 4, Exh. A; Moran Aff.,

¶ 19).

34.    On January 13, 2000, before Moran had the opportunity to conduct a counseling

session with plaintiff, she sent Moran an e-mail stating that she was out of work due to neck and

back pain, in addition to a sore throat, earache and extremely rapid heart rate.  (Moran Aff., Exh.

19).

35.    Retroactive to January 11, 2000, plaintiff commenced a medical leave of absence

under the Family and Medical Leave Act.  (Paquin Aff., ¶ 5).

36.    Plaintiff, like most mortgage loan originators, was assigned to cover certain

specific Fleet Bank branches within her territory, including the Orange branch where she

maintained an office.  (Moran Aff., ¶ 24, 35; Pl. Dep. at 93-94).

37.    Fleet Bank and FMG were, at all times relevant to the Amended Complaint, separate entities that were both wholly owned by the same parent company.  (Moran Aff., ¶ 24).

38.    FMG mortgage loan originators served at the pleasure of the Fleet Bank branch to which they were assigned.  If a Fleet Bank branch manager requested that Moran reassign a mortgage loan originator assigned to the branch, he would generally have little choice but to accede to that request.  (Moran Aff., ¶ 24).

39.    On or about February 2000, after plaintiff had commenced her medical leave of absence, Barbara Tartaglio, Senior Business Banking Specialist, referred a mortgage customer to plaintiff.  Loan officers were not allowed to take new mortgage applications while on disability leave, but plaintiff believes she may have taken the application from this customer during a brief period that she allegedly returned from leave.  (Pl. Dep. at 42-43, 46).

40.    Sometime in February or March 2000, Moran received a call from Barbara Tartaglio, Senior Business Banking Specialist, in the Fleet Bank Orange branch, informing him that a long-time customer whom she had referred to plaintiff to process a mortgage application on his new home was very upset and dissatisfied with plaintiff.  Tartaglio informed Moran that the issue, in part, concerned a disagreement as to whether either Tartaglio or the customer had informed plaintiff that his current home was pending sale.  Tartaglio informed Moran that the customer wanted to speak directly with Moran about it.  Tartaglio also related to Moran that when she attempted to speak about the matter with plaintiff, plaintiff became heated and, among other things, had accused her of taking the customer's side on the issue because she had a "personal relationship" with the customer.  (Moran Aff., ¶ 25).

41.     Moran thereafter spoke with the customer and heard his version of events, which Moran found to be credible.  As was related to Moran, the source of the discontent primarily had to do with the fact that his application had run into a snag because his home had not sold.  The customer was adamant that he had never informed plaintiff that his home had been sold.  He also related other conduct of plaintiff's that caused Moran concern, including commenting that the customer's wife should help out more or words to that effect and asked for a referral to a lawyer so she could sue her "bastard" boss.  Moran thereafter worked with the processing staff to locate an alternative lending solution and the customer was able to obtain a mortgage on his new home without further complication.  (Moran Aff., ¶ 36).

42.     Moran also spoke with Tartaglio, who confirmed that she had personally spoken with plaintiff about the fact that the customer's current home had not been sold.  (Moran Aff., ¶ 25).

43.     Moran spoke with plaintiff who admitted in writing that she had "kindly" and "innocently" suggested to the customer that "maybe his wife could help him" to alleviate stress he was experiencing due to the move, but insisted the customer had told her he had sold his home and denied having acted unprofessionally toward either Tartaglio or the customer.  (Moran Aff., ¶ 25; Pl. Dep. at 494).

44.     Plaintiff acknowledges that she may have told Tartaglio that she had taken the customer's side because of a personal relationship with the customer.  (Pl. Dep. at 134-35).

45.     Plaintiff believes that Tartaglio harbored anger toward plaintiff because of an issue involving a personal loan and that was the sole reason she had made up lies about her.  She

did not believe Tartaglio was biased against her on account of her religion.  (Pl. Dep. at 132-135, 380).

46.    Plaintiff believed that the customer made inaccurate statements about their interactions because he "just didn't like loan officers."  (Pl. Dep. at 138-39).

47.    Moran found the accounts of Tartaglio and the customer to be credible.  (Moran Aff. ¶ 25).

48.    Following this incident, Cindi Norris, Branch Manager at the Fleet Bank branch in Orange, contacted Moran and requested that plaintiff, who maintained an office in the branch, be removed as the mortgage loan officer assigned to the Orange Branch.  (Moran Aff., ¶ 26).

49.    Plaintiff does not know if her religion had anything to do with Norris' decision to request that plaintiff be reassigned (Pl. Dep. at 130).

50.    This was not the first time a branch manager had requested that Moran remove plaintiff from a Fleet Bank branch.  Following an unpleasant exchange with plaintiff, another branch manager, Sandra Ruff, had requested that plaintiff be reassigned from her Fleet Bank branch.  (Moran Aff., ¶ 27).

51.    Moran removed branches from other loan officers for reasons including that the branch manager did not like them.  (Pl. Dep. at 155).

52.    Moran worked with Human Resources to prepare a Counsel – Step #2 (the "2000 Counsel") to issue to plaintiff upon her return from medical leave.  In Moran's view, the purpose of a formal counsel is to get an employee "back on track."  (Moran Aff., ¶ 29, Exh. S; Deposition

of Kevin Moran (hereafter Moran Dep.), at 103, excerpts of which are attached to Garofalo Aff.,

¶ 5, Exh. C).

53.     Loan officers were issued business equipment, including laptop computers, to

utilize for loan applications and other purposes.  There was no requirement that loan officers

carry their laptops with them.  (Pl. Dep. at 133).

54.     According to plaintiff, loan officers spent most of their time at one location (Pl.

Dep. at 105-106).

55.     While on medical leave, plaintiff submitted notes from her medical providers

restricting her ability to lift more than five (5) pounds.  Although numerous physician notes were

issued, Dr. Marc J. Warman submitted a note on March 23, 2000, stating that "Ms Ungerleider

cannot return to work until she has her PC on her desk or home office is available (so she did not

have to carry her computer)."  (Pl. Dep. at 330).  (Emphasis added).

56.     By March 16, 2000, FMG was working to procure a desktop computer to house

for plaintiff in her central branch office.  Installing a desktop would involve connecting it to the

FMG, not Fleet Bank, computer system at an estimated cost of approximately $2400.  On

March 21, 2000, Moran informed Laura Mclendon via e-mail that "[w]e will need to order one"

and "asking for a tentative time frame."  Moran was advised it would take approximately one

month.  (Moran Aff., ¶ 22; Exh. Q).

57.     Generally, loan officers have a great deal of freedom as to where they can

perform their positions.  They could take loan applications at a bank branch, at the FMG

mortgage sales office in Seymour, at the customer's home, his or her place of business, a realtor office or other locations.  (Moran Dep. at 8).

58.     Moran informed plaintiff that, until a desktop could be installed, she could leave her laptop at home, take paper mortgage applications from customers and then enter and upload the applications electronically from home.  (Pl. Dep. at 331-32; Moran Aff., ¶ 23; Paquin Aff., ¶¶ 14-15, Exh. D).

59.     As Moran testified it was not a requirement that loan officers carry their laptops with them.  Loan officers at that time did not generally use their laptop computers when they met face-to-face with clients.  Most loan officers took handwritten applications and then thereafter input and uploaded that information on their laptop computers.  (Moran Dep. at 133).

60.     Plaintiff testified that she primarily only carried her laptop computer to and from work.  She also testified that there was nothing preventing her from leaving her laptop at a branch all the time other than the fact that she needed to work in the evenings to be a "top producer" and she preferred to work at homes in the evening because she had a husband and child.  (Pl. Dep. at 105-106, 111-112).

61.     Although plaintiff now denies that she accepted any accommodation short of having a laptop at her desk, on April 5, 2000, plaintiff sent a facsimile to Paquin in which she proposed to return to work the following Monday and wrote "[t]he letter from Medical Doctor & Chiropractor accept home office to keep laptop w/ desk position as alternative unless, hopefully a PC is available at a future date."  (Pl. Dep. at 323-324; Moran Aff., ¶ 28; Exh. R).

62.    Upon plaintiff's return from medical leave on April 10, 2000, Moran met with plaintiff to inform her of the removal of the Orange branch (lest she unwittingly show up there) and to issue her the 2000 Counsel, which stated as the reason for the counsel:

Unprofessional conduct

- Confrontation with branch staff (Orange branch)
- Loan Quality
- Meeting attendance

It cited the following previous discussions regarding similar incidents:

Confrontations with branch staff or in bank branches

- Sandra Ruff – Milford branch
- Carmella – Milford branch
- Richard Evans – Orange branch
- Manager

The counsel further admonished that plaintiff was to:

- Fully adhere to FBF code of ethics and professional standards in all communications with internal and external customers.
- Electronic and paper applications must fully adhere to company quality standards.
- Employee is to attend all required meetings and training sessions on date schedules.
- Employee is to provide coverage for scheduled floor time unless employee has made arrangements for substitute and communicated so to management and PA.

Plaintiff refused to sign the Counsel.  (Moran Aff., ¶ 29; Exh. S).

63.     The purpose of the 2000 Counsel, from Moran's viewpoint, was to put plaintiff on notice of areas in need of improvement and to develop a plan to encourage plaintiff to be successful at Fleet.  (Moran Dep. at 130).

64.     Plaintiff, who was paid on a commission, rather than salary, basis, did not suffer any loss of compensation as a result of the issuance of the 2000 Counsel.  (Paquin Aff., ¶ 22).

65.     On April 11, 2000, plaintiff sent a lengthy rebuttal disputing every facet of the 2000 Counsel.  She denied that there were any issues concerning her attendance, loan quality and also denied any wrongdoing in her interactions with Tartaglio or the customer.  She also offered her belief that Tartaglio may have been targeting her over a prior issue concerning Tartaglio's refinance of an investment property.  (Moran Aff., ¶ 30; Exh. T).

66.     On April 14, 2000, Moran responded by pointing out plaintiff's unprofessional and unacceptable behavior, including having accused Tartaglio of taking the customer's side because she had a personal relationship with the customer.  He informed plaintiff that her "negativity toward co-workers and the company that you discuss with others within the company, including me cannot continue."  Moran observed that the Code of Ethics required employees to treat each other with respect and professionalism and that the "comments and conduct that have been noted create a very uncomfortable and unproductive place to work."  Moran also informed plaintiff that he has spoken to Tartaglio and was satisfied that she bore plaintiff no ill feelings regarding her own personal refinance that impacted the branch manager's decision to end the branch's relationship with plaintiff.  (Moran Aff., ¶ 32, Exh. V).

67.     In this memo, Moran also provided plaintiff with dates of missed trainings and floor times and reiterated to her that her loan application quality and timeliness were

unsatisfactory.  He stated that he would again set up a time for her to meet with a trainer to help her understand the new computer system.  Moran stated that, despite extended training through the year, plaintiff was continuing to have issues with duplications of loans on the system and missing fields.  He informed plaintiff that all areas had to improve and that if immediate improvement did not occur, further disciplinary action, including possibly termination, would occur.  Moran closed the memo by stating that he was looking forward to a turnaround in her performance, thanked her for her cooperation and advised her to take this opportunity to improve and work together.  (Moran Aff., ¶ 32 pg. 2, Exh. V).

68.     On April 14, 2000, Moran sent a memo to plaintiff advising her that he had spoken to Norris and requested that she reconsider her request that plaintiff no longer cover the Orange branch.  Moran informed her that Norris had explained that the relationship was "beyond repair" and had no wish to reconsider the matter.  Moran advised plaintiff in this memo not to pursue the matter with Norris or her staff.  He identified the numerous branches plaintiff still had assigned to her and his belief that they provided an excellent opportunity for business development.  Moran then stated that he looked "forward to putting this issue behind us and look forward to your being successful in your relationship with Fleet Mortgage."  (Moran Aff., ¶ 31, Exh. U).

69.     Moran had removed branches from other loan officers that plaintiff did not know to be Jewish and had not replaced them with equivalent branches.  (Pl. Dep. at 359-360, 376).

70.     Moran was thereafter informed by Jonathan Woods, Senior Vice President and District Manager of the New Haven Region, that on April 17, 2000, plaintiff went into the

Orange branch and made unprofessional statements to branch personnel, including that she was going to sue Tartaglio and Norris.  (Moran Aff., ¶ 33).

71.     On April 19, 2000, Moran informed plaintiff to drop her Orange branch keys to him by the end of the day and not to return to the Orange branch without instructions from him. She failed to comply with either directive.  (Moran Aff., ¶ 36).

72.     On April 20, 2000, plaintiff, with her son, went to the Orange branch in contravention of Moran's directive, turned in her key and removed her belongings.  (Pl. Dep. at 392-393).

73.     Plaintiff wrote Moran yet another lengthy e-mail on April 20, 2000 that continued to dispute every aspect of the 2000 Counsel.  In addressing one of the prior incidents mentioned in the 2000 Counsel concerning a confrontation with Sandra Ruff in the Milford Branch, plaintiff wrote that "Ms. Russ, the Afro-Amer. branch manager obviously his [sic] happier with her Afro-Amer. Loan Officer.  Let's leave it at that."  (Moran Aff., ¶ 38, Exh. W ¶2).

74.     Norris informed Paquin that plaintiff had contacted her to question her about the reassignment of the Orange Branch.  (Paquin Aff., ¶ 12).

75.     On April 25, 2000, plaintiff left Paquin a voice mail in which she stated "I guess I am going to have to quit but I really don't want to" and that she wanted to "resolve this dispute before I leave the company."  (Paquin Aff., ¶ 17).

76.     On April 26, 2000, Moran responded to plaintiff's April 24 e-mail in writing, informing plaintiff that referring to Russ as our "Afro-Amer. branch manager" and to the loan officer as "Afro Amer." was totally inappropriate.  He warned plaintiff that all communication

18

must be "professional and free from personal commentary." In that memo, Moran did acknowledge that some, but not all, of the dates of missed trainings underlying the attendance portion of the 2000 Counsel had occurred while plaintiff was on medical leave. Moran informed plaintiff that the remaining dates of missed trainings and floor time that he had provided to her stood. Moran also informed plaintiff that he had been advised that she had gone to the Orange branch on April 17, 2000 in contravention of his directive and had had a conversation that had been described to him as unprofessional. He requested to hear plaintiff's version of events. He stated that, at that discussion, his "intent [was] to resolve any open issues and determine your employment status." He also agreed to provide plaintiff assistance with setting up an office in the Fleet Bank Milford Green Branch, including contacting FMG's facilities group. (Moran Aff., ¶ 39, Exh. X).

77.     At no time did plaintiff express any concern to Moran about the Milford Green Branch, which was to serve as her new central office, nor did she present any information that her back condition affected her ability to climb the stairs to the branch nor did she seek any type of accommodation in connection with same. In fact, had plaintiff been dissatisfied with the Milford Green Branch, other options were available to her, including setting up an office at the FMG Seymour Sales office. (Moran Aff. ¶ 35).

78.     Plaintiff elevated her disagreement with the 2000 Counsel and the removal of the branch to Paquin and John Frazza, Mortgage Production Regional Manager. (Paquin Aff., ¶ 9).

79.     On or about May 1, 2000, Paquin spoke to plaintiff who stated that she did not agree with any attendance issues, that she felt Moran was "harassing" her and threatening her job

and that the technical problems she was experiencing were not her fault. (Paquin Aff., ¶ 8, Exh. B).

80.     At no time during her discussions with Paquin did plaintiff give any indication that she felt that Moran was biased against her on account of her religion nor did she inform Paquin that Moran had ever allegedly made anti-Semitic remarks. (Paquin Aff., ¶ 11).

81.     In accordance with FMG's conflict resolution policy, Paquin commenced a review of plaintiff's dispute of the 2000 Counsel. (Paquin Aff., ¶ 10).

82.     During the course of this review, Paquin interviewed approximately seventeen individuals, each of whom, in Paquin's judgment, substantiated the bases for the 2000 Counsel. Many offered examples of their own frustrating or trying interactions with plaintiff. Paquin shared this information with Frazza. (Paquin Aff., ¶ 10).

83.     On or about April 25, 2000, plaintiff left Paquin a voice mail in which she stated "I guess I am going to have to quit but I really don't want to" and that she wanted to "resolve this dispute before I leave the ;company." (Paquin Aff., ¶ 12).

84.     On May 17, 2000, plaintiff sent an e-mail to Paquin in which she stated that she would be "resigning from this company as soon as I can get the status of my professional record from you and John [Frazza] because I cannot tolerate one more day of this." (Paquin Aff., Exh. 18

85.     On May 19, 2000, plaintiff requested a transfer and stated that "I have otherwise been forced to resign because I will not work one more minute under Kevin." (Paquin Aff., Exh. 19).

86.     On May 24, 2000, Frazza and Paquin met with plaintiff.  Frazza informed plaintiff that he and Paquin had found no support for her allegations that Moran had harassed her or treated her unprofessionally, informed her of their conclusion that the events that led to the 2000 Counsel were valid and that the Counsel would remain.  They then advised her that it was accepting her resignation effective immediately.  (Paquin Aff., ¶ 20).

87.     Plaintiff abruptly left the meeting, only to return stating that she hated the company and was glad that this had happened.  (Paquin Aff. ¶ 21; Pl. Dep. at 344).

88.     No one ever told plaintiff she was fired.  (Pl. Dep. at 123).

89.     Despite her claims of harassment based on a protected class, plaintiff testified that if she had received a desktop personal computer, she would not have resigned when she did.  (Pl. Dep. at 322).

90.     There are no written records of plaintiff requesting a desktop computer following her return from medical leave on April 10, 2000 nor of FMG having denied any such request.  (Paquin Aff., ¶ 15).

91.     On June 9, 2000, plaintiff filed an administrative complaint with the Connecticut Commission on Human Rights and Opportunities (CHRO) that was dual-filed with the Equal Employment Opportunity Commission, alleging that she had been warned, given a poor evaluation, and discriminated against in the terms and conditions of employment on the basis of her sex, age, religion, and physical disability.  Although plaintiff had already left her employment with FMG at the time, plaintiff did not indicate on the Affidavit of Illegal Discrimination, CHRO Form 103, that she had been constructively terminated.  (Garofalo Aff., ¶

6, Exh. D).  Plaintiff admitted that she had no intention of bringing such a claim at that time and

that she has no knowledge of having amended her complaint to bring such a claim.  (Pl. Dep. at

347-349).  Plaintiff did not pursue her claims of age or gender discrimination included in her

affidavit.

92.    During her deposition, plaintiff testified that her primary reason for resigning was

FMG's purported failure to accommodate her alleged disability and that, had it merely provided

her with a desktop computer, she would not have resigned when she did and she would have

continued to try to resolve the other issues.  (Pl. Dep. at 322).

93.    Plaintiff never informed Paquin that she was dissatisfied with the interim

accommodation that was provided nor did she request any alternative or further accommodation

prior to resigning.  (Paquin Aff., ¶ 15).

94.    Plaintiff testified that if FMG had provided her with a desktop at the Milford

Green Branch, this would have been a satisfactory accommodation for her back.  (Pl. Dep. at

395).

95.    Asked why Moran and she had such a poor relationship, plaintiff testified at

various times during her deposition that, "he just didn't like me," "I can't speak to what

motivates [Moran] for sure," and "I don't know, I can't give an answer of why he did what he

did."  (Pl. Dep. at 164, 201, 389).

96.    Plaintiff identified at least five other loan officers, all of whom reported to Moran

and all of whom had allegedly suffering back or neck injuries lifting Fleet equipment.  Plaintiff

believes they may have taken Family and Medical Leaves.  According to plaintiff, Moran did not

treat any of these employees poorly.  They did not have branches taken away, were not harassed

and were able to move on and continue with their jobs.  In fact, he even promoted one of them.

(Pl. Dep. at 375-376; 468).

Respectfully submitted,

THE DEFENDANT
WASHINGTON MUTUAL BANK, FA as
successor in interest by operation of law to
Washington Mutual Home Loans, Inc., the
successor by merger to Fleet Mortgage Corporation

By:     _____
Beverly W. Garofalo (ct11439)
Brown Raysman Millstein Felder
 & Steiner, LLP
CityPlace II, 10th Floor
185 Asylum Street
Hartford, CT  06103
(860) 275.6400

## CERTIFICATION

This is to certify that on November 10, 2003, a true copy of the foregoing Statement of
Material Facts Not in Dispute was sent via first-class mail, postage prepaid, to:

Ellen M. Telker, Esq.
564 Boston Post Road
Milford, CT  06460

_____
Beverly W. Garofalo

23