UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------- X
**LINDA UNGERLEIDER,**          :
                                                     : **CIVIL ACTION NO.:**
      **Plaintiff**                          : **3:02CV659(AVC)**
                                                     :
   **v.**                                                :
                                                    :
**FLEET MORTGAGE GROUP OF FLEET BANK [sic],**          :
                                                     :
      **Defendant**                  : **NOVEMBER 11, 2003**
---------------------------------------------------- X

## AFFIDAVIT OF RACHEL PAQUIN

      I, Rachel Paquin, am over the age of eighteen (18) and understand the obligations of an oath.

1.    I have personal knowledge of the matters attested to herein.

2.    I commenced employment with Fleet Mortgage Group ("FMG") on April 20, 1992. Throughout my employment, I have worked in a variety of positions, all within the Human Resources Department at FMG or other related entities. In or about 1999 and 2000, I held the title of Human Resources Business Partner I.

3.    During the 1999 and 2000 timeframe, I had numerous discussions with Kevin Moran, Sales Manager, concerning Linda Ungerleider, a mortgage loan officer who reported to him. Mr. Moran expressed concerns about numerous aspects of Ungerleider's performance and conduct, including with regard to professionalism, communication, work relations, attendance and loan quality.

4.    In late 1999 and early 2000, Mr. Moran and I discussed the fact that he would meet with Ungerleider to verbally counsel her about the performance and conduct issues listed above. Attached as Exhibit A is a true and accurate copy of my notes dated January 11, 2000 of a discussion I had with Mr. Moran wherein we agreed upon this course of action. I prepared those notes in the ordinary course of business.

5.    On or about January 11, 2000, plaintiff commenced a short-term disability leave.

6.    In or about March 2000, I was advised by Mr. Moran that Barbara Tartaglio, a Senior Business Specialist in the Fleet Bank Orange branch, had complained to him about an interaction with Ungerleider and had also advised him that a customer had complained to her about Ungerleider. I understand that Mr. Moran spoke directly to Ms. Tartaglio, the

customer and with Ungerleider about the matter. Sometime thereafter, Mr. Moran also informed me that Cindi Norris, the branch manager of the Orange Branch, had requested that plaintiff no longer be assigned to the branch.

7. As of April 2000, a Step #2 – Counsel was the second step in FMG's progressive discipline process. The third step was a Step #3 – Reprimand.

8. I thereafter worked with Mr. Moran to prepare a Step #2 – Counsel for Ungerleider addressing her unprofessional interaction with Ms. Tartaglio, loan quality issues and attendance. It was agreed that the Counsel and news of the reassignment of the Orange branch would be presented upon Ungerleider's return from medical leave.

9. Ungerleider elevated her disagreement with the 2000 Counsel and the removal of the branch to me and John Frazza, Mortgage Production Regional Manager. Attached as Exhibit B are true and accurate copies of notes of a discussion I had with Ungerleider on or about May 1, 2000. I had numerous discussions with plaintiff following the issuance of the Step #2 – Counsel and the reassignment of the Orange branch wherein she disagreed with the criticisms contained therein. Ungerleider claimed that Moran had "harassed" and "threatened" her job for years, but did not provide me with any specifics.

10. In accordance with FMG's conflict resolution policy, I commenced a thorough review of plaintiff's concerns about the Counsel and her claims that she was being "harassed" and "threatened" by Moran, which included interviews and/or discussions with approximately seventeen individuals. Based upon my interviews and review of various documents, I determined that the issues raised in the Counsel were warranted. Many of those interviewed offered examples of their own frustrating or trying interactions with Ungerleider. I shared this information with Mr. Frazza.

11. At no time during this process did Ungerleider ever advise me that Mr. Moran had ever made any type of anti-Semitic remarks nor that she believed he was biased against her on account of her religion.

12. I have no recollection that Ungerleider had complained to me at any prior time that Mr. Moran had made any type of anti-Semitic remark or that he was biased against her on account of her religion. Had she done so, I most certainly would have initiated a prompt investigation in accordance with Fleet's Freedom from Harassment policy, a copy of which is attached hereto as Exhibit C.

13. In April or May 2000, Norris informed me that Ungerleider had contacted her to question her about her reassignment from the Orange branch.

14. While plaintiff was on medical leave in 2000, I became aware that she had certain lifting restrictions. I understood that FMG was working to obtain a desktop computer to house in her main branch office in addition to the company issued laptop that she could leave at home.

15. Attached as Exhibit D are handwritten notes I made documenting the accommodation that was provided to ensure that Ungerleider did not exceed her lifting restrictions,

2

namely, that she was advised that she could keep her laptop at her home, take manual applications and then input them onto her laptop from home.  I am not aware of any records reflecting Ungerleider requesting any additional accommodations nor of Fleet denying her request for a desktop computer.  I do not recall plaintiff asking for any further accommodations following her return from medical leave in April 2000,  I am also not aware that FMG had ever denied her request for a desktop computer in addition to her company issued laptop.

16. Attached as Exhibit E is a true and accurate copy of a string of e-mails forwarded to me by Donna Dailey, a Human Resources Manager, in which Odette Marra, Central Processing Manager IV, had compiled a number of issues concerning Ungerleider's loan files.

17. On or about April 25, 2000, Ungerleider left me a voice mail in which she stated "I guess I am going to have to quit but I really don't want to" and that she wanted to "resolve this dispute before I leave the company."

18. Attached as Exhibit F is a true and accurate copy of a string of e-mails received by me, including one from Ungerleider to me dated May 17, 2000, in which plaintiff tendered her resignation.

19. Attached as Exhibit G is a true and accurate copy of an e-mail dated May 19, 2000 that I received from Ungerleider.

20. On May 24, 2000, Frazza and I met with Ungerleider.  Frazza informed Ungerleider that they had found no reason to support her allegations that Moran had harassed her or treated her unprofessionally, informed her of our conclusion that the events that led to the Counsel were valid and that the Counsel would remain.  He also advised her that FMG was accepting her resignation.

21. Plaintiff abruptly left the meeting, only to return stating that she hated the company and that she was glad that this had happened.

22. To my knowledge, plaintiff, who was paid on a commission, rather than salary, basis, did not suffer any decrease in pay as a result of the issuance of the 2000 Counsel.

_____
Rachel Paquin

Signed and sworn to before me
this ___ day of November 2003.

_____
Notary Public/
Commissioner of Superior Court

HARTFORD 80194v1