UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------ X
LINDA UNGERLEIDER,                               :
                                                 :   CIVIL ACTION NO.:
       Plaintiff                              :   3:02CV659(AVC)
                                                 :
   v.                                            :
                                                 :
FLEET MORTGAGE GROUP OF                          :
FLEET BANK [sic],                                :
                                                 :
       Defendant                              :   NOVEMBER 10, 2003
------------------------------------------------ X

## AFFIDAVIT OF KEVIN MORAN

I, Kevin Moran, am over the age of eighteen (18) and understand the obligations of an oath.

1. I have personal knowledge of the matters attested to herein.

2. I commenced employment with Fleet Mortgage Group ("FMG") as a Sales Manager on December 1, 1995, upon the merger of Fleet Financial Group ("FFG") with my former employer Shawmut National Bank.

3. Effective December 1, 1995, Linda Ungerleider ("Ungerleider"), a mortgage loan officer, began reporting to me.

4. Attached as Exhibit A is a true and accurate copy of a completed performance appraisal form that I issued to Ungerleider on or about February 15, 1996 (the "1995 Performance Review"). I prepared the 1995 Performance Review in the ordinary course of business. Also attached as part of Exhibit A is a true and accurate copy of a memorandum I received from Ungerleider dated February 16, 1996 disagreeing with numerous statements contained in the 1995 Performance Review.

5. Attached as Exhibit B is a true and accurate copy of a completed performance appraisal form that I issued to Ungerleider on or about February 13, 1997 and which Ungerleider refused to sign (the "1996 Performance Review"). I prepared the 1996 Performance Review in the ordinary course of business. Also attached as part of Exhibit B is a true and accurate copy of a memorandum I received from Ungerleider dated February 13, 1997 disagreeing with numerous statements contained in the 1996 Performance Review.

6. Attached as Exhibit C is a true and accurate copy of a Step #2 Formal Counsel and Developmental Action Plan (the "1997 Counsel") that I issued to Ungerleider on or about

       May 23, 1997 and which Ungerleider refused to sign. The 1997 Counsel was prepared by me in the ordinary course of business. Prior to issuing the 1997 Counsel, I reviewed accounts provided to me by Ungerleider and another FMG employee, Richard Evans, and found Mr. Evans' account to be credible.

7. Attached as Exhibit D is a true and accurate copy of an e-mail dated May 22, 1997 that I received from Richard Evans describing a troubling interaction he had had with Ungerleider.

8. Attached as Exhibit E is a true and accurate copy of a completed performance appraisal form issued to Ungerleider on or about February 5, 1998 (the "1997 Performance Review"). I prepared the 1997 Performance Review in the ordinary course of business.

9. Attached as Exhibit F is a true and accurate copy of a completed performance appraisal form issued to Ungerleider on or about February 17, 1999 (the "1998 Performance Review"). I prepared the 1998 Performance Review in the ordinary course of business.

10. In 1997 and 1998, plaintiff's mortgage loan production was strong and she was showing improved knowledge of FMG's products. I do not recall having to spend as much time managing Ungerleider or her issues as I had in previous review periods, although it is quite possible I had become somewhat immune to her issues, including her interpersonal issues with staff, her chronic complaint about FMG policies and procedures, her compensation and the processing staff. Given her reactions to the 1995 and 1996 Performance Reviews, in preparing the 1997 and 1998 Performance Reviews, I hoped and believed that Ungerleider would respond better to positive feedback than to negative feedback thereby enabling both of us to focus on our respective jobs. In hindsight I have realized that this approach did not solve the problems that I was experiencing with Ungerleider, but only served to temper them for a period of time.

11. Attached as Exhibit G is a true and accurate copy of my handwritten notes describing an exchange between Ungerleider and myself concerning Ungerleider's violation of policy involving the preparation and distribution of marketing materials ridden with typos and factually incorrect information that had not been approved by appropriate FMG marketing department. I prepared these handwritten notes in the ordinary course of business.

12. Attached as Exhibit H is a true and accurate copy of an e-mail dated November 21, 1999 received by me from Ungerleider and an e-mail dated November 22, 1999 prepared by me in the ordinary course of business and which I sent to Ungerleider.

13. Attached as Exhibit I is a true and accurate copy of a string of e-mails forwarded to me by Howard Ackerman, Mortgage Production Regional Manager, on December 6, 1999. The first e-mail in Exhibit I dated December 6, 1999, was from Ungerleider to my manager's manager at the time, Michael Massella, Mortgage Production Senior Group Manager, with a copy to my manager at the time, Michael Pulver, Mortgage Production Regional Manager, and a copy to me. As shown in a December 6, 1999 e-mail from Mr. Massella to Mr. Ackerman, Mr. Massella requested his assistance in looking into the

2

issues raised by Ungerleider. Mr. Ackerman, in turn, asked for my assistance. In an e-mail dated December 6, 1999, I provided my honest input in response to Mr. Ackerman's request for additional information. Mr. Ackerman then instructed me to work with the Human Resources "on a formal counseling" of Ungerleider.

14. Attached as Exhibit J is a true and accurate copy of an e-mail dated November 30, 1999 that I had received from Pierce J. Downey, one of Ungerleider's co-workers who also reported to me, forwarding an e-mail he had received from Ungerleider dated November 24, 1999.

15. Attached as Exhibit K is a true and accurate copy of an e-mail from myself to Donna Dailey, Human Resources Manager, dated December 16, 1999. I prepared this e-mail in the ordinary course of business.

16. Attached as Exhibit L is a true and accurate copy of an e-mail dated December 31, 1999 that I received from Rachel Paquin, HR Business Partner I, following up on a conversation we had had about Ungerleider on December 16, 1999 and an e-mail I prepared in response to her dated January 3, 2000.

17. Attached as Exhibit M is a true and accurate copy of a string of e-mails between Ungerleider and myself. I received the e-mail dated January 3, 2000 from Ungerleider. I prepared the e-mail dated January 4, 2000 to Ungerleider in the ordinary course of business. I received the e-mail dated January 5, 2000 from Ungerleider. I forwarded this string of e-mails to Ms. Paquin on January 5, 2000 as another example of Ungerleider's conduct.

18. Attached as Exhibit N is a true and accurate copy of an e-mail dated December 9, 1999 received by me from Ava M. Simonelli, an FMG loan processor.

19. On January 11, 2000, I had a discussion with Ms. Paquin wherein we agreed that I would conduct a verbal counseling session with Ungerleider about her professionalism, communication, work relations and attendance at meetings. However, before I could meet with Ungerleider, she commenced a medical leave of absence.

20. Attached as Exhibit O is a true and accurate copy of an e-mail dated January 13, 2000 received by me from Ungerleider.

21. Attached as Exhibit P is a true and accurate copy of a memo dated March 2, 2000 received by me from Ungerleider.

22. Attaches as Exhibit Q is a true and accurate copy of a string of e-mails describing FMG's efforts to obtain a desktop computer for Ungerleider as an accommodation to her alleged disability.

23. Because it would take a period of time to obtain and install a desktop computer for Ungerleider, I advised her that, as an interim measure, she could leave her FMG issued laptop computer at home and take paper mortgage applications. She could then enter the

3

       application information and upload the application on her laptop computer when she returned home.

24. Mortgage loan originators at FMG were generally assigned territories in which to work. Most loan originators reporting to me were assigned to cover various Fleet Bank branches within their territory. Fleet Bank and FMG were not the same company. Rather, upon information and belief, at all times relevant to the above-captioned lawsuit, they were affiliated companies wholly-owned by the same parent company. In my view, FMG mortgage loan originators served at the pleasure of the Fleet Bank branch to which they were assigned. If a Fleet Bank branch manager requested that I reassign a mortgage loan originator assigned to the branch, I would generally have little choice but to accede to that request.

25. In late February or early March 2000, I received a telephone call from Barbara Tartaglio, Senior Business Banking Specialist in Fleet Bank's Orange branch informing me that a customer she had referred to Ungerleider to apply for a mortgage on his new home was very upset and dissatisfied with Ungerleider. Ms. Tartaglio informed me that the issue, in part, concerned a disagreement as to whether either Ms. Tartaglio or the customer had informed plaintiff that his current home was pending sale. Ms. Tartaglio informed me that the customer wanted to speak directly with me about the matter. Ms. Tartaglio also informed me that when she attempted to speak about the matter with plaintiff, plaintiff had raised her voice and, among other things, had accused her of taking the customer's side on the issue because she claimed that Ms. Tartaglio had a "personal relationship" with the customer. I thereafter spoke with the customer and heard his version of events. The customer was adamant that he had never informed plaintiff that his home had been sold. He also related other conduct to me that caused me concern, including that Ungerleider had told him that his wife should help out more or words to that effect and asked for a referral to a lawyer so she could sue her "bastard" boss. In addition to speaking with the customer, I also spoke again with Ms. Tartaglio who confirmed that she had personally spoken with plaintiff about the fact that the customer's then current home had not been sold and informed me that Ungerleider had assured her that this would not pose a problem. I thereafter worked with our processing staff to locate an alternative lending solution and the customer was able to obtain a mortgage on his new home without further complications. I also spoke to the plaintiff, who admitted she had "kindly" and "innocently" suggested to the customer that "maybe his wife could help him "to alleviate stress he was experiencing due to the move." I found the customer and Ms. Tartaglio's account of events to be credible.

26. Following this incident, Cindy Norris, Branch Manager of the Fleet Bank Orange branch, informed me that she no longer wished to have Ungerleider as the FMG loan originator assigned to the Orange branch. I thereafter asked her to reconsider her decision, which she declined to do.

27. This was not the first time a Fleet Bank branch manager had requested that I remove Ungerleider as the bank branch's assigned loan originator. After reporting an unpleasant incident she had had with Ungerleider, Sandra Ruff had previously requested that I do so and I complied with that request.

4

28. Attaches as Exhibit R is a true and accurate copy of a facsimile dated April 5, 2000 received by me from Ungerleider.

29. Attached as Exhibit S is a true and accurate copy of a Step #2 Formal Counsel and Developmental Action Plan (the "2000 Counsel") that I issued to Ungerleider on April 10, 2000. With the assistance of FMG's Human Resources Department, I prepared the 2000 Counsel in the ordinary course of business. Ungerleider refused to sign the 2000 Counsel.

30. Attached as Exhibit T is true and accurate copy of an e-mail dated April 11, 2000 received by me from Ungerleider.

31. Attached as Exhibit U is a true and accurate copy of a memo dated April 14, 2000 from me to Ungerleider with a copy to Rachel Paquin. I prepared this memo in the ordinary course of business.

32. Attached as Exhibit V is a true and accurate copy of a memo dated April 14, 2000 from me to Ungerleider. I prepared this memo in the ordinary course of business.

33. I was informed by Jonathan Wood, Senior Vice President, District Manager of the New Haven Region, that on April 17, 2000 plaintiff had gone into the Orange branch and made unprofessional statements to branch personnel, including yelling that she was not turning in her keys and that she was going to sue Ms. Tartaglio and Ms. Norris.

34. On April 18, 2000, I asked Ungerleider in a face-to-face meeting to return the keys to the Fleet Bank Orange branch. She refused.

35. Because plaintiff had maintained an office in the Orange Fleet Bank branch I attempted to work with her to try to identify another location for her to utilize as her central office location. As I recall, I suggested that she locate her office at FMG's main sales office in Seymour, Connecticut, where I maintain my office and which other loan originators utilize as their central office location. She informed me that she had been in contact with the branch manager at the Fleet Bank Milford Green branch, which was in close proximity to her home, and that he had offered her space within the branch to utilize as an office. I did not require her to utilize that office and if she was not satisfied with that office, she never informed me of that fact nor did she ever notify me that any medical condition prevented her from accessing her office at the Milford Green branch.

36. On April 19, 2000, I informed Ungerleider to drop off her keys to the Orange branch in FMG's Shelton location by the end of the day and not to return to the Orange branch without instructions from me. She failed to comply with either directive.

37. Rachel Paquin and I were in the process of coordinating to obtain assistance for plaintiff to move her belongings from the Orange branch to a new office location when, as I have been informed, she arrived with her son at the Orange branch on April 20, 2000, in derogation of my direct order that she refrain from entering the branch, and removed her belongings.

5

38.     Attached as Exhibit W is a true and accurate copy of an e-mail dated April 20, 2000 received by me from Ungerleider.

39.     Attached as Exhibit X is a true and accurate copy of a memorandum dated April 26, 2000 from me to Ungerleider. I prepared this memorandum in the ordinary course of business.

40.     Attached as Exhibit Y is a true and accurate copy of a memorandum dated May 2, 2000 from me to Mr. Frazza. I prepared this memorandum in the ordinary course of business. To the best of my knowledge, the information contained in this memorandum is accurate.

```
                                        _____
                                        Kevin Moran
```

Signed and sworn to before me
this ___ day of November 2003.

_____
Notary Public/
Commissioner of Superior Court