UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------- X
LINDA UNGERLEIDER,                             :
                                               : CIVIL ACTION NO.:
         Plaintiff                             : 3:02CV659(AVC)
                                               :
    v.                                         :
                                               :
FLEET MORTGAGE GROUP OF                        :
FLEET BANK [sic],                              :
                                               :
         Defendant                             : NOVEMBER 17, 2003
---------------------------------------------- X

## MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANT'S AMENDED MOTION FOR SUMMARY JUDGMENT

Defendant Washington Mutual Bank FA, as successor in interest by operation of law to Washington Mutual Home Loans, Inc., the successor by merger to Fleet Mortgage Corporation ("FMG"), hereby submits its Memorandum of Law in Support of Defendant's Motion for Summary Judgment. Plaintiff, Linda Ungerleider, makes five basic claims in this case: (1) constructive discharge on account of her religion and disability; (2) religious discrimination; (3) disability discrimination; (4) failure to accommodate disability; and (5) retaliation for taking a medical leave of absence. However, the undisputed facts show, inter alia, that: (1) plaintiff was not constructively discharged because the matters alleged by plaintiff do not rise to a sufficiently serious level such that a reasonable person would have felt compelled to resign; (2) the issues and concerns regarding plaintiff's performance and unacceptable treatment of fellow employees were unrelated to her religion and indeed predated any awareness of her religion; (3) the issues and concerns regarding plaintiff's performance and unacceptable treatment of fellow employees

were unrelated to her disability and indeed predated any assertion of disability[1]; (4) FMG reasonably accommodated plaintiff's disability, albeit not in the precise manner demanded by her; and (5) plaintiff's retaliation claim is time-barred. For the reasons set forth more fully below, judgment as a matter of law should be granted as to each claim asserted by plaintiff.

## I.   SUMMARY OF FACTS

Plaintiff commenced her employment with FMG, then a wholly-owned subsidiary of Fleet Financial Group ("FFG"), as a mortgage loan originator on December 5, 1994. (See Defendant's Local Rule 56(c)(1) Statement, hereinafter referred to as (Facts) ¶ 1). Commencing on December 1, 1995, plaintiff began reporting to Kevin Moran, Sales Manager, who had joined FMG upon FFG's merger with Shawmut National Bank. (Facts ¶ 3). As is clear from the performance review Moran issued to plaintiff on February 15, 1996, rating plaintiff's overall performance as "Needs Improvement," plaintiff had done little to endear herself to Moran during the first months they had worked together. (Facts ¶¶ 4-5). His comments in that review and plaintiff's utter refusal to acknowledge the validity of same foretell the difficult and rocky relationship that would exist between the two of them until plaintiff's voluntary resignation on May 24, 2000. (Facts ¶¶ 4-6, 10). It is highly significant that at the time Moran issued this review plaintiff had not and did not claim to be disabled. Nor, to plaintiff's belief, did Moran know that she was Jewish. (Facts ¶¶ 7, 9). Thus, there is no reason to believe that this first review reflected anything other than Moran's genuine assessment of plaintiff and her performance.

---

[1] While it is likely that plaintiff is not a "qualified individual with a disability" because, among other reasons, there is no evidence that the back injuries allegedly comprising her disability substantially limit her from performing one or more major life activity, for purpose of this motion for summary judgment only FMG will assume that plaintiff is disabled within the meaning of the ADA.

2

The next annual review that Moran prepared in February 1997 showed some slight improvement in plaintiff's performance, but continued to rate plaintiff low in numerous areas, including Communications, Judgment/Decision Making and Work Relations. (Facts ¶ 11). In response, once again refusing to accept responsibility for her actions, plaintiff lambasted the personnel within FMG's Processing Department and lashed out personally at Moran. (Facts ¶ 12). Another issue arose later that year -- a heated exchange between plaintiff and another employee in a Fleet Bank branch -- that prompted Moran to issue plaintiff a Step #2 -- Counsel.[2] (Facts ¶¶ 14-18). Not surprisingly, plaintiff has denied any wrongdoing. (Facts ¶ 16).

In early December 1999, plaintiff sent an e-mail to an FMG senior manager at least two levels above Moran complaining bitterly about two FMG loan processor employees. (Facts ¶ 25). When senior management asked for Moran's input, he explained that plaintiff had been a difficult employee for some time and that, in his view, her e-mail had violated FMG's policies on conflict resolution. (Facts ¶ 26). Senior management thereafter directed Moran to prepare a formal counsel for plaintiff. (Facts ¶ 27). At or about this time, there were other issues going on as well. For example, one of plaintiff's co-workers had forwarded to Moran an e-mail from plaintiff in which she had expressed very negative views about Moran. (Facts ¶ 23). The Processing Department, seemingly frustrated with plaintiff's complaints about its level of service, compiled an e-mail reflecting errors plaintiff had committed. (Facts ¶ 28). Plaintiff sent an e-mail to Moran in which she disparagingly referred to one of her co-workers as "Ms. Born Again." (Facts ¶ 32). When, in response to that e-mail, Moran expressed concern about the tone of plaintiff's e-mail, she denied that it had been improper. (Facts ¶ 32).

---

[2] As indicated by its title, a Step #2 – Counsel, was the second step in FMG's progressive discipline process. The third step was a Step #3 – Reprimand. (Facts ¶ 14).

Accordingly, in consultation with Human Resources, it was decided that Moran would address plaintiff's ongoing performance and conduct issues by issuing a verbal counsel on professionalism, communication, work relations and attendance at meetings. (Facts ¶¶ 27, 33). Before, however, Moran could meet with plaintiff to issue the counsel, she commenced a medical leave of absence due to a prior back injury.3 (Facts ¶ 34).

Sometime in February 2000, plaintiff accepted a mortgage loan referral from Barbara Tartaglio, a Senior Business Banking Specialist in Fleet Bank's Orange branch where plaintiff maintained an office.4 (Facts ¶¶ 36-39). A customer was seeking a mortgage on a new home. (Facts ¶ 40). In March 2000, Tartaglio contacted Moran to inform her that the customer had called her very upset about his interactions with plaintiff and that he wanted to speak directly to Moran about the matter. (Facts ¶ 40). Tartaglio further informed Moran that when she attempted to speak to plaintiff about the customer's concerns, plaintiff became heated and accused Tartaglio of taking the customer's side because she had a "personal relationship" with the customer. (Facts ¶ 40). Moran spoke directly with the customer and to plaintiff to obtain their respective accounts of what had transpired.5 (Facts ¶ 40). The customer related other aspects of his business dealings with plaintiff, including plaintiff's suggestion to the customer that his wife help out more and asking for a referral to a lawyer so that she could sue her

---

[3]   This was plaintiff's second leave of absence while at FMG. According to plaintiff, she had injured her back in April 1996 while lifting a "suitcase" containing FMG computer equipment and manuals. (Facts ¶ 21). On June 10, 1999, plaintiff commenced her first leave of absence purportedly due to the injury she had sustained years earlier, and returned two months later in August 1999. (Facts ¶ 21).

[4]   Plaintiff claims that this mortgage application was taken during a small window in which she had briefly returned to work during her medical leave, although that claim is highly suspect. (Facts ¶ 39).

[5]   As was related to Moran, the source of the customer's discontent, primarily had to do with the fact that he had run into difficulties with his mortgage application because his current home had not yet sold. A dispute arose over whether he had informed plaintiff that his home had sold. (Facts ¶ 40). In addition to speaking with the customer, Moran spoke to Tartaglio who stated that she had been a party to discussions with plaintiff in which they had discussed the fact that this customer's current home had not yet been sold. (Facts ¶ 42). Thus, either Tartaglio and the customer were lying about plaintiff or vice-versa. Moran concluded that more likely than not it was plaintiff who had created this problem and was now denying responsibility as she had done on prior occasions. (Facts ¶¶ 40-42).

4

"bastard" boss. (Facts ¶ 40). After this incident, Cindi Norris, manager of the Orange branch, contacted Moran to request that a different loan officer be assigned to the branch.[6] (Facts ¶ 48).

Based on these additional issues, Moran, in consultation with Human Resources, prepared a Step #2 – Counsel (the "2000 Counsel") to issue to plaintiff upon her return from medical leave. (Facts ¶ 52). Lest plaintiff unwittingly show up at the Orange branch, Moran presented the Counsel to plaintiff and informed her of the branch reassignment promptly upon her return. (Facts ¶ 62). Needless to say, plaintiff disputed each and every aspect of the 2000 Counsel, including any attendance or loan quality issues, and denied any wrongdoing or unprofessional conduct in her dealings with Tartaglio or the customer or anyone else for that matter. (Facts ¶ 62). She offered motives to explain why they would have misrepresented their interactions with plaintiff, none of which involved religion, disability, or other protected basis. (Facts ¶ 65). Within a couple of weeks of receiving the 2000 Counsel, plaintiff left a voice mail message for Paquin in which she stated that she was going to have to leave the company. (Facts ¶ 75).

Despite Moran's directive that plaintiff not communicate with employees in the Orange branch about the matter, Moran learned from a Senior Vice President that plaintiff had gone into the branch and threatened to "sue" Norris and Tartaglio. (Facts ¶ 70). Similarly, plaintiff disobeyed Moran's orders that she turn her branch keys into him and went to the Orange branch a second time, this time with her son, to remove her belongings. (Facts ¶ 72). In the meantime, Moran's written communications demonstrate that he continued to treat plaintiff in a professional, civil manner and had even asked Norris to reconsider her decision about the Orange

---

[6] At the time, FMG and Fleet Bank were affiliated entities both owned by the same parent company. (Facts ¶ 2). FMG loan officers were assigned to cover various bank branches within their territories. Branches would refer loan inquiries to the loan officer assigned to their branch. However, FMG loan officers generally served at the pleasure of the branch manager. If a branch manager requested a different loan officer, Moran would have little choice but to comply. (Facts ¶¶ 37, 38).

5

branch (which she declined to do). (Facts ¶ 68). Moran patiently responded to plaintiff's numerous inquiries and explanations about the issues contained in the 2000 Counsel.[7] (Facts ¶ 50).

Plaintiff elevated her concerns with the 2000 Counsel to Paquin and Jonathan Frazza, Regional Vice President of Production. (Facts ¶ 78). Although plaintiff claimed that Moran was unfairly harassing her, she did not mention any belief that her religion or disability played any role in this harassment. (Facts ¶ 80). Paquin commenced a comprehensive and thorough review of the issues identified in the 2000 Counsel that included interviews with at least seventeen different employees. Paquin and Frazza ultimately concluded that the 2000 Counsel was justified and found no evidence to substantiate plaintiff's claims of harassment. (Facts ¶ 82).

On May 17, 2000, plaintiff sent an e-mail to Paquin in which she stated that she would be resigning her employment upon the completion of Paquin's review of the 2000 Counsel. (Facts ¶ 84). She sent another e-mail on May 19, 2000, stating that she would not work one more minute under Moran. (Facts ¶ 85). On May 24, 2000, Paquin and Frazza met with plaintiff. They informed her that they had found no support for her claim that Moran had harassed her or treated her unprofessionally. (Facts ¶ 86). They also informed her that the 2000 Counsel would not be removed from her personnel file and then accepted her resignation. (Facts ¶ 86). Plaintiff walked out of the meeting, only to return stating that she hated the company and that she was glad this had happened. (Facts ¶ 87).

---

[7]  In trying to explain away one of the past issues cited in the 2000 Counsel in which an African American manager had requested that plaintiff be reassigned from her branch, plaintiff characterized the situation as one "Afro. American" branch manager preferring to have another "Afro. American" loan officer. Once again, plaintiff's choice of words were utterly inappropriate and she refused to consider even for a moment that any fault lay with her. (Facts ¶ 73).

## II. PROCEDURAL BACKGROUND

On June 9, 2000, plaintiff filed a complaint of discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), which was dual-filed with the Equal Employment Opportunity Commission ("EEOC"). (Facts ¶ 91). The Affidavit of Illegal Discrimination, CHRO Form 103, did not include a claim of constructive discharge. (Facts ¶ 91). Thereafter, on April 10, 2002, after obtaining a release to sue, plaintiff filed this lawsuit in federal district court.

On June 24, 2002, FMG filed a Motion For an Order to Stay Proceeding and Compel Arbitration of Plaintiff's Claims ("Motion to Compel") based upon the arbitration provision contained within plaintiff's Fleet Mortgage Group, Inc. Fleet Mortgage Corporation 2000 Outside Loan Officer Compensation Plan ("2000 Compensation Plan"). Plaintiff objected to FMG's Motion to Compel on many grounds that included that her signature on the 2000 Compensation Plan had been forged and that she could not afford the costs of arbitration. See August 26, 2002 Affidavit of Linda Ungerleider ("Affidavit"), ¶¶ 8, 26-27 attached to plaintiff's August 28, 2002 Memorandum of Law in Opposition to the Defendant's Motion to Compel Arbitration or in the Alternative, To Conduct Limited Discovery. Based upon plaintiff's vigorous opposition and statements contained in her Affidavit and to avoid incurring significant attorney's fees litigating the arbitrability of plaintiff's claims, on October 11, 2002, FMG voluntarily withdrew its Motion to Compel.[8]

---

[8] In the course of this lawsuit, FMG has come to learn that certain statements contained in the affidavit that plaintiff submitted to this Court in support of her opposition to the Motion to Compel were not true. For example, despite having sworn to the Court that her signature had been forged, plaintiff readily agreed during her deposition that the signature appearing on the 2000 Commission Plan was hers. (Pl. Dep. at 15-16). To support her claims of inability to pay the costs of arbitration, plaintiff had sworn in her affidavit that she had been let go from one of her post-FMG positions for economic reasons along with three others at the company. (Affidavit, ¶ 10). However, the manager who had terminated her from that job testified at his deposition that she had been terminated strictly for performance reasons and that plaintiff had never been told that it was for economic reasons. (Deposition of Joseph Dellapuca dated July 28, 2003 (hereinafter "Dellapuca Dep.") at 16-18, 27, excerpts are attached to Garofalo Aff., ¶

7

On June 26, 2003, plaintiff filed an Amended Complaint in this action (the "Amended Complaint"), alleging, that she had been discriminated against in the terms and conditions of her employment and constructively discharged on the basis of her religion (Jewish) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-1, et seq. ("Title VII") and an alleged disability (back injury), in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. (the "ADA").[9] She also claimed that FMG had failed to provide reasonable accommodations in accordance with the ADA and that it had retaliated against her for exercising her rights under the Family Medical Leave Act, 29 U.S.C. §§ 2601 et seq. (the "FMLA"). On July 14, 2003, FMG filed its Answer and Affirmative Defenses. The period for conducting discovery has concluded and this case is ripe for summary adjudication.

## III. SUMMARY OF ARGUMENT

Plaintiff claims that Moran levied unwarranted criticism on her due to her religion and her alleged disability, and that FMG failed to provide her a reasonable accommodation for her alleged disability, which purportedly ultimately led to her constructive discharge from FMG in May 2000. However, as discussed below, plaintiff's claims, which are entirely conclusory in nature, fail as a matter of law.

As a preliminary matter, plaintiff's claim that she was constructively discharged from FMG on account of her religion and disability fail as a matter of law. First, this Count lacks jurisdiction to consider this claim due to plaintiff's failure to include it as part of her administrative complaint. Second, plaintiff testified that her primary reason for resigning was FMG's purported failure to accommodate her alleged disability and that, had it provided her with

---

5, Exh. C). When confronted with these inconsistencies during her deposition, plaintiff denied understanding that the Affidavit she had submitted to the Court was under oath, claiming that her attorney at the time, Gary Phelan, had only sent her the last page to sign and had never explained that she was under oath. (Pl. Dep. at 519).

[9]  Plaintiff opted not to pursue the claims of age and gender discrimination that were included in her administrative complaint filed with the CHRO. (Facts ¶ 91).

a desktop computer, she would not have resigned when she did. (Facts ¶ 94). However, FMG fully complied with its obligations to make reasonable accommodations and, moreover, even if it had not, there is no evidence that FMG deliberately acted in a manner to force plaintiff to resign. Third, the purported "harassment" was nothing more than Moran's reasonable reaction to her conduct. Finally, plaintiff has failed to establish any nexus between any alleged conduct of FMG and her religion or disability.

Plaintiff cannot establish even a prima facie case of religion or disability discrimination because she was not subject to an adverse employment action. Moreover, any alleged adverse action of FMG did not occur under circumstances giving rise to an inference of discrimination. In fact, plaintiff testified that Moran issued her a highly critical performance review months before he learned that she was Jewish or that she had suffered a disabling injury. Asked why Moran and she had a poor relationship from the outset, plaintiff invariably responded with explanations such as, "he just didn't like me," "I can't speak [to] what motivates Kevin for sure," and "I don't know, I can't give an answer of why he did what he did." (Facts ¶ 95). Plaintiff even volunteered that Moran's dislike of her could have been driven by her willingness to go around Moran or over his head or that he favored loan officers with whom he had previously worked while at Shawmut. In fact, the initial directive in late 1999 to commence disciplinary action against plaintiff came to Moran from an FMG senior manager. Plaintiff has presented no admissible evidence that this individual was biased against her, much less that he even had knowledge of her religion or disability. Finally, although plaintiff may disagree with Moran's criticisms of her conduct and performance, there is no evidence upon which a reasonable juror could find that he did not genuinely believe the contents of the 2000 Counsel.

Plaintiff's claim that FMG failed to accommodate her lifting restriction upon her return from medical leave in April 2000 also fails as matter of law. It is undisputed that, in response to her requests, FMG had taken steps to procure a desktop computer for plaintiff so she did not have to carry her company issued laptop computer to and from work. In the meantime, however, as an interim accommodation, she could leave her laptop at home and take mortgage applications by hand.

Plaintiff's FMLA claim is time-barred because she did not file the Amended Complaint asserting same within the applicable statute of limitations for non-willful FMLA violations and she has failed to plead or present evidence that any alleged violations were willful within the meaning of FMLA.

## IV.   LEGAL ARGUMENT

### A.   Standard on Summary Judgment

Summary judgment shall enter if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact ... Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The substantive law of the matter identifies which facts are material. Id. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. " Id. The moving party has the initial burden of demonstrating that there is no genuine issue of material fact to be decided. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). As to any issue on which the moving party does not have the ultimate burden of proof, the moving party may

satisfy its burden by showing "that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

If the moving party satisfies its burden with respect to summary judgment, "the burden shifts to the nonmovant to proffer evidence demonstrating that a trial is required because a disputed issue of material fact exists." Weg v. Macchiarola, 995 F.2d 15, 18 (2nd Cir. 1993). To do so, the nonmoving party must set forth specific material facts indicating there is a genuine issue of fact for trial. Fed. R. Civ. P. 56(e). To combat summary judgment, "[t]he plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Id. at * 15-16. "Merely colorable" evidence is not a sufficient basis opposing summary judgment. Anderson, 477 U.S. at 249-50. In an employment suit, "when an employer provides convincing evidence that its conduct and plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer." Davila v. The City of New York, et al., 99 Civ. 1885 (RNB) (AJP), 2000 U.S. Dist. LEXIS 17012, *15 (S.D.N.Y. Nov. 20, 2000).[10]

The Second Circuit has held that summary judgment is appropriate in certain discrimination cases, regardless of the fact that such cases may involve state of mind or intent. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985) cert. denied 474 U.S. 829 (1985) ("the salutary purposes of summary judgment--avoiding protracted, expensive and harassing trials--apply no less to discrimination cases than to commercial or other areas of litigation"). Based upon the undisputed facts in this case, FMG is entitled to summary judgment on each of plaintiff's claims as a matter of law.

---

[10] A copy of each cited unpublished decision is attached hereto in the Appendix of Unpublished Decisions.

### B. Plaintiff's Claim That She Was Constructively Discharged From FMG Fails as a Matter of Law

Against the backdrop set forth above, FMG shall address plaintiff's claims, starting with her claim that she was constructively discharge on account of her religion and disability as alleged in Counts One and Two of the Amended Complaint. For the reasons discussed below, this claim fails as a matter of law.

#### 1. Plaintiff Failed to Exhaust Administrative Remedies

Before filing a lawsuit in federal court asserting claims under Title VII or the ADA, a plaintiff must first exhaust her administrative agencies by filing a charge of discrimination with the appropriate administrative agency. Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 82-83 (2d Cir. 2001); 42 U.S.C. § 2000e-5; 42 U.S.C. § 12117. Although plaintiff had already resigned her employment when she filed her complaint with the CHRO, plaintiff did not claim in CHRO Form 103-Affidavit of Illegal Discrimination that she had been constructively discharged from FMG. (Facts ¶ 91). Plaintiff readily admitted that she did not intend to make such a claim at the time she filed her administrative complaint and does not recall having ever amended her administrative complaint to add a claim of constructive discharge at a later time. (Facts ¶ 91). As such, this Court lacks jurisdiction to consider plaintiff's claim of constructive discharge. See, e.g., Holtz, 258 F.3d at 82-83; Harewood v. Beth Isr. Med. Ctr., 02 Civ. 5511 (HB), 2003 U.S. Dist. LEXIS 10002, *11-12 (S.D.N.Y. June 12, 2003) (plaintiff failed to exhaust retaliation claim when she did not allege facts setting forth such a claim and did not indicate so on her charge's cover sheet); Javier v. Beiersdorf, Inc., Civil No. 3:01cv458(AVC), 2002 U.S. Dist. LEXIS 8731

at * 16-17 (D. Conn. April 11, 2002) (plaintiff must exhaust administrative remedies in discrimination cases).[11]

### 2. No Reasonable Person Would Have Felt Compelled to Resign Under These Circumstances

Even if this Court had jurisdiction to consider plaintiff's claim of constructive discharge, the record in this case is devoid of evidence even approaching the exacting standard for proving same. An employee who has resigned her employment can sustain a claim of constructive discharge only when her employer intentionally created a work atmosphere so intolerable that she was forced to quit involuntarily. Kirsch v. Fleet St., Ltd., 148 F.3d 149, 161 (2d Cir. 1998); Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 89 (2d Cir. 1996). The Second Circuit has adopted a heightened standard for constructive discharge that requires a showing that the employer deliberately made the working conditions so intolerable so as to force the employee to resign. See Stetson v. NYNEX Serv. Co., 995 F.2d 355, 361 (2d Cir. 1993); Arnold v. United International Video Stores, 3:93cv1976 (AVC) 1994 U.S. Dist. LEXIS 20770 at * 15-16 (D. Conn. Aug. 17, 1994). Working conditions are intolerable only when, viewed as a whole, they are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Chertkova, 92 F.3d at 89.

When asked to identify all bases for her claim of constrictive discharge, plaintiff stated essentially that she resigned because FMG had failed to provide her with a desktop and she had been "harassed" by Moran upon her return from leave, including being issued a "false written warning." (Pl. Dep., at 304-07).

---

[11] As this Court has stated, the "failure to exhaust administrative remedies permits a court to dismiss the action because no subject matter jurisdiction exists ... This is especially true where Congress has designed an extensive administrative procedure to protect the interests of potential plaintiffs. Failure to follow administrative procedures in pursuing a claim of discrimination forecloses access to judicial relief." Javier v. Beiersdorf, Inc., 2002 U.S. Dist. LEXIS 8731, at * 19.

Plaintiff testified that had FMG accommodated her request for a desktop computer, she would not have resigned when she did. (Facts ¶¶ 92, 94). It is undisputed, however, that FMG was in the process of obtaining a desktop computer for her and that, in the interim, it had permitted her to leave her laptop at home, take paper mortgage applications and then electronically upload them from home. (Facts ¶ 58). The undisputed evidence shows that Moran had been in contact with the appropriate personnel within FMG in an effort to obtain such a desktop for plaintiff. (Facts ¶ 56). As Moran testified during his deposition:

> I believe at the time, Fleet was looking at finding a solution and an accommodation. I believe that the time, there was a recommendation to Linda to conduct business by keeping her laptop stationary, which I believe we recommended would be at her home and/or at another Fleet location that we would provide to her. And that . . . accommodation would be on an interim basis until such time as we could fully research and ideally implement a PC in an office that would make sense, in terms of her geographic territory.

(See Deposition of Kevin Moran, (hereinafter "Moran Dep."), at 131, excerpts of which are attached to Garofalo Aff., Exh. B).

This accommodation enabled plaintiff to perform the essential functions of her job without exceeding the lifting restrictions imposed by her physicians. As Moran testified:

> Loan officers do not use their laptops when they meet face-to-face with clients. The overwhelming majority, they meet with a customer and take a handwritten application, which they use as a reference; and they would then, typically, then input the information into the laptop and upload it.

(Moran Dep. at 133). He further testified that "it wasn't a requirement [that loan officers carry their laptops]. The requirement was just to get the job done. They did not have to carry the laptop with them." (Moran Dep. at 133). Plaintiff essentially conceded as much when she testified that she generally only needed to carry her laptop to and from work each day.[12] (Facts ¶ 60).

---

[12] Responding to questioning about why plaintiff did not simply leave her laptop at her branch office rather than carrying it home each night, plaintiff testified that she needed her laptop at home in the evenings in order to remain a "top producer." (Facts ¶ 60). She also acknowledged, however, that there was nothing to prevent her from

14

A brief delay in obtaining plaintiff's first choice of accommodation, particularly given the time being devoted to other issues involving plaintiff and the fact that she was in the process of establishing a new office location, can hardly be viewed as unreasonable. See Terrell v. USAir, 132 F.3d 621, 627-28 (11th Cir. 1998) (three month delay in providing employee with drop keyboard not unreasonable, particularly because employee had access to drop key board and was not required to type when access was not available); Hartsfield v. Miami Dade Court, 90 F. Supp. 2d 1363, 1371-73 (S.D. Fla. 2000) (granting summary judgment for employer despite ten month delay in providing special equipment and training; plaintiff had received some other accommodation and had suffered no adverse employment action); Davis v. York Int'l, Inc., Am. Disabilities Ca. (BNA) 1810, 1816 (D. Md. 1993) (three-month delay in installing special equipment not unreasonable); Powers v. Polygram Holding, 40 F. Supp. 2d 195, 202 (S.D.N.Y. 1999) (three week delay in granting request for reduced hours not unreasonable); compare Worthington v. City of New Haven, 994 F. Supp. 111, 113-14 (D. Conn. 1997) (two year delay in providing requested accommodation unreasonable).

Indeed, plaintiff knew that the desktop would not be available upon her return. She agreed to this accommodation until "hopefully a PC is available at a future date." (Facts ¶ 61). Even if plaintiff had not agreed to this particular accommodation, "the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." 29 C.F.R. §1630, appendix. In other words, the ADA "does not require the employer to provide every accommodation the disabled employee may request, so long as the accommodation provided is reasonable." Fink v. New York City Dep't of Personnel, 53 F.3d

---

staying at the branch after hours to do her work or returning in the evening to do work other than the fact that she had a husband and child at home. (Facts ¶ 60). This too would have alleviated the need to carry a laptop to and from work.