565, 567 (2d Cir. 1995); see also Gronne v. Apple Bank for Savings, 1 Fed. Appx. 64, 67 (2d

Cir. 2001). Plaintiff has failed to offer evidence that FMG's interim accommodation was

unreasonable or that, with it, she was unable to perform the essential functions of her job. Fink,

53 F.3d at 567; see also 29 CFR §1630.16, appendix ("[n]o specific form of accommodation is

guaranteed for all individuals with a particular disability").

If upon returning to work plaintiff had discovered that the accommodation she had

previously agreed to was inadequate, she was obliged to bring this to the attention of FMG. See

Adams v. Rochester Gen. Hosp., 977 F. Supp. 226, 235 (D. Conn. 1997)("[i]t is an employee's

burden to inform his employer not only of his alleged disability but also about his need for

assistance and to suggest a reasonable accommodation") citing Borkowski v. Valley Cent.

School Dist., 63 F.3d 131, 139-141 (2d Cir. 1995). Yet, there is no evidence, including within the

abundance of written correspondence from plaintiff following her return from medical leave, that

plaintiff ever informed FMG of her alleged dissatisfaction. (Facts ¶ 93).

Despite her failure to raise her this with FMG, plaintiff testified that she would not have

resigned when she did had FMG merely provided her with a desktop computer. (Facts ¶¶ 92,

94). This testimony is fatal to her claim of constructive discharge. First, an employee is not free

to resign and claim constructive discharge without first having explored less drastic alternatives.

See Larkin v. Town of W. Hartford, 891 F. Supp. 719, 728-29 (D. Conn. 1995) (reasonable

employee will thoroughly explore alternative avenues before concluding resignation is only

option), aff'd, 101 F.3d 109 (2d Cir. 1996); Williams v. City of Kansas City, 223 F.3d 749, 754

(8th Cir. 2000) ("[i]t is difficult to find an employee's resignation objectively reasonable and

subject an employer to liability for constructive discharge when the employee quits without

giving her employer a chance to fix the problem"); see also EEOC v. Sears, Roebucks & Co.,

16

233 F.3d 432, 441 (7th Cir. 2000) ("unless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress").  Second, even if FMG had failed to fulfill its obligations under the law, a mere failure to accommodate a disability standing alone cannot substantiate a claim of constructive discharge.  To hold otherwise would "convert every failure to accommodate under the [ADA] into a potential claim for constructive discharge." Johnson v. Shalala, 991 F.2d 126, 131 (4th Cir. 1993) (even though employer's accommodation attempts fell well short of requirements of Rehabilitation Act, this failure did not constitute evidence that the employer intended that employee quit).  Rather, a plaintiff "must present some evidence that the employer intentionally sought to drive her from her position." Id. at 132.  This plaintiff has failed to do.  Thus, to the extent her entire claim for resigning when she did rests upon FMG's purported failure to accommodate her disability, her claim of constructive discharge fails as a matter of law.

In light of plaintiff's testimony she would not have resigned when she did had FMG provided her with a desktop, there is no need for this Court even to reach Moran's alleged harassment as a fact supporting plaintiff's claim of constructive discharge. (Facts ¶ 92). Nonetheless, both in an abundance of caution and because Moran's alleged harassment is relevant to the other aspects of plaintiff's discrimination claims, FMG will analyze this assertion.

During her deposition, plaintiff was asked to identify specific instances of harassment that prompted her resignation.  First plaintiff claimed that Moran continually threatened to terminate her employment. (Pl. Dep. at 304).  However, plaintiff admitted that these "threats" only happened three times following her return from medical leave in April 2000, once when Moran delivered the 2000 Counsel and stated that she would be terminated if she did not improve, the 2000 Counsel itself which reiterated that failure to improve could result in

termination and once when Moran purportedly advised plaintiff that her employment would be terminated if she did not vacate the Orange branch following his instruction that she do so.[13]  (Pl. Dep. at 308-313).  As Moran testified, "I believe the stage we were at, at the time that Linda returned to work, was to address what we felt were issues that needed to be addressed, to develop a plan to get back on the right track, and to encourage her to be successful at Fleet." (Moran Dep. at 130).  Far from harassment that could be viewed as evidence of an intent to force plaintiff to resign, Moran was merely implementing the initial steps of progressive discipline by putting plaintiff on notice of areas in need of improvement and informing her of the consequences of continued nonperformance.

Second, plaintiff testified that Moran "harassed" her by issuing the 2000 Counsel. Plaintiff's reliance upon the 2000 Counsel itself as evidence of harassment to support her constructive discharge claim is misplaced. See, e.g.,  Weeks v. New York State (Div. of Parole), 273 F.3d 76, 85 (2d Cir. 2001) ("a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action"); Stembridge v. City of N.Y., 88 F. Supp. 2d 276, 283 (S.D.N.Y. 2000) (receipt of a written reprimand warning that repetition of improper behavior could result in disciplinary action was not an adverse employment action); see also discussion infra at 22-25.

Moreover, as discussed infra at pp. 29-31, although plaintiff may disagree with the substance of the 2000 Counsel, she has not presented evidence demonstrating that Moran did not genuinely believe the content of the Counsel when he issued it nor the information from Tartaglio, the mortgage loan customer and others.  See Spence v. Maryland Casualty Co., 995 F.2d 1147, 1156 (2d Cir. 1993) (evidence that the employee disagreed with the employer's

---

[13]     Moran did not instruct plaintiff to vacate the Orange branch (i.e., remove her belongings), just that she turn in the keys to the branch.  (Facts ¶ 71).

criticisms cannot support claim of constructive discharge); Stetson v. NYNEX Serv. Co., 995 F.2d at 361 (plaintiff cannot establish constructive discharge by showing that he was displeased with assignments and/or quality of work was unfairly criticized); see also Mauro v. Southern New England Telephone, 46 F. Supp. 2d 181, 186 (D. Conn. 1999) ("[a] claim of constructive discharge does not result from evidence that the employee disagreed with the employer's criticisms of her work, that he did not receive a raise, or that he preferred not to continue working for that employer"). Moreover, to the extent plaintiff will inevitably seek to cast doubt on the validity of the criticisms, "[a]n employer is only responsible for employment decisions based on information available to it … ." Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 725 (2d Cir. 1994).[14]

Plaintiff next cites the removal of the Orange branch and the failure to replace it with a new branch as evidence of Moran's purported harassment. It is, however, undisputed that it was Norris who asked Moran to assign a different loan officer to the branch. (Facts ¶ 48). Moran, who did ask Norris to reconsider, had little choice but to accede to her request. (Facts ¶¶ 38, 48). That FMG did not provide plaintiff with a new branch to replace the Orange branch is not, as plaintiff claims, evidence of "harassment." It was plaintiff's own unprofessional conducted that caused her to lose the branch and, moreover, Moran had removed branches from other loan officers and not replaced them with equivalent branches. (Facts ¶ 69). Further, even if plaintiff had anticipated that the removal of the Orange branch and the lack of a replacement branch would have led to intolerable working conditions, rather than quitting, she was obliged to stick it out to see whether the anticipated environment did in fact materialize. See, e.g., Garner v. Wal-

---

[14]    Indeed, three years earlier Moran had issued plaintiff a Counsel that she had vigorously disputed, yet she had not felt compelled to resign at that time (nor was she terminated despite similar language in that Counsel to the effect that further incidents could lead to termination). (Facts ¶¶ 15, 16).

Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987) (part of an employee's obligation is not to assume the worse).

Plaintiff's final "fact" supporting her claim of intolerable harassment by Moran was the fact that the Fleet Bank branch that was to serve as her central office following the removal of the Orange branch had no elevator and required her to walk up two flights of stairs. (Pl. Dep. at 306). There is, however, no evidence to suggest that plaintiff ever expressed any concern about this branch, that she put FMG on notice or presented medical information that she was unable to climb stairs due to her alleged disability or that she sought any type of further accommodation. (Facts ¶ 77). Further, FMG did not force plaintiff to set up an office in this branch nor was plaintiff without other alternatives. (Facts ¶ 77).

Even accepting all of plaintiff's claims of failure to accommodate and harassment as true, there is insufficient evidence upon which a rational fact finder could find that Fleet had deliberately made conditions so intolerable that a reasonable person would have felt compelled to resign. Compare Kader v. Paper Software, 111 F.3d 337, 339 (2d Cir. 1997) (humiliation and stress of working under the direct supervision of a person who was conducting a sexual relationship with his wife, and in proximity to the new couple, held insufficient to create constructive discharge); Stetson v. NYNEX Serv. Co., 995 F.2d 355, 361 (2d Cir. 1993) (unfair criticisms, harsh supervisor, poor assignments and demotion not deemed constructive discharge); Martin v. Citibank, N.A., 762 F.2d 212, 221 (2d Cir. 1985) (supervisor's unnecessary announcement to coworkers that plaintiff had been polygraphed with respect to missing money at another branch of the bank, unfounded complaints as to plaintiff's attitude, and interference with plaintiff's ability to perform her duties insufficient to sustain constructive termination claim); see also Clowes v. Allegheny Valley Hospital, 991 F.2d 1159, 1162 (3d Cir. 1993) cert.

denied 510 U.S. 964 (1993) (evidence of hypercritical supervision fell well short of permitting an inference of constructive discharge, even if treatment was unfair and unwarranted).

Finally, a claim of constructive discharge is meaningless unless plaintiff could establish a nexus between the allegedly intolerable conditions and her protected class status. Durley v. APAC, Inc., 236 F.3d 651, 658 (11th Cir. 2000) (no causal link between actions creating intolerable working conditions and alleged discrimination); Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998) (no link between additional job responsibilities and any alleged protected activity). As discussed infra pp. 21-34, plaintiff has presented no credible evidence to support that any of FMG's actions were connected to her religion or disability and, as such, her claim of constructive discharge fails as a matter of law and this Court should grant summary judgment on plaintiff's claims of constructive discharge in Counts One and Two of the Amended Complaint.

**C.    Fleet is Entitled to Judgment on Plaintiff's Religious Discrimination Claim as a Matter of Law**

In Count Two of the Amended Complaint, plaintiff claims that FMG discriminated against her on account of her religion. Absent direct evidence of discrimination, a plaintiff's claim of religious discrimination under Title VII is analyzed under the familiar three-step burden shifting analysis laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this analysis, plaintiff has the initial burden to establish a prima facie case of discrimination by showing that: (1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstance gave rise to an inference of discrimination. See McDonnell Douglas, 411 U.S. at 802; Soars v. University of New Haven, 154 F. Supp. 2d 365, 372 (D. Conn. 2001).

21

If plaintiff succeeds in setting forth her prima facie case, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). Once the defendant sets forth such a reason, any presumption arising from the prima facie case evaporates. In order for the matter to continue, plaintiff must then come forward with evidence that the defendant's proffered reason is a mere pretext for unlawful discrimination. See Reeves, 530 U.S. at 146-49. Even if a plaintiff produces evidence sufficient to establish a prima facie case and to cast doubt on the employer's proffered reason for its actions, summary judgment is still appropriate when the evidence viewed as a whole would not permit a jury to conclude that discrimination had occurred. James v. New York Racing Ass'n, 233 F.3d 149 (2d Cir. 2000).

**1.    Plaintiff Cannot Establish a Prima Facie Case of Religious Discrimination.**

Plaintiff cannot meet her burden to establish even a prima facie case of discrimination. She has failed to adduce evidence that she was subject to an adverse employment action and, moreover, the circumstances of any alleged adverse action do not give rise to an inference of discrimination.

**a.    Plaintiff Did Not Suffer an Adverse Employment Action.**

Although plaintiff presumably will claim that the adverse action supporting the third prong of the prima facie case was her alleged constructive discharge, as discussed supra at pp. 13-21, such claim fails as a matter of law. Thus, the only "adverse employment actions" plaintiff can seek to rely upon following her return from medical leave in April 2000 were Moran's

22

issuance of the 2000 Counsel and the reassignment of the Orange branch.[15]  However, neither

event constituted an adverse employment action within the meaning of the law.  As summarized

by the Second Circuit, an adverse action by an employer "is a 'materially adverse change in the

terms and conditions of employment.'"  Weeks, 273 F.3d at 85, quoting Galabya v. New York

City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000).  Sufficiently serious actions that might meet

this standard include "termination of employment, a demotion evidenced by a decrease in wage

or salary, a less distinguished title, a material loss of benefits, significantly diminished material

responsibilities, or other indices . . . unique to a particular situation."  Id.  It must "affect[]

employment in a way that is both detrimental and substantial."  Weeks, 273 F.3d. at 87.  In

Weeks, the Court concluded that the issuance of a "Notice of Discipline" and a "Counseling

Memo" and plaintiff's forcible transfer to another office among other things, did not constitute

"adverse action" for purposes of establishing a prima facie case of discrimination.  With regard

to the disciplinary action, the Court of Appeals observed the absence of any facts from which a

jury could infer that it had had any serious affect on her working conditions, stating that "a

criticism of an employee (which is part of training and necessary to allow employees to develop,

improve and avoid discipline) is not an adverse employment action."  Id. at 86.  As to the

allegation that the plaintiff in Weeks had been forced to relocate to another office, the Court

opined that no matter how unpleasant, the move had no "tangible adverse effect . . . on the terms

and conditions of [plaintiff's] employment."  Id. at 87.

     Similarly, in this case, there is no evidence that the 2000 Counsel had a material effect on

plaintiff's employment.  Plaintiff was compensated on a commission, not salary, basis.  (Facts ¶

64).  The Counsel did not, accordingly, have any impact on her compensation.  (Id.).  Although

---

[15]    Plaintiff may also claim that she received a poor evaluation from Moran before she went out on medical leave in 2000, however for the reasons discussed, below, a poor evaluation is also not an "adverse employment action."

the 2000 Counsel provided that further disciplinary action could lead to termination, it is undisputed that plaintiff was not terminated.  In fact, the 2000 Counsel was only the second step in the progressive discipline process, the next would have been a Step #3 – Reprimand.  (Facts ¶ 14).  Plaintiff knew that termination was not an inevitable consequence of receiving a Step #2 – Counsel because she had been issued one in 1997 and remained in FMG's employment some three years later.  (Facts ¶ 15).

Thus, as discussed above, the 2000 Counsel was merely one step in a progressive disciplinary process designed to avoid termination by putting employees on notice of their deficiencies.  Moran testified that "[t]he idea of the formal counsel is not to accuse our employees of being guilty of a particular behavior, it is to address a performance issue and then try to discuss [corrective] measures." (Moran Dep. at 37).  He also testified that "I believe the stage we were at, at the time that [plaintiff] returned to work, was to address what we felt were issues that needed to be addressed, to develop a plan to get back on the right track, and to encourage her to be successful at Fleet." (Moran Dep. at 130).  Under no circumstances could this step in the progressive discipline process be deemed to constitute a materially adverse change in the terms and conditions of plaintiff's employment.  See also Mathurin v. Skrivaneck, 00 Civ. 1762, 2003 U.S. Dist. LEXIS 10200 at *32-33 (S.D.N.Y. June 5, 2003) adopted by Mathurin v. Skrivaneck 00 Civ. 1762 (RMB)(MHD), 2003 U.S. Dist. LEXIS 11396 (S.D.N.Y. July 2, 2003)(counseling memos and notice of discipline did not constitute adverse employment action); Satterfield v. United Parcel Service, 00 Civ. 7190, 2003 U.S. Dist. LEXIS 17229 at *33, 34 (S.D.N.Y. Sept. 28, 2003) (issuance of verbal and written warnings, being placed on "Notice of Discharge" in the event of future violations of company policy and being escorted out of workplace by security not deemed adverse employment action).

24

Similarly, no reasonable jury could find that the removal of the Orange branch created a materially adverse change in the terms and conditions of plaintiff's employment. Although plaintiff may attempt to claim that she faced the prospect of reduced compensation due to a loss of referrals from the Orange branch, this concern was entirely speculative. First, this assertion is belied by the content of her own admission to another loan officer just months earlier that "we probably all get only a few deals a year from each branch". (Facts ¶ 23). Second, as Moran testified, "there was still a very viable opportunity [for plaintiff] with the remaining branches. In addition, . . . the number of branches that a loan officer has does not preclude them from all the various types of outside business developments at their disposal." (Moran Dep. at 130-31). To the extent plaintiff claims that the removal of the branch impacted her ability to meet with her customer base, as Moran explained, loan officers "would take applications normally where the customer requested that they meet which could be a bank branch, . . . the mortgage sales office [in Seymour], . . . the customer's home, . . . the customer's place of business, a realtor office . . . or other location." (Facts ¶ 57). Plaintiff was in the process of establishing a central office in Milford and also had other branches within her disposal as well. While it may have been less convenient for plaintiff to meet with customers at a different location, "not everything that makes an employee unhappy is an actionable adverse action." Markel v. Board of Regents of Univ. of Wis. Sys., 276 F.3d 906, 911 (7th Cir. 2002).

**b.    Any "Adverse Action" Did Not Occur Under Circumstances Giving Rise to an Inference of Religious Discrimination.**

Plaintiff has also failed to present evidence on the fourth prong of her prima facie case, namely, that the 2000 Counsel was issued or that the Orange branch was reassigned under circumstances giving rise to an inference of discrimination. Plaintiff's own testimony belies her conclusory assertions of unlawful religious discrimination. Plaintiff claims Moran first learned

that she was Jewish in October 1996 and then gave her a poor review in January 1997. (Facts ¶¶ 5-7). However, Moran actually prepared his first performance review of plaintiff, in which he rated her performance as "Needs Improvement" and cited numerous areas in need of improvement, some eight months before he allegedly learned she was Jewish. (Id.). That review identified the precise conduct issues outlined four years later in the 2000 Counsel. (Facts ¶ 6).

Furthermore, to the extent plaintiff contends Moran started treating her differently after he purportedly learned she was Jewish, her performance reviews steadily improved over the course of the next three annual performance reviews. (Facts ¶¶ 11, 13, 19-20). Plaintiff has offered no plausible reasons, much less admissible evidence, to explain this obvious flaw to her claim that Moran began treating her unfairly once he learned she was Jewish. Indeed, plaintiff testified that she and Moran had never had a good or friendly working relationship. (Facts ¶ 4).

With regard to the removal of the Orange branch, the circumstances do not in any way suggest that plaintiff's religion was a factor. On the contrary, the undisputed facts reveal that it was Norris, nor Moran, who requested that plaintiff be reassigned. (Facts ¶ 48). Plaintiff has offered no admissible evidence to suggest that Norris was motivated by any discriminatory animus against plaintiff on account of her religion. Additionally, plaintiff admitted that Moran had removed branches from other loan officers whom she did not know to be Jewish and had not replaced them with equivalent branches. (Facts ¶ 69).

Plaintiff undoubtedly will seek to rely upon four isolated remarks she claims Moran made during the course of her employment at FMG.[16] However, plaintiff cannot recall when these alleged remarks occurred, has no record of these alleged remarks, has not clearly identified a

---

[16]    Plaintiff contends that during one FMG holiday party, Moran commented on the little Jewish girl singing Christmas carols, that he boasted about his grandfather who allegedly been in the German war (which is not even true), that he once referred to a customer as a Johnny Maneshevitz and that he said that anyone who does not work on Good Friday must be an atheist. Although these allegations must be taken as true for purposes of summary judgment, Moran has denied making any of these alleged statements. (Pl. Dep. at 169-179).

witness to any of these alleged remarks and seems to have no specific recollection of ever having complained about them.[17]  (Pl. Dep. at 185, 187-88).  These alleged remarks, while referencing religion, do not demonstrate that Moran held a discriminatory animus toward Jewish people.[18]  Furthermore, even if the comments were deemed to be anti-Semitic in nature, such stray remarks do not constitute evidence of discrimination.  See Campbell v. Alliance Nat'l Inc., 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) (isolated stray remark insufficient to establish racial animus and defeat a motion for summary judgment).[19]  Further, there is no evidence that these alleged remarks were made in temporal proximity nor that they were in any way connected to the allegedly adverse employment actions at issue in this case.  As such, they are irrelevant and cannot serve as a basis for an inference of discrimination.  See Morris v. New York City Dep't of Sanitation, No. 99 Civ. 4367, 2003 U.S. Dist. LEXIS 5146, 2003 WL 1739009, at *20 (S.D.N.Y. Apr. 2, 2003) ("stray remarks in the workplace, by themselves, and without a demonstrated nexus to the complained of personnel actions, will not defeat the employer's motion for summary judgment"); Tutko v. James River Paper Company, Inc., No. 3:96CV1256(AVC), 1998 U.S. Dist. LEXIS 20614 at *13 (D. Conn. Sept. 29, 1998), citing Ezold v. Wolf, Block, Schorr, and Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992) ("[s]tray remarks by non-decision makers or

---

[17]    Plaintiff testified that she believes she did mention Moran's alleged remarks once to Rachel Paquin during the 1996 or 1997 timeframe.  (Pl. Dep. at 185, 187).  Paquin, in turn, has no recollection of having received such complaint and believes, if she had, she would have investigated it in accordance with FMG policies. (Facts ¶ 81). As plaintiff also testified, however, she may have only complained to Paquin about Moran's treatment of her in general.  It is highly significant that plaintiff did not bring up any alleged anti-Semitic remarks much less complain to Paquin that Moran was biased against her on account of her religion in connection with Paquin's review of the 2000 Counsel. (Facts ¶ 80).

[18]    Plaintiff did not see anything inappropriate with her references to one employee as "Miss Born Again" or another as an "Afro. American branch manager".

[19]    Courts in this Circuit have seen fit to grant and/or affirm summary judgment in cases with far more egregious remarks by decision makers than those alleged here.  See Woroski v. Nashua Corp., 31 F.3d 105, 108 (2d Cir. 1994) (affirming summary judgment in age discrimination case where decision maker allegedly said that the "salary work force [] was older, had been around too long, made too much money and enjoyed too many benefits"); Rinsler v. Sony Pictures Engm't, Inc., 02 Civ. 4096 (SAS), 2003 U.S. Dist. LEXIS 14754, *23-24 (S.D.N.Y. Aug. 22, 2003) (granting summary judgment in race discrimination cause despite comment that plaintiff "as a white person, could not be sensitive to black issues").

by decision-makers unrelated to the decision process are rarely given weight, particularly if they were made temporally remote from the date of decision").

### 2. FMG has Offered Legitimate Non-Discriminatory Reasons for its Actions.

Even if plaintiff could establish the elements of a prima facie case, FMG has met its burden to articulate a legitimate reason for any alleged adverse employment action.  In particular, Moran issued the 2000 Counsel and reassigned the Orange Fleet Bank branch upon being presented with credible evidence from others that plaintiff had acted unprofessionally in interactions with co-workers and branch personnel.[20]  Throughout their years together, Moran had witnessed and documented plaintiff's histrionics and unprofessionalism in her dealings with Moran and with her co-workers.  Dating back to her first annual performance review from Moran and continuing through to the date of her resignation, plaintiff never accepted constructive criticism and denied any and all wrongdoing on her part.  (See, e.g., Facts ¶¶ 10, 12, 16; Pl. Dep. at 470-72).  Contrary to plaintiff's assertions, the undisputed evidence shows that Moran provided plaintiff with more than ample opportunity to dispute the content of the 2000 Counsel, but her familiar refrain that she was not to blame did not, in Moran's judgment, warrant rescission of the Counsel.  Although plaintiff may disagree that her conduct was unprofessional, she has admitted to engaging in certain conduct that Moran found problematic, including expressing her belief to Tartaglio that she had taken the customer's side because of a "personal relationship" with the customer, suggesting to the customer that his wife should help out more, referring to another loan officer as "Miss Born Again" and characterizing a Fleet Bank branch manager who had previously requested that plaintiff be removed from her branch merely as one

---

[20]     The 2000 Counsel also raised issues with plaintiff's loan quality and attendance.  (Facts ¶ 62).

"Afro. American" branch manager preferring to have an "Afro. American" loan officer.[21] (Facts

¶¶ 32, 43, 44, 73). Furthermore, Paquin's interviews of approximately seventeen individuals

substantiated the validity of the 2000 Counsel. (Facts ¶ 82). Thus, FMG has articulated

legitimate reasons for any so-called adverse action. See, e.g., Selenke v. Medical Imaging of

Colo., 248 F.3d 1249, 1259 (10th Cir. 2001) (employee discharged for inciting conflicts with co-

workers); Hoffman v. MCA, Inc., 144 F.2d 1117, 1123-24 (7th Cir. 1998) (plaintiff discharged

for making inappropriate remarks at sales meeting and prior incidents of disruptive behavior);

Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1082 (6th Cir. 1994) (plaintiff

discharged for being argumentative, confrontational with co-workers and superiors and being

generally considered "obnoxious").[22]

### 3.    No Rational Trier of Fact Could Find that Defendant's Proffered Reasons Were False, Much Less That The Real Reason Was Intentional Discrimination

In defending a claim of discrimination, an employer need not be correct in taking the

action that it did; all that is required is that it genuinely believed that the action was warranted.

See Dister v. The Continental Group, Inc., 859 F.2d 1108, 1116 (2d Cir. 1988) (evidence that

employer made poor business decision generally insufficient to set forth genuine issue of

material fact; "reasons tendered need not be well advised, but merely truthful"); Graefenhain v.

Pabst Brewing Co., 827 F.2d 13, 20 (7th Cir.1987) ("[a] business decision need not be good or

even wise. It simply has to be nondiscriminatory ..."), quoting Dister, 859 F.2d at 1116; see also

Cavuoto v. Oxford Health Plans, 3:99CV446(EBB), 2001 U.S. Dist. LEXIS 14357 at *11 (D.

Conn. June 13, 2001) (court cannot second guess the business decisions of defendant, even if

---

[21]     Plaintiff also admitted to conduct following the issuance of the 2000 Counsel that was improper, including disobeying Moran's directive that she not go to the Orange Bank branch alone and that she turn her key into him. (Facts ¶ 71-72).
[22]     In contrast to these cited cases, FMG did not even terminate plaintiff, it simply issued her a counsel.

they seem unjust or unfair); Mauro, 46 F. Supp. 2d at 186 (summary judgment granted; business

reason simply unsound, not discriminatory); Pugh v. City of Attica, 259 F.3d 619, 629 (7th Cir.

2001) ("[e]ven if the [employer's] action appears precipitous under the circumstances, we are not

in a position to question the wisdom of a decision that was honestly made"); Roberts v.

Separators, Inc., 172 F.3d 448, 453 (7th Cir. 1999) (it is insufficient for plaintiff to prove he did

not make alleged statements that defendant thought amounted to bad attitude; plaintiff must

prove that defendant did not honestly believe he had made them).  Plaintiff has not presented any

evidence upon which a jury could find that Moran did not genuinely believe that any alleged

adverse actions were warranted under the circumstances.

    Even if plaintiff could raise questions about the propriety of any aspect of the 2000

Counsel, the evidence as a whole would not permit a finding that plaintiff was subject to

unlawful discrimination on account of her religion.  Throughout her deposition, plaintiff testified

in circular fashion that the evidence underlying her claim of discrimination was that Moran had

treated her unfairly.  (See, e.g., Pl. Dep. at 368-69.) However, at various times, plaintiff testified

that it was possible that Moran simply did not like her.  (Pl. Dep. at 161-62, 389).  Plaintiff even

offered other perfectly lawful reasons for his treatment, including that she (apparently unlike

Moran) was "customer oriented" and went over Moran's head if he did not respond to her

quickly enough and that he may have favored the loan officers with whom he had previously

worked at Shawmut.  (Pl. Dep. at 160-63, 196-97).

    Plaintiff has likewise failed to offer relevant, admissible evidence that similarly situated

non-Jewish employees were treated more favorably under similar circumstances.  In fact,

plaintiff testified that Moran had removed other individuals' branch offices, but that on at least

two occasions did not provide them with equal branches to make up for it.  Plaintiff did not

believe these individuals to be Jewish.  (Facts ¶ 69).

Based on the utter lack of evidence to substantiate her claim of religious discrimination,

judgment should be granted on Count Two of the Amended Complaint as a matter of law.

### D.    Fleet is Entitled to Judgment on Plaintiff's Disability Discrimination Claim as a Matter of Law

In Count One of the Amended Complaint, plaintiff claims that FMG discriminated

against her on account of her disability in violation of the ADA.  As with plaintiff's claims of

religious discrimination, she has offered no admissible evidence demonstrating that any of

FMG's actions were based on an alleged disability.  Application of the same three-step burden

shifting analysis discussed supra at p. 21-22, confirms that plaintiff cannot establish a prima facie

case of disability discrimination and, even if she could, no rational jury could find that FMG's

proffered reasons for its actions were a mere pretext for unlawful discrimination.

### 1.    Plaintiff Cannot Establish a Prima Facie Case of Disability Discrimination.

As discussed supra at pp. 22-25, none of the alleged actions that plaintiff complains of

amounted to an "adverse employment action" within the meaning of the law.  Furthermore, the

2000 Counsel and the removal of the Orange branch did not occur under circumstances that, as a

matter of law, give rise to an inference of discrimination.

As a preliminary matter, plaintiff testified that she sustained the injury that caused her to

become disabled in or about April 1996 and that Moran did not learn of the injury until the

following month.  Yet, plaintiff testified that her relationship with Moran was strained from the

outset, that he had never liked her or treated her well and acknowledged that Moran had given

her a poor performance review that she had disputed even before she had suffered her

purportedly disabling back injury.  (Facts ¶¶ 4, 9, 95).  She also cannot explain why, were Moran

inclined to discriminate against on the basis of her disability, his reviews of her performance would have improved for three consecutive years after he allegedly learned of her back injury. Moreover, according to plaintiff, at no time did Moran ever make any type of derogatory comments about her physical condition. (Pl. Dep. at 213).

At her deposition plaintiff identified at least five FMG employees reporting to Moran whom she claims had sustained similar back injuries from lifting computer equipment, some of whom had allegedly been out of work due to their injuries or related surgeries. Yet, plaintiff readily admitted time and time again during her deposition that Moran treated these employees well, even promoting at least one of them. (Facts ¶ 96). Thus, plaintiff's own testimony belies any claim that Moran harbored animus against employees who suffered from disabilities or took medical leaves of absence.

The only evidence plaintiff appears to rely upon to support her claim of disability discrimination is the temporal proximity between her return from medical leave in April 2000 and the issuance of the 2000 Counsel and removal of the Orange branch. (Pl. Dep. at 375). However, the undisputed facts reveal that Moran was directed by a member of senior management[23] to prepare a counsel in December 1999 and that Moran had planned on meeting with plaintiff to orally counsel her about professionalism, communication, work relations and attendance at meetings before she went out on medical leave in January 2000. (Facts ¶ 33). The undisputed facts also reveal that, while plaintiff was on medical leave, Moran was advised of certain conduct, including her heated exchange with Tartaglio and the customer's dissatisfaction, that led him to conclude that a Step #2 – Counsel, rather than an oral counsel, was warranted. (Facts ¶¶ 40-44). Finally, as a direct result of plaintiff's conduct prior to her return from medical

---

[23] Plaintiff has presented no evidence to suggest that this manager had any knowledge that plaintiff suffered from an alleged disability.

leave, Norris requested that Moran remove plaintiff as the loan office assigned to her branch.

(Facts ¶ 48). Under these circumstances, the mere temporal proximity between any alleged

adverse employment action and plaintiff's return from medical leave cannot give rise to an

inference of discrimination.

### 2.    FMG has Offered Legitimate Non-Discriminatory Reasons for its Actions.

As discussed supra at p. 28-29, FMG has met its burden to present evidence of its

legitimate, non-discriminatory reasons for issuing the 2000 Counsel and removing the Orange

branch, which are duly incorporated as if set forth in full herein.

### 3.    Plaintiff Has Failed to Present Credible Evidence that FMG's Proffered Reason is False or that the Real Reason is Unlawful Discrimination.

As discussed supra at pp. 29-31, plaintiff has failed to offer any competent evidence to

cast doubt on the veracity of FMG's stated reasons for its actions.  Instead, she seeks to rely

entirely upon her self-serving claims that she did nothing wrong and likely hopes to engage this

Court in the futile exercise of determining who was right and who was wrong about every detail

of every action that led FMG to commence the disciplinary process.  However, as discussed

supra at p. 29-31, the only question for this Court is whether plaintiff has presented sufficient

evidence upon which a reasonable jury could find that Moran did not honestly believe that the

facts and circumstances warranted the disciplinary actions that he took.  For all of the reasons

previously identified, FMG submits that she has not.

Finally, even if plaintiff could establish a prima facie case of disability discrimination and

show the existence of a material fact on whether FMG's proffered reasons were true, the totality

of evidence does not support a finding of unlawful disability discrimination.  Rather, the

evidence demonstrates that plaintiff had been a thorn in Moran's side since the very outset of

their working relationship. It also shows that plaintiff clashed with any number of other employees while working at FMG. Plaintiff's own caustic e-mails reveal what Moran and others were forced to deal with on a day-to-day basis. Yet, plaintiff continues to believe that at no time during the entirety of her employment did she ever comport herself unprofessionally. (Pl. Dep. at 471-72, 483). In light of the undisputed evidence demonstrating FMG's reasonableness and restraint in its dealings with plaintiff, no rational jury would deliver a verdict for plaintiff on her claim of disability discrimination.

**E.    FMG is Entitled to Judgment on Plaintiff's Failure to Accommodate Claim Under the ADA as a Matter of Law**

In Count One of the Amended Complaint, plaintiff claims that FMG violated the ADA by failing to provide her with a desktop computer in addition to her laptop computer as an accommodation for her alleged disability. The ADA requires employers to make reasonable accommodations for the known disabilities of its employees to enable them to perform the essential functions of their position. 42 U.S.C. § 12112, et seq.

To establish a prima facie case of failure to accommodate under the ADA, plaintiff must present evidence that (1) she was a disabled person within the meaning of the ADA; (2) FMG had notice of her disability; (3) with reasonable accommodation she could have performed the essential functions of her job; and (4) FMG refused to make such accommodations. Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6 (2d Cir. 1999). As discussed supra at pp. 14-17, plaintiff has failed to present evidence that FMG failed to provide her with a reasonable accommodation to enable her to perform the essential functions of her position. As such, her claim fails as a matter of law.

F.    **Fleet is Entitled to Judgment on Plaintiff's FMLA Claim as a Matter of Law Because The Claim is Time Barred and Plaintiff Cannot Establish Retaliation**

In Count Three of the Amended Complaint, plaintiff claims FMG retaliated against her for taking a medical leave of absence pursuant to the FMLA. This claim is, however, time-barred because plaintiff has failed to plead, nor is there competent evidence to support, that FMG willfully violated the FMLA.

Generally, claims under the FMLA must be brought within two years of the alleged actionable event. 29 U.S.C. § 2617(c)(1). Only when the conduct alleged constitutes a willful violation of the FMLA does a three-year statute of limitations apply. 29 U.S.C. § 2617(c)(2). Plaintiff did not file her FMLA claim within two years of May 24, 2000, the latest date any alleged FMLA violation could have occurred. Thus, her only claim arising under the FMLA must be one for a willful violation. However, the Amended Complaint does not allege, and plaintiff has not presented admissible evidence to support a finding, that FMG knew or showed reckless disregard to whether its conduct was prohibited by the FMLA as is required to state a cause of action for a willful violation of the FMLA. See McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988); Hanger v. Lake County, et al., Civil No. 011506 (RHK/RLE) 2002 U.S. Dist. LEXIS 25403 at *12-13 (D. Minn., Dec. 31, 2002); but see Nero v. Industrial Molding Corp., 167 F.3d 921, 929 (5th Cir. 1999) (declining to incorporate "reckless disregard" standard to establish willful violation).

It is undisputed that between 1999 and 2000, plaintiff was provided with far more leave time than is required under the FMLA[24] and there is no evidence to suggest that upon completion of her leaves she was not restored to her prior position. Thus, her claim appears to be that she

---

[24]    Within a twelve month period, plaintiff took approximately twenty-four weeks of medical leave. (See Amended Complaint, ¶¶ 28, 32-33).

35

was willfully retaliated against for taking an FMLA leave. Plaintiff testified, however, that as

many as five other employees reporting to Moran may have taken FMLA leaves and that, unlike

her, none of them had been subjected to any adverse actions. (Facts ¶ 96). The evidence

plaintiff has cited to support her claim that she was retaliated against for having taken a leave

under the FMLA is identical to that cited to support her claim of disability discrimination. Thus,

for the reasons discussed <u>supra</u> at pp. 31-34, plaintiff's claims arising under the FMLA fail as a

matter of law.

**V.    CONCLUSION**

For all of the foregoing reasons, Fleet respectfully requests that this Court grant its

Motion for Summary Judgment on all counts of the Amended Complaint.

Respectfully submitted,

THE DEFENDANT
WASHINGTON MUTUAL BANK, FA as
successor in interest by operation of law to
Washington Mutual Home Loans, Inc., the
successor by merger to Fleet Mortgage Corporation

By:    Beverly W. Garofalo
————————————————
Beverly W. Garofalo (ct11439)
Brown Raysman Millstein Felder
 & Steiner, LLP
CityPlace II, 10th Floor
185 Asylum Street
Hartford, CT  06103
(860) 275.6400

## **CERTIFICATION**

This is to certify that on November 17, 2003, a true copy of the foregoing Memorandum of Law in Support of Defendant's Amended Motion for Summary Judgment was sent via first-class mail, postage prepaid, to:

Ellen M. Telker, Esq.
564 Boston Post Road
Milford, CT  06460

_____
Beverly W. Garofalo

37