Ungerleider vs Fleet Mortgage Group

5/8/2003                                                              Linda Ungerleider

Page 15

 1

 2                              (Defendant's Exhibit No. 1,

 3                              2000 commission plan, marked

 4                              for identification.)

 5

 6     BY MS. GAROFALO:

 7     Q    Can you tell me what that document is?

 8     A    This is a commission plan contract that's

 9          signed every year.

10     Q    And can you turn to the last page of this

11          document.  Is that your signature?

12     A    That's my signature.

13     Q    Did you ever represent to anybody that that was

14          not your signature?

15     A    I don't believe that this last page -- when --

16          in all my other commission contracts when I

17          signed it, I signed it with a day of a month,

18          not just the month and the year, but it

19          included a day of the month.  There's question

20          whether or not I signed in January because I

21          was out on disability leave most of the month.

22     Q    I'll repeat the question then.  Is that your

23          signature?

24     A    That's my signature next to "Employee

25          signature."  I question whether or not that's

Brandon Smith Reporting Service

d4b99268-03b9-477f-bc3a-f009df837d6a

Ungerleider vs Fleet Mortgage Group

5/8/2003                                                    Linda Ungerleider

Page 16

1          my dating, the date that I would write in.

2     Q    So you do not dispute that you signed this 2000

3          commission plan?

4     A    I don't dispute that this page was signed at

5          some time or something thereof.  The dates --

6          the zeros on this page on one line are

7          detached.  On the second line, they're attached

8          the same way the zeros are attached when Kevin

9          Moran signed it.  So I question whether this

10         date is my date of the signature.

11    Q    But you're not questioning that you did, in

12         fact, sign this document?

13    A    No.

14    Q    So that is your signature after "Employee

15         signature?"

16    A    Signature -- just the date is in question of

17         when it was actually signed.

18    Q    Did you handwrite your name?

19    A    Yes.

20    Q    So you wrote "Linda," and you signed this

21         document?

22    A    I signed it, but I don't believe I dated it.

23    Q    Do you think somebody else put the date?

24    A    It's not the way I date my contracts.

25    Q    The question is:  Do you think somebody else

Brandon Smith Reporting Service

Page 23

1          that correct?

2     A    I'm suggesting the possibility.  I don't know

3          if that's true.

4     Q    Do you recall looking at the 2000 commission

5          plan sometime in April of 2000?

6     A    I don't recall it, and the first time I saw

7          this commission plan was after I filed the

8          claim.

9     Q    Okay.  So it's your testimony here today that

10         prior to you filing this lawsuit you never saw

11         your 2000 commission plan?

12    A    To the best of my recollection, no.  I wasn't

13         at work long enough.

14    Q    That's not -- there's no question pending.  Did

15         there come a time when Kevin Moran learned --

16         withdraw that.

17              Ms. Ungerleider, are you Jewish?

18    A    Yes.

19    Q    Did there come a time when Mr. Moran, Kevin

20         Moran, learned that you were Jewish?

21    A    Yes.

22    Q    And who is Kevin Moran?

23    A    He was the sales manager.

24    Q    Was he your manager?

25    A    Yes, one of them.

Page 30

| | | |
|---|---|---|
| 1 | | holiday. |
| 2 | Q | In October or thereabouts in 1996? |
| 3 | A | Yes. |
| 4 | Q | So can you look through this review dated by |
| 5 | | Kevin Moran at least on 2/15/96 and tell me |
| 6 | | whether you have ever seen this document |
| 7 | | before? |
| 8 | A | This performance appraisal is familiar that |
| 9 | | this is something that I would have received or |
| 10 | | I've seen it at some point.  I remember seeing |
| 11 | | a performance appraisal in this format at some |
| 12 | | point while working at Fleet.  I don't -- |
| 13 | | there's no way I can remember -- I mean, it |
| 14 | | seems familiar, the language. |
| 15 | Q | Can you turn to page 4 of the exhibit.  Do you |
| 16 | | recognize that? |
| 17 | A | Yes. |
| 18 | Q | What is it? |
| 19 | A | That was my -- because he had only reviewed |
| 20 | | me -- the end-of-the-year review comes in '96 |
| 21 | | for the previous year, and because he had only |
| 22 | | reviewed me for such a short time, I questioned |
| 23 | | how he came up with his overall rating of 2, |
| 24 | | and we were told whenever we questioned our |
| 25 | | review that we were to comment on the questions |

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 31

1        so they could be addressed so we can improve --

2        so we could improve anything that we weren't

3        doing -- anything that we weren't doing right.

4    Q   Does this refresh your recollection as to

5        whether you ever saw this particular review?

6    A   Well, I recall -- I mean, I know that I would

7        have been reviewed in '95.  The question I have

8        is the signature.  I don't question the review

9        at this point.

10            MS. GAROFALO:  Can you read back the

11         question.

12

13             (Reporter read the last

14             question.)

15

16   A   Yes, this refreshes it.

17  BY MS. GAROFALO:

18   Q   And do you recall in that review if you turn to

19       page 2 Mr. Moran stated that Linda is, however,

20       very much on a learning curve as it pertains to

21       the loan origination business, and it is clear

22       by her closing rate, 52 percent, and the number

23       of problems that she is having with her loans

24       that it is imperative that she bring herself up

25       to speed at once on the fundamentals of sound

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 32

| | | |
|---|---|---|
| 1 | | underwriting?  Do you recall him saying that? |
| 2 | A | I'm reading what he wrote.  I'm going to review |
| 3 | | what my comments were. |
| 4 | Q | My question is:  Do you recall him saying that |
| 5 | | to you as part of this review?  Do you agree |
| 6 | | this is what he said? |
| 7 | A | Do I agree he wrote this, yes. |
| 8 | Q | And do you also agree that he said that you had |
| 9 | | to consistently promote constructive dialogue |
| 10 | | with your processing staff and sales |
| 11 | | associates, and further he stated that you had |
| 12 | | been very critical of policies and procedures |
| 13 | | at FMG which have been disruptive to team |
| 14 | | building? |
| 15 | A | Do I recall him stating this? |
| 16 | Q | Yes, as part of your review. |
| 17 | A | I don't recall him stating it.  I recall |
| 18 | | reading it. |
| 19 | Q | Contemporaneous with when this review was given |
| 20 | | to you, you read it? |
| 21 | A | Yes, but I didn't agree with it. |
| 22 | Q | And why do you think Mr. Moran said those |
| 23 | | things about you? |
| 24 | A | Well, at that point in time, I believe based on |
| 25 | | knowing that what he was saying was |

d4b99268-03b9-477f-bc3a-f009df837d6a

Ungerleider vs Fleet Mortgage Group

Page 33

```
 1           occurring -- not all of it, but much of it was

 2           occurring in regards to relating to other

 3           people -- other players, team players as they

 4           were referred to, such as Robin Hanley who was

 5           later fired, Paula Barnes who was later fired,

 6           that all of the -- not all but anybody that had

 7           been assigned to them had the same

 8           difficulties, I believed at the time I felt I

 9           was being picked on because it wasn't unique to

10           just me.

11    Q      So you think you were being subjected to unfair

12           criticism by Mr. Moran?

13    A      Because I wasn't the only one with the same

14           situation.

15    Q      Can you just answer yes or no to that question?

16                 MS. GAROFALO:  Can you read it back.

17

18                           (Reporter read the requested

19                            material.)

20

21    A      Yes.

22   BY MS. GAROFALO:

23    Q      And he subjected you to that criticism on a

24           performance review that he signed

25           February 15th, 1996?
```

d4b99268-03b9-477f-bc3a-f009df837d6a

Ungerleider vs Fleet Mortgage Group

5/8/2003                                                      Linda Ungerleider

Page 34

1    A    Yes.

2    Q    Do you have any -- withdraw that.

3                    Why do you think you were being

4         singled out for unfair criticism by Mr. Moran?

5    A    I'm not sure why he singled me out, but I

6         believe --

7                    MS. TELKER:  Objection.  I believe her

8              testimony was that she wasn't being singled

9              out, that he was critical of other people.

10   BY MS. GAROFALO:

11   Q    Is that what you're saying?  Everybody got

12        reviews like this?

13   A    I'm not sure what other people's reviews were,

14        but what I'm saying is that everybody that

15        reported to -- there are several issues to that

16        comment, to his statement, first of all.

17   Q    I don't want an explanation.  I'm asking:  Do

18        you feel that Mr. Moran singled you out and

19        unfairly criticized you?

20   A    Yes, but --

21   Q    Wait.  That's it.  That's a yes or no question.

22        And why -- do you have any thoughts as to why

23        Mr. Moran in February of 1996 was singling you

24        out for unfair criticism?

25   A    I believe there was no other reason than

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 35

```
 1          because he thought I was Jewish.  I don't know
 2          why he singled me out.
 3     Q    So you believe that Mr. Moran singled you out
 4          in February of 1996 and gave you a bad
 5          performance review because he believed you were
 6          Jewish?
 7     A    I don't know if that's the reason.  I don't
 8          know if he singled me out because I was Jewish,
 9          but I know that he singled me out in some of
10          these remarks for some reason.
11     Q    How would he have known in February of 1996
12          that you were Jewish?
13     A    I don't know.
14     Q    Do you know whether he even knew you were
15          Jewish in February of 1996?
16     A    I don't know.  I only remembered the statement
17          when he did -- when I knew that he knew I was
18          Jewish.
19     Q    And that was in October of 1996?
20     A    I believe that's the date.  That's the date
21          we're assuming.
22     Q    Right, the fall of 1996?
23     A    Right.
24     Q    Any other reason why you think he was singling
25          you out?
```

Brandon Smith Reporting Service

d4b99268-03b9-477f-bc3a-f009df837d6a

Ungerleider vs Fleet Mortgage Group

Linda Ungerleider

Page 36

```
 1   A    Well, other people in the company knew that I
 2        was Jewish that he worked with.
 3   Q    Do you have any reason to believe any of those
 4        people told him you were Jewish?
 5   A    It can happen.
 6   Q    I believe in your complaint you stated that he
 7        expressed his surprise that you were Jewish in
 8        October of 1996.
 9   A    It seemed to me that he did.
10   Q    So as far as you can tell from his reaction,
11        you believed he was finding this out for the
12        first time?
13   A    I believe that that's when he found out.  I
14        believe that this information that he based his
15        decision on for review because he wasn't there
16        long enough to gather this information to make
17        his end-of-the-year performance review was from
18        other members of the team that would have
19        provided him information.
20   Q    What other members of the team?
21   A    There was a Team 5 they called it.  This would
22        be the supervisor of the processing team who in
23        the comments on page -- I guess it's page 4
24        would have indicated lack of the ability to
25        communicate with them.
```

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 39

```
 1                    MS. TELKER:  She can say she doesn't

 2            know.

 3     A     I don't know.

 4  BY MS. GAROFALO:

 5     Q     So your testimony is --

 6     A     It's separate.  He was wrong about the 2 based

 7            on the year, and he treated me differently

 8            after I told him I was Jewish.  So one doesn't

 9            have anything to do with the other possibly.

10                    MS. TELKER:  She doesn't know what was

11            going on in his mind.

12  BY MS. GAROFALO:

13     Q     Right.  So you have no idea what was motivating

14            Mr. Moran to write this review, yes or no?

15     A     I don't know.

16     Q     Okay.  Suffice it to say though, you do not

17            agree with any of the criticisms contained in

18            that review?

19     A     I agree that I needed still more -- I was new

20            in the business, and I definitely agreed that I

21            had a lot more to learn.

22     Q     Anything else you agreed with?

23     A     That would include guidelines, improvement with

24            guidelines.

25     Q     Did you agree you needed improvement in
```

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 42

CONFIDENTIAL CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 2
 3              MS. GAROFALO:  We have a stipulated
 4         protective order, and I'm going to mark
 5         this part of the deposition confidential.
 6   BY MS. GAROFALO:
 7   Q    Did there come a time when Barbara Tartaglia
 8        referred a client to you by the name of
 9        Mr. Buckins?
10   A    Yes.
11   Q    And when did that occur?
12   A    In the year 2000.
13   Q    Do you recall when in the year 2000?
14   A    I recall as best as I can the one week I came
15        back to -- came back from disability leave.
16   Q    Do you know the dates when you came back from
17        disability leave?
18   A    I don't have the exact dates.  The date that I
19        came back -- when I came back, I was supposed
20        to come back to get a PC, and when there wasn't
21        a PC, I had to leave work again.
22   Q    So was it a matter of days that you were back?
23   A    I think a week.
24   Q    Is it possible it was from February 2nd to
25        February 8th?
```

d4b99268-03b9-477f-bc3a-f009df837d6a

Hleider vs Fleet Mortgage Group

5/8/2003                                                                Linda Ungerleider

Page 43

| | | |
|---|---|---|
| 1 | A | Possible. |
| 2 | Q | Do you recall where you were when Ms. Tartaglia |
| 3 | | asked you if you could help this gentleman? |
| 4 | A | I don't recall. |
| 5 | Q | Were you -- did she call you on the phone? |
| 6 | A | They call on the phone.  They leave notes on my |
| 7 | | desk. |
| 8 | Q | The question is:  In this particular instance, |
| 9 | | do you recall whether she called you on the |
| 10 | | telephone? |
| 11 | A | I don't recall. |
| 12 | Q | Do you recall what she said to you about this |
| 13 | | customer? |
| 14 | A | That he was a good customer of the bank, |
| 15 | | something like that. |
| 16 | Q | Anything else you recall her saying to you? |
| 17 | A | I don't recall. |
| 18 | Q | And what was it that she told you that this |
| 19 | | gentleman was looking for? |
| 20 | A | He was purchasing a home so he needed a |
| 21 | | mortgage. |
| 22 | Q | Do you recall what you said to her? |
| 23 | A | That I would call him back. |
| 24 | Q | Anything else? |
| 25 | A | I don't recall. |

Brandon Smith Reporting Service

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 44

1    Q    What did you do next?

2    A    Standard procedure, called the customer.

3    Q    And what do you recall of your first discussion

4          with the customer?

5    A    What I recall is that he had indicated that he

6          had refinanced his home approximately six

7          months prior to the decision to purchase a home

8          which was new construction, that he -- I recall

9          that he was not happy with the loan officer

10         that he worked with previously, that he

11         indicated that he sold his home himself and

12         that he needed to close on the purchase in

13         something like three or three-and-a-half weeks.

14    Q    So that was in your very first conversation?

15    A    Um-hum.

16    Q    Yes?

17    A    Yes.

18    Q    Do you recall anything that you said?

19    A    I don't recall the exact discussion other than

20         what's typical is to take an application.

21    Q    Did you take an application from him?

22    A    He wanted to do the application himself so he

23         asked if he could have the application faxed or

24         mailed.  I don't remember how it went to him,

25         but he filled out the mortgage application

d4b99268-03b9-477f-bc3a-f009df837d6a

Crileider vs Fleet Mortgage Group

5/8/2003                                          Linda Ungerleider

Page 45

1          himself which is not usually done.

2    Q    And how did he return it to you?

3    A    He -- we had to schedule a time for him to

4          provide other documents.  Because he was

5          self-employed, he had large corporate tax

6          returns with many, many pages so he wouldn't be

7          able to fax everything as other customers

8          would.  It would be too burdensome so we agreed

9          to meet on a Saturday where he dropped off the

10         application that he filled out himself and the

11         documents that are attached with it.

12   Q    And this would have been during that one-week

13         period when you came back from family medical

14         leave?

15   A    Usually it would occur within a week.

16   Q    No.  I'm asking you:  Did you take this

17         application from him during that period of time

18         when you had returned from family medical leave

19         for, as you recall, a one-week period in

20         February of 2000?

21   A    I can't recall -- I was working so I assume the

22         answer's yes.

23   Q    Because were you supposed to be taking

24         applications while you were out on a disability

25         leave?

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 46

```
 1    A    When you start -- no.  When you're on a

 2         disability leave, you can't.  When you start an

 3         application, there's nobody that can -- would

 4         volunteer to take over.

 5    Q    The question is:  Can you start an application

 6         while you are on disability leave?

 7    A    Sometimes phone calls -- I was called at home

 8         by people from Fleet while I was out on

 9         disability.  They would call me, yes.

10    Q    Can you take a new mortgage application while

11         you are out on disability leave?

12    A    No.

13    Q    Did anybody ever tell you that?

14    A    Yes.

15    Q    Who told you that?

16    A    I think it was Moran.

17    Q    Kevin Moran?

18    A    Um-hum.

19    Q    And when do you think he told you that?

20    A    I don't remember when he told me that.

21    Q    Was it prior to the time you took the loan

22         application from Mr. Buckins?

23    A    I don't recall.

24              MS. GAROFALO:  I'm going to mark this.

25         It's an E-mail.
```

d4b99268-03b9-477f-bc3a-f009df837d6a

Ungerleider vs Fleet Mortgage Group

Page 47

```
 1
 2                          (Defendant's Exhibit No. 8,
 3                          E-mail, 2/1/00, marked for
 4                          identification.)
 5
 6      BY MS. GAROFALO:
 7      Q    I'm going to show you an E-mail from Linda
 8           Ungerleider to Kevin Moran and others dated
 9           February 1st, 2000.  Do you recognize that
10           E-mail?
11      A    Yes.
12      Q    And does this refresh your recollection as to
13           whether or not you were told that you were not
14           to be taking any new loans while you were on
15           short-term disability before you took the loan
16           application for Mr. Buckins?
17      A    It's from me to Kevin, subject Beech file taken
18           in November of '99.  That's when I had already
19           returned from disability leave.  I was back so
20           this wasn't when I was out on disability.
21           November of '99 I was not out on disability.
22                The E-mail is I was informed by Kevin
23           that I was not to take any new loans while on
24           short-term disability.  "This subject loan was
25           taken in November and the customer was told to
```

Brandon Smith Reporting Service

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 48

1      call back in February when their equity loan

2      was seasoned.  He was very anxious and

3      concerned that the interest rates would go up

4      and asked that I get him locked into a rate

5      today.  Therefore, this new loan had to be done

6      for the customer.  I am not lifting or pulling

7      equipment while performing this task and tried

8      to contact someone for help."

9   Q  And the question I asked you was:  Does this

10     refresh your recollection that Mr. Moran had

11     informed you not to take any new loans while on

12     disability leave before you took the loan

13     application from Mr. Buckins?  This is dated

14     February 1st.

15  A  I'm sorry.  I'm confused.  What's the question

16     again?

17              MS. GAROFALO:  Can you read it back.

18

19              (Reporter read the last

20              question.)

21

22  A  Yes, but they -- if I took the loan from

23     Mr. Buckins while out on disability, then why

24     did they call me while I was out on disability

25     to take care of Mr. Buckins?  So I question

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 49

1       whether the procurement of Mr. Buckins was

2       while I was out on disability or not out

3       because somehow I got his name from an

4       employee.

5   BY MS. GAROFALO:

6   Q   Is it possible that you -- well, withdraw that.

7           Did you go to the bank branch and

8       conduct business during the period of time that

9       you were out on disability from January 2000 to

10      April 2000?  When I say "the bank branch," I

11      mean the Orange bank branch.

12  A   Part of the harassment was being asked to do

13      things while I was out on disability.  So there

14      were times that I was asked to come to the

15      branch to take care of issues because there

16      wasn't anybody else taking care of them for me

17      in order to get the customer serviced properly.

18  Q   And who was asking you to do this?

19  A   Usually it would be Moran.

20  Q   Did Ms. Tartaglia ask you whether you were

21      still on sick leave when she asked if you would

22      be able to assist Mr. Buckins?

23  A   I don't recall.

24  Q   Do you recall ever telling her that you were on

25      something called a partial disability leave?

Page 50

```
 1    A    There was a time that they talked about a
 2         partial disability leave, but I questioned what
 3         that allowed me to do and what that meant I
 4         could do.
 5    Q    Were you ever on something called a partial
 6         disability leave?
 7    A    I don't recall how that was handled.
 8    Q    You don't recall whether you were ever on a
 9         partial disability leave?
10    A    I don't recall ever getting a partial
11         disability payment or anything.
12    Q    When you were on disability leave for those
13         weeks in 2000, were you getting any type of
14         compensation?
15    A    When I was on the leave?
16    Q    Yes.
17    A    Yes.
18    Q    And what were you being paid?
19    A    I don't recall the exact amount.
20    Q    Well, who was paying you?
21    A    Fleet's disability administrators.
22    Q    You were --
23    A    I believe that's who it was.
24    Q    You were receiving short-term disability pay?
25    A    Right.
```

d4b99268-03b9-477f-bc3a-f009df837d6a

5/8/2003                                                     Linda Ungerleider

Page 51

| | | |
|---|---|---|
| 1 | Q | Because you were unable to work? |
| 2 | A | Right. |
| 3 | Q | And if you had been able to work, then you |
| 4 | | would not be eligible for short-term disability |
| 5 | | pay? |
| 6 | A | Right. |
| 7 | Q | Did Ms. Tartaglia demand that you complete the |
| 8 | | application or take the application for |
| 9 | | Mr. Buckins? |
| 10 | A | Did she ever demand that I take the |
| 11 | | application? |
| 12 | Q | Because if you were not available to take the |
| 13 | | application because you had been on disability |
| 14 | | leave, there were other loan originators who |
| 15 | | could have taken this application, correct? |
| 16 | A | Yes. |
| 17 | Q | So you volunteered to take this application? |
| 18 | A | I didn't volunteer.  I don't know -- I don't |
| 19 | | know at what point in time I was given the |
| 20 | | phone call to make to Mr. Tartaglia.  I never |
| 21 | | actually took the application because he filled |
| 22 | | it out himself.  I mean Mr. Buckins. |
| 23 | Q | Were you told to call Mr. Buckins or were you |
| 24 | | asked if you could assist Mr. Buckins? |
| 25 | A | I was given a referral which is the process of |

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 52

```
 1          my job.

 2     Q    And you took that referral?

 3     A    Yes.

 4     Q    And you could have rejected that referral?

 5     A    But the referral could have been -- I don't

 6          recall when the referral was given.  Phone

 7          calls versus the actual taking of an

 8          application are different.  You could get a

 9          phone call and have a discussion at one point

10          and take an application months down the road so

11          I don't recall --

12     Q    What makes you eligible for a commission?

13     A    When the loan closes.

14     Q    Okay.  But before any loan could close --

15     A    Actually 30 days -- Fleet sometimes didn't pay

16          up until 30 days or 60 days after the close on

17          it.

18     Q    But you have to take an application before you

19          would ever be eligible for a commission and the

20          loan ultimately closes?

21     A    Yes.

22     Q    And what Mr. Moran had told you was that you

23          were not to open any -- take any new

24          applications while you were on disability

25          leave?
```

d4b99268-03b9-477f-bc3a-f009df837d6a

5/8/2003                                                      Linda Ungerleider

Page 53

1    A    Yes.

2    Q    And it's your testimony that you did not take

3         any new applications for any customers while

4         you were on disability leave in 2000?

5    A    No.    While I was on disability leave?

6    Q    Yes.

7    A    I don't believe I did.

8    Q    Okay.  Because that would have been a violation

9         of policy and a directive from Mr. Moran if you

10        had done that?

11   A    Right.

12   Q    And would you have been subjected to

13        disciplinary action if you had done that?

14   A    I don't think it would have been that extreme,

15        but it would be -- for a phone call, that they

16        would have taken disciplinary action for a

17        phone call.

18   Q    Not just a phone call, actually meeting a

19        customer, taking an application --

20   A    But I didn't meet with the customer to take the

21        application.  Taking the application is defined

22        as having it -- having the application

23        registered and sent to the process center to be

24        processed.

25   Q    And you would not have done that while you were

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 54

1            on disability leave?

2    A    Right.

3    Q    Because that would have been a violation of

4         policy and of Mr. Moran's directive?

5    A    And during --

6    Q    Yes or no?

7    A    Yes.

8    Q    That's fine.  Did there come a time when you

9         met with Mr. Buckins?

10   A    Sorry?

11               MS. GAROFALO:  Can you read that back.

12

13               (Reporter read the last

14               question.)

15

16   A    Yes.

17   BY MS. GAROFALO:

18   Q    And when was that?

19   A    It was a Saturday.  I don't remember the date.

20   Q    And where did you meet with him?

21   A    In the Orange Fleet Bank.

22   Q    And what would you -- how would you define what

23        you did with him on that day?

24   A    He was dropping off the application he filled

25        out.  He was dropping off the forms that I

Page 55

```
 1            requested for the processing of the loan, and

 2            he spent roughly an hour or longer -- I don't

 3            remember exactly how long -- showing me

 4            pictures of the home that he had purchased.

 5       Q    So did you take the application that day?

 6       A    Did I physically take it?  It was handed to me.

 7       Q    And what did you do with the handwritten

 8            application that he handed to you?

 9       A    It was mailed from the Fleet Bank.  It was put

10            into the airborne express package to be mailed

11            out of the Orange branch that day.

12       Q    So you did not prepare a typed-up mortgage

13            application?

14       A    No.  That would have had to have been done -- I

15            don't recall -- wait.  Let me think.  After

16            it's been handwritten -- see, I don't recall

17            whether he gave me the information over the

18            phone and I put it into the system.  At the

19            time of conversation, it could have been done

20            or whether it was done after he handed it to me

21            I don't recall.

22       Q    But you would have done that?  You would have

23            put it into the system?

24       A    At some point.

25       Q    So to go back again, when you met with him on
```

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 56

```
 1              Saturday and he physically handed you his
 2              handwritten loan application, did you -- is
 3              that defined as taking his application?
 4       A      Not in loan origination it's not.
 5       Q      Why not?
 6       A      Because loan origination is when there's a
 7              three-day window where you have to have the
 8              loan to begin processing in the system.
 9       Q      So when it goes into the system, is that
10              when --
11       A      That's when it's considered taking the
12              application versus physically taking it.
13       Q      Okay.
14       A      I think what occurred is that he had to drop it
15              off -- he had to get it to -- we had to get it
16              to Providence, Rhode Island.  There wasn't --
17              we all handle our own files.  There wasn't
18              anybody else that would have taken that file in
19              the drop-off situation and sent it.  So it was
20              a matter of dropping it -- just probably
21              running in, sitting with him.  I don't think
22              that week I was actually working full-time.
23              This was more out of helping the customer get
24              his loan because he only had a three-week
25              window.  He needed me to get it done for him.
```

d4b99268-03b9-477f-bc3a-f009df837d6a

Ungerleider vs Fleet Mortgage Group

Page 57

1    Q    Did you try contacting any other loan officers

2         to see whether anybody could help him?

3    A    Nobody, unfortunately, in this business does

4         that.

5    Q    Did you ask anybody to help you?  Did you tell

6         anybody you were on disability leave?

7    A    I asked Moran to help me many times.

8    Q    Did you ask Mr. Moran to help you specifically

9         regarding the application from Stan Buckins?

10   A    I don't recall.

11   Q    Do you have any reason to think that you did?

12   A    Any reason to think I asked him specifically?

13        Probably not because Moran was asking me to

14        take -- was demanding of me to get things that

15        customers were dropping off on my desk in

16        Orange to get them to Providence which forced

17        me while in and out of disability, whether it

18        be partial disability or whatever -- that

19        forced me to come into the branch to get it

20        done because nobody else was doing it.

21   Q    Did somebody force you to come into the branch

22        on a Saturday while you were on disability

23        leave to meet with Mr. Buckins?

24   A    I had to get -- I had to service the customer.

25        If I didn't, I would have been -- I would have

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 58

1       been reprimanded.

2    Q    But you have no recollection of asking anybody

3         for assistance with regard to Mr. Buckins?

4    A    I asked for assistance the whole time.

5    Q    The question is:  Do you have any recollection

6         of asking somebody to help you in dealing with

7         Mr. Buckins?

8    A    I don't recall if I specifically did for

9         Mr. Buckins.

10   Q    Do you recall how much time transpired between

11        the day Barbara Tartaglia asked you to assist

12        Mr. Buckins and the day you met with

13        Mr. Buckins?

14   A    I believe a week, but I'm really not sure

15        exactly how many days.

16   Q    Did you receive a commission when the loan for

17        Mr. Buckins ultimately closed?

18   A    I believe so.  May I stand up for a minute

19        while you're asking me?

20   Q    Sure.  And did Mr. Buckins tell you that he had

21        entered into a contract with a buyer?

22   A    Yes.

23   Q    And he told you that he had sold his home

24        himself?

25   A    Yes.

d4b99268-03b9-477f-bc3a-f009df837d6a

Case 3:02-cv-00659-AVC Cleiders vs. Fleet Mortgage Group Document 52-4 Filed 11/17/2003 Page 29 of 34

5/8/2003 Linda Ungerleider

Page 59

| | | |
|---|---|---|
| 1 | Q | What would you have had with you the day you |
| 2 | | met with Mr. Buckins in -- on that Saturday in |
| 3 | | February of 2000? Would you have had any |
| 4 | | equipment with you? |
| 5 | A | I wouldn't have had to. |
| 6 | Q | The question is: Did you have any equipment |
| 7 | | with you? |
| 8 | A | No. |
| 9 | Q | And why didn't you need equipment? |
| 10 | A | I wasn't taking an application. |
| 11 | Q | So you took the application when you entered it |
| 12 | | into the system? |
| 13 | A | Right. |
| 14 | Q | And when did you do that? |
| 15 | A | I don't remember. |
| 16 | Q | Where did you do that? |
| 17 | A | I don't remember. |
| 18 | Q | Would your equipment have been at home? |
| 19 | A | It could be at home or it could have been in |
| 20 | | the office. |
| 21 | Q | How would it have gotten to the office? |
| 22 | A | I would have had to carry it. |
| 23 | Q | You would have done that while you were on |
| 24 | | disability leave? |
| 25 | A | I didn't have any choice. In 2000 that was |

Page 60

1       already six months after I was -- they were

2       suggesting a PC so I could keep my laptop at

3       home and have a PC in the office.

4    Q   The question I asked was:  You had no choice

5       but while on disability leave to bring your

6       laptop into Orange?

7    A   I would have taken it home then.  I didn't

8       bring it into Orange for Mr. Buckins.

9    Q   Okay.  So it wasn't there?

10   A   I don't -- no, not for him.

11   Q   Because you just said it might have been there.

12   A   Yeah.  I believe it wasn't.

13   Q   So you entered the loan from home?

14   A   I believe so.

15   Q   While you were on disability leave?

16   A   I believe so.  I can't really be sure.  There

17      were times where -- while I was out where loans

18      might have been entered for me.  I don't

19      recall.

20   Q   Did there come a time when you learned --

21      withdraw that.

22              What was the significance of whether

23      or not Mr. Buckins' home was under contract?

24   A   Say that again, please?

25              MS. GAROFALO:  Can you read it back.

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 61

```
 1
 2                        (Reporter read the last
 3                        question.)
 4
 5     A    From what I remember, I believe -- I believe
 6          that he needed proceeds of the sale, but if I
 7          looked at the contract, I'd probably remember
 8          the reason.
 9     BY MS. GAROFALO:
10     Q    He was buying a new home?
11     A    Right.
12     Q    Taking out a fairly large mortgage?
13     A    Right, but he had a fairly large amount of
14          assets, I believe.  I don't remember.
15     Q    Did there ever come a time when you learned
16          that, in fact, his home had not been sold or
17          was not under contract?
18     A    No.  Actually, what happened, to the best I can
19          remember, was I having been a real estate agent
20          suggested to Mr. Buckins on the phone that
21          although he believed his house was sold I
22          advised him -- I asked him -- suggested to him
23          that he have an attorney to make sure that the
24          paperwork was there so that it wasn't just a
25          customer who liked the home but that the
```

Brandon Smith Reporting Service

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 62

1          customer really was entering into an agreement.

2          So I attempted to help him in a real estate

3          manner to make sure that it was truly on

4          deposit.

5     Q    So what did you do?

6     A    So I just tried to help him.

7     Q    And was that during that meeting on Saturday?

8          You asked him if he had an actual contract?

9     A    No.  I suggested that from when -- when I

10         prequalified the customer on the phone and he

11         told me his house was sold, I suggested it

12         then.  I might have even suggested it or asked

13         him if he had a sales agreement.  I might have

14         at the time when I met with him looking through

15         the documents -- I might have asked for a sales

16         agreement at that time.

17    Q    Did there come a time that you learned, in

18         fact, his house was not under contract but was

19         pending sale -- or not even pending sale, that

20         was for sale?

21    A    In other words, did I learn if the deal fell

22         through for him?

23    Q    If there ever was a deal.  Did you learn at

24         some point in time that, in fact, his house was

25         for sale, that it had not been sold?

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 63

| 1 | A | It apparently became an issue when it |
| 2 | | apparently did not sell as he believed which |
| 3 | | changed his ability to get the type of mortgage |
| 4 | | he was looking for. |
| 5 | Q | And how far down the road from when you first |
| 6 | | met with him on that Saturday would this have |
| 7 | | become an issue? |
| 8 | A | While I was out on disability, Tartaglia called |
| 9 | | me to ask me about the fact -- about regarding |
| 10 | | the sale of his house, and that's when I told |
| 11 | | her at the time of application he indicated he |
| 12 | | sold his home.  He indicated to me that he sold |
| 13 | | it, and he indicated it in writing on his |
| 14 | | application that he sold it. |
| 15 | Q | If somebody puts on an application that they're |
| 16 | | asking a certain amount of money for their |
| 17 | | home, would that indicate that the home had |
| 18 | | been sold? |
| 19 | A | If they're asking -- |
| 20 | Q | I mean, somebody who has sold their home |
| 21 | | wouldn't say that they're asking for a certain |
| 22 | | amount for their home. |
| 23 | A | Well, he was under the assumption this house |
| 24 | | was sold.  So the amount of money he was asking |
| 25 | | for, it could have been that he wanted to |

Brandon Smith Reporting Service

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 64

```
 1              borrow -- I think he wanted to borrow as much
 2              as he could.  He didn't want to have to use his
 3              other assets.  So the loan amount can change
 4              during the process of the application.
 5      Q       If you have sold your home and it's under
 6              contract, would you put that you were asking a
 7              certain price for your home?
 8      A       There is a section of the application where you
 9              state the value of your home, and typically if
10              the home is on deposit, you typically put --
11              whether it would be me putting it or the
12              customer putting it, you state the sales price
13              because that determines the value.
14      Q       Not an asking price because an asking price
15              would indicate that it was on the market?
16      A       If the customer is filling out his own
17              application, I don't know what he would
18              consider value.
19      Q       So you learned that there was an issue about
20              whether or not his home was under contract from
21              Barbara Tartaglia?
22      A       That's how I learned, yes.
23      Q       Can you give me any idea how soon after that
24              Saturday meeting with Mr. Buckins you learned
25              that?
```

d4b99268-03b9-477f-bc3a-f009df837d6a