Page 175

1    A    No.   What stands out the most is him saying it.

2    Q    But you don't remember a single person?

3    A    No.

4    Q    And you don't know what year this was said?

5    A    No.

6    Q    Was anybody present when he made the comment

7         about being proud or his grandfather being

8         proud to have served, what was it, as a German

9         soldier before the SS?

10   A    In the SS which is a special division.  No.

11        Whenever Kevin said things, even if -- like the

12        Johnny Manishevitz was a staff meeting.

13   Q    I'm asking about this particular statement.

14   A    Whenever he said things, it would just come as

15        such a shock that all I heard was what I heard.

16        I didn't really pay attention to who was around

17        me.  It was just like a shock moment.

18   Q    So you don't have any idea of whether there was

19        anybody else who heard that comment, no?

20   A    No.

21   Q    And you think that was early on in '96, '97?

22   A    The German soldier one was early on.

23   Q    And explain to me what is the Johnny

24        Manishevitz -- what does it mean?

25   A    Why am I offended by it?

Page 176

| | | |
|---|---|---|
| 1 | Q | Yeah.  I don't know what it means. |
| 2 | A | Well, Manishevitz is a cheap Jewish wine, and |
| 3 | | Johnny I guess -- he said Johnny because |
| 4 | | sometimes Johnny is referred to as John Smith. |
| 5 | | He was referring to -- it's not like he would |
| 6 | | stand up and say if somebody was -- he |
| 7 | | referenced a customer by his -- by connecting |
| 8 | | it with some kind of religious object.  So I |
| 9 | | don't know why he said that either. |
| 10 | Q | Okay. |
| 11 | A | It was derogatory. |
| 12 | Q | And he said this in front of a staff meeting? |
| 13 | A | Yes. |
| 14 | Q | Who was at that staff meeting? |
| 15 | A | I don't remember exactly who, but typically |
| 16 | | who's at staff meetings are the loan officers. |
| 17 | Q | But you don't remember a single person who was |
| 18 | | at the staff meeting where he made this |
| 19 | | comment? |
| 20 | A | I remember people that were there like Richard |
| 21 | | Warwick, Carol Cook, Bob Foote.  I think it's |
| 22 | | Richard Warwick is the only one that possibly |
| 23 | | would be the one that would remember to a point |
| 24 | | where -- nobody else would really remember it |
| 25 | | because it wouldn't be offensive to them. |

Brandon Smith Reporting Service

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 177

1        Richard Warwick might have remembered it to be

2        offensive to him.

3     Q  So you don't think a person would remember an

4        anti-Semitic comment unless they were Jewish?

5     A  No.  Gary Phelan didn't even know what

6        Manishevitz was.  I had to explain it to him.

7        So nobody would find something offensive if

8        they didn't know what it meant.

9     Q  Okay.  So was Richard Warwick Jewish?

10    A  I don't know.  I think he might have been, but

11       I'm not sure.

12    Q  Okay.

13    A  Richard Warwick is no longer -- anybody that I

14       could call to witness -- Carol Cook, Bob Foote

15       would have been able to be a witness, but now

16       that Fleet has bought P&C, has merged with

17       Washington Mutual, they no longer could be a

18       witness because they would face retaliation if

19       they helped me.

20    Q  Have you asked any of them to be a witness for

21       you?

22    A  No.  I know it's a waste of time to ask them,

23       but I would have if they weren't connected to

24       Fleet.

25    Q  So you think that if put under oath they would

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 178

```
 1              perjure themselves?

 2    A    I don't know if they would under oath perjure

 3         themselves, but I know they don't want to lose

 4         their six-digit income jobs.

 5    Q    Have you spoken with anybody to be a witness on

 6         your behalf in this lawsuit?

 7    A    Spoken to them?

 8    Q    Or communicated with them, either through

 9         yourself or through counsel.

10    A    Ken Friedman.

11    Q    Anybody else?

12    A    Kevin Inkley.  I've been beginning.  I haven't

13         been told to do it yet but just in general

14         asked if they recalled incidences.

15    Q    Anybody else?

16    A    Not yet.

17    Q    Any other comments that you can think of other

18         than -- and was the Johnny Manishevitz, was

19         that one, a single time, yes?

20    A    Yes.

21    Q    And the comment about anybody who would work on

22         Good Friday must be an atheist, that was one

23         time, yes?

24    A    Yes.

25    Q    And the statement about his grandfather, he
```

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 179

| 1  |   | said that once? |
|----|---|-----------------|
| 2  | A | Yes. |
| 3  | Q | Do you remember if anybody was present when he |
| 4  |   | made the comment about being an atheist if you |
| 5  |   | were willing to work on Good Friday? |
| 6  | A | It was in his office, and his door was open, |
| 7  |   | but I don't think anybody else heard.  I went |
| 8  |   | in to volunteer so I don't think there was |
| 9  |   | anybody in the room. |
| 10 | Q | And the Christmas -- or the holiday party |
| 11 |   | statement, we've already confirmed that was |
| 12 |   | just one time? |
| 13 | A | Except that he would discuss -- at staff |
| 14 |   | meetings discuss booking the -- discuss booking |
| 15 |   | the holiday dinner that he took us all out to, |
| 16 |   | and he would pick Jewish holidays -- the |
| 17 |   | Hanukkah, and other people would say that falls |
| 18 |   | on Hanukkah.  I would never be -- I'd be afraid |
| 19 |   | to say it, but other people would, and then he |
| 20 |   | would switch the date. |
| 21 | Q | And how many times did that happen? |
| 22 | A | A couple, two or three years in a row. |
| 23 | Q | Do you think he was intentionally picking |
| 24 |   | Hanukkah? |
| 25 | A | I don't know.  I know the Fleet desk calendars |

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 185

1          used -- referenced, which you had the E-mail --

2          would reference "jew them down" to a point

3          where I couldn't stand it anymore.

4     Q    So you complained about that, right?

5     A    Yeah.

6     Q    Okay.

7     A    So I didn't know whether it was intentional,

8          not intentional.  Other people were

9          accommodated.  I wasn't.

10    Q    Do you know what calendar Fran DeSalvo used for

11         scheduling floor time or desk duty?

12    A    Well, she had the big calendar on the desk that

13         she filled in.  I don't know if she used any

14         other source.  We would go -- there were

15         calendars all over the place.  We had to put --

16         you had to put in more than one location --

17    Q    Who did you complain to about Kevin's

18         anti-Semitic comments?

19    A    Rachel Paquin at HR.

20    Q    And when did you complain to her?

21    A    I had made a phone call -- we didn't have -- I

22         don't believe we had E-mail at the time because

23         I didn't E-mail her, but I had complained about

24         Kevin Moran to HR as I thought you actually

25         could without retribution, but apparently that

d4b99268-03b9-477f-bc3a-f009df837d6a

Ungerleider vs Fleet Mortgage Group

5/8/2003                                                                Linda Ungerleider

Page 187

| | | |
|---|---|---|
| 1 | A | Well, I asked them about just making notes. |
| 2 | | They said, "Well, that would be" -- "you could |
| 3 | | write notes, but it would be better if you had |
| 4 | | anything that Fleet provided to you" versus |
| 5 | | just my -- I could right now sit and write a |
| 6 | | letter and sign it. |
| 7 | Q | But you didn't make any contemporaneous notes |
| 8 | | of these comments? |
| 9 | A | No.  It was pretty embedded in my mind.  I |
| 10 | | didn't have to. |
| 11 | Q | And you said that you complained about it to |
| 12 | | Rachel Paquin.  When did you do that? |
| 13 | A | I complained to Rachel Paquin about how Kevin |
| 14 | | treated me in general. |
| 15 | Q | Did you ever tell her -- |
| 16 | A | More than once. |
| 17 | Q | Right.  That's one thing, to complain about how |
| 18 | | you were being treated in general.  Did you |
| 19 | | ever complain that you were being subjected to |
| 20 | | anti-Semitic remarks? |
| 21 | A | I believe I did.  I'm pretty sure I did. |
| 22 | Q | I would think you would remember that.  When do |
| 23 | | you think that you did that? |
| 24 | A | Well, I don't really remember for sure if I did |
| 25 | | because I was afraid to.  I don't remember for |

Brandon Smith Reporting Service

d4b99268-03b9-477f-bc3a-f009df837d6a

Ungerleider vs Fleet Mortgage Group

5/8/2003                                                          Linda Ungerleider

Page 188

1         sure, but I complained about him.  I complained

2         in general about how he treated me.

3    Q    Right, but that's not what I'm asking.  I'm

4         asking whether you have a recollection of ever

5         complaining to anybody at Fleet that Mr. Moran

6         had made anti-Semitic remarks about you or in

7         front of you or to you?

8    A    I believe I did.

9    Q    Who did you speak to?

10   A    Anytime I ever spoke to anybody about problems

11        with Kevin, it was only to Rachel Paquin.

12   Q    And when did you begin having conversations

13        with Rachel about Mr. Moran?

14   A    I think I called her on it -- I don't remember

15        exactly -- after the German soldier thing.

16   Q    So very early on?

17   A    I believe so.

18   Q    That was in the '96 or '97 timeframe?

19   A    I believe so.  I don't know for sure.

20   Q    And what did Ms. Paquin say in response to

21        that?

22   A    She would look into the issue.

23   Q    And she never did?

24   A    She might have, but I just let it go.  I just

25        didn't follow up on it.

d4b99268-03b9-477f-bc3a-f009df837d6a

Un. Heider vs Fleet Mortgage Group

Page 194

```
 1          help with a customer, I never knew what cold

 2          stare -- somebody said, "He's giving you a cold

 3          stare."  I never really knew what that meant,

 4          but Kevin gave me a cold stare.  He was looking

 5          through me like I didn't exist.

 6     Q    And that was through the entire time -- well,

 7          when did that start -- when did that begin that

 8          he started giving you the cold stare?

 9     A    The difference from the little, short time

10          before he mentioned the Jewish thing where he

11          was friendly and I even put it down in writing.

12          It was really a pleasure having him as a

13          manager because he was really knowledgeable,

14          and it was helpful in learning the business to

15          suddenly this.  So -- but it was progressively

16          worse.  It definitely got progressively worse

17          from the time he said, "I didn't know you were

18          Jewish," until especially towards the end, at

19          the end.

20     Q    So that was a constant then --

21     A    It was never a friendly relationship.

22     Q    From the fall of 1996 straight through until

23          April of 2000, you guys did not have a

24          friendly, good relationship?

25     A    In front of other people like anything that was
```

d4b99268-03b9-477f-bc3a-f009df837d6a

5/8/2003                                                      Linda Ungerleider

Page 196

| | | |
|---|---|---|
| 1 | | quickly because of her injury. |
| 2 | Q | But did you ever see him -- did you feel he |
| 3 | | treated her better than you? |
| 4 | A | He was nicer to her. |
| 5 | Q | And Monica Carlson? |
| 6 | A | Um-hum. |
| 7 | Q | Yes? |
| 8 | A | Yes.  He was very close with Monica. |
| 9 | Q | He was very close with Monica? |
| 10 | A | Um-hum. |
| 11 | Q | Yes? |
| 12 | A | Yes. |
| 13 | Q | Throughout the entire time that Monica worked |
| 14 | | at the bank? |
| 15 | A | They're all good friends. |
| 16 | Q | All of those people I just named? |
| 17 | A | The Shawmut people came together, not Elizabeth |
| 18 | | Glynn.  She was new, but the Shawmut people -- |
| 19 | | as a matter of fact, the people who were the |
| 20 | | Shawmut people, other names, not the people who |
| 21 | | were injured, other people literally were his |
| 22 | | best friends, played in a band with him, were |
| 23 | | in his wedding standing with him.  So it was a |
| 24 | | close-knit group. |
| 25 | Q | But you never observed him to be treating any |

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 197

```
 1        of these people poorly or badly, no?

 2    A   No.

 3    Q   So you felt that you were singled out for worse

 4        treatment than any of those individuals?

 5    A   Yes.

 6    Q   And you think that was on account of your

 7        religion?

 8    A   I believe so.

 9    Q   Anything else?

10    A   Well, they didn't have to go above his head.

11        He responded to their customer complaints,

12        needs.  He even spent one day a week with

13        Sharon Scrimenti.  They would -- at sales

14        meetings, they would yell, complain and scream

15        about all the horrible things that were going

16        on.

17                  May 17th, 2001, after I left Fleet it

18        was in the front page of The Register that

19        Fleet had the worst customer service in the

20        banking industry so all the people complaining

21        to all of the loan officers, Kevin would listen

22        to them like whine, whine, whine at the sales

23        meeting.  It wasn't unique to have problems.

24        He didn't yell at them for whining.  He would

25        make notes.  He would help them.
```

d4b99268-03b9-477f-bc3a-f009df837d6a

Ulrleider vs Fleet Mortgage Group

5/8/2003                                                          Linda Ungerleider

Page 198

```
 1                    And with me if I would timidly like,

 2          okay.  I'm going to try to say something -- if

 3          I tried to ask for help, it was like I just

 4          committed a crime even to the point where when

 5          we had what's called the guest at the staff

 6          meeting there was -- people that were of Fleet

 7          Bank, not Fleet Mortgage that would come to be

 8          guests.  In particular Len Berger once came,

 9          B-E-R-G-E-R.  People had said things.  Kevin

10          turned red as a beat in his face.  He was so

11          mad that they were being so negative and

12          complaining about Fleet Mortgage, and they

13          didn't get written up.  They didn't get

14          threatened to be terminated, nothing.

15      Q   So the whole time after the fall of '96 through

16          May of 2000, you never had a good working

17          relationship with Kevin Moran?

18      A   I don't feel it was a good working

19          relationship.

20      Q   Okay.  And you mentioned that you did get good

21          reviews during some of this period though.  I

22          believe '98 --

23      A   After that one 2 that he gave me, up until the

24          one after the leave of absence, they were

25          all -- the scores were 2 to 5, and I would get
```

Brandon Smith Reporting Service

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 199

1        mostly 4s, a couple 3s.  I got outstanding --

2        like two years in a row, I got outstanding

3        which is overall performance for customer

4        service and performance and some 3s which would

5        be meets expectations.

6               MS. GAROFALO:  Let me mark this.

7

8                       (Defendant's Exhibit No. 20,

9                       1996 performance appraisal,

10                      marked for identification.)

11

12   BY MS. GAROFALO:

13   Q    This is a document entitled, "Performance

14        appraisal," and on the first page, it says,

15        "Rating period:  1/96 to 12/96."

16   A    Um-hum.

17   Q    Have you seen this document before?

18   A    Yes.

19   Q    And how would you characterize this review?

20   A    This was a good review.  Like, again, we were

21        told anything that we wanted to go over that we

22        didn't agree with or thought needed more

23        explanation should be written out on a separate

24        piece of paper.

25   Q    So you did that?

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 200

```
 1    A    Um-hum.

 2    Q    But you were satisfied with this review?  You

 3         viewed it as a good review?

 4    A    Yeah.  It was probably fair enough.

 5    Q    Okay.  And this was issued to you -- or you

 6         wrote your response to this at least according

 7         to the fourth page on February 13th, 1997?

 8    A    Right.  Anything that was -- yes.

 9    Q    Okay.  And that's a true and accurate copy on

10         pages 4 and 5 of this exhibit?  You created

11         those?

12    A    Yes.

13    Q    That's your signature on both pages?

14    A    Um-hum, yes.  If I wasn't singled out, I

15         wouldn't have to be in a defensive mentality.

16         He knew everybody couldn't get along with Paula

17         and Tina and all of them because they were

18         impossible to get along with, and it wasn't

19         necessarily even their fault.  It's that they

20         were overloaded with too much files, but,

21         whatever, everybody had the same issues, but he

22         just had to get it in.  He had to single me out

23         because he didn't put the same thing with

24         everybody.  People compared notes.  I mean, I

25         happened to have better overall -- not better
```

Brandon Smith Reporting Service

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 201

```
1         than everybody.  I was probably within the top

2         five of the office, three to five, not number

3         one, not number two, but more like number

4         three, but he just -- it bothered me to be

5         singled out regarding issues that affected

6         everybody.

7    Q    Is it possible that the reason why he singled

8         you out had nothing to do with your religion?

9         Could it have been that he just didn't like

10        you, that he had personality conflicts, that he

11        didn't appreciate you going around him to get

12        your job done?

13   A    Well, I don't think --

14             MS. TELKER:  That question is very

15          complicated.

16             MS. GAROFALO:  You can state your

17          objection.

18   A    I don't know.  I can't give an answer of why he

19        did what he did.

20   BY MS. GAROFALO:

21   Q    Okay.  But he did -- after some period of time

22        that he knew you were Jewish, you got a number

23        of very good reviews, correct?

24   A    Um-hum, but he had to because it was fact.  Any

25        little thing he could put in to undermine it he
```

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 204

```
 1    A    Because if there is no other reason, I would
 2         have been -- maybe they feared further risk of
 3         injury.  Maybe they feared another long-term
 4         disability person which wouldn't have happened,
 5         wouldn't have happened if they provided me with
 6         a PC if I was careful.
 7              Maybe it was the timing because
 8         already James was out and Judy Entress.  I
 9         don't know if she filed for any claim or
10         anything, but I'm somebody that's becoming --
11         potentially becoming a financial burden which
12         then I was thinking how could that be because
13         it's such a big company.  You know, if I'm
14         doing well for them, you would think they'd
15         keep me, and if I get hurt, I get hurt.  So I
16         didn't understand, but I don't think Kevin was
17         alone in that final decision.
18    Q    Did there come a time when you sustained a
19         work-related injury?
20    A    Yes.
21    Q    And when was that?
22    A    When we got the equipment, the first technical
23         equipment.
24    Q    And when was that?
25    A    I think it was '96.
```

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 205

```
 1    Q    April '96?

 2    A    I'm still not sure of the date.  It was

 3         whenever the training was that I was scheduled

 4         to go to.

 5    Q    Did you allege in your complaint in paragraph

 6         17 --

 7    A    Yeah.  We tried to narrow it down as best as we

 8         could.

 9    Q    But on or about April 1st, 1996?

10    A    That's why we're looking for further documents

11         so we can make sure our dates are correct.

12    Q    So that date might be wrong that's in your

13         complaint?

14    A    It could be.  That's why it's on or around.

15    Q    So on or around.  You're saying that's correct.

16         It's on or around April 1st.  It's not

17         December 12th, 1997.  It's on or around

18         April 1st, 1996?

19    A    Attorney Phelan was using information from the

20         reference comp because I continued -- Fleet was

21         making -- we were going by the doctor's

22         records, and we were trying to find out the

23         exact date when that took place.  It was

24         whenever that training took place.  I think the

25         month is what we can't be sure about.
```

Page 212

| | | |
|---|---|---|
| 1 | Q | So this was no different than how he normally |
| 2 | | treated you? |
| 3 | A | No. |
| 4 | Q | So then from -- he would have first learned |
| 5 | | that you had some type of a back condition in |
| 6 | | or around May of 1996, yes? |
| 7 | A | See, the thing with the job is you don't -- |
| 8 | Q | That's a yes or no. |
| 9 | A | Yes. |
| 10 | Q | And do you believe that he took any action |
| 11 | | against you after learning from you in May 1996 |
| 12 | | that you had a back injury because you had a |
| 13 | | back injury? |
| 14 | A | Do I think Kevin did?  I don't know if he did. |
| 15 | Q | Nothing sticks out in your head? |
| 16 | A | No. |
| 17 | Q | So what is the point in time when you |
| 18 | | believe -- withdraw that. |
| 19 | | Do you believe there is a point in |
| 20 | | time when he changes and does start taking |
| 21 | | action against you because you had a |
| 22 | | disability? |
| 23 | A | That time would be from April 10th, the very |
| 24 | | noticeable -- very noticeable time to me was |
| 25 | | April 10th, the day -- the return of the |

Brandon Smith Reporting Service

d4b99268-03b9-477f-bc3a-f009df837d6a

Page 213

```
 1          disability leave.

 2    Q     Prior to that time, had he ever made any

 3          comments or statements to cause you to believe

 4          that he had any issue with the fact that you

 5          had had an injury condition?

 6    A     No.

 7    Q     No?

 8    A     No.

 9    Q     Did he ever make any derogatory comments about

10          your physical condition?

11    A     No.

12    Q     No?

13    A     No.

14    Q     In your -- where did you work before you worked

15          at Fleet?

16    A     Prior to April 10th, he never made any

17          derogatory issues --

18    Q     Right.

19    A     -- of my back.

20    Q     Right.  Okay.  Where did you work before you

21          joined Fleet?

22    A     Directly before I had a couple of jobs at the

23          same time.  I still -- I had been a real estate

24          agent full-time from 1978, and then when the

25          market got slow in -- I can't remember.  I need
```

d4b99268-03b9-477f-bc3a-f009df837d6a

COPY

Page 235

1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF CONNECTICUT

2

3        - - - - - - - - - - - - - x
         LINDA UNGERLEIDER,              |
4              Plaintiff,

                                         |

5        VS.                             CIVIL ACTION NO.
                                         |   3:02CV659(AVC)

6        FLEET MORTGAGE GROUP OF
         FLEET BANK [sic],               |
7              Defendant.
         - - - - - - - - - - - - - x    Volume 2

8

9

10

         ----------------------------------------------------------
11           CONTINUED DEPOSITION OF:  LINDA UNGERLEIDER
         ----------------------------------------------------------

12

13

14

15          Taken before James A. Scally, Registered
         Professional Reporter, a Notary Public in and for the State
16       of Connecticut, pursuant to the Federal Rules of Civil
         Procedure, at the offices of Brown Raysman Millstein Felder
17       & Steiner, CityPlace II, 185 Asylum Street, Hartford,
         Connecticut, on July 14, 2003, commencing at 10:03 a.m.

18

19

20

21

22

23

                         BRANDON SMITH REPORTING SERVICE
24                            (860) 549-1850
                              44 Capitol Avenue
25                       Hartford, Connecticut 06106

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 304

1     Q    Okay.  And, again, other than the fact that he got

2     a warning, you don't have any recollection of any other

3     negative or adverse treatment by Kevin Moran towards Mr.

4     Freedman?

5     A    I don't recall any.

6     Q    You believe Dino Cortez left Fleet because of Mr.

7     Moran?

8     A    I don't know if that's why he left.  I just know

9     how I heard him being treated.

10    Q    So you have no knowledge as to whether Mr.

11    Cortez's departure from Fleet had anything to do with Mr.

12    Moran; is that correct?

13    A    I don't know if that's the reason why he left,

14    correct.

15    Q    Why did you resign your employment with Fleet?

16    A    I had no other choice.

17    Q    Why did you resign your employment with Fleet?

18    A    I had no other choice.  I would have been further

19    injured.

20    Q    How would you have been further injured?

21    A    Without being able to be simply accommodated, I

22    was required to still carry more equipment than I needed --

23    should have and needed to do my job, and it could further

24    hurt my back.

25    Q    Any other reason?

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 305

1      A     I was harassed beyond -- inhumanely harassed.

2      Q     Anything else?

3      A     I was given a false written warning that they

4   weren't willing to correct.

5      Q     Anything else?

6      A     I think that's it.

7      Q     Okay.  You state that you were inhumanely

8   harassed.  By whom?

9      A     Kevin Moran.

10      Q     Over what period of time were you inhumanely

11   harassed by Kevin Moran?

12      A     From the day I returned, April 10th, until the day

13   I resigned.

14      Q     Tell me every incident of inhumane harassment by

15   Kevin Moran to you from April 10th, 2000, until the day you

16   resigned.

17      A     Threatening to terminate me constantly.

18      Q     Anything else?

19      A     Threatening that if I didn't -- threatening that

20   if I didn't do my job, he would -- threatening that I

21   wasn't doing my job, but then not letting me do my job,

22   which meant going into the Orange branch, so a lot of

23   mixed -- mixed demands to make it impossible to do my job.

24      Q     Anything else?

25      A     Being demanded to get out of my office in Orange,

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 306

1    but not being told, getting any help to do it.

2        Q    Anything else?

3        A    Being laughed at when I said that it wasn't fair

4    and "Why are you doing this to me," and sneered at.  And

5    not given answers to why he would make false statements

6    about me.

7        Q    Anything else?

8        A    Saying that I -- telling me that I'm not

9    professional.

10       Q    Anything else?

11       A    Forcing me to have an office without an elevator

12   in a two-and-a-half-story office building.  Not helping me

13   to get Fleet to stop taking large sums of money out of my

14   personal checking account.

15       Q    Anything else?

16       A    Not willing to answer why you wouldn't do simple

17   accommodations.

18       Q    You're talking about physical accommodations?

19       A    Getting a PC so I could do my job.

20       Q    Anything else?

21       A    Not helping me with -- there seemed to be suddenly

22   customers that were -- I was having -- it appeared I was

23   having difficulty with customers when I returned in that

24   short period of time, and he wasn't willing to help me with

25   the instances.

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 307

1    Q    Anything else?

2    A    Not willing to trade off to give me a different

3    branch somewhat equal to, as best as he could, to be

4    somewhat equal to the Orange branch.

5    Q    Anything else?

6    A    Saying things to me in his office privately and

7    then saying things differently in e-mail.  Saying that I

8    didn't know what I was doing on the computer, knowing that

9    everybody was having the same problem.  Just treating me

10   completely unlike anybody else was being treated.

11   Q    Anything else?

12   A    I think that's it.

13   Q    How much conversation would you say you had with

14   Mr. Moran, not e-mail communications, not written

15   communications.  Let's break it down:  How many face-to-

16   face conversations do you believe that you had with Kevin

17   Moran from April 10th, 2000, until your resignation?

18   A    Face to face, I don't remember.

19   Q    More than one?

20   A    I would be guessing.

21   Q    So you have no idea?

22   A    More than one, I would think, but don't recall,

23   remember, at all.

24   Q    So you don't remember a single conversation face

25   to face where he ever threatened to terminate you?

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 308

1      A    What was the question again?

2      Q    How many face-to-face conversations do you believe

3    you had with Kevin Moran from April 10th, 2000, until your

4    resignation?

5              MS. TELKER:   That wasn't the last question.

6      A    You're changing your question.

7      Q    I thought that's the one that you wanted.  I said

8    so you don't remember a single conversation face to face

9    where he threatened to terminate you?

10     A    Yes, I do remember.  I don't remember how many

11   times, but there were more than one.

12     Q    So how many times did he threaten to terminate

13   you, and to the best of your recollection, please tell me

14   exactly what or as much as you can remember about what he

15   told you.

16     A    Face to face --

17     Q    Yes.

18     A    -- is the question?  Threatening to terminate me,

19   face to face, the first time was the April 10th, 2000.  Ten

20   o'clock in the morning.  At his office when he handed me

21   the written warning.  I believe that was the time; I

22   remember it was early in the day.  And threatened to

23   terminate me.  From that point on, I would be coming into

24   the -- his office location, the headquarters, showing him

25   the evidence and documentation encountering his written

Brandon Smith Reporting Service

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 309

1   warning, false written warnings, and every time I would

2   come in with them, he would threaten to terminate me.

3       Q    Okay.

4       A    So I don't remember how many times I came in, but

5   I kept coming in.  I kept trying to fix the problem.

6       Q    Let's go back.  What did he say to you in the

7   April 10th, 2000 meeting that was threatening to terminate

8   you?

9       A    What did he say?

10      Q    Yes.

11      A    He said that he was -- that if I didn't --

12  something -- I don't know exactly verbatim, but something

13  that if I didn't correct the -- if I didn't correct what I

14  was doing wrong, I would be terminated.

15      Q    Is there anything else that he said that you

16  deemed to be a threat to terminate you?

17      A    The written warning.

18      Q    Just the written warning and him telling you that

19  if you didn't improve your performance, what -- it could

20  lead to further disciplinary action, up to and including

21  termination?

22      A    Yes.  And also if I didn't get out of the Orange

23  branch right away, he would terminate me.

24      Q    When did he say that to you?

25      A    From the --

Brandon Smith Reporting Service

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 310

1      Q    Did he tell you that on April 10th?

2      A    Yes.  No.  Actually, I don't remember him saying

3    specifically getting out, if I didn't get on out that day,

4    he would terminate me.  It was more general.  If I didn't

5    correct these things in the warning.

6      Q    So that's what he told you on the 10th, which was

7    you need to correct your performance, and if you don't,

8    your employment could be terminated?

9      A    "You have to correct your computer; you have to

10   correct how you -- you have to -- you can't continue to

11   miss meetings."  We went over the warning.

12     Q    But he didn't tell you that if you don't get out

13   of the Orange branch right away, you're going to be fired

14   on April 10th?

15     A    Not on April 10th.

16     Q    Okay.  How many times did you go to him to show

17   him evidence?

18     A    I don't remember how many times, but --

19     Q    Can you -- more than once?

20     A    Yes.

21     Q    More than twice?

22     A    I believe so.

23     Q    More than three times?

24     A    I don't remember.

25     Q    So it could have been as little as two times?

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 311

1      A     I don't remember.

2      Q     And what do you recall him saying to you that was

3    a threat to terminate your employment?

4      A     He just generally threatened to terminate my

5    employment.

6      Q     Tell me what he -- what you can recall him saying.

7      A     That's what I recall, that he threatened to

8    terminate my employment.

9      Q     Out of the blue he said, "I'm going to fire you"?

10     A     He used the word "terminate."

11     Q     Out of the blue he said, "I'm going to terminate

12   your employment" --

13     A     If I didn't do things.

14     Q     What things?

15     A     I don't recall.  He just threatened to terminate

16   me.  And I don't recall.

17     Q     So you don't recall anything about the words that

18   he spoke to you that you took to be a threat to terminate

19   your employment?

20     A     I think I said that already, I don't.

21     Q     Was anybody else ever present when he threatened

22   to terminate your employment?

23     A     Well, the HR people were aware of this threat.

24     Q     Was anybody else ever present when he threatened

25   to terminate your employment?

Brandon Smith Reporting Service

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 312

1      A      His office door was open, and there might have

2  been people that might have heard.

3      Q      Do you know who might have heard?

4      A      There were -- there might have been anybody that

5  worked in that office at any time.

6      Q      Do you have any knowledge that some -- that

7  somebody heard him threaten to terminate your employment?

8      A      Nobody that I can name specifically.

9      Q      Is there anything that you can think of that he

10  said to you other than that if you don't improve the

11  performance and conduct issues that were documented in the

12  written warning given to you on April 10th, that you

13  considered -- withdraw that.  Let me change that.

14          Other than Kevin Moran telling you that if you did

15  not improve the performance and conduct issues outlined in

16  the April 10th, 2000 written warning, that you would be

17  subject to further discipline up to and including

18  termination, are there any other circumstances under which

19  you believe Mr. Moran was threatening to terminate your

20  employment?

21      A      I remember that he -- they were looking for

22  documents to process applications, and they were on my desk

23  in the Orange branch, and he threatened me that if I didn't

24  process -- if I didn't process my -- if I didn't get my

25  documents in, I would be terminated because I wasn't doing

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

7/14/2003                                                    Linda Underleider

Page 313

1    my job, even though he wouldn't let me go into the Orange

2    branch.  So there was a time -- there was a time when he

3    said that as well.

4         Q    Anything else that you can remember?

5         A    No.

6         Q    Did you make any notes of any of these threats at

7    the time?

8         A    At the time, it would only have been what Fleet

9    has in their -- what Fleet would have in their records

10   would be e-mails back and forth with Paquin regarding the

11   whole incident, all of them.

12        Q    Other than that --

13        A    No.

14        Q    -- you did not maintain any notes?

15        A    No.

16        Q    You did not make any records yourself of any words

17   that he used or --

18        A    No.

19        Q    Okay.  Is there anything that you can think of

20   that could refresh your recollection as to the content of

21   any discussions that you had with Mr. Moran face to face or

22   via telephone from April 10th, 2000, through May 24th,

23   2000?

24        A    No.  That was -- I was very distressed and frantic

25   because I had --

Brandon Smith Reporting Service

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 322

1                    MS. TELKER:  Her previous testimony was
2      there were several reasons why she resigned, I believe.
3                    MS. GAROFALO:  Well, but she also testified
4      that that's why ultimately she resigned.
5      A     That was the most physically critical reason.
6      Emotionally there were other reasons.
7      Q     So when you just said -- when you just testified
8      that that's why you resigned, because they hadn't responded
9      to your request for a PC, is that not a true statement?
10     A     No.  I had to resign because they didn't
11     accommodate it, and I didn't want to end up having back
12     surgery like other loan officers did.
13     Q     So if you don't know, you can say you don't know.
14     The question I'm asking is:  If they had given you a PC,
15     would you have resigned your employment?
16     A     I would have definitely -- I would have -- I would
17     go to work right now for them if everything could be fixed.
18     Q     Would you please answer the question:  If they had
19     given you a PC --
20     A     If they had given me a PC, I would not have
21     resigned that day, then.  I would have continued to try to
22     resolve the other issues.  And if I was continued to be as
23     harassed by Moran as I was, I would speculate that I might
24     have still resigned because of the emotional treatment.
25     Q     Okay.  Thank you.  So leaving your laptop at home

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 323

1    and working from your home was never an accommodation that

2    your treaters would have recommended or accepted; is that

3    correct?

4         A    The treater -- I don't know what the treaters

5    would have recommended, but it wouldn't -- I wouldn't have

6    been able to do my job that way.

7         Q    Did you ever accept from Fleet the accommodation

8    that you would work from a home office --

9         A    No.

10        Q    -- and leave your laptop at home?

11        A    No, because it wouldn't work.

12        Q    Is the answer yes or no?

13        A    No.

14        Q    So it's your testimony that you didn't return to

15   Fleet Bank on April 10th, 2000, accepting the alternative

16   that you would work from home?

17        A    No.

18                  MS. GAROFALO:  Can we mark this as Exhibit

19   25.

20                  (Exhibit 25, 4/5/00 fax, marked.)

21        Q    I'm showing you what's been marked as Exhibit 25,

22   and can you tell me if you recognize any of the handwriting

23   on there?

24                  MS. TELKER:  What is it?

25                  THE WITNESS:  It's a fax to Kevin; it says,

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 324

```
 1    "Remarks."

 2        Q     (By Ms. Garofalo)  Why don't you read it into the

 3    record.  Wait.  First answer the question:  Is that your

 4    handwriting?

 5        A     Looks like it.

 6        Q     Do you recognize your own handwriting, Ms.

 7    Ungerleider?

 8        A     It looks like it.

 9        Q     Is that your handwriting or isn't it?

10        A     Yes, I'm assuming it is.

11              MS. TELKER:  She says it looks like it.

12              MS. GAROFALO:  Who doesn't recognize their

13    own handwriting?

14        Q     (By Ms. Garofalo)  Is it your handwriting or is it

15    not your handwriting?

16        A     It looks like my handwriting.

17        Q     Do you have any reason to believe that this isn't

18    your handwriting?

19        A     No.

20        Q     So can we say that this is your handwriting?

21        A     Yes.

22        Q     Can you please read what is in the remarks section

23    into the record?

24        A     Number 1 --

25              MS. TELKER:  What's the date of it?
```

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 329

1  recognize that fax number?

2      A    No.   That is little print on the top.   I don't

3  know where that came from.

4      Q    Do you recognize the fax number 203-925-1247?

5      A    Yes.   This was the general fax cover from Shelton,

6  Connecticut.   Even at this point we were in Seymour,

7  Connecticut.   So it's just a fax number.   Not necessarily

8  where it's faxed.

9              MS. GAROFALO:   Okay.   I reserve the right

10  to, because Ms. Ungerleider is not saying -- is saying that

11  she doesn't know whether she wrote this or not, to have

12  this reviewed by a handwriting expert who perhaps can shed

13  light on whether this is her handwriting or not.

14              Why don't we mark as the next exhibit,

15  Exhibit 26, this document.

16              MS. TELKER:   Besides, it's very clear that

17  she's saying "if."   She didn't say she accepted it.   She's

18  saying --

19              MS. GAROFALO:   You don't have to explain

20  the language.   You can save that for trial.

21              MS. TELKER:   Right.   Exactly.

22              MS. GAROFALO:   It says, "The letter from

23  medical doctor and chiropractor, accept home office to keep

24  laptop" --

25              THE WITNESS:   Doesn't have page 2.

Brandon Smith Reporting Service

Page 330

1                        MS. GAROFALO:  I'm not going to get in an

2    argument with you guys.  Please mark the exhibit.

3                        MS. TELKER:  Fine.

4                        THE WITNESS:  Give us the full document,

5    not just half of it.

6                        MS. GAROFALO:  Well --

7                        (Exhibit 26, photocopy of note from Dr.

8    Warman, marked.)

9        Q    (By Ms. Garofalo)  I'm going to show you what's

10   been marked as Exhibit 26.  Can you tell me who Mark J.

11   Warman --

12                       MS. TELKER:  Wasn't that 26?

13       Q    -- M.D. is?

14                       MS. GAROFALO:  No.  This is 26.

15                       THE WITNESS:  That's 25.  26 is Dr. Mark

16   Warman.

17       Q    Can you tell me who he is?

18       A    Sports and occupational physician.

19       Q    And is he somebody who treated you?

20       A    Yes.  One of them.

21       Q    Can you read into the record what this says?

22       A    "Ms. Ungerleider cannot return to work until she

23   has her PC on her desk or home office is available so she

24   does not have to carry her computer."

25       Q    So does this refresh your recollection as to

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 331

1    whether any of your treaters said that a home office would

2    be a suitable alternative?

3        A    They are saying that it's unsuitable -- a suitable

4    alternative; however, it doesn't allow me to do the job I

5    need to do.  You need to be at a computer.  Customers

6    weren't going to come to my home.

7        Q    But didn't Fleet tell you that you could take

8    manual applications and enter them onto your laptop in the

9    evening?

10       A    In the old --

11       Q    Or during the workday when you were at home?

12       A    There was a time where that might have worked, but

13   when the industry was having -- Fleet was having -- and the

14   industry was having, midday rate changes --

15       Q    Can we please have you respond?

16                MS. TELKER:  She did explain her answer.

17                MS. GAROFALO:  But she has not answered the

18   question.  The question was didn't Fleet --

19       A    I will answer.

20       Q    Answer the question first.

21       A    I am answering.

22       Q    No.  It's a yes or no:  Did Fleet tell you that

23   you could take manual applications and enter them onto your

24   laptop in the evening?  Yes or no?

25       A    They told me, but they knew I couldn't do my job

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 332

1    that way.  That was part of the harassment.

2        Q    So, yes, they told you that you could leave your

3    laptop --

4        A    I don't know if they told me, but whether they

5    told me or not, I couldn't do my job that way.  I needed to

6    have access to get updates of the status and communication

7    with the processor, with the pricing people to be able to

8    do my job.  So whether or not I could take it manually or

9    do it at home, it doesn't matter.  It was required.  You

10   needed to be -- to have a PC, you needed to have something.

11   It was to be a PC -- what would have worked out was a PC at

12   the desk and a laptop at home.

13       Q    Right.

14       A    That way, just like it's being done where I'm

15   working now.

16       Q    And that wasn't available, so you chose to come

17   back to the office knowing that it wasn't available, and

18   you accepted a home office and keeping your laptop there as

19   an alternative until hopefully a PC would be available at a

20   future date?  Isn't that correct as of April 5th, 2000?

21       A    I didn't accept it.

22       Q    So if you wrote that here, if this turns out to be

23   your handwriting here, then you were saying something that

24   wasn't true?

25       A    I needed to get back to work to make -- to pay

Page 344

1    how many times.

2        Q    More than five times?

3        A    Probably.

4        Q    More than ten times?

5        A    Probably.

6        Q    More than 15 times?

7        A    I don't know.

8        Q    And who did you talk to about forwarding materials

9    or documents that customers would drop off to you at your

10   other branch?

11       A    I asked -- I had asked Kevin Moran to take care of

12   that.

13       Q    You didn't ask anybody at the branch?

14       A    Not at that point.  I wasn't having conversations

15   where they would be helpful to me.

16       Q    Do you claim that branches were -- no.  Withdraw

17   that.

18            In your final meeting with Rachel Paquin and Mr.

19   Frazza, did you tell them that you hated the company?

20       A    Yes.

21       Q    Did you tell them that you were glad you were

22   leaving the company?

23       A    Yes.  I was hysterical.

24       Q    I'm going to show you what's been marked as

25   Defendant's Exhibit 3 and show you the cover sheet form

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0