Page 347

```
 1      Q    What other reasons?

 2      A    Because I filed a lawsuit because they wouldn't

 3  pay my medical bills for work-related injury.

 4      Q    Other than workers' comp retaliation, anything

 5  else?

 6      A    Not that I can think of.

 7      Q    So when you filed this, the only thing that you

 8  were claiming was that you had been given a warning and

 9  given a poor evaluation and discriminated against on April

10  10th, 2000; is that correct?

11      A    And that discriminated against disability.

12      Q    Well, no, but I'm asking, I'm saying that the

13  adverse employment actions you were complaining about at

14  the time were limited to having been warned, having been

15  given a poor evaluation, and having been discriminated

16  against in the terms and conditions of your employment on

17  April 10th, 2000?

18      A    Disability discrimination, yes.

19      Q    Well, actually, you claimed gender, age,

20  religion --

21           MS. TELKER:   Right.

22      Q    -- disability.

23      A    Whatever's on there is what I claimed.

24      Q    Okay.  But you're saying it was what occurred to

25  you on April 10th, 2000.  That's what you were complaining
```

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 348

1    about when you went to the CHRO; is that correct?

2         A    Yes.

3         Q    Did you speak with anybody, any type of an intake

4    person, any type of an employee at the CHRO when you filled

5    this out?

6         A    I don't think they assisted me to fill it out.

7         Q    The question was did you speak with anybody, any

8    type of intake person?

9         A    I don't remember.

10        Q    Did you personally physically go to a CHRO office?

11        A    No.

12        Q    How did you get this form?

13        A    I believe, if I remember right, I mailed for it.

14        Q    Do you have a copy of what you mailed it in?

15        A    No.  Whatever you have, I have.

16        Q    How did you have an understanding about going to

17   the CHRO?

18        A    How did I know to go there?

19        Q    Yes.

20        A    Don't remember.

21        Q    So was it after this lawsuit had begun?  I asked

22   the question before:  When did you realize -- withdraw

23   that.

24             At the time that you filed this, you were not

25   intending to claim that you had been constructively

Brandon Smith Reporting Service

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 349

1    discharged; is that correct?

2         A    At the time I filed it.

3         Q    No?

4         A    No.

5         Q    Okay.  Did you ever file any kind an amended

6    complaint with the CHRO claiming constructive termination?

7         A    I don't recall.

8         Q    Do you have any knowledge of having done that?

9         A    I had discussions that my purpose was, as noticed,

10   I didn't check off compensation.  The purpose was to see if

11   they could help me get my job back.

12        Q    The question was:  Do you have any knowledge of

13   having filed an amended complaint?

14        A    I don't recall.

15        Q    Did you ever speak with anybody on the phone at

16   the CHRO to get any information on how to fill out the

17   form?

18        A    I don't remember.

19        Q    Who do you believe at Fleet was motivated to

20   discriminate against you on account of your religion?

21        A    I think that's an objectionable question.

22        Q    There was no objection.  The question is pending.

23        A    What was the question again?  Who did I believe

24   discriminated against me?

25        Q    Who do you believe at Fleet was motivated to

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

7/14/2003

Linda Underleider

Page 356

1    Mouth guards, and I've had off and on.

2    Q    That you would wear at night?

3    A    At night, tried it during the day.

4    Q    And when was that?

5    A    Even recently, like a couple years ago, sometimes

6    with stress, it's clenching.  But I never had -- I never

7    really had wires, I don't think.

8    Q    Would you remember if you ever had wires in your

9    mouth?

10    A    I definitely didn't have my mouth wired shut.  But

11    I definitely had to wear -- after the Fleet thing, I had to

12    wear a mouth guard around the clock because of clenching

13    and muscle spasm.

14    Q    Okay.  Did you ever tell anybody that you were

15    having your mouth, your jaw, wired shut?

16    A    No, I don't think so.

17    Q    You have no recollection of telling anybody that?

18    A    No recollection.

19    Q    You mentioned that you believe Kevin Moran

20    discriminated against you on account of your religion.  I

21    believe during your last day of testimony, you talked about

22    comments and statements that you contend Mr. Moran had said

23    that were anti-Semitic.  Other than -- and we talked about

24    the fact that you felt like you got a bad performance

25    review after you believe he discovered that you were Jewish

Page 357

1    or realized that you were Jewish.

2              Is it your contention in this case that the fact

3    that you were Jewish was a factor in Mr. Moran's issuance

4    to you of a written warning in 2000?

5        A    I don't know the particular reasons.

6        Q    I'm asking you whether you're contending in this

7    lawsuit --

8        A    Oh, contending, yes.

9        Q    And what are you basing that contention on?  And

10   I've tried to summarize what you testified in your last

11   day.  If it's that and there's nothing more, then you can

12   just say that.

13       A    It's just I don't know -- I don't believe it was

14   more -- more than just -- initially I really believed it

15   was just Kevin Moran, and then I really then understood

16   that it was more of -- it appeared to be more of a

17   corporate decision to try to make me resign or work towards

18   terminating me because more because of the disability, but

19   personally, there was -- there's no doubt in my mind,

20   because of comments said to me, that Kevin Moran didn't

21   like me because I was Jewish.

22       Q    The question I asked is:  Do you contend in this

23   case that the fact that you were Jewish was a factor in Mr.

24   Moran's issuance to you of a written warning in 2000?  And

25   what do you -- and if so, what do you base that contention

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 358

1    upon?

2        A    The last answer I gave is the best I can give.  I

3    don't have any other comment.

4        Q    So you have no other --

5        A    I can't speculate.

6        Q    You have no other information or evidence or facts

7    that you're relying upon to support that claim other than

8    what you've already testified to; is that correct?

9        A    What I've provided.

10       Q    All right.  Well, is there anything else that you

11   believe you've provided that you haven't testified to?

12              MS. TELKER:  Well, what -- do you have

13   the -- what she testified to the last time, so she could

14   see if there's anything she wants to add to?

15              MS. GAROFALO:  Well, she stated that she

16   has read her transcript.  I've tried to summarize what I

17   believed was the testimony that I remembered.

18       Q    Is there anything else that you can think of that

19   I haven't mentioned that you're relying upon?

20       A    I mean I would want to review it more for making a

21   final comment that there was nothing else.

22       Q    Then we'll have to say what are you relying upon

23   to support your claim that --

24       A    Previous experience.

25       Q    Excuse me.  -- that the April 2000 final warning

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 359

1  or written warning was on account of your religion?

2      A    I have no more to say about it.  It's based on how

3  he treated me.

4      Q    And nothing else?

5      A    Nothing else.

6      Q    Similarly, do you contend that the Orange branch

7  was removed from your responsibility by Kevin Moran in 2000

8  on account of your religion?

9      A    One of the reasons.

10     Q    And what facts do you base this claim upon that

11  the Orange branch was removed by Kevin Moran on account of

12  your religion?

13     A    Facts was that he made -- nobody was willing to

14  sit down and discuss something very silly about customers;

15  nobody was willing to discuss it or discuss a remedy, which

16  doesn't seem to be a normal action in the workplace.

17     Q    I know you disagree with the removal of the Orange

18  branch.  My question is:  What makes you think that your

19  religion was a factor in that action?

20     A    Because he had made -- he's made derogatory

21  comments and things were said that had he respected me for

22  or liked me or treated me equally, I think he would have

23  treated me equally and given me another branch like he did

24  for other people.  When he had to take them out of a branch

25  for various reasons, he accommodated them with an equal, as

Brandon Smith Reporting Service

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 360

1    best as he could, an equal branch.

2        Q    Is there anything else that you're relying upon

3    for your claim that that branch was removed from you on

4    account of your religion?

5        A    No.

6        Q    And it's your testimony that every time he took a

7    branch away from somebody, he always replaced it with

8    another branch; is that correct?

9        A    I can't say what he always did.

10        Q    Okay.  So you're speculating when you say every

11    time a loan officer had a branch removed, they got it

12    replaced with another branch?

13        A    I'm not totally speculating.  I'm going with the

14    situations from when I was there that I can recall where

15    particular loan officers were removed and branches were

16    switched.

17        Q    And in every one of those instances that you can

18    recall, somebody had another branch given to them?

19        A    The ones that I recall.

20        Q    And you never recall an instance where, for

21    example, a loan officer got a branch taken away and they

22    didn't get it replaced?

23        A    There were -- Kevin took branches away from loan

24    officers to give to other loan officers, and ultimately the

25    other two people I'm thinking of quit because of it.  I

Page 361

1    mean it could have been one of the reasons why they quit.

2        Q    And what two people were they?

3        A    Carol Cook and Bob Foote were removed from

4    branches, but I don't know if -- I think they might have

5    been switched.  I don't know.

6        Q    Why would they have quit if they got another

7    branch?

8        A    Because they weren't happy that the branches which

9    he took away, which were income-producing branches, were

10    given to somebody else.

11        Q    Were either of them Jewish?

12        A    I don't know.

13        Q    So you would agree that Kevin Moran from time to

14    time took branches away from people and that the people who

15    had the branches taken away were not happy?

16        A    They weren't given equal branches.

17        Q    So that happened?

18        A    But it was a different circumstance.

19        Q    Okay.

20        A    It was the branches that were taken away from them

21    were not their offices and were not their biggest producing

22    income.  They were just like when I had Shelton, what were

23    the two branches?  Seymour and Ansonia taken away from me,

24    I didn't get upset, as upset -- I was upset, but I wasn't

25    as upset because they were minor branches.  They weren't,

Page 362

1    you know, something that would help pay the bill branches.

2    They weren't my office.

3        Q    Why were those branches removed?

4        A    That's when I returned from the physical

5    disability leave.  So --

6        Q    Why were those branches removed?

7        A    Why were they removed?  He told me they were

8    removed to create another territory for a new loan officer.

9    However, he could have taken them from, let's say, Sharon

10   Scramente who might have had maybe 10 or 12 branches.  He

11   could have given her some of the new hires -- some of

12   Sharon's or some of somebody else's, but it just seems that

13   the timing of taking them away from me, when I came back

14   from disability, was questionable.

15       Q    So it's your testimony that those branches were

16   taken away immediately upon you coming back from disability

17   leave?

18       A    I don't know if it was immediately.  Within a

19   short time, though.

20       Q    How much time?

21       A    I don't remember.

22       Q    But you just testified it was immediately.

23       A    Well, immediately, not like it was six months or a

24   year away.

25       Q    Could it have been three months away?

Brandon Smith Reporting Service

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 366

1      Q     Okay.

2      A     But Pierce, as I said before, which I didn't know

3   which loan officer, he didn't want the branch that was

4   taken away from him.

5      Q     So if he didn't want the branch, why are you

6   writing him a letter criticizing Kevin Moran to Pierce

7   Downey?

8      A     Because I was hoping to get him, being that he's

9   best friends with Kevin Moran, played in his band, was in

10  his wedding party, the whole thing, trying to get him to

11  give me some reason of why he did this to me.  I mean

12  they're best friends.

13     Q     Okay.  So it's your testimony that nobody other

14  than you and Pierce Downey had branches taken away from

15  you, Pierce didn't care about losing his, and, indeed,

16  Pierce was one of Kevin Moran's best friends.  So he

17  obviously wasn't trying to hurt Pierce Downey by taking a

18  branch away from him, correct?

19     A     I'm not going to speculate what Kevin was doing.

20  I just know how I felt about it, and I know that Pierce

21  didn't want that branch.  It was in a staff meeting at one

22  time when he -- there were some people that didn't want to

23  be in particular branches; sometimes people volunteered and

24  switched.

25     Q     Okay.  And I'm just trying to get at that as far

Brandon Smith Reporting Service

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 368

1      Q      Did everybody have the same number of branches?

2      A      Well, the better you did, the more you got and the

3    better ones you got.

4      Q      So other than what you've already testified to,

5    any reason to believe that your religion played a role in

6    his taking away of this branch, these branches from you

7    in '99?

8      A      Any other reason?

9      Q      Correct.

10     A      Besides religion?

11     Q      No.  Anything else that supports your claim that

12   religion was a factor.

13     A      Supports my claim.  I don't know.

14     Q      Do you contend in this case that you were

15   constructively discharged from Fleet on account of your

16   religion?

17     A      That's one of the reasons.

18     Q      Yes or no?

19     A      Yes.

20     Q      Is that a claim?

21     A      Yes.

22     Q      And what are the facts that you're basing that on?

23     A      The way I was treated.

24     Q      Anything else?

25     A      Are we still talking about the religion?

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 369

1       Q     Yes.

2       A     That's it.

3       Q     What do you mean by "The way I was treated"?

4       A     I've already said it.  That's my final answer.

5       Q     You have no other facts to support your claim,

6    other than what you've already testified to, that your

7    alleged constructive discharge was on account of your

8    religion?

9       A     I have no other facts.

10      Q     Did you have an offer of employment from Guilford

11   Savings Bank?

12      A     Yes.

13      Q     Did you ever commence employment at Guilford

14   Savings Bank?

15      A     No.

16      Q     And why not?

17      A     Because the income was too low and it was -- the

18   location requirement to work on Saturdays was to be there,

19   I think, 8:30, and to get over the Quinnipiac Bridge during

20   Cape summer traffic, I never would have made it.

21      Q     Did you accept the position?

22      A     I told them I would think about it, and when

23   everything else was coming up, I was getting desperate, but

24   I don't believe I ever accepted it.  I didn't start working

25   there.

Page 375

1    support your claim that you were constructively terminated

2    on account of your disability?

3        A    One fact is there appeared to be e-mails regarding

4    providing me with a PC, but there was never a PC provided.

5        Q    Anything else?

6        A    I was forced to move out of an office without

7    being provided with anybody to help me.  I was forced to go

8    to an office two and a half stories, 32 steps, without an

9    elevator with them knowing I had a back problem.  Bad back

10   problem.

11       Q    Anything else?

12       A    What other supporting evidence?

13       Q    Yes.  What are you relying upon for your belief

14   that the constructive termination occurred on account of

15   your disability?

16       A    And because it occurred -- what was -- what

17   happened to me, what they did to me was when I returned

18   immediately from disability leave.

19       Q    So timing?

20       A    Timing, yes.

21       Q    Anything else?

22       A    They wouldn't -- they didn't treat me equally as

23   they did with other people that came back from back injury

24   or surgery or back problems.  They treated them

25   differently, and didn't treat me equally.

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 376

1      Q      So you were treated worse than other people who

2      had come back from back injuries or surgeries; is that

3      correct?

4      A      Differently.

5      Q      Well, what do you mean by "differently"?

6      A      One person was given a job where she wouldn't be

7      required -- I don't -- she was actually what I would

8      consider a promotion.  I would have liked it.  Private

9      banking position, when she returned.

10      Q      Who was that?

11      A      Elizabeth Glen.

12      Q      Okay.  Who else?

13      A      Other people that went out on back surgery, back

14      or neck problems, when they came back, they didn't have

15      branches taken away from them, didn't have harassments, and

16      money taken out of their accounts, and they didn't have any

17      complaints; they were happy.  They were able to move on and

18      continue with their job.

19      Q      And how many people do you think -- how many

20      people do you think would fall into that category?

21      A      I think one -- at least five.

22      Q      They all reported to Kevin Moran?

23      A      Yes.

24      Q      Anything else you're relying upon to support your

25      claim that you were constructively discharged on account of

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 380

1    Tartaglio did this because you had a disability?

2         A    No.

3         Q    Do you believe that Barbara Tartaglio fabricated

4    an alleged confrontation with you because of your religion?

5         A    I believe she had some issues with my religion.

6         Q    So is that answer a yes?

7         A    Yes.

8         Q    And what do you base that upon?  Withdraw that.

9              Do you -- actually, I'm going to keep the question

10   in.

11             What do you base that contention on?

12        A    I don't know.

13        Q    No facts?

14        A    Whatever facts I have would be hearsay.  So I'd

15   rather just state I don't know.

16        Q    You can repeat hearsay here.

17        A    She made derogatory comments.  I can't prove them.

18   I just know what I heard.

19        Q    And who told you that she had made derogatory

20   comments?

21        A    She made them to me.

22        Q    About your religion?

23        A    It was just -- she didn't -- there wasn't a

24   definite -- someone had given me a little Christmas tree.

25   It was in blue and silver balls; they called it a Hanukkah

Brandon Smith Reporting Service

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 381

1    bush.  She questioned why would I have a Christmas tree on

2    my desk.  She had a definite attitude.

3        Q    Other than that questioning why you would have a

4    Christmas tree on your desk, any other hearsay or

5    statements or remarks that you're relying upon for your

6    conclusion that Barbara Tartaglio had issues with your

7    religion?

8        A    I don't have any other things I can remember.

9        Q    Okay.  Isn't your belief that Barbara Tartaglio

10   exaggerated or made up this incident because she had a

11   personal grudge against you related to the refinance of her

12   own home?

13       A    I believe that was another issue.  Barbara

14   Tartaglio has issues.

15       Q    There's no question pending.

16       A    Oh.

17       Q    Please strike that.

18            Was Richard Evans biased against you on account of

19   your religion?

20       A    I don't think so.

21       Q    Now, you contend -- is it your contention that

22   Fleet's calendars are somehow evidence of discrimination?

23       A    Yes.

24       Q    Okay.  And what is it that you're claiming?

25       A    Well, it was odd that I had to prove that I --

Page 389

1      A    I don't recall.

2      Q    Kevin Moran gave you a poor review before you ever

3   became disabled; is that correct?

4      A    At one time, yes.

5      Q    Is it possible that Kevin Moran just didn't like

6   you?

7      A    Is it possible that he didn't like me?

8   Absolutely, it's possible.

9      Q    Do you think he didn't like you?

10     A    He liked the money I made for him.  So he kind of

11  gave me mixed feelings.  It wasn't a poor review.  It was a

12  "needs improvement" review.

13     Q    But that occurred before you had any type of a

14  disability?

15     A    Before I had a work-related -- a back injury

16  disability.

17     Q    Why did Joan Salvato leave Fleet?

18     A    I don't know why.

19     Q    Have you ever offered an opinion as to why she had

20  left?

21     A    She spoke to me outside, but I don't really -- I

22  can't really be -- it's hearsay what she told me.

23     Q    That's okay.  Tell me, what did she tell you about

24  the reasons why she left Fleet?

25     A    She didn't like working for the people --

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 392

```
 1    called Hudson Savings Bank or something like that?

 2        A    I think so.

 3        Q    And when was that?

 4        A    I don't remember.

 5        Q    Was it while you were still at Fleet or after you

 6    had left Fleet?

 7        A    I don't remember when.

 8        Q    Did you ever tell anybody at Fleet that you had

 9    been offered a position there?

10        A    I don't remember.

11        Q    How do you spell Personas or Personis mortgage?

12        A    P-e-r-s-o-n-a-s.

13        Q    And where are they located?

14        A    Milford.  And he isn't aware that I'm leaving him

15    until I get a go from Wells Fargo.

16        Q    So you have not yet tendered your resignation?

17        A    No.

18        Q    But you are leaving?

19        A    If Wells Fargo doesn't -- still hires me.

20        Q    Is it your testimony that nobody at Fleet ever

21    offered to get you or to assist you with movers to move

22    your stuff?

23        A    Yes.

24        Q    Did you eventually move your stuff?

25        A    Yes.
```

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 393

1      Q    Out of the Orange branch?

2      A    I didn't, but my son did.

3      Q    Okay.  You did -- withdraw that.

4           Did Kevin Moran ever direct you not to go to the

5    Orange branch?

6      A    Yes.

7      Q    Did you disobey that directive?

8      A    Not intentionally.

9      Q    Did you disobey that directive?

10     A    Yes.

11     Q    And you didn't go in that branch just to conduct

12   personal business, did you, when you were disobeying his

13   directive?

14     A    I had to get the paperwork being dropped off by

15   customers to get their loans processed so they could close

16   on the homes they were purchasing.  I had no choice because

17   nobody was helping me.

18     Q    So Kevin Moran directed you not to go into the

19   branch, but you did anyway, correct?

20     A    And at the same time he made --

21     Q    Correct?

22     A    Yes.

23     Q    That's it.  Was there any restriction on your

24   ability to walk up steps?

25     A    Restriction from the doctor?

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

7/14/2003

Linda Underleider

Page 395

1    was there any other problem with the Milford Green branch?

2         A    Well, if I was a normally healthy person without a

3    back injury, it would have been satisfactory.  Other than

4    the fact that I didn't live in that town and people knew to

5    come to Orange to do business with me.

6         Q    But you testified that you already spoke to your

7    customers.  If you had had a PC on your desk at the Milford

8    Green branch, would that have been a satisfactory

9    accommodation?

10        A    It wouldn't -- it would have been satisfactory to

11   accommodate the back, but it still wouldn't have been -- it

12   still wasn't equal to having the Orange branch, which was

13   my predominant source of income.  But I would not have

14   quit.

15        Q    Did you ever tell any prospective employer that it

16   didn't matter if you didn't have the Orange branch because

17   your customers would go to you no matter where you were

18   located?

19        A    I don't recall telling anybody that.  It wasn't --

20   it was -- realtors would refer them to me usually by phone.

21   But the other reason of getting business was sitting in the

22   first desk as the people came in.  If mortgages was on

23   their mind, refinancing or whatever, and they saw me, they

24   would recognize me, know me, maybe that's why I did well

25   there, because there was more of a confidence because they

Brandon Smith Reporting Service

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 463

1    against you?

2         A    I believe it would be right from the first leave,

3    which was, I think, July sometime, July of '99.

4         Q    So you claim that you were retaliated against for

5    taking leave in July of 1999?

6         A    Because I had to take a leave.

7         Q    Okay.  And any other leave?

8         A    And all following leaves.

9         Q    How many other leaves did you take?

10        A    Well, it was on and off through the end of '99

11   until the April 10th, 2000.

12        Q    Is it your testimony that you took more than one

13   family medical leave in 1999?

14        A    No.  Just one in '99.

15        Q    Okay.  Then you left in July, and you came back in

16   about August of '99?

17        A    Somewheres around there.

18        Q    That's the only one you took in '99, correct?

19        A    Correct.

20        Q    Then you took another one starting in January

21   2000, and you came back April 10th --

22        A    Right.

23        Q    -- 2000, correct?

24        A    Correct.

25        Q    So you're claiming you were retaliated against for

Page 464

1    having taken both of those leaves of absences?

2        A    Yes.

3        Q    What do you think happened to you on account of

4    having taken your July 1999 family medical leave?

5        A    What do I think happened to me?

6        Q    Yes.  What was the adverse action that was taken

7    against you?  In what way were you retaliated against?

8        A    The -- there appeared to be a, I'll call it a

9    conspiracy, based on one particular e-mail looking for

10   opportunities to give me counsel which, according to

11   Fleet's employee handbook policy, is what leads to

12   termination.  So it looks like they were looking to get rid

13   of me.

14       Q    Anything else?

15       A    And all that happened, that occurred.

16       Q    What is the adverse action that was taken against

17   you when you returned?

18       A    The sudden change in the review, in a performance

19   review by Kevin Moran, the removal of branches, the

20   treatment changed dramatically.

21       Q    And that's in '99?

22       A    '99, there was a performance review and removal of

23   branches.

24       Q    Anything else?

25       A    He didn't give me an award that I received.

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 467

1      Q    Then you believe that things happened to you after

2    you came back from leave in 2000 on account of the fact

3    that you had been out on family medical leave?

4      A    I believe definitely he -- April 10th, the day I

5    come back, he has a review that he obviously was preparing

6    while I was out on disability.

7      Q    I thought you said he gave you that review in

8    December.

9      A    No.  I'm talking the warning.  I'm sorry.  The

10   warning April 10th had to have been prepared while I was

11   out on disability leave.  He had to have been researching

12   dates because he went as far back as December '98, which is

13   odd.

14     Q    Anything else?

15     A    What was the question?  When did I believe it

16   started?

17     Q    What do you believe happened to you upon returning

18   from leave in 2000 that was retaliatory?

19     A    Giving me a false warning, leading towards

20   termination, threatened termination, removing a branch,

21   being forced to work in a place that would further injure

22   my back, harassing, not allowed to come in to pick up my

23   personal things or my customer things.

24     Q    Anything different than what you've already

25   testified to to support --

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 468

1       A     No.

2       Q     -- what you're claiming is the basis for your

3   belief that you were discriminated against on account of

4   your disability?

5       A     No.

6       Q     Did those five or so people that you mentioned

7   before that had had surgery and/or back problems or neck

8   problems, had they taken family medical leave?

9       A     I don't know.  Trying to get those records.

10      Q     The question is did they?

11      A     Well, if they followed -- if Fleet followed the

12  same policy, the answer would be yes.

13      Q     Okay.  So they may have been out on family and

14  medical leave as well?

15      A     Yes.

16                  MS. TELKER:  She said she doesn't know.

17                  MS. GAROFALO:  Then she said yes.

18                  MS. TELKER:  She said both.

19                  MS. GAROFALO:  Right.

20      Q     Do you know whether by April 10th, 2000, you had

21  exhausted all of your family and medical leave that was

22  available to you?

23      A     I don't think so.  I don't know.  It wasn't

24  something I thought about.

25      Q     When did it first occur to you that you had been

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

7/14/2003

Linda Underleider

Page 470

1   had PC's and originated on them.  They didn't -- they

2   didn't work harder on trying to mend what might have been a

3   misunderstanding to resolve an issue in the Orange branch.

4   They didn't take, as they say in their employee handbook

5   that they will, if it's not resolved from the supervisor

6   and his -- their manager, that they take it to two, I guess

7   not -- something like unbiased managers, outside of my

8   territory and discuss it with them to see if they can

9   resolve the problem.  They didn't do that.

10          They knowingly and admittedly in e-mail and in

11  discovery stated that they were aware that five out of

12  eleven dates of alleged missed mandatory meetings that I

13  was out on disability, but were unwilling to correct them,

14  unwilling to correct the warning, and expected me to accept

15  it and move on.

16      Q    But you weren't going to accept it and move on?

17      A    Nobody would -- nobody would accept having a

18  slanderous, written, libel statement of unprofessional

19  conduct in their personnel file.  That would be something

20  that unless it was legitimate, if it was legitimate --

21      Q    Did you agree with any of the statements contained

22  in the written warning?

23      A    The only thing I agreed with is that I was -- I

24  did not attend the Cohen Brown training because it was

25  Hanukkah.

Page 471

1    Q    Anything else?

2    A    No, because it was all proven to be false.

3    Q    So you didn't agree that you had ever acted

4    unprofessionally; is that correct?

5    A    Under the Fleet policy guidelines of

6    unprofessional, I did not act unprofessional.

7    Q    And you had no intention of changing your conduct

8    as a result of having been issued that written warning?

9    A    I didn't have any conduct to change.  I was a

10   really nice person.

11   Q    And you had done nothing wrong?

12   A    That's vague.  Did nothing wrong when?

13   Q    Well, is there anything that you can acknowledge

14   that you did that would have warranted any of the

15   criticisms that Kevin Moran included in that written

16   warning?

17   A    The -- not the -- no.  From April 10th to the

18   resignation, I was very upset, and when I -- but not -- I

19   had no reason to be considered unprofessional.

20   Q    The question I'm asking is:  Did you accept any of

21   the criticisms or acknowledge that any of the criticisms

22   contained in the April 10th written -- April 10th, 2000

23   written warning were --

24   A    True?

25   Q    -- were warranted?

Brandon Smith Reporting Service

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Underleider vs Fleet

Page 472

```
1      A     No.  They were -- I didn't accept them.

2      Q     Not a single one?

3      A     No.

4                   MS. TELKER:  Well, have we got to the

5      warning?

6      A     We're trying to --

7                   MS. GAROFALO:  Why don't we take a break.

8      I'll try to find a copy of the warning, and then hopefully

9      we can wrap it up soon.

10                  (Recess:  5:06 to 5:13 p.m.)

11                  MS. GAROFALO:  Let's mark this --

12                  MS. TELKER:  You know, it's just, I mean

13     I've had a number of people look, I have a whole big box,

14     and they can't find it.  So I don't know whether maybe Gary

15     didn't send it.  You know, I don't know, but.

16                  THE WITNESS:  He said he never found it

17     either, though.

18                  MS. GAROFALO:  It's 326 and 327.  But I

19     will give you a copy of it.  Certainly also attached to

20     Fleet's submission to the CHRO.

21                  (Exhibit 38, formal counsel, marked.)

22     Q     (By Ms. Garofalo)  If I could draw your attention

23     to Exhibit No. 38, can you tell me if that's a document

24     that you've seen before?

25     A     This is not the April 10th, and it doesn't have
```

Page 483

1    Q    But you did not agree that you ever engaged in any

2    professional -- unprofessional conduct; is that correct?

3    A    I did not do anything unprofessional conduct.

4    Q    During any time in 2000?

5    A    Absolutely not.

6    Q    Including even after you received that formal

7    warning, it's your contention that you never did anything

8    unprofessional?

9         MS. TELKER:  Well, of course, where is

10   there a definition of "unprofessional?"

11   Q    Do you understand what "unprofessional" means?

12   A    What do you consider unprofessional?

13   Q    I'm not going to tell you.  I'm going to ask you

14   if you have a definition.  If you say, "I don't know what

15   it means to be professional or unprofessional, I can't

16   answer the question," then fine.

17   A    I was professional, but I was upset after April

18   10th.

19   Q    Did you engage in any conduct that you deemed,

20   looking back on it, that you would deem to be

21   unprofessional from April 10th, 2000, to April 24th, 2000?

22        MS. TELKER:  May?

23   Q    May 24th, 2000.

24        MS. GAROFALO:  Thank you.

25   A    No.

Brandon Smith Reporting Service

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 484

1      Q      And you do not agree that there was any problem

2   with your loan quality, any more so than anybody else?

3      A      Correct.

4      Q      And you do not agree that you had any difficulties

5   with meeting attendance?

6      A      Correct.

7      Q      And do you acknowledge that you ever had a

8   confrontation with Sandra Ruff?

9      A      I didn't have a confrontation with Sandra Ruff.

10     Q      Okay.  And so you disagree that you ever had a

11  confrontation with Sandra Ruff?

12     A      I disagree.

13     Q      Did you ever have any unprofessional interactions

14  with Sandra Ruff?

15     A      No.

16     Q      Do you know whether Sandra Ruff ever complained

17  about you?

18     A      I believe she did.

19     Q      And why did she complain about you?

20     A      Actually, I don't know if she complained.  I know

21  she asked for another loan officer.

22     Q      Why did she ask for another loan officer than you,

23  to your knowledge?

24     A      Because she wanted somebody who could service her,

25  her community better, is what I believe.

Brandon Smith Reporting Service

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 485

1    Q    And did you ever tell anyone it was because she

2    wanted to have an Afro-American loan originator in her

3    branch?

4    A    I e-mailed and stated it's what she needed,

5    believed she needed, and what she wanted.

6    Q    So is that accurate that you did do that?

7    A    But not in a derogatory sense.  In a factual

8    sense.

9    Q    Okay.  Carmela, did you have any confrontations or

10   unprofessional interactions with her?

11   A    I left a note on Carmela's desk asking for a Fleet

12   customer's, copy of Fleet customer's bank statement which

13   was required for loan process, and I forgot to put my name,

14   who was requesting it, and I came into a branch one day,

15   and she yelled at me because I didn't sign it, and it

16   caused her a lot of work to have to figure out who left her

17   the message.  So that was the confrontation.

18   Q    She yelled at you?

19   A    Yes.

20   Q    Did you yell back at her?

21   A    No.

22   Q    Did you complain to anybody?

23   A    Not at all.  I didn't think it was a big deal.

24   Q    So how would Mr. Moran know about it?

25   A    Then they discussed it with Mr. Moran, with Kevin.

Brandon Smith Reporting Service

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 486

1      Q    What did they discuss with Mr. Moran?

2      A    They wanted another loan officer, which she had

3    also didn't want other loan officers like Pierce Downey.

4    So I'm not the only one that she didn't want.

5      Q    Did they not want you as a loan officer because of

6    some kind of interaction?

7      A    I don't know.  She -- she went through quite a few

8    loan officers.  So I don't know why she didn't want me.  I

9    speculated.

10     Q    Okay.  But you became aware that at some point

11   Sandra Ruff and Carmela told Kevin Moran something about

12   you --

13     A    Uh-huh.

14     Q    -- that perhaps wasn't positive?

15     A    At some point Carmela made a statement about of

16   her being upset that I didn't sign my name on a little

17   note.

18     Q    And that's all it was limited to?

19     A    Uh-huh.  I'd like -- you could ask her and find

20   out if it's greater than that.

21     Q    And Richard Evans, you deny that you did anything

22   at all unprofessional or inappropriate in your interactions

23   with him back in 1997?

24     A    Absolutely.

25     Q    Okay.  I'm going to show you another document.  I

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 494

1    A    No.  Probably more than one.

2    Q    And it's your testimony that you didn't establish

3    a home office at any time in particular in 2000?  It was

4    something that you had had for some period of time?

5    A    Yes.

6    Q    Did you ever tell Kevin Moran that Barbara

7    Tartaglio was taking the customer's side because she had a

8    personal relationship with a customer?

9    A    I don't remember the exact wording, but she was

10   unwilling to listen to my side of the story.  She only

11   listened to Jay's side of the story.

12   Q    The question I'm asking was:  Did you ever tell

13   Kevin Moran that Barbara Tartaglio was taking the

14   customer's side because she had a personal relationship

15   with a customer?

16   A    I might have.

17   Q    Do you believe that Kevin Moran had been

18   threatening your job for almost three years before the time

19   that you resigned your employment?

20   A    He -- he was always -- I was always walking on egg

21   shells with him.  I hung in there because I loved my job

22   and I did real well.  He was always making some -- he made

23   threats to me often.

24   Q    Throughout your entire employment?

25   A    I don't remember throughout.  Just he -- he

416d7e69-3bc1-4ea1-88b7-4dda8b7b72b0

Page 519

1   Ungerleider that was submitted to the United States

2   District Court.

3        Q    And I would just like to ask you to flip through

4   it and tell me if that's your signature on the last page.

5                    MS. TELKER:  Is there a date on that?

6                    THE WITNESS:  It has to do with I think the

7   arbitration, motion to arbitrate.

8                    MS. TELKER:  Oh.

9                    THE WITNESS:  Compel.  It's my signature.

10       Q    (By Ms. Garofalo)  And do you recall signing that?

11       A    Yes.

12       Q    And do you recall reading the affidavit before you

13   signed it?

14       A    Yes.

15       Q    So to the best of your knowledge, everything

16   contained in here would have been true and accurate?

17                    MS. TELKER:  Well, what's the date of that?

18                    THE WITNESS:  August 26th, 2002.

19                    THE WITNESS:  I'm not sure -- I'm still

20   trying to get those CORE reports to try to be -- then I'll

21   know when I was at work.  So I don't remember if I took a

22   leave on January 10th, as it indicates in paragraph --

23   question or paragraph 5.

24                    It's incorrect; it states -- Phelan did

25   this report.  It states that June to December 2000, I was

EXHIBIT B