COPY

```
1                 UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT
2

3    LINDA UNGERLEIDER              |
              PLAINTIFF             |CIVIL ACTION NO. 3
4                                   |
     VS.                            |
5                                   |02CV659 (AVC)
     FLEET MORTGAGE GROUP OF        |
6    FLEET BANK,                    |JULY 22, 2003
     DEFENDANTS                     |
7
```

8

COPY

```
    ------------------------------------------------------
9          DEPOSITION OF:  KEVIN MORAN
    ------------------------------------------------------
10
11
              Taken before Katrina Loda, Licensed Shorthand
12   Reporter, a Notary Public in and for the State of
     Connecticut, pursuant to Notice and the Connecticut Practice
13   Book, at the offices of Ellen M. Telker, 564 Boston Post
     Road, Milford, Connecticut, on July 22, 2003, commencing at
14   1:12 p.m.
15
16
17
18
19
                     Brandon Smith Reporting Service
20                        44 Capitol Avenue
                     Hartford, Connecticut 06106
21                        (860) 549-1850
22
23
24
25
```

68d0b066-276f-43c1-82da-8917f28bd70f

Ungerleider vs Fleet

7/22/2003                                                            Kevin Moran

Page 8

1          Q      Okay.  And so, well, where would they take

2     mortgage applications?

3                           MS. GAROFALO:  Objection to form.

4                     Do you want to rephrase or do you want him

5                     to try to answer it?

6          Q      All right.  Well, did loan officers take

7     applications for mortgages?

8          A      Yes.

9          Q      Okay.  And so how -- where would they do that?

10         A      They would take applications normally where the

11    customer requested that they meet which could be a bank

12    branch, which could be the mortgage sales office, which

13    could be the customer's home, which could be the

14    customer's place of business, a realtor office might be

15    involved in a transaction, um, or other locations.

16         Q      Okay.  But so typically the loan officer would go

17    wherever they were required to go kind of?

18         A      Once again, in general we would try to accommodate

19    the wishes of the customer in terms of the time and the

20    place of the meeting.

21         Q      Okay.  And specifically was one of the loan

22    officers that you supervised Linda Ungerleider?

23         A      That is correct.

24         Q      And did Ms. Ungerleider have an office in the

25    Orange bank branch?

Brandon Smith Reporting Service

7/22/2003

Kevin Moran

Page 36

1              the following proceedings were had:)

2

3                    MS. GAROFALO:  Back on the record.

4                    MS. TELKER:  Could we maybe just finish

5              up with this particular document.

6                    MS. GAROFALO:  That's fine.  With the

7              April 14th 2000 memo?

8                    MS. TELKER:  Right.  There was another

9              sheet prior to this that was the -- has to

10              do with dates and floor time too so.

11                    MS. GAROFALO:  Right.  Okay.  Go ahead.

12      Q      (By Ms. Telker)  Okay.  So this is a memo which

13      is a follow -- indicates in the first sentence that it's a

14      follow-up to a written warning; correct?

15                    MS. GAROFALO:  Objection.  The document

16              speaks for itself.  Do you want him to read

17              anything.

18      Q      Okay.  Well, all right.  In the warning you

19      accused Ms. Ungerleider of unprofessional conduct?

20                    MS. GAROFALO:  Objection to form.

21      Q      Did you in the written warning say Ms.

22      Ungerleider was guilty of unprofessional conduct?

23                    MS. GAROFALO:  Objection to form.  But

24              you can answer.

25      A      I'm not really quite certain how to answer that

Page 37

1    question.  The idea of the formal counsel is not to accuse

2    our employees of being guilty of a particular behavior, it

3    is to address a performance issue and then try to discuss

4    rective (sic) measures.

5        Q    Would it be fair to say that one of the

6    elements mentioned in the formal counsel was a contention

7    that Ms. Ungerleider had been unprofessional?  If you

8    recall.

9        A    To the best of my recollection the counsel

10   addressed an incident of unprofessional conduct.

11       Q    Okay.

12       A    And it was brought to my attention.

13       Q    Okay.  What is unprofessional conduct in your --

14   well, okay, is there a formal definition of unprofessional

15   conduct?

16                    MS. GAROFALO:  Objection to form.

17                    You mean within Fleet.

18       Q    Yeah.  Okay.  Does Fleet have a formal definition

19   of unprofessional conduct or Fleet Mortgage I guess we would

20   say that you know of?  If you don't know than you say you

21   don't know?

22       A    My answer would be we tend -- unprofessional

23   conduct would be considered conduct that is contrary to our

24   code of ethics.

25       Q    Well -- so you're saying unprofessional means

Page 75

1                    UNITED STATES DISTRICT COURT

2                    DISTRICT OF CONNECTICUT

3

4

5    _____X

6    LINDA UNGERLEIDER            :    CIVIL ACTION

7    VS.                          :    NO.: 3:02CV659

8    FLEET MORTGAGE GROUP OF FLEET :    (AVC)

9    BANK (sic)                   :

10   _____X    **COPY**

11                  VOLUME NUMBER II, PAGES

12                  DEPOSITION OF:  KEVIN MORAN

13                  DATE:  SEPTEMBER 4, 2003

14                  HELD AT:  LAW OFFICES OF ELLEN TELKER

15                            564 BOSTON POST ROAD

16                            MILFORD, CONNECTICUT

17

18

19

20         Reporter:  Margaret A. Sharpe, LSR 00023

21            BRANDON SMITH REPORTING SERVICE

22               44 Capitol Avenue

23               Hartford, CT   06106

24               (860) 549-1850

25               john@brandonreporting.com

Page 103

1    disability, correct?

2                    MS. GAROFALO:  Objection to form.

3                    MR. MORAN:  No.

4                    MS. SUNDELL:  That was the April 14th letter

5    that we already looked at.  This was in response to

6    Linda --

7    BY MS. TELKER:

8         Q    I'm sorry.  In this memorandum, you

9    acknowledge Linda's response to the counsel, right?

10                   MS. GAROFALO:  Objection to form.

11   BY MS. TELKER:

12        Q    Well, in this memorandum, you indicate that

13   you would -- well, not change the statements in the

14   counsel, correct?

15                   MS. GAROFALO:  Objection.

16   BY MS. TELKER:

17        Q    Okay.  Is it possible to amend a formal

18   counsel once it has been given to an employee?

19        A    I don't know the answer to that.

20        Q    Okay.  What is the purpose of a formal

21   counsel?

22        A    To try to get a person back on track.

23        Q    Okay.  And, now, does any kind of infraction

24   on the part of an employee result in a formal counsel?

25                   MS. GAROFALO:  Objection to form.

3b915675-def4-4341-836a-13fee54ca0ba

Page 118

1          Q      But when they -- but isn't it true that most

2     of them carried a lap -- wasn't it a requirement that they

3     carry a laptop?

4                 MS. GAROFALO:  Objection to form.

5     BY MS. TELKER:

6          Q      Did Linda and other loan officers attend a

7     training session where they were given equipment that they

8     were to carry with them?

9                 MS. GAROFALO:  Objection to form.  You mean,

10    just carry with them all the time, or --

11    BY MS. TELKER:

12         Q      Well, to carry when they weren't at work to

13    take applications?

14         A      The loan officers were issued business

15    equipment that they could utilize for loan applications and

16    other purposes.

17         Q      Okay.  And were they all -- was it

18    substantially the same equipment for each loan officer?

19         A      The computer equipment should be pretty much

20    identical from one to another.

21         Q      And between -- well, subsequent to the year

22    2000, has that equipment that they carry changed?

23         A      It changes routinely as upgrades and changes

24    to, you know, our systems needs change.

25         Q      Okay.  But would it be possible to find out

**Brandon Smith Reporting Service**

Ungerleider vs Fleet

Kevin Moran ( Volume II )

Page 130

1          A       I believe that's been addressed in the

2    Brogdon memorandum from April of 2000.

3          Q       And when Linda finally resigned, what was

4    your -- what was your reaction?

5          A       I don't necessarily recall my reaction at

6    the time.  It was quite some time ago.

7          Q       And were you -- if she hadn't resigned, were

8    you prepared to terminate her employment?

9          A       I don't believe we were -- I believe the

10   stage we were at, at the time that Linda returned to work,

11   was to address what we felt were issues that needed to be

12   addressed, to develop a plan to get back on the right

13   track, and to encourage her to be successful at Fleet.

14         Q       Okay.  How can -- can you explain how she

15   could have done that when you were -- when you removed the

16   main branch that she was working at, and when you refused

17   to provide her with any accommodations for her back

18   problem?

19                 MS. GAROFALO:  Objection to form.

20   BY MS. TELKER:

21         Q       Okay.  How could she have been successful

22   when, as you indicated before, you didn't give her a

23   replacement office for Orange?

24         A       I believe there was still a very viable

25   opportunity with the remaining branches.  In addition, that

3b915675-def4-4341-836a-13fee54ca0ba

Page 131

1    does not -- the number of branches that a loan officer has

2    does not preclude them from all the various types of

3    outside business developments at their disposal.

4         Q    Okay.  Well, but she was unable to carry the

5    equipment and she didn't have an office to work in, how

6    could she do that?

7         A    I believe at the time, Fleet was looking at

8    finding a solution and an accommodation.  I believe at the

9    time, there was a recommendation to Linda to conduct

10   business by keeping her laptop stationary, which I believe

11   we recommended would be at her home and/or at another Fleet

12   location that we would provide to her.  And that that

13   accommodation would be on an interim basis until such time

14   as we could fully research and ideally implement a PC in an

15   office that would make sense, in terms of her geographic

16   territory.

17        Q    Okay.  But I thought it was your testimony

18   that you did not give her a location?

19        A    I don't believe -- I don't remember that

20   question.

21        Q    Yeah, I asked you if you -- if she was given

22   an office to replace the Orange branch and you said --

23        A    I apologize if I misunderstood the intent of

24   the question.  My understanding of the question was, were

25   we adding another office to replace it.  I believe I gave

Ungerleider vs Fleet

Page 133

1    then, typically, then input the information into the laptop

2    and upload it.

3         Q      So if that's the case, then why was it so

4    important that they carry the laptop?

5         A      It --

6              MS. GAROFALO:   Objection to form; go ahead.

7              MR. MORAN:   It wasn't.   It wasn't a

8    requirement.   The requirement was just to get the job done.

9    They did not have to carry the laptop with them.

10   BY MS. TELKER:

11        Q      The second floor office in Milford, was

12   there an elevator to the second floor?

13        A      At the time, I was not aware whether there

14   was or not.   My assumption was there was.   I subsequently

15   learned that there is not one.

16        Q      What you are saying is that the applications

17   were done manually?

18        A      I would say at that period of time, the

19   overwhelming majority of loan officers took applications by

20   hand on a hand-written mortgage application to use as a

21   reference.   Then at a later time, after meeting with the

22   customer, would input the data into the laptops and upload

23   the loan and do the rest of the job.

24        Q      Well, wasn't that one of the criticisms that

25   you made of Linda, that she was doing them manually and

3b915675-def4-4341-836a-13fee54ca0ba

**ORIGINAL**

Page 45

1        I, _Kevin Moran_ , do hereby certify that the
following corrections and additions of the transcript taken
2    on July 22, 2003 are true and accurate to the best of my
knowledge and belief.

3

4    CORRECTION            PAGE            LINE            REASON
5    and it's              4               17              Typo
6    organizational Structures    22      Typo
7    Corrective            37      4               Typo
8    employee              40      12              Typo
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   11/5/03                          Kevin Moran
     DATE                             Kevin Moran

20
     At Hartford CT            in said County of
21   Hartford         , this      5th       day of
     November         , 2003, personally appeared
22   Kevin Moran, and he made oath to the truth of the foregoing
     corrections by him subscribed.

23
     Before me, Beverly Garofalo  Notary Public
24   Beverly Garofalo               Commissioner of
     My Commission expires          Superior Court

25   (KL)

7/22/2003   **ORIGINAL**                                        Kevin Moran

Page 46

1                    CERTIFICATE OF DEPONENT

2

3        I Kevin Moran, do hereby certify that the foregoing

4    testimony taken on July 22, 2003, is true and accurate to

5    the best of my knowledge and belief.

6

7

8

9    __11/5/03_____              _____

10        DATE                              Kevin Moran

11

12        At_____in said County of

13    _____, this_____day of_____,

14    2003, personally appeared Kevin Moran, and he made oath to

15    the truth of the foregoing answers by him subscribed.

16

17

18

19    Before me,_____, Notary Public.

20    My Commission expires: _____

21

22

23

24

25

68d0b066-276f-43c1-82da-8917f28bd70f

EXHIBIT C

Page 1

1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF CONNECTICUT
2

3

4      - - - - - - - - - - - - - - - -

LINDA UNGERLEIDER
5      vs.                                Civil Action No.:
FLEET MORTGAGE GROUP OF                   3:02 CV 659 (AVC)
6      FLEET BANK(s.e)

       - - - - - - - - - - - - - - - -
7

8

9

10

                        DEPOSITION OF:  JOSEPH DellaPUCA
11                      DATE:  July 28, 2003
                        HELD AT:  MURTHA CULLINA,
12                      Whitney Grove Square, New Haven, CT

13

14

15

16

17

18

19

20

21

                        Jayne Ciccotelli, LSR
22              Brandon Smith Reporting Service, LLC
                        44 Capitol Avenue
23                      Hartford, CT  06106
                        (860) 549-1850

24

25

5b300aed-fa90-44a0-b25e-ceb2868ae35c

Ungerleider vs. Fleet

7/28/2003                                                    Joseph DellaPuca

Page 16

```
 1        A.    Yes.

 2        Q.    When was that?

 3        A.    I would say probably a month later.

 4        Q.    What happened?

 5        A.    I saw a decline in her -- well, my main

 6   thrust is basically fill up, which is occupancy, and

 7   she wasn't bringing in deposits to the community.  So

 8   she was more going through the motions rather than

 9   going to another level to get the business in.  So we

10   were coaching her that she had to go to the next level

11   in order to bring in the deposits and if that

12   expectation wasn't met, then, obviously, something had

13   to be done because that's how we survive.

14        Q.    When you say "we" were coaching her, who was

15   coaching her?

16        A.    Myself and Tammy.

17        Q.    Did there come a time then when Linda

18   Ungerleider ceased working at Laurel Gardens?

19        A.    Yes.

20        Q.    And whose decision was that?

21        A.    My decision.

22        Q.    Can you explain to me why Laurel Gardens

23   terminated Linda Ungerleider's employment?

24        A.    Because she wasn't meeting the expectations

25   of the organization.
```

Brandon Smith Reporting Service

Page 17

1      Q.    Anything else other than what you just

2    testified to?

3      A.    That's the main thrust.

4      Q.    Anything else that wasn't a main thrust but

5    still played a factor?

6      A.    Nope.

7      Q.    Who informed Ms. Ungerleider that her

8    employment was being terminated?

9      A.    I informed her.

10     Q.    Do you remember what her reaction was?

11     A.    Stunned.

12     Q.    Do you remember what she --

13     A.    She felt she was doing a good job.

14     Q.    Do you remember anything that she said during

15    that meeting?

16     A.    I know she was indignant.  I can't recall the

17    exact words.  She was not happy.

18     Q.    Do you feel that you had previously made her

19    aware of the fact that Laurel Gardens was not satisfied

20    with --

21     A.    Definitely.

22     Q.    -- her performance --

23          You just have to let me finish the question

24    so the --

25     A.    I'm sorry.

5b300aed-fa90-44a0-b25e-ceb2868ae35c

Ungerleider vs. Fleet

7/28/2003

Joseph DellaPuca

Page 18

1       Q.    -- court reporter can take it down.

2       A.    Definitely.

3       Q.    On, approximately, how many occasions?

4       A.    At least six or seven occasions.

5       Q.    When she would be confronted with any

6    deficiencies in her performance, do you have any

7    recollection of how she would respond?

8       A.    She would go "okay."  She knew what our

9    expectations were.

10      Q.    She didn't refute your observations?

11      A.    I don't -- it was so long ago.  I can't

12   recall.

13      Q.    Okay.

14                  MS. GAROFALO:  Would you mark this as an

15   exhibit.

16                  (Termination Evaluation marked

17                  Defendant's Exhibit 4 for identification)

18      Q.    Drawing your attention to what's been marked

19   as Defendant's Exhibit 4, can you tell me --

20      A.    This is --

21      Q.    -- what this is?

22      A.    -- our termination paper that we use when we

23   terminate an employee at Laurel Gardens of Woodbridge.

24      Q.    Is that your signature --

25      A.    Yes.

5b300aed-fa90-44a0-b25e-ceb2868ae35c

Page 27

```
 1        Q.   What were the circumstances, generally?

 2        A.   Inability to do their job.

 3        Q.   How many directors have you let go?

 4        A.   Two.

 5        Q.   Other than Ms. Ungerleider?

 6        A.   Yes.

 7        Q.   And when were they let go?

 8        A.   One was let go in April of 2003 and another

 9   one was let go July, June or July of last year.

10        Q.   Of 2002?

11        A.   2002.

12        Q.   Okay.  If Ms. Ungerleider had stated that she

13   was let go due to financial troubles of Laurel Gardens'

14   five assisted care facilities and that she was laid off

15   along with three other directors, would that be a

16   truthful statement?

17        A.   No.

18        Q.   Do you know if anybody within management at

19   Laurel Gardens ever suggested to Ms. Ungerleider that

20   this was the reason for her termination?

21        A.   No.

22        Q.   Has Laurel Gardens ever filed for Chapter 11

23   bankruptcy protection?

24        A.   No.

25             MS. GAROFALO:  I don't have any other
```

5b300aed-fa90-44a0-b25e-ceb2868ae35c

Exhibit D

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS & OPPORTUNITIES
### FORM 103
## AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE

DATE: _5-30-00_     CASE NO. _0630567_

MY NAME IS: _Linda Ungerleider_

AND I RESIDE AT _157 Englewood Drive  Orange CT 06477_

THE RESPONDENT IS _Fleet Mortgage Group of Fleet Bank_

WHOSE BUSINESS ADDRESS IS _115 Main St.  Seymour, CT 06483_

I Was:

( )terminated     ( )not hired/not promoted
( )suspended     ( )not rented a dwelling
( )placed on probation     ( )harassed ( )sexually harassed
( )demoted     ( )earning a different rate of pay
(X)warned     ( )constructively discharged
(X)given a poor evaluation     ( )retaliated against
( )denied a raise     ( )not hired due to a disability
( )less trained     ( )delegated difficult assignments
( )denied an office     ( )other_____
( )denied service(s)
(X)discriminated against in terms and conditions of employment

on _April 10  2000_ and believe that my

( )race     ( )national origin
( )color     ( )martial arts
(X)sex ( )male (X)female     (X)physical disability
( )previously opposed, filed or assisted     ( )mental retardation
( )ancestry     ( )mental disorder
(X)age DOB     ( )religious creed
(X)religion     ( )familial status
( )pregnancy     ( )sexual orientation
( )alienage     ( )lawful source of income

was in part a factor in this action. I believe that the respondent violated the following Connecticut General Statutes and acts listed below and ( ) enforced through Section 46a-58(a) (if applicable).

(X)46a-60(a)(1)     (X)Section 504 of the Rehabilitation Act
( )46a-60(a)(4)      of 1973, as amended.
( )46a-60(a)(7)( )( )( )     (X)Title VII of the Civil Rights Act of 1964, as amended,
( )46a-60(a)(8)( )( )( )      42 U.S.C. 2000e and the Civil Rights Act of 1991 (cite
( )46a-64c( )( )      for 15 individuals employed)
( )46a-64a( )( )( )     ( )Age discrimination in Employment Act of 1967, 29
( )46a-81( )( )( )      U.S.C. 621-634 (cite for over 20 individuals employed)
( )46a-80
(X)Americans with Disabilities Act
   42, U.S.C. 12101 et seq.
( )Equal Pay Act of 1964, U.S.C.     ( )other_____

RECEIVED
STATE OF CONNECTICUT
JUN 9 2000
COMM. ON HUMAN RIGHTS
& OPPORTUNITIES
WEST CENTRAL REGION

I provide the following particulars: (PLEASE TYPE OR PRINT THIS INFORMATION)

I am a 49 year old middle aged female who returned to work on April 10, 2000 after being out on short term disability for an injury occurring at work. Immediately upon my return I was traumatized between work, the company's attitude and the behavior of my supervisor who did everything in their power to use my disability to drive me out of the company. This was a job that I loved and for which I enjoyed getting up and going to work each and every day.

For example:

1. Even though they knew about my medical problems, rather than accommodate my medical disabilities they did the following:

A. Upon the very first day back to my job, excited and feeling good and ready to sell, I was called into my supervisor's office and was handed a "written warning." I was shocked and felt as though my blood drained from my body as I read this warning that had dates going back to December 1998 and throughout the year 1999. Nothing even about the first quarter of my performance in 2000. Dates of "missed training, missed mandatory meetings and floor time scheduled." When I went to our Human Resource Department (HR), I proved that each and every one of these dates were erroneous with documentation that I not only attended them but had certificates substantiating my attendance, HR ignored this and refused to correct the errors. This same supervisor even admitted in e-mail to me of some of his warnings.

B. Also, in the above warning, I was told that I would no longer be the loan officer of one of my Fleet Bank branches. This interfered with my loan jurisdiction causing loss of loan commissions which was to become a major loss of income. To make matters worse, this branch was in my hometown, one mile from my home and a branch that I had successfully serviced for six years with no prior complaints. But now, the Bank manager claimed that I was "unprofessional" with one customer. She claimed this was during a phone call to one of her service representatives in the branch. She made this claim even though she was not part of the call; and refused to give me the opportunity to discuss the actual event. It is actually, a small miracle, with all the customer complaints in the banking industry and with Fleet Bank, that if this were truly justified then I would think that one customer complaint in six years deserves a medal because this is well above average for any loan officer in this business. I was then asked to "surrender the key to this Orange branch and to immediately remove my office from the location." I was treated as though I had committed a crime and they completely disregarded the fact that I was not suppose to lift and carry heavy equipment due to my recent disability. When I went to return the key, I asked the bank to sign a receipt that the key was being returned. I was told that they didn't have to give me a receipt. I knew that this was not the normal procedure.

1

Because, the Post Center Fleet Bank had been robbed only a few weeks earlier, I certainly was not going to return a key to the Bank without witness or receipt. I called our Town's Police Dept. and Lt. Kevin Kelly agreed that I should have proof that I returned it and the police were willing to escort me by coming to the branch to serve as a witness. I tried again to have the manager's asst. to give me the bank form that would prove I handed in the key but she still refused as well as slandered my name to many of the people in our Town that know me. I brought my 18 year old son with me to have him help me move my articles out of my office and I was still hoping to not have to get the police involved since I was employed by Fleet. So I called HR, explained the situation, and they finally agreed to speak with this manager, who immediately took the form that is typical for the surrender of a key, signed it and threw it at me saying "here, are you happy."

C. My supervisor accused me of inadequately knowing how to use my computer. The fact is that the antiquated service and equipment are the number one problem being addressed by the Fleet Mortgage Corporation at this time; and a letter from a Senior Technical Support indicated in a letter to me that "I knew the system very well".

D. My supervisor constantly threatened my employment status even though I have been a top 10% Corporate producer and Top 5% in his office. He intimidated and harassed me to a point that even other loan officers recognized it and would ask me about his treatment of me. He caused me to leave his office trembling, shaking, nauseous and dizzy on a daily basis since my return to work. As a result I have been put on medications to help the nightmares and insomnia caused by this situation. I also had developed a very hyper heart rate and higher than normal blood pressure.

E. At a sales meeting in the first quarter of 2000, I was told that I had received some type of sales recognition while I was out on disability but my supervisor never shared that information with me.

F. This company claims to be an equal opportunity employer; however, I was constantly turned down when I asked to have equal mortgage products to sell (ACORN) a state mortgage product that is very competitive. Keeping in mind that we are on 100% commission; those that had the ACORN product were the consistent winners of Company awards and trips. This supervisor always claimed that the product was being discontinued as he continued to give it to select few. He also claimed that Fleet did not allow it to be offered in all territories; however, my territory was part of Fleet's program. It was unfair that my customers could not receive the same low interest, low down payment product as some other customers dealing with different loan officers in our same office.

2

G.  In his warning he accused me of not taking two days of Floor duty in 1999. When in fact, I have proof that I was not scheduled due to a previous switch of duty days.  And why was this 2 days in an entire year not mentioned during one of the quarterly reviews in the year it happened?  Why is this even worth warning since he doesn't even require a few of his staff to take floor duty if "they don't want to." More proof of his unfair treatment.

H.  Only after demanding to see my branch manager's reviews did I discover that in general and as expected, the reviews were very favorable; however, they too contained numerous errors.  Examples would be the expectations to do tasks that fall under the Customer Service Representative's job description and not that of the Loan Officer;  or being blamed for "banners fading outside of the building."

I had never felt so beaten and frustrated and ill and yet did not want to quit the job. I even asked if I could report to the only other manager in Connecticut which is much further from my home (Hartford) but the harassment became so unbearable to myself and my family that I had to resign last week.  Resign from a company where I reached a vested position; top producer status; and the chance for continued success.  With my son going to College this September and facing my first tuition payment I normally would not have left the job but the trauma I was experiencing was directly correlated with my worsening medical condition.

3



CONNECTICUT COMMISSION *on* HUMAN RIGHTS & OPPORTUNITIES

**SL003r**

Tuesday, June 13, 2000

Fleet Mortgage Group of Fleet Bank
115 Main Street
Seymour, CT 06483

CHRO No. 0030567 Linda Ungerleider vs. Fleet Mortgage Group of Fleet Bank
EEOC No. 16aa03330

Dear Respondent:

This is to serve you with notice that the above entitled complaint has been filed against you with this Commission. A copy of the complaint is attached hereto and is incorporated herein. The complaint identifies the alleged unlawful discriminatory practices.

Also attached hereto is the Commission's General Notice form advising the parties of their rights, duties and responsibilities. Carefully read the information contained in this letter and the GENERAL NOTICE - Parties, Rights, Duties and Responsibilities.

Pursuant to CONN. GEN. STAT. Section 46a-83(a), as amended, you **must** file a written answer to the complaint, under oath, with the Commission within thirty (30) calendar days of receipt of the complaint. If you fail to answer the complaint in accordance with the time frame noted above and as prescribed by law, the Commission may DEFAULT YOU. {See Article III, Section III of the General Notice and the appropriate Statutes and Regulations}. You may request and the Commission may grant, for good cause shown, one extension of time of fifteen days within which to file an answer to the complaint.

Also, you have a duty to certify to the Commission that you have provided the Complainant with copies of all documents you file. For your convenience and use, the enclosed Certification form is made available.

Except as otherwise provided in Section 46a-83(b) Connecticut General Statutes and PA 98-245, the Commission must, within ninety (90) days of the filing of the respondent's answer, conduct a merit assessment review upon each complaint filed with it after July 1, 1994. The review will be based on:

    a.    the complaint;

    b.    the Respondent's answer and responses to the Commission's requests for information, if any; and

c.    the Complainant's comments, if any, to the Respondent's answer and information responses, provided that said response is filed with the Commission within fifteen (15) days of Complainant's receipt of Respondent's answer and responses to the Commission's request for information as is required by Sec. 46a-54-67(b) of the Regulations of Connecticut State Agencies.

The Complainant's response period commences to run upon Complainant's receipt of Respondent's Answer and Schedule A responses. The Commission suggests that the Respondent send this material by certified mail to the Complainant.

Throughout the processing of this complaint, you have a right to inspect and review the investigative file.

Once the Commission has completed its investigation, it will issue a draft finding and determination. You will have fifteen (15) calendar days to comment upon this finding. Following your comments, if any, a finding and determination upon the merits will be entered. You will receive notice of it as provided by law.

The Commission is available to assist you if you wish to pursue settlement of this complaint. Particularly, your attention is called to Section 46a-83b, Connecticut General Statutes (formerly Public Act 94-113). This enactment establishes an Alternative Dispute Resolution (ADR) process that the parties may utilize. In essence - it allows for the parties to select a neutral third party, to either mediate and/or arbitrate their dispute. If you elect to pursue this process, the Commission is required to suspend its investigation into the complaint for a period of ninety (90) days. For further information about this option, please examine Section 46a-83b, C.G.S. (formerly Public Act 94-113).

For a detailed explanation of the parties', rights, duties, and responsibilities, please consult the enclosed General Notice and the applicable law and regulations. If we can be of further assistance to you, please do not hesitate to contact the Regional Office.

The enclosed Notices contain important information with respect to the Commission's No Fault Conciliation Process.

Sincerely

Ms. Cynthia Bogle-Assegai
Regional Manager

cc: Respondent's Attorney

Enclosures:    Copies of Affidavit of Complaint, Form #103
               Request for information Schedule A
               Copies of General Notice - Parties' Rights, Duties and Responsibilities  Form #107
               Copies of Complainant(s)/Respondent(s)/Certification of Mailing Form #004
               Copies of General Notice - No Fault Conciliation Form #206
               Copy of Independent Mediation/Alternate Dispute Resolution Form 431

## COMMISSION ON HUMAN RIGHTS AND OPPORTUNTIES
### FACT SHEET

  

### SETTLEMENT OPTIONS

# It's in Your Best Interest

Filing a complaint alleging discrimination or being accused of illegal discrimination is a serious matter. As a Respondent, you may be exposed to public scrutiny and financial liability, even if you have done nothing illegal. As a Complainant, participation in the CHRO process may create uncertainty in your life due to the unpredictable nature of this legal process. Both the Complainant and the Respondent may be required to spend an extensive amount of time participating in the investigation and possibly a public hearing.

The Connecticut Commission on Human Rights Opportunities (CHRO) has established a number of procedures for you to take advantage of to resolve claims of illegal discrimination as quickly as possible. CHRO encourages the parties to engage in settlement efforts and is available to assist the parties in reaching a voluntary resolution of the complaint, as outlined in this Fact Sheet. It may be in your best interest to consider these settlement options.

### *The sooner the better*

As a general rule, it is in your best interest to resolve a charge of illegal discrimination as early in the process as possible.

### *First Chance* ~ No Fault Conciliation

Under applicable law, only the Respondent can initiate this conciliation effort after receiving the complaint. If you take advantage of this settlement option, you may avoid the risk of an adverse decision as well as the time and expense incurred in preparing a response to a complaint. (The case must be settled or an answer must be filed within 45 days from the date the complaint is received.)

### *Before a Finding of Reasonable Cause* ~ Pre-Determination Conciliation

Once an answer has been filed, but before the CHRO decides whether reasonable cause exists, either party can seek to resolve the case. The pre-determination conciliation process represents another voluntary means by which the parties can reach a mutually acceptable resolution to a complaint.

### *After a finding of Reasonable Cause, but before a Public Hearing~* Conciliation Agreement

If an investigation results in a finding of reasonable cause, CHRO attempts to negotiate a Conciliation Agreement. *A reasonable cause finding does not establish culpability*, but it does indicate that there is sufficient evidence to certify the case to a public hearing. A settlement at this juncture will minimize the time and cost of participating in the public hearing process. After a reasonable cause finding, the CHRO must be a party to any agreement that resolves the complaint filed with the CHRO.

*Please turn over*—————— ➤➤➤➤➤➤➤➤➤➤➤➤➤➤➤➤➤➤➤➤➤➤➤➤➤➤➤

## *Post Certification* ~ Public Hearing Process

Once a case is certified to the Office of Public Hearing, a Human Rights Referee will be assigned to conduct a settlement conference. Either party may initiate settlement at any time prior to a final decision issued by a Human Rights Referee. (However, CHRO must be a party to any agreement that resolves the complaint filed with CHRO.)

## *Outside the State Process* ~ Alternative Dispute Resolution (ADR)

The parties may agree to utilize an Alternative Dispute Resolution process. The parties hire a mediator from outside of the agency to mediate a settlement of the complaint. Upon agreement of the parties, ADR may be either binding or non binding. If the parties agree to binding arbitration, the Complainant must withdraw his/her complaint from CHRO. Within ten days of receipt of the agreement to arbitrate, CHRO will notify the parties if it accepts the arbitration or intends to pursue the complaint for public policy reasons. (Non-binding ADR suspends CHRO processing of the complaint for no more than three months.)

## *Other Disposition* ~ Make Whole Relief

A Respondent may end potential exposure by offering the Complainant *Make Whole Relief.* In accordance with applicable law, such an offer must eliminate the discriminatory practice complained of, take steps to prevent a like occurrence in the future and offer "full relief" by making the Complainant whole (i.e., by placing the Complainant in substantially the same position as s/he would have been in, had the alleged discrimination never occurred).

**YOU MAY CALL A REGIONAL OFFICE AND SPEAK TO THE REGIONAL MANAGER TO OBTAIN MORE INFORMATION REGARDING YOUR SETTLEMENT OPTIONS:**

CAPITOL REGION . . . . . . . . . . . . . (860) 566-7710
1229 ALBANY AVENUE
HARTORD, CT 06112
FAX (860) 566-1997
E-MAIL: chro.capitol@po.state.ct.us

EASTERN REGION . . . . . . . . . . . . (860) 886-5703
100 BROADWAY
NORWICH, CT 06360
FAX (860) 886-2550
E-MAIL: chro.eastern@po.state.ct.us

SOUTHWEST REGION . . . . . . . . . (203) 579-6246
1057 BROAD STREET
BRIDGEPORT, CT 06604
FAX (203) 579-6950
E-MAIL: chro.southwest@po.state.ct.us

WEST CENTRAL REGION . . . . . . . (203) 596-4237
50 LINDEN STREET
WATERBURY, CT 06702
FAX (203) 596-4241
E-MAIL: chro.westcentral@po.state.ct.us

*The Commission on Human Rights and Opportunities is an*
*Affirmative Action, Equal Opportunity Employer.*

## EMPLOYMENT SCHEDULE A
### Request for Information

***In addition to admitting or denying (with documentation) the numbered statements on the affidavit, please provide the following:***

1. State the full legal name of the respondent.

2. State the proper address of the respondent's facility where the complainant alleges that an act or acts of discrimination occurred.

3. If the respondent is incorporated, indicate under what state's laws it is incorporated.

4. If the respondent is incorporated, state the address of respondent's corporate headquarters.

5. State the name and address of respondent's agent for service.

6. If the respondent is currently the subject of bankruptcy proceedings, or has been the subject of bankruptcy proceedings during the past three years, provide documentation of the current status of such proceedings.

7. State the name, title and address of the individual to be contacted for further information in this matter.

8. Separately state the number of respondent's employees in Connecticut and at the facility where the complainant alleges that the discriminatory conduct occurred.

9. Submit a response, in "admit" "deny" format, to each allegation of the complaint. For each allegation that is denied, submit a statement that sets forth the facts upon which you rely in your denial. Please submit any and all documents and written statements of witnesses or participants to support your position.

10. Submit copies of all written rules, policies and procedures relating to the issue(s) raised in the complaint. If these are not in writing, explain the rules, policies and procedures.

11. If the complainant was discharged, disciplined, or subject to any other adverse employment decision, submit the following information:

    a) Date complainant was advised of the act complained of;

    b) Explain in detail the reason(s) for the action taken;

    c) Identify the person(s) recommending the action(s) at issue, including name, position held, race, sex, age and disability (if any), as appropriate;

    d) Identify the person(s) making the final decision, including name, position held, race, sex, age and disability (if any), as appropriate;

e)  Provide a copy of any evaluation(s) or investigative report(s), and all other relevant documents relating to the act;

f)  Provide a list of all employees who committed the same or substantially similar offense(s) that the complainant committed, and the disciplinary action taken against each of them. Supply backup documentation for the listed employees. Identify each employee by name, position held, race, sex, age and disability (if any), as appropriate;

g)  List all employees discharged or who received the same discipline as the complainant within the past two years. For each employee listed, include employee's name, position held, reason for and date of discipline, race, sex, age and disability (if any), as appropriate. Provide a copy of the discipline or separation notice for each person.

12. If the complainant was denied a promotion or not hired, provide the following information:

a)  Describe the selection process, and provide copies of documents describing the process, if available;

b)  Describe the job at issue, indicating the qualifications sought. Provide a copy of the written job description, as well as a copy of any advertisements or internal postings for the position at issue;

c)  Provide applications and resumes for all applicants for the position. Identify the successful candidate or candidates;

d)  Explain why complainant was not selected, and why the successful candidate(s) was selected;

e)  Provide other examples of promotions or hire for similar positions;

f)  Identify by race, sex, age and disability (if any), as appropriate, all individuals holding the same title as the position sought by the complainant;

g)  Identify the person(s) recommending the action(s) at issue, including name, position held, race, sex, age and disability (if any), as appropriate;

h)  Identify the person(s) making the final decision, including name, position held, race, sex, age and disability (if any), as appropriate.

13. If this complaint alleges a failure to hire, failure to promote, demotion or termination of employment, provide the rate(s) of pay for the position(s) at issue.

14. If this complaint involves a claim of physical disability, did you make any attempts to reasonably accommodate the disability at issue? If so, please detail them.

15. Provide any other information and/or explanation you deem relevant to this complaint, and any other information which will assist the Commission in reaching a decision in this matter.

**FORM 107**

### GENERAL NOTICE:
### PARTIES RIGHTS, DUTIES & RESPONSIBILITIES

TO:         Complainants, Respondents and their Attorneys

FROM:       The Office of the Deputy Director for Enforcement

DATE:

SUBJECT:    GENERAL NOTICE - PARTIES RIGHTS, DUTIES, & RESPONSIBILITIES
            DURING COMPLAINT INVESTIGATION

---

## PURPOSE OF MEMORANDUM

The purpose of this memorandum is to briefly acquaint <u>INTERESTED PERSONS, PARTIES</u> AND THEIR ATTORNEYS with the processes and procedures utilized by the Commission to conduct uncontested complaint investigations.   More specifically, this memorandum addresses the parties' procedural rights, duties and responsibilities as prescribed by the Connecticut General Statutes and applicable Regulations. BY PUBLISHING THIS MEMORANDUM, THE COMMISSION DOES NOT INTEND FOR ANY PERSON OR PARTY TO RELY UPON IT IN LIEU OF THE APPLICABLE STATUTES AND REGULATIONS THAT GOVERN THE PROCEEDINGS. See, generally, C.G.S. 46a-51 et seq. and the Regulations of Connecticut State Agencies at 46a-54-26 et seq.

### ARTICLE I

### PARTIES JOINT RIGHTS, DUTIES & RESPONSIBILITIES

## SECTION I:   RIGHT TO COUNSEL

The Commission will be represented by the Attorney General or the Commission's counsel or his designee.  This attorney represents only the Commission and not you.  You may have an attorney if you choose to hire one.  (See 46a-84d).

## SECTION II:   RIGHT TO PARTICIPATE IN ALTERNATE DISPUTE RESOLUTION

The Commission is available to assist you if you wish to pursue settlement of your complaint.  Particularly, your attention is called to C.G.S. 46a-83b (formerly Public Act 94-113).  This enactment establishes an Alternate Dispute Resolution process that the parties may utilize.  In essence, (ADR) allows for the parties to select a neutral third party, to either mediate and/or arbitrate their dispute.  If you elect to pursue this process, the Commission is required to suspend its investigation into the complaint for a period of ninety (90) days.

## SECTION III:   RIGHT TO INSPECT DOCUMENTS IN CASE FILE

Both parties have the right to inspect and copy evidence in the Commission's file pertaining to the complaint, including but not limited to documents and statements of witnesses.  That is to say, that the parties have a right to inspect and copy any evidence in the investigative file, except as otherwise provided by federal law or any provision of the Connecticut General Statutes.  (See 46a-83(d) of the Connecticut General Statutes and 46a-54-74 of the Regulations of Connecticut State Agencies.) There is a copy charge of $.25 per page and $2.00 per tape. Checks must be made payable to Treasurer, State of Connecticut and sent to Business Manager, CHRO, 21 Grand Street, Hartford, CT 06106.  The Commission will calculate the charges and provide you with a form to submit to the business manager with your payment.  No funds will be accepted in a regional office and will be returned if received.

**SECTION IV:    RIGHT TO COMMENT UPON DRAFT SUMMARY**

Both parties have fifteen (15) days from the mailing of the preliminary draft finding to provide written or oral comments on all evidence in the Commission's file, except as otherwise provided by federal law. (See Section 46a-54-76 of the Regulations of Connecticut State Agencies.)

**SECTION V:    RIGHT TO BRING ACTION IN SUPERIOR COURT**
**Conciliation - breach of Agreement**

If a conciliation agreement is executed and a party thereto believes that it has been breached, he/she may bring an action in the Superior Court within one (1) year of the conciliation agreement, pursuant to Section 46a-98a of the Connecticut General Statutes.

**SECTION VI:    DUTY TO PROVIDE OTHER PARTY WITH INFORMATION**

The Commission will investigate your complaint as expeditiously as possible pursuant to chapter 814c of the Connecticut General Statutes. Generally, the complainant and the respondent are required to provide each other with a copy of all documents filed with the Commission. In other words, when you provide a document or other evidence to the Commission, you should send a copy to the other party. Use the address contained in the filed complaint until you are told to use a different address. (See 46a-54-40 - 46a-54-74 of the Regulations of Connecticut State Agencies.) If a party engages an attorney during the course of the complaint process, it is the duty of the party to provide the other party with a notice of appearance of their counsel.

**SECTION VII:    DUTY TO PARTICIPATE IN MANDATORY MEDIATION**

If the Commission chooses to enforce mandatory mediation pursuant to C.G.S. §46a-83(c), both parties must participate. If the complainant fails to attend mandatory mediation without a showing of good cause the complaint may be dismissed. If the respondent fails to attend mandatory mediation without a showing of good cause the respondent may be defaulted.

**ARTICLE II**

**COMPLAINANT'S RIGHTS, DUTIES AND RESPONSIBILITIES**

In addition to the above rights the complainant has the following rights, duties and responsibilities:

**SECTION I:    DUTY TO COOPERATE**

Complainant has a duty to respond <u>timely</u> to any <u>information</u> and/or <u>assistance requested</u> by the Commission and to cooperate with the Commission at all times. It is complainant's <u>sole duty and responsibility to notify the Commission</u> of your whereabouts at <u>all times</u> throughout the pendency of this complaint. In the event that your address and/or telephone number changes it is your duty to notify the Commission immediately <u>IN WRITING.</u> <u>YOUR COMPLAINT MAY BE DISMISSED</u> if you do not notify us and we can't contact you, or if you fail to timely cooperate with the Commission. It is your duty to comply with the requirements set forth herein and the requirements set forth in the Commission's Duty To Cooperate Form 002.

**SECTION II:    DUTY TO ACCEPT A MAKE WHOLE RELIEF OFFER**

Pursuant to C.G.S. 46a-83© (formerly Public Act 94-238), the Commission may close its investigation into a complaint where the complainant fails to accept a make whole relief offer. A make whole relief offer is one where the respondent has eliminated the discriminatory practice complained of, taken steps to prevent a like occurrence in the future and offered full relief to the complainant.

## SECTION III:    RIGHT TO BRING ACTION IN SUPERIOR COURT

As a general rule, all complaints alleging illegal discrimination in employment, public accommodations, credit, unfair state practices and housing must initially be filed with this Commission before complainant can file an action in the Superior court.

See: Sullivan v. Board of Police commissioners, City of Waterbury, et al., 196 Conn. 208 *1985).  However, state law permits four exceptions.  These are codified in the State's Discriminatory Practices Act, as follows:

1.    when complainant has been issued a "release of jurisdiction" by the Commission pursuant to C.G.S. 46a-100;

2.    when complainant seeks to enforce a conciliation agreement pursuant to C.G.S. 46-98a;

3.    when complainant seeks to remedy an alleged discriminatory state practice pursuant to C.G.S. 46a-99; and

4.    when complainant seeks to remedy an alleged discriminatory credit practice pursuant to C.G.S. S46-98.

Specific information concerning these private rights of action is set forth below.

A.  Filing - Expiration of 210 days: If a discrimination complaint has been filed with the Commission and is still pending at the expiration of 210 days from the date of filing, complainant may request a "release of jurisdiction" in Superior Court. The Executive Director may decline the request if the case has been scheduled for public hearing or may defer action if there is reason to believe that the complaint will be resolved within thirty (30) days.  Otherwise, the "release of jurisdiction" must be issued within ten (10) business days after receipt of the request.  Upon issuing the release, the complaint shall be dismissed by the Commission.  Complainant must file his/her complaint in the Superior Court within ninety (90) days after the issuance of the "release of jurisdiction" or otherwise within two (2) years of the date of filing the complaint with the Commission.  {See C.G.S. 46a-100 and 46a-101.}

B.  Joint Request: C.G.S. 46a-101(b) as amended by P.A. 98-245 provides that the complainant and the respondent may jointly request that the Commission issue a "release of jurisdiction" on a pending complaint at any time from the date of filing until the expiration of 210 days.  After 210 days, but less than two years from the date of filing, the complainant may request a release if the complaint is still pending.

C.  Discriminatory Action by the State: Complainant may maintain a private right of action if his/her complaint alleges a discriminatory practice by a state agency under CONN. GEN. STAT. Sections 46a-70 to 46a-78 or Sections 46a-81h to 46a-81o inclusive.  See 46a-99 of the Connecticut General Statutes.

D.  Discriminatory Credit Practices: Complainant may opt to file his/her complaint in the Superior Court, in lieu of filing it with this Commission, in accordance with C.G.S. 46a-98(a).

## SECTION IV:    RIGHT TO REQUEST RECONSIDERATION

If the Investigator determines that there is no reasonable cause to believe a violation of the statutes has occurred as alleged in the complaint, s/he will dismiss the complaint in accordance with Commission procedure.  Complainant has fifteen (15) calendar days from the date of such dismissal or a Merit Assessment dismissal or other dismissal adverse to the complainant to request that the Commissioners reconsider the dismissal.  {See: 46a-83 of the Connecticut General Statutes and Section 46a-54-79 of the Regulations of Connecticut State Agencies.}

## SECTION V:    RIGHT TO APPEAL THE DISMISSAL OF YOUR COMPLAINT

Alternatively, complainant may appeal the dismissal of the complaint to the Connecticut Superior Court pursuant to Sections 46a-94a and 4-183 of the Connecticut General Statutes. A complainant does not have a right to appeal a MAR dismissal or a dismissal for failure to accept make whole relief unless the complainant has requested reconsideration of the dismissal and the request has been denied. Any appeal must strictly comply with all applicable statutory and other requirements.

## ARTICLE III

## RESPONDENT'S RIGHTS, DUTIES & RESPONSIBILITIES

### SECTION I:    DUTY TO ANSWER

Pursuant to CONN. GEN. STAT. Section 46a-83(a), as amended, respondent must file a written answer to the complainant, UNDER OATH, with the Commission within thirty (30) calendar days of the receipt of the complaint. Accordingly, while an extension may be granted by the Executive Director or his designee, it will only be granted upon a showing of good cause. {See Sections 46a-54-63 of the Regulations of Connecticut State Agencies.}

### SECTION II:    FORM OF ANSWER

Respondent must answer each allegation set out in the complaint. Please state whether respondent admits, denies or has insufficient knowledge to admit or deny a numbered allegation. For example, if you disagree with allegation one, you should state "allegation one, deny." If you can admit or deny part of an allegation, you must do so even if you have insufficient knowledge as to another part of that allegation. See Section 46a-54-60 of the Regulations of Connecticut State Agencies. If you deny an allegation, the Commission requests that you set out the facts on which you rely for your denial and attach any and all supporting documentation.

### SECTION III:    DEFAULT FOR FAILURE TO ANSWER

Pursuant to Section 46a-83(I) of the CONN. GEN. STAT., the Executive Director of the Commission may DEFAULT a respondent if the respondent:

1.    fails to answer a complaint in accordance with the time frame noted above or within such extension of time as may be granted; or

2.    fails to answer interrogatories or respond to a subpoena (any timely filed objection will be considered);

3.    after notice and without good cause, fails to attend a mandatory mediation session.

See Section 46a-83 of the CONN. GEN. STAT., as amended. Upon the issuance of a DEFAULT, a hearing will be held for the sole purpose of fashioning an order requiring the respondent to make the complainant whole and to eliminate the discriminatory practice.

### SECTION IV:    DUTY TO ANSWER UNDER OATH

Your answer must be UNDER OATH. Answers not filed under oath are subject to default as outlined in Section III of this Article. Several respondents have inquired as to what form to use for the oath. The following is a form of the oath that may be used: