# OATH

State of Connecticut
(Town)

County of _____
Personally appeared (name of respondent, president or other competent witness)
and made oath to the truth of the matter contained in the foregoing answer
before me.

_____
Notary Public/Commissioner of the Superior Court

While the <u>form</u> of the oath above is optional, the <u>requirement</u> of an oath is not; you may be <u>DEFAULTED</u> if your answer is not under oath.

## SECTION V:    DATA FROM PERSONNEL FILES

C.G.S. §31-128 governs the disclosure of material from personnel files. Subsection 31-128f(2) of that law permits government agencies to obtain personnel data in "...the investigation or defense of personnel-related complaints against the employer." The Commission therefore expects to be provided all necessary information/data requested on all employees, including but not limited to individuals' names, title/position and other data required for the investigation of the complaint. As an example, if the respondent states that other persons were treated similarly as the complainant, the Commission expects to be provided with the names of those persons as well as documentary proof of the similar treatment.

## SECTION VI:    MAKE WHOLE RELIEF OFFER

Pursuant to C.G.S. 46a-83c (formerly Public Act 94-238), the Commission may close its investigation into a complaint where respondent has:

a.    eliminated the discriminatory practice complained of;

b.    taken adequate steps to prevent a like occurrence in the future; and

c.    offered full relief to the complainant.

The complainant has a duty to accept a make whole relief offer. If the complainant fails to accept a make whole relief offer, the complaint will be dismissed. If a request for reconsideration of the dismissal is not received, the executive director or designee will issue a release of jurisdiction.

## ARTICLE IV

## COMMISSION PROCESSES & PROCEDURAL DUTIES

## SECTION I:    INVESTIGATION

Pursuant to Section 46a-83 of the Connecticut General Statutes, the Commission is empowered to investigate complaints of discrimination. A written finding of reasonable cause or no reasonable cause for believing the claim alleged in the complaint will be entered.

## SECTION II:    90 DAY MERIT ASSESSMENT REVIEW

Except as otherwise provided in C.G.S. 46a-83(b) and as amended by PA. 98-245, the Commission must, within ninety (90) days of the filing of the respondent's answer, conduct a merit assessment review upon each complaint filed with it after July 1, 1994.

The review will be based on :

a.    the complaint;

b.    the respondent's answer and responses to the Commission's requests for information if any; and,

c.    the complainant's comments, if any, to the respondent's answer and information responses provided that said response is filed with the Commission within fifteen (15) days of complainant's receipt of respondent's answer and responses to the Commission's request for information as is required by Sec. 46a-54-67(b) of the Regulations of Connecticut State Agencies.

The Commission will use the following policy to determine when the complainant's 15 day rebuttal period ends:

a.    The Commission will assume that the complainant received the answer to the complaint and the Commission's requests for information, if any, if the respondent prepares and mails to the Commission a certification of mailing (see form 004 for example) indicating proper service upon complainant or complainant's attorney;

b.    This presumption can be rebutted if the complainant notifies the Commission that s/he did not receive the answer to the complaint and Commission's request for information, if any, not withstanding respondent's certification to the contrary;

c.    In this event respondent will be required to provide proof of service which can be any of the methods of service outlined in Section 46a-54-29 of the Regulations of Connecticut State Agencies.

The purpose of the merit assessment review is to determine if the complaint:

1.    fails to state a claim for relief; or

2.    is frivolous on its face; or

3.    poses no reasonable possibility that further investigation will result in a finding of reasonable cause.

If any of these determinations are made, the complaint will be summarily dismissed. If a request for reconsideration of the dismissal of the complaint is not received, the executive director or designee will issue a release of jurisdiction.

All complaints that are not summarily dismissed will be retained and the Commission will determine the most appropriate method for further processing of it. The Commission may use any of the methods discussed below.

## SECTION III:    MANDATORY MEDIATION

The Commission may require the parties to participate in mandatory mediation in order to promote the voluntary resolution of complaints. If this complaint is selected for mandatory mediation, both parties must attend the session. A complaint may be dismissed or an order of default entered if either fails to attend a mandatory mediation session, without good cause.

## SECTION IV: EXPEDITED OR EXTENDED FACT FINDING

The Commission may seek to process your complaint through expedited or extended fact finding conferences. This process is conducted for the purpose of fact finding.

### SECTION V:    COMPLETE INVESTIGATIONS

The Commission may seek to process your complaint by conducting a complete investigation. This process is used to determine whether there is reasonable cause to believe that a discriminatory practice has been or is being committed as alleged in the complaint.

### SECTION VI:    DETERMINATION - REASONABLE CAUSE

If reasonable cause is found, the Commission shall attempt to eliminate the practice complained of by conference, conciliation and persuasion within the first sixty (60) day period from the determination. However, if conciliation is unsuccessful, at the end of the first forty-five (45) day period - from the date of the reasonable cause determination - the complaint will be certified to hearing. Such a hearing shall be held not later than ninety(90) days after the finding of reasonable cause

**GENERAL NOTICE - NO FAULT CONCILIATION**

TO:        **Complainant, Respondent and their Attorneys**

FROM:     **Regional Manager**

DATE:     July 1, 1998

SUBJECT:   GENERAL NOTICE: NO FAULT CONCILIATION PROCESS

---

Please be advised that the Commission has a No Fault Conciliation Process. The No Fault Conciliation process is a voluntary effort on behalf of the parties to settle the complaint without regard to fault. As such, the Commission engages no efforts to determine liability.

Practically speaking, the Commission's No Fault Conciliation process can only be initiated by the Respondent requesting the same. However, the Complainant is at liberty to call the process to the Respondent's attention. The Commission will not assist in the process absent interest by the Respondent.

To be successful, a No Fault Conciliation Agreement must be signed by the parties and approved by the Commission, prior to the due date of the Respondent's Answer, which generally speaking is 30 to 45 days from the date that the complaint is served upon the Respondent.

You should be aware of the fact that presently your participation is a voluntary matter over which you have sole discretion. However, as the investigative process goes forward, you may be compelled to participate in the Commission's conciliation processes. Pursuant to Section 46a-83(b) of the Connecticut General Statutes (formerly Public Act 94-238) the Commission has the authority to default either party who, without good cause, fails to participate in its Mandatory Mediation Process. Therefore, it is critical that you make the decision to participate <u>NOW</u>, when you may do so, on terms and conditions most favorable to your interest.

The parties will derive, at a minimum, the following benefits as a result of participating in No Fault conciliation:

1. The complaint will be disposed of within 30-45 days of filing;

2. Complainant will avoid the risk of an adverse decision dismissing the complaint for lack of merit, and the cost and time it would take to challenge the dismissal on appeal; and

3. Respondent will avoid the time and the estimated thousands of dollars, incurred in managerial personnel cost and attorney's fees that is frequently incurred in preparing and filing the Answer.

If you're interested in participating in this process, please call the Regional Manager.

SECTION II: MAKE WHOLE RELIEF

1.    **What Is Make Whole Relief And How Does It Work?**
Both parties should be aware of the Make Whole Relief provision established in C.G.S. '46a-83(b)(formerly Public Act 94-238). This provision gives the Respondent the right to control its cost and limit its exposure to liability by settling the complaint despite opposition by the Complainant.

2.    **What Constitutes Make Whole Relief**
In order for the Commission to find that the Respondent has submitted a make whole relief offer, C.G.S. '46a-83(b) requires Respondent to: (1) eliminate the discriminatory practice(s) complained of; (2) take steps to prevent [a] like occurrence(s) in the future; and (3) offer full relief, including back pay, to the Complainant even through Complainant

FORM 431

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

SUBJECT:   **AGREEMENT TO PARTICIPATE IN INDEPENDENT
MEDIATION/ALTERNATE DISPUTE RESOLUTION**

Case Name: _____
CHRO No: _____
EEOC No: _____

The undersigned, parties to this complaint, hereby agree as follows:

1.  to participate, subject to the Commission's approval, in the Commission's Independent Dispute Resolution (ADR) Processes:

2.  to mediate all of the issues raised in the complaint by participating in the Commission's Independent Mediation-ADR process:

3.  to use the independent ADR service provider hereinafter named to perform the functions identified herein:

Name of Service Provider _____

Address_____

City_____ State_____

Contact Person_____

Area Code & Telephone Number_____

Area Code & Facsimile Number_____

4.  that the named service provider has agreed to perform the mediation services required by this agreement and represents that the mediator assigned (or to be assigned) to this complaint, has attended the Commission's Alternate Dispute Resolution Service Providers' Seminar within the last twelve months; and

5.  to waive any and all the time periods with respect to the processing of this complaint, except the ninety (90) day time period allowed by CONN. GEN.

Form 431

STAT. Sec. 46a-83(b) to conduct Merit Assessment Reviews, and hereby acknowledge that the effect of this wavier will be that the date of reactivation will be deemed the date of filing for the purpose of statutory regulatory time frames should this complaint be reactivated.

6.      to maintain the confidentiality of the mediation process to the full extent allowed by law.

IN WITNESS HEREOF, the undersigned  parties to this agreement do hereby affix their signatures this _____day of_____ 199___.


[Complainant's Name]


_____          _____
Complainant's Signature                                    Date


[Respondent's Name]


_____          _____
Respondent's signature                                     Date
By its Authorized Representative


Form 431

# COMPLAINANT'(s) / RESPONDENT(s)'

## "CERTIFICATION OF MAILING FORM"

Case No. _____

I hereby certify that I served a copy of the enclosed document(s) by [ ]hand delivery, [ ]U.S.

Mail [ ]other on the [ ]Respondent; [ ]Complainant or their attorney named below:

_____
Name

_____
Address

_____
City, State, Zip

_____
Signed

_____
Date

F004

Issued 4/94
Revised 1/1/96

EXHIBIT 3
AFF. PAQUIN

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

-------------------------------------------------- X

**LINDA UNGERLEIDER,**          :

                               :    **CIVIL ACTION NO.:**

       **Plaintiff**         :    **3:02CV659(AVC)**

                               :

     **v.**                    :

                               :

**FLEET MORTGAGE GROUP OF** :

**FLEET BANK [sic],**           :

                               :

     **Defendant**         :    **NOVEMBER 11, 2003**

-------------------------------------------------- X

### AFFIDAVIT OF RACHEL PAQUIN

    I, Rachel Paquin, am over the age of eighteen (18) and understand the obligations of an oath.

1.    I have personal knowledge of the matters attested to herein.

2.    I commenced employment with Fleet Mortgage Group ("FMG") on April 20, 1992. Throughout my employment, I have worked in a variety of positions, all within the Human Resources Department at FMG or other related entities. In or about 1999 and 2000, I held the title of Human Resources Business Partner I.

3.    During the 1999 and 2000 timeframe, I had numerous discussions with Kevin Moran, Sales Manager, concerning Linda Ungerleider, a mortgage loan officer who reported to him. Mr. Moran expressed concerns about numerous aspects of Ungerleider's performance and conduct, including with regard to professionalism, communication, work relations, attendance and loan quality.

4.    In late 1999 and early 2000, Mr. Moran and I discussed the fact that he would meet with Ungerleider to verbally counsel her about the performance and conduct issues listed above. Attached as Exhibit A is a true and accurate copy of my notes dated January 11, 2000 of a discussion I had with Mr. Moran wherein we agreed upon this course of action. I prepared those notes in the ordinary course of business.

5.    On or about January 11, 2000, plaintiff commenced a short-term disability leave.

6.    In or about March 2000, I was advised by Mr. Moran that Barbara Tartaglio, a Senior Business Specialist in the Fleet Bank Orange branch, had complained to him about an interaction with Ungerleider and had also advised him that a customer had complained to her about Ungerleider. I understand that Mr. Moran spoke directly to Ms. Tartaglio, the

customer and with Ungerleider about the matter. Sometime thereafter, Mr. Moran also informed me that Cindi Norris, the branch manager of the Orange Branch, had requested that plaintiff no longer be assigned to the branch.

7.    As of April 2000, a Step #2 – Counsel was the second step in FMG's progressive discipline process. The third step was a Step #3 – Reprimand.

8.    I thereafter worked with Mr. Moran to prepare a Step #2 – Counsel for Ungerleider addressing her unprofessional interaction with Ms. Tartaglio, loan quality issues and attendance. It was agreed that the Counsel and news of the reassignment of the Orange branch would be presented upon Ungerleider's return from medical leave.

9.    Ungerleider elevated her disagreement with the 2000 Counsel and the removal of the branch to me and John Frazza, Mortgage Production Regional Manager. Attached as Exhibit B are true and accurate copies of notes of a discussion I had with Ungerleider on or about May 1, 2000. I had numerous discussions with plaintiff following the issuance of the Step #2 – Counsel and the reassignment of the Orange branch wherein she disagreed with the criticisms contained therein. Ungerleider claimed that Moran had "harassed" and "threatened" her job for years, but did not provide me with any specifics.

10.   In accordance with FMG's conflict resolution policy, I commenced a thorough review of plaintiff's concerns about the Counsel and her claims that she was being "harassed" and "threatened" by Moran, which included interviews and/or discussions with approximately seventeen individuals. Based upon my interviews and review of various documents, I determined that the issues raised in the Counsel were warranted. Many of those interviewed offered examples of their own frustrating or trying interactions with Ungerleider. I shared this information with Mr. Frazza.

11.   At no time during this process did Ungerleider ever advise me that Mr. Moran had ever made any type of anti-Semitic remarks nor that she believed he was biased against her on account of her religion.

12.   I have no recollection that Ungerleider had complained to me at any prior time that Mr. Moran had made any type of anti-Semitic remark or that he was biased against her on account of her religion. Had she done so, I most certainly would have initiated a prompt investigation in accordance with Fleet's Freedom from Harassment policy, a copy of which is attached hereto as Exhibit C.

13.   In April or May 2000, Norris informed me that Ungerleider had contacted her to question her about her reassignment from the Orange branch.

14.   While plaintiff was on medical leave in 2000, I became aware that she had certain lifting restrictions. I understood that FMG was working to obtain a desktop computer to house in her main branch office in addition to the company issued laptop that she could leave at home.

15.   Attached as Exhibit D are handwritten notes I made documenting the accommodation that was provided to ensure that Ungerleider did not exceed her lifting restrictions,

2

namely, that she was advised that she could keep her laptop at her home, take manual applications and then input them onto her laptop from home. I am not aware of any records reflecting Ungerleider requesting any additional accommodations nor of Fleet denying her request for a desktop computer. I do not recall plaintiff asking for any further accommodations following her return from medical leave in April 2000. I am also not aware that FMG had ever denied her request for a desktop computer in addition to her company issued laptop.

16.    Attached as Exhibit E is a true and accurate copy of a string of e-mails forwarded to me by Donna Dailey, a Human Resources Manager, in which Odette Marra, Central Processing Manager IV, had compiled a number of issues concerning Ungerleider's loan files.

17.    On or about April 25, 2000, Ungerleider left me a voice mail in which she stated "I guess I am going to have to quit but I really don't want to" and that she wanted to "resolve this dispute before I leave the company."

18.    Attached as Exhibit F is a true and accurate copy of a string of e-mails received by me, including one from Ungerleider to me dated May 17, 2000, in which plaintiff tendered her resignation.

19.    Attached as Exhibit G is a true and accurate copy of an e-mail dated May 19, 2000 that I received from Ungerleider.

20.    On May 24, 2000, Frazza and I met with Ungerleider. Frazza informed Ungerleider that they had found no reason to support her allegations that Moran had harassed her or treated her unprofessionally, informed her of our conclusion that the events that led to the Counsel were valid and that the Counsel would remain. He also advised her that FMG was accepting her resignation.

21.    Plaintiff abruptly left the meeting, only to return stating that she hated the company and that she was glad that this had happened.

22.    To my knowledge, plaintiff, who was paid on a commission, rather than salary, basis, did not suffer any decrease in pay as a result of the issuance of the 2000 Counsel.

Rachel Paquin

Signed and sworn to before me
this 10th day of November 2003.

Notary Public    BARBARA COSTA
Commissioner of Superior Court

my Commission expires 7-1-2005

EXHIBIT A



Linda Ungerleider    1/11/2000

888 926 8818
*7
3011
811111
1
0

Hello    1/11/2000

Spoke to Kevin reg. Linda

He is going to have a verbal
w/ her regarding her professionalism
Communication / Work Relations/
Attendance @ Meeting → He well
follow-up w/ the results

FMG 00121

**EXHIBIT B**

*What a man misses mostly in heaven is company.*
— Mark Twain

- Commitments
- Journal Entry
- Thoughts & Ideas
- Agendas
- Conversations

**1**
Monday
May 2000

**Daily Record of Events**    122nd Day   244 Left   Week 18

Linda Ungerleider

Does not agree w/ any attendance
issues –

Feels Kevin is harassing. always
threatens her job - will not discuss
these issues w/out her attorney
present

Technical problems are not
her fault - she has documentation
from help desk on her technical
issues

Conference call

~~████████████~~

Told Linda to put something
together w/ her issues of
slander w/ branch - PG
forward to their HR for
investigation - Give them the
opportunity to look into issues

© 1998 Franklin Covey Co.                                    Original-Classic

FMG 00201

**EXHIBIT C**

PLAINTIFF'S
EXHIBIT NO. 5
FOR IDENTIFICATION
DATE 7/22/03 RPTR
PENGAD 800-631-6989

# Working at Flee

Employee Information
Handbook


Fleet

## FLEET FINANCIAL GROUP

## EMPLOYEE INFORMATION HANDBOOK STATEMENT

The contents of this handbook are provided as a matter of information and are subject to change or cancellation in whole or in part at any time, at Fleet's discretion.

Nothing written in this handbook constitutes a contract and there is no guarantee of employment to any employee for any specific duration. The information contained herein is not meant explicitly or by implication to suggest the existence of a contractual relationship between Fleet and any employee. You have the right to terminate your employment at any time and Fleet retains the same right, regardless of any other company documents or oral or written agreements issued by any company representative. No manager or supervisor of Fleet has the authority to enter into any agreement with an individual for employment for a specified period of time. If this handbook is in conflict with a policy or plan document, the policy or plan document will prevail.

All questions regarding the information in this handbook should be addressed with your manager or your local human resources representative.

## AFFIRMATIVE ACTION / EQUAL EMPLOYMENT OPPORTUNITY POLICY

Fleet has an established policy of Equal Employment opportunity with respect to race, color, religion, age, gender, national origin, sexual orientation, marital status, disability, disabled veterans of any war, veterans of the Vietnam era and all other categories as covered under federal, state or local law. This policy applies to every aspect of employment, including, but not limited to recruitment, hiring, placement, promotion, compensation, benefits, transfers, training, job elimination and termination.

To further our efforts, a separate policy addressing our commitment to disabled persons, disabled veterans and veterans of the Vietnam era encourages self-identification for the purpose of opportunity. The self-identification form is posted on company bulletin boards along with the Affirmative Action Statement signed by Fleet's chairman and CEO; both documents can be obtained through the local human resources department.

Fleet's Affirmative Action policies are available to employees during normal business hours in all human resources departments.

## DIVERSITY

Above and beyond our affirmative action efforts, Fleet is committed to continuously strive to ensure that all employees enjoy an inclusive work environment that recognizes, respects, values, and effectively manages their unique diversity for the mutual benefit of all employees, customers, and the corporation. Fleet has

established a Diversity Council which has the following roles and responsibilities:

- Provide overall leadership on diversity issues
- Develop diversity strategies
- Provide guidance and support to senior management
- Monitor progress toward achievement of objectives
- Provide business groups with advice and recommendations on diversity policies, procedures, and processes.

## FREEDOM FROM HARASSMENT

Fleet has a fundamental belief that all people should be treated with dignity and respect. Employees have a basic right to work in a comfortable environment, free from derogatory remarks, unwelcome sexual advances, and any other verbal or physical conduct constituting harassment on the basis of race, color, religion, gender, age, national origin, sexual orientation, marital status, disability, veteran status, or any other category covered under federal, state or local law.

All incidents of a harassing nature should be reported to human resources. Human resources will investigate all complaints promptly maintaining confidentiality when possible and with the utmost discretion. Retaliation against employees for filing a complaint regarding harassment or for participating in an investigation based on harassment is strictly prohibited.

With respect to sexual harassment, Fleet prohibits:

- Unwelcome sexual advances; requests for sexual favors; and all other verbal or physical conduct of a sexual or otherwise offensive nature, especially where
  - submission to such conduct is made either explicitly or implicitly as a term or condition of an individual's employment;
  - submission to or rejection of such conduct is used as the basis for employment decisions;
  - such conduct has the purpose or effect of creating an intimidating, hostile, or offensive working environment.
- Offensive comments, jokes, innuendos, and other sexually oriented statements

Violations of this policy are subject to discipline, up to and including termination.

Questions, complaints or other issues pertaining to the Freedom from Harassment policy should be directed to your supervisor or local human resources department.

## CODE OF ETHICS

The Fleet Code of Ethics handbook has been designed to offer employees a summary of the corporation's philosophy regarding important issues that are necessary to maintain professional standards.

Exhibit D

**Paquin, Rachel R.**

| | |
|---|---|
| **From:** | Dailey, Donna J |
| **Sent:** | Monday, February 14, 2000 12:09 PM |
| **To:** | Paquin, Rachel R. |
| **Subject:** | Linda Ungerleider |
| **Importance:** | High |

Not sure if I gave you this already or what...Please call Mike Pulver to discuss Linda regarding her disability and her laptop. She is coming to management again regarding what she would like them to do for her on this. I explained reasonable accommodation and what they needed to consider in reviewing her request. Since you had already done some research on this, I would like you to talk with him before they respond to Linda. I believe they were going to talk to her on Tuesday 2/15 to find out what she was looking for. Thanks.

\* ACCOMMODATIONS WERE MADE WHEN RETURNED IN APRIL, 20 BECAUSE SHE COULD ONLY CARRY UP TO 5lbs WE AGREED TO ALLOW HER TO KEEP LAPTOP AT HER HOME. SHE WOULD BE ABLE TO TAKE APPLICATIONS MANUALLY AND INPUT AT HOME.

1

FMG 00139

EXHIBIT E

Paquin, Rachel R.

| | |
|---|---|
| **From:** | Dailey, Donna J |
| **Sent:** | Monday, February 07, 2000 3:15 PM |
| **To:** | Paquin, Rachel R. |
| **Subject:** | FW: arc grove team 5 |
| **Importance:** | Low |

For your file.

-----Original Message-----

| | |
|---|---|
| **From:** | Marra, Odette R. |
| **Sent:** | Thursday, December 23, 1999 11:35 AM |
| **To:** | Dailey, Donna J |
| **Subject:** | FW: arc grove team 5 |
| **Importance:** | Low |

Donna, the e-mail didn't get chopped off, I must have been interrupted and didn't finish. Sorry about that.

-----Original Message-----

| | |
|---|---|
| **From:** | Marra, Odette R. |
| **Sent:** | Thursday, December 09, 1999 6:16 PM |
| **To:** | Pulver, Michael R. |
| **Subject:** | RE: arc grove team 5 |
| **Importance:** | Low |

Per your request the following response is to the 12/6 e-mail sent to Mike Massella from Linda Ungerleider.

The Belko application was uploaded from Linda on 10/28. On 10/29 the findings report was generated and the branch PA produced the POS letter. Because Linda had indicated on the compass 1003 that the borrowers current residence was a pending sale, the findings included the HUD I as a condition. On 11/4 Marc Grove left Linda a message to discuss the findings report, she never returned his call which is not uncommon for Linda . On 11/8 the commitment letter was sent to the borrower. On 11/15 Linda called Marc to discuss the outstanding conditions and to inform him that the borrower would not be selling their current residence prior to the closing of this loan. Upon reviewing the file Marc concurred that the borrower qualified without the sale and consequently updated DU and generated new findings. Linda did not ask Marc to revise the commitment letter therefore a new commitment was not sent.   Much to Marc's surprise Linda called Betsy on 12/6 to complain that Marc had not revised the commitment letter to reflect the ommission of the HUD 1. Linda then asked Betsy how she could be expected to work with Marc and others when she has a severe stress condition.  Betsy commented that  being a loan officer may not be the best career to have if she needs to avoid stress.  Betsy then promised to generate an updated commitment letter which she did and mailed it out the same day.

Mike as you know we've had serious issues with Linda's files for a long time.  Listed below are some recent examples:

ACCT#/NAME                    ISSUE

Ilies 1000180858 -        Uploaded loan with prop address as: **123 i hate this, worthless, CT**
                          Title to be held in: **just lost another loan while computer programming**

Colangelo 1000180864 -    App date 11/29. No taxes, no liabilities, no income, no assets completed
                          in compass. loan amt 75,000, 57,000 existing lien. Purpose of refi:
                          interest rate reduction.

Bodea 1000180861          All loans uploaded 11/23.  All sent without info necessary to
Beech 1000180862          generate TIL/GFE.  History comment from Linda states to hold off
Surh 1000180863           sending GFE/TIL.  Missing appraisal contact on one loan.

Surh/Greenberg            Borrower & Co-borrower SS# the same.
1000180863

Beech 1000180862          Borrower on job for 2 months.  Borr said told Linda 2 mos at app. Linda
                          put 6 yrs on 1003.

*40% of the time Linda uploads the same loan twice.  Consequently we leave messages and send e-mails to determine which loan# she wants to keep.  These phone calls/e-mails are rarely returned.  Which means that her pipeline numbers are not 100% accurate.  Linda's current pipeline consists of 15 loans.  4 of these are duplicates but are counted in her compass pipline #. as live loans.

Linda has a huge issue with credit uploads.  This means we can't get into the loan to review fees.  Again she rarely returns

1

FMG 00136

Often Linda will complain about not getting a final commitment and feels that we're giving poor service to her realtors and borrowers. Several of these complaints were on loans that she still hadn't mailed to the SSC. Linda has a hard time understanding that we can't issue a FINAL commitment if we don't have the application package. We have done everything humanley possible to explain the process to Linda. Sometimes she acknowledges that her issues may be tied to her medication , sometimes she says her issues are tied to having the worst sales manager and the worst operations support imaginable.

**[Marra, Odette R.]** On  Original Message——

From: Pulver, Michael R.
Sent: Thursday, December 09, 1999 8:29 AM
To: Marra, Odette R.
Subject: FW: arc grove team 5
Importance: Low

Odette, please advise how we responded to Linda.  Mike

-----Original Message-----
From: Ackerman, Howard
Sent: Wednesday, December 08, 1999 6:49 PM
To: Pulver, Michael R.; Moran, Kevin A.
Cc: Dailey, Donna J
Subject: RE: arc grove team 5
Importance: Low

Status on this please.
Howard.

-----Original Message-----
From: Massella, Michael M.
Sent: Monday, December 06, 1999 6:00 PM
To: Ackerman, Howard; Pulver, Michael R.; Moran, Kevin A.
Cc: Dailey, Donna J
Subject: FW: arc grove team 5
Importance:        Low

FYI - Once again please see that we address this as best we can.
-----Original Message-----
From: Ungerleider, Linda
Sent: Monday, December 06, 1999 5:51 PM
To: Massella, Michael M.
Subject: RE: arc grove team 5
Importance:        Low

Mike: Thank you for your response.  to date, and still at this time, with time is of the essence; however, I have still not received any communication or response to the two files that were told to me by marc grove that they were approved in which we are faced with having to close these purchases within a week. I'm sure you will recall what it was like dealing with attorneys and realtors calling me several times a day, asking me why I haven't gotten the commitment letter faxed to them. Marc Grove has had many of our current loan officers with many problems and fortunately Kevin did recognize the need to switch me to Ava but in the meantime; I need answers to these files and I feel that by 5:30 today, since working on these problems from early last week that my manager and team 5 supervisor should have results. Don't you. Youj are so correct about our No. l or 2 office. There are many loan officers that get immediate results from their management and then their are those of us that are not liked and quit; i.e. kathy wyman most recently, bob foote, carol cook and I am not quitting  because of my treatment.  I expect to be treated fairly and equally by my superiors in my office.  I am one to not throw in the towel but to fight for my rights.  I have been fortunate to have supervisors that liked and appreciated my work and c conscientiousness and can get superior references from all past managers.  I cannot continue to have one or two people cause my hands to tremble, cry and feel completely devastated because of personality conflicts.  I know I didn't grow up and am am best friends with Kevin as Sharon,Pierce, Belinda, etc. but I am a valuable employee to this company otherwise and when top management realizes that my wining and complaints are always because of the lack of service to my customers and to my realtors, then  perhaps we can get somewhere to the real root of the problem.  You know how you have to step on egg shells when dealing with realtors.  From the first day that I was given Marc Grove I asked Kevin for another processor as I knew he couldn't handle the file load.  I again remind everyone that this was not an issue for almost two years when I had Frank Romanelli, Steve N., Chad Baker, and Mike Desorcey.  I remind everyone the only frustrations I had were breakdowns of the laptop and communication from Kevin.  I even lost Betsy Salisbury phone extension because I never had any complaints or servicing issues.  You might check with Eliz. Glynn as another source of unhappiness with processing when she had Marc.  I know he is a nice enough fellow and can handle a certain amount of workload but the other mentioned processors were keepers.  Again, thank you for your time.  I will try to see if Kevin will talk to me about what we can do about our relationship to get the job done.  At this point, I am giving my Realtors, attorneys and those that have been jerked around this past month due to poor service from Marc Kevin's number.

-----Original Message-----
From:            Massella, Michael M.

2

FMG 00137

Sent:        To: Ungerleider, Linda ; December 06, 1999 12:52 PM
Cc: Pulver, Michael R.; Moran, Kevin A.; Ackerman, Howard; Dailey, Donna J
Subject:     RE: arc grove team 5
Importance:  Low

Linda:

I'm sorry for some of your frustrating experiences, unfortunately this market brings a high degree of frustration and sometimes miscommunications. I think it is best to sit down with Kevin Moran and work with him and address this matter. The Shelton branch has always been one of Fleet's top performing branches. Customer service is number one and the SSC has made great strides in achieving this goal. I've have forwarded your letter to Howard Ackerman and Donna Dailey for them to review. If I can be of any further assistance please let me know.  Sincerely, Mike Massella

> -----Original Message-----
> From:         Ungerleider, Linda
> Sent:         Monday, December 06, 1999 11:59 AM
> To:           Massella, Michael M.; Massella, Michael M.
> Cc:           Pulver, Michael R.; Moran, Kevin A.
> Subject:      arc grove team 5
> Importance:   Low


I think that you should be aware that Betsy Salisbury told me that perhaps I shouldn't be a loan officer anymore.  For almost two years, while having the fortunate opportunity to have Frank, Steve and Chad and Mike as processors, I never even had to call Kevin and I even lost Betsy's extension because I never had problems when they were handling my files.  Kevin has taken Marc Grove off my pipeline; however, I have asked that all my files be removed from him.  I just got off the phone with Betsy, an attornies office and a Realtor with my hands shaking so much, that I couldn't even hardly hold onto the phone.  For the third time, he has told me weeks in advance that loans are cleared to close and/or approved with conditions met and still has not sent out mortgage commitment letters to the point that the customer goes past their mortgage commitment condition on sales agreement.  Now, again, it is only a week from an actual closing the Betsy Belko, file closing Dec. 17 and Betsy Salisbury feels there really isn't a problem that Marc Grove still has an error on the committment letter.  She doesn't understand why the condition of having to sell your home and the home is not sold an "issue."  This as you know, is not a true committment.  The customer is qualified without leasing or selling her home to close on Dec. 17th and this letter must be faxed as such, today, to attorney Tom Lynch, Milford.  I have given the fax number to Salisbury.

I have lost the trust of Sophis Messore, my number one realtor, who she herself had been the number one Century 21 agent for 5 consecutive years.  This is the third file this month that was screwed up by Marc and I don't know how I will gain her trust other than I told her that management has changed my processor and I apologized for the aggravation.

I have indicated more than once that I love my job and I feel Fleet has problems but so does every company but it is a few people that I must work with that cause me the severity of stress that caused me to have to go via ambulance to Milford Hospital for what they said was causing my grabbing chest pains as severe stress disorder when Marc took over my files.  I feel very confident that I am not the only one to make this complaint about servicing our customers and ask why we would lay off a competent worker as Steve was.

I think that a discussion with Betsy about her feeling for Marc Grove and her comments to loan officers is warranted. linda

Linda Ungerleider/Shelton
1-800-528-0745 ext. 3003

3

FMG 00138

EXHIBIT F

**Paquin, Rachel R.**

| | |
|---|---|
| **From:** | Ivey, Franklin |
| **Sent:** | Friday, May 19, 2000 8:33 AM |
| **To:** | Paquin, Rachel R. |
| **Cc:** | Clifford, Marguerite R. |
| **Subject:** | FW: employment status: |

-----Original Message-----
| | |
|---|---|
| **From:** | Cieri, Mauro A. |
| **Sent:** | Friday, May 19, 2000 7:56 AM |
| **To:** | Ivey, Franklin |
| **Subject:** | RE: employment status: |

I'm on board with this decision.
Moe.

-----Original Message-----
| | |
|---|---|
| **From:** | Ivey, Franklin |
| **Sent:** | Thursday, May 18, 2000 3:04 PM |
| **To:** | Cieri, Mauro A. |
| **Cc:** | Paquin, Rachel R. |
| **Subject:** | FW: employment status: |
| **Importance:** | High |

Moe, attached is latest e-mail from Linda and our recommendation for the last step.

I spoke with Rachel. She has investigated the issues/complaints that Linda raised in her meeting with John Frazza and Rachel. Rachel has followed up with various sources to and can not find any issue of Kevin being unprofessional or of harassing Linda. In fact all of the information that Rachel has documented supports Kevin, and strongly indicates that Linda is an extremely difficult person to work with.

With the new incident that Linda has raised (last e-mail I forwarded), Rachel has followed up with the parties involved and again has found no issue with Kevin.

Rachel and John need to follow up with Linda based on their last meeting. Rachel and John have concluded, and I support, that in this meeting (hopefully on Monday 5/22) John will advise Linda that they have found no reason to support her allegations that Kevin has harassed her or has treated her unprofessionally in any way. They will advise her that they have concluded that the events that led to her recent reprimand are in fact valid and that the reprimand stands.

I have further suggested that they conclude this meeting by advising Linda that we mutually agree with her 5/18/00 e-mail and her decision to resign and that we accept her resignation to be effective immediately. If she balks at the language of her resigning, we will advise that we still agree with her decision and feel that the working relationship has become too strained to continue and that we are terminating her employment effective immediately.

Call if you want to discuss.

The pay status issue is related to her last disability leave. I believe that Rachel has this under control.

-----Original Message-----
| | |
|---|---|
| **From:** | Paquin, Rachel R. |
| **Sent:** | Thursday, May 18, 2000 2:00 PM |
| **To:** | Ivey, Franklin |
| **Subject:** | FW: employment status: |
| **Importance:** | High |

-----Original Message-----
| | |
|---|---|
| **From:** | Ungerleider, Linda M. |
| **Sent:** | Wednesday, May 17, 2000 9:48 PM |
| **To:** | Paquin, Rachel R. |
| **Subject:** | employment status: |
| **Importance:** | Low |

Rachel: I will be resigning from this company as soon as I get the status of my professional record from you and John because I cannot tolerate one more day of this. It causes me chest pains, nausea and the inability to do my job. Please wrap up this decision as well as my pay status. If this is not favorable to my record then I will be forced to go to the disability commission. I will be sharing this information from Kevin regarding his conversation with Dr. Saadat to have her share her side of the story with you. If you would like to call her please let me know as I will share all information and phone numbers as well as the Realtors that have sent Kevin a letter which he also probably didn't share with you regarding the fact that Dr. Saadat and the Realtor asked for me to work with her instead of another loan

1

**FMG 00264**

Our office will fax you a copy of this letter Thursday.

Linda /Shelton
1-800-528-0745 ext. 3003

2

FMG 00265

**EXHIBIT G**

**Paquin, Rachel R.**

| | |
|---|---|
| **From:** | Haskell, Rebecca M. |
| **Sent:** | Monday, May 22, 2000 8:43 AM |
| **To:** | Paquin, Rachel R. |
| **Subject:** | FW: W.Hartford |
| | |
| **Importance:** | High |

fyi -

-----Original Message-----

| | |
|---|---|
| **From:** | Ungerleider, Linda M. |
| **Sent:** | Friday, May 19, 2000 7:32 AM |
| **To:** | Frazza, John F.; Frazza, John F. |
| **Subject:** | W.Hartford |
| **Importance:** | High |

John:  Although I have been offered private banking for Hudson Savings and some other opportunities; I feel that because I have vested years with Fleet, I would like to know if it is ever possible to transfer to another office?  Would I be able to work under Greg's Hartford office and territory?  I have otherwise been forced to resign because I will not work one more minute under Kevin.  I had planned on returning key and equipment Saturday with my husband's help, as I cannot lift but I will wait for you to get back on this by Wednesday when we meet and if this arrangement is possible then I would prefer meeting you in Hartford.  I am going into Seymour today to get a few things I have there and to see everyone.  It is very difficult, as I have really enjoyed working with the rest of the team in Seymour.

Linda Ungerleider/Shelton
1-800-528-0745 ext. 3003

1

**FMG 00266**