UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED 

| | | |
|---|---|---|
| LINDA UNGERLEIDER<br>PLAINTIFF | : | |
| VS | : | CIVIL ACTION NO.<br>302cv659(AVC) |
| FLEET MORTGAGE GROUP OF<br>FLEET BANK,<br>DEFENDANT | : | FEBRUARY 26, 2004 |

## LOCAL RULE 56 (a)2 STATEMENT

**PART ONE**

1. Admitted.

2. Insufficient knowledge

3. Admitted

4. Denied

5. Denied

6. Denied

7. Insufficient knowledge

8. Insufficient knowledge

9. Admits date when injury was sustained. Has insufficient knowledge as to when Moran learned of date.

10. Admitted

11. Denied

12. Admitted

1

13. Denied

14. Denied

15. Denied

16. Admitted first sentence. Does not understand second sentence.

17. Denied

18. Denied

19. Admitted

20. Admitted

21. Admitted

22. Denied

23. Denied

24. Admitted

25. Denied

26. Insufficient knowledge

27. Insufficient knowledge

28. Insufficient knowledge

29. Denied.

30. Denied.

31. Insufficient knowledge.

32. Denied.

33. Insufficient knowledge.

34. Admits to sending email stating that she was out of work due to neck and back pain, sore throat, earache and rapid heart rate.

35. Admitted.

36. Insufficient knowledge

37. Insufficient knowledge.

38. Insufficient knowledge.

39. First sentence admitted. Insufficient knowledge for second sentence.

40. Insufficient knowledge.

41. Insufficient knowledge.

42. Insufficient knowledge.

43. Denied. The citation by Defendant does not support the statement. Therefore, the Statement should not be considered for purposes of the pending Motion for Summary Judgement.

44. Do not understand statement.

45. Insufficient knowledge.

46. Insufficient knowledge.

47. Insufficient knowledge.

48. Insufficient knowledge.

49. Insufficient knowledge.

50. Denied.

51. Insufficient knowledge.

52. Insufficient knowledge.

53. Denied.

54. Denied.

55. First sentence admitted.

56. Insufficient knowledge.

57. Denied.

58. Denied.

59. Denied.

60. Denied. Statement taken out of context.

61. Denied.

62. Admitted.

63. Insufficient knowledge.

64. Denied.

65. Admitted.

66. Denied.

67. Denied.

68. Insufficient knowledge.

69. Insufficient Knowledge.

70. Insufficient knowledge.

71. Admits that plaintiff was told to return key.

72. Admits that plaintiff went to branch to remove belongings.

73. Admits that email was sent.

74. Insufficient knowledge.

75. Insufficient knowledge. Said paragraph is hearsay and would not be admissible at Trial.

76. Admits that Moran sent plaintiff email.

77. Denied.

78. Do not understand statement.

79. Insufficient knowledge.

80. Denied.

81. Denied.

82. Insufficient knowledge.

83. Admitted that plaintiff left voice mail, but has insufficient knowledge as to content.

84. Admitted.

85. Admitted.

86. Admitted.

87. Admits leaving the meeting.

88. Denied.

89. Denied

89. Denied

90. Denied

91. Admits to sending claim to CHRO without Attorney assisting. Plaintiff's statement pages 1-3 to CHRO states retaliation action and forced to resign. The last paragraph, page 3 refers to not wanting to resign.

92. Denied

93. Denied

94. Admitted. Statement taken out of context

95. Insufficient knowledge.

96. Admits to 5 other loan officers, all of whom reported to Moran and all of whom had allegedly suffered back and/or neck injuries. Admits they took Family and Medical Leaves from Fleet. Admits that they were not treated poorly nor having branches taken away from them after their leave, and one was promoted. Insufficient knowledge as to how they received their injuries. (P. Dep. Pags. 375-76 or Pg. 468).

PART TWO

## DISPUTED ISSUES OF MATERIAL FACT

1. Plaintiff's job description and primary job responsibilities were to establish business relationships outside of the Fleet Bank, FMG, environment as well as respond to referrals from the eight Fleet Bank branch office's personnel staff and to assist in the processing of the loan application to the close and funding of the loan. (P. Ex. 1)

2. One of the "Abilities Required" in the Position Description for a mortgage loan external originator is "ability to travel distances, standing and sitting." (P. Ex. 1)

3. When Plaintiff first started working for FMG, mortgage applications were handwritten and taken manually; however, in 1996, Plaintiff was sent to E. Providence, RI to train with the new computer technology of inputting mortgage loans into a system. At the training, each participant was handed a suitcase weighing 55 lbs. The items included are listed in Plaintiff's Exhibit 2 (P. Ex. 2).

4. As a result of carrying this computer equipment, the plaintiff, a 5" 1", petite 108-pound woman sustained injuries and consulted a sports and occupational Physician who gave the medical opinion stated in Plaintiff's exhibit 3. (P. Ex. 3).

5. In connection with Plaintiff's workman's compensation case, Plaintiff was ordered to see Neurosurgeon, Michael Karnasiewicz, M.D. He gave the medical opinion that "It is my feeling that 5% of this was preexisting condition and 5% was secondary to the repetitive nature of her duties at Fleet." The repetitive nature refers to the 3 years of lifting and carrying the 33 lbs. Of equipment (without training manuals and extra computer accessories) that was required. (P. Ex. 4)

6. In February, 1997, Plaintiff received Performance Appraisal for the year 1996. She received a rating of "3" which is defined as "meets expectations" and further defined as "meets major job responsibilities. Performs duties in a satisfactory manner." She received a "4" defined as exceeds expectations in Production. (P. Ex. 5).

7. Branch managers who dealt with plaintiff as their loan officer, provided reviews to plaintiff's supervisor, Moran. Throughout 1997, she received superior ratings. (P. Ex. 6).

8. Defendant states that plaintiff "ONLY received a meets expectation rating for year ending 1996; however, she ranked 47th out of 328 loan officers and remained in the top 15-20 percent of FMG. (P.Ex.7).

9. In 1997 Plaintiff received a letter from Regional Vice President, John Frazza stating that FMG is "…proud to have you on our team. Thank you for your hard work and dedication." (P. Ex. 8).

10. Plaintiff received a Performance Appraisal for the year 1997. She received an overall 4 rating for the year. This rating is "exceeds expectations." This review is for production, branch coverage, customer service, compliance and endorsement of FMG. (P. Ex. 9).

11. Plaintiff also received a Performance Appraisal in 1998 which her ratings were an overall 4, which is, exceeds expectations. (P. Ex. 10).

12. In 1998 Plaintiff received, First, Second, Third and Fourth Quarterly Reviews by Moran as well as the Performance Appraisal for the 1998 year. All reviews and appraisals as well as 1998 Branch Assessments were predominantly rated outstanding or excellent and overall exceeds expectations." There were no customer complaint issues, lack of return of phone calls, production, coverage, compliance or endorsement of FMG or anything deemed unprofessional. Plaintiff additionally, received the "Distinguished Service Award" for customer service. (P. Exhs. 11-16).

13. In 1999 Plaintiff continued to receive the outstanding quarterly reviews as well as superior 1999 Branch Assessments until she went out disability leave and FML. (P. Ex. 17 & 18).

14. In 1999 Plaintiff ranked 39 out 446 loan officers placing her in the top 10% of FMG. (P. Ex. 19).

7

15. Immediately upon Plaintiff's return from her disability leave, her performance review dropped. Moran totally disregarded the high ratings for the first half of the year. (P. Ex. 20 & 21).

16. Said low review is an adverse job action since as stated in Commission Plan of 2000, a rating of 2 affects the quality bonus for the next quarter (reduced income potential) as well as threat of termination of employment. Moran states in his deposition, "it affects her compensation." (P. Ex. 22) & Moran Dep. 7/22/03, P. 24, Lines 12-18).

17. In January, 2000, Plaintiff became worse with pain. She took family medical leave until April 10, 2000 when CORE, Fleet's Managed Disability Administrator approved her return to work with job modifications. (P. Ex. 23).

18. Plaintiff requested accommodation for her disability from management. The email dated 2/14/00 from Dailey of Human Resources to Paquin of Human Resources states, "Please call Mike Pulver to discuss Linda regarding her disability and her laptop. She is coming to management **AGAIN** regarding what she would like them to do for her on this." Plaintiff never received any feedback or follow-up discussion regarding her need for a simple accommodation. (P. Ex. 24).

19. In addition, Plaintiff was transferred to a Second Level office which required her to carry and lift the heavy equipment up 32 wide planked steps and with no elevator. Plaintiff was removed from a first level office in the town of Orange where she resided and where she maintained her office for the 7 years with FMG. (P. Ex. 24 & P. Ex. 55).

20. Plaintiff received a "Written Formal Counsel" the day she returned to work from the Family Medical Leave April 10, 2000. Plaintiff proves that the written review was in complete error and a sabotage of her file. This was the beginning of retaliation towards her by FMG. She immediately began to secure evidence to correct the inaccuracies in the formal counsel. She proved that she had attended all of the trainings and meetings listed that Moran said she missed other than 12/17/98, Cohen Brown Training, which fell on her Jewish holiday Hanukkah. (P. Ex. 25).

8

21. Plaintiff provided Moran with email from Judith Marshall, Fleet Corporate Trainer, May 1, 2000, which states, "you did attend Fleet One-November 3, 1999 and received a 95." (P. Ex. 26)

22. Plaintiff provided Moran with the agenda that she received at the (make-up) Compass LX Training. (P. Ex. 27).

23. Moran admitted in his Memorandum to Plaintiff dated 4/26/00 that "I have verified the dates of your disability and acknowledge that you were on disability leave for the June and July Compass LX Training session." Moran admits statement; however, refuses to correct written warning. (P. Ex. 28).

24. As Moran admitted in his deposition, floor time was not mandatory yet he made 2 alleged days missed as a formal counsel issue. (P. Ex. 29, Moran Deposition 7/22/03, Page 31, lines 3-25 & 32).

25. Not all loan officers took or wanted floor duty. (P. Ex. 30)

26. Monica Carlson, Belinda Greco, Alice Robinson and Sharon Scrimenti are not on the floor duty example and they did not take floor duty while Plaintiff was at FMG. Moran admits in deposition, "Floor time there were exceptions made." (P. Ex. 31) and (Moran Dep.7/22/03, P. 31, Lines 3-25 & P. 32, Lines 1-25).

27. The Fleet Employee Handbook sets forth a "Conflict Resolution" procedure. (P. Ex. 32).

28. Ms. Paquin admitted in her deposition that she did not follow the procedures set forth in the handbook for Conflict Resolution. (P. Ex. 33 Pacquin Dep. 7/22/03, P. 28, Lines 3-19).

29. Both Ms. Pacquin and Mr. Moran admit that the handbook does not contain a definition of "unprofessional." Defendant makes alleged claims of unprofessionalism and alleges that Plaintiff was not a good employee; however, Mr. Kevin Inkley, former Director of Operations of FMG hired Plaintiff to work in the capacity of a Loan Officer for Citizens Bank. Mr. Inkley was the manager supervising Moran, Paquin, Dailey, Frazza and the entire Providence Center who made these alleged claims of Plaintiff. Mr. Inkley is the current Vice President of the Mortgage Dept. of Citizens Bank. Plaintiff has been harassed by FMG since leaving and Mr. Inkley states in an email to her to reassure her concerns,

"Rest assure if anything comes up about Fleet." (P. Ex.62) and (Ex. 34 Moran Dep. 9/4/03, P.87, Lines 9-17).

30. When Moran was asked at his deposition if he had any customer complaints about Linda, Moran stated, "I don't have any specific recollection." FMG has not produced any customer complaints about plaintiff; however, plaintiff retrieved complaints about Moran and processors. (P. Ex. 34) and (Moran Dep. 9/4/03, P.87, Lines 9-17).

31. For the calendar year 1999, Plaintiff's income was $100, 320. (P.Ex. 35).

32. As far as the Plaintiff knew, applications had to be taken on the computer, and could no longer be done manually from an email she received February 7, 2000, "Your laptop is functional and you are required to utilize it to originate mortgages with the company. (P. Ex. 36).

33. Moran listed "Loan Quality" in the written formal counsel April 10, 2000. There was a time in 1999 when Plaintiff was led to believe by Moran that the "credit merge" problems she was experiencing was that "she didn't know how to do it." Moran never told Plaintiff that the issue she was experiencing was a systems problem experienced by all loan officers. It was not until Plaintiff contacted Mr. Brogdan the Senior Technical Analyst, did she learn that her problem was something out of her control. Moran received a letter from Robert Brogdan, Senior Technical Analyst on May 12, 2000 about Plaintiff's technical ability in which Brogdan states: She knows her procedures for this evolution very well so I have no reason to believe she would skip a step or have user induced problems. We could not find any obvious reason for the system not to work as advertised and Linda seems to know what she is doing so we will have to continue to try to find solution." In addition, Brogdan states, "I can say with very high degree of certainty that there is no problem with the laptop, the application or her account. I can also say that Linda appears to know what she is doing." (P. Ex. 37).

34. Moran defines the term he used in his formal counsel "loan quality" as it "having to do with using the computer system." (P. Ex. 34 Moran Dep. 9/4/03, P. 85, Lines 1-3 and Lines 7.13. Also P. 84, Lines 16-25.

10

35. Plaintiff was asked to return the keys to the Orange Bank branch. The bank had a form called a surrender form which had to be signed and witnessed. Tartaglia refused to give Plaintiff the form for ten (10) days. (P. Ex. 38).
36. Plaintiff learned of an "achievement award and monetary award" that she had earned while out on disability leave. Moran did not give her the award and denied that she had received the award. Although her last day was May 24, 2000, she did not receive the award and check until June 29, 2000. (P. Ex. 39).
37. Plaintiff endured anti-semitic slurs, innuendos and different treatment then to others by Moran and his personal assistant early into the relationship when Moran became her supervisor. Derogatory comments were so offensive that at one point, Plaintiff requested in writing to Moran that he do something about it although no response was rendered. (P. Ex. 40).
38. Moran stated in his deposition that his job responsibility is "to assist the loan officer and customers with problems" but when Plaintiff's customer, Rabbi Herbert Brockman had difficulty in obtaining a refinance of his mortgage, which was already serviced by FMG for 16 years, Moran refused to assist plaintiff. Rabbi Brockman provided the necessary documents for the condition of his loan approval, however, they denied his mortgage. Rabbi Brockman states in his exhibit "I immediately called New Haven Savings Bank. The process took 48 hours and I was accepted." Moran ordered Plaintiff to call Brockman to notify him that his loan was denied. (P. Ex. 41).
39. After her return from family medical leave in April 10, 2000, Plaintiff became aware that large funds were being withdrawn from her Fleet checking account unauthorized. These withdrawals amounted to $7,000.00 When she called Human Resources about this problem she was directed to contact payroll. That department refused to help her. After months of unprofessional treatment to Plaintiff the funds were corrected and they were accompanied by notes of apology. (P. Ex. 42).
40. A letter sent to CORE's attention from Dr. Forte, dated February 18, 2000 stated that Plaintiff "should be provided with a desk top computer." In addition, Dr. Marc Warman, Sports and Occupation MD, wrote a note stating that she "was to

have a PC on her desk or home office is available (so she does not have to carry her computer to and from work) was his intentions. In order to do the job, Plaintiff needed a PC at her workstation and a laptop left at her home for her evening and weekend calls to customers and this accommodation would have avoided the need to carry the computer as indicated in Dr. Warman's note., Bringing Fleet's retail customers to Plaintiff's own home and bedroom office was not an option. (P. Ex. 43 & 44).

41. Plaintiff submitted a complaint to the CHRO on May 5, 2000. She filed without the assistance of an Attorney. Her written statement refers to retaliation and her inability to perform her job forcing her to resign. (P. Ex. 45).

42. Plaintiff received a letter from the CHRO October 30, 2000 that her case was retained for Full Investigation and" that the allegations raised are such that they merit further investigation." (P. Ex. 46).

43. On May 24, 2000, Regional Vice President and Paquin, Director of Human Resources asked to meet me in Seymour. Frazza handed me a Note that stated, "we looked into your issues and have concluded that the written remains as it was given." Plaintiff's issues were not resolved. She risked further injury to her back if she had continued working at Fleet without accommodation while lifting and carrying her equipment up to the 2 1/2 story office. (P. Ex. 48).

                      THE PLAINTIFF,
                      LINDA UNGERLEIDER

BY _____
ELLEN M. TELKER
564 Boston Post Road
Milford, CT 06460
Tel:203/877-4108
Fax:203/878-2084
Federal Bar No. CT10780
HER ATTORNEY