UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

LINDA UNGERLEIDER
    PLAINTIFF                         :

VS                                    :        CIVIL ACTION NO.
                                               302cv659(AVC)

FLEET MORTGAGE GROUP OF
    FLEET BANK                        :        FEBRUARY 26, 2004

## AFFIDAVIT

1. I, Linda Ungerleider am over the age of eighteen (18) years and understand the Obligations of an oath.

2. I have personal knowledge of the matters and attest to herein.

3. My central office was located in the Fleet Bank Branch of Orange, CT throughout My employment with Fleet until I was told to remove my belongs and myself On April 10, 2000. This was the first day back from family medical leave. (P. Ex. 49).

4. Throughout my tenure at Fleet, I maintained high sales productivity as a top Sales person within FMG. I maintained excellence in customer service, branch Referral response, problem solving, professionalism and all major job responsibilities. (P. Ex. 5, 7, 9, 10, 11, 12, 13, 14, 17, 18).

5. I received the "Distinguished Fleet Service Award which was recognized at a Sales conference and placed in the Newspaper. (P. Ex. 15).

6. There were no customer complaints throughout my entire tenure with Fleet. On the contrary, I received letters from customers and an Attorney complaining about my sales manager, Kevin Moran as well as some of my processors and their

1

supervisors. The complaints stated were that Moran did not return calls as well as other important needs. In some cases, I received hysterical calls from customers, Real Estate agents and Attorney offices stating that moving trucks were in the driveways and Fleet still did not give a clear to close. (P. Ex. 50)

7. My branch managers assessed my performance quarterly each year starting year 1997. The ratings were based on a scale of 1-5 with 5 being superior. I received received mostly superior ratings.
(P. Ex. 6, 16, 18).

8. Moran received a letter from a well-respected Real Estate Broker named Judy Cooper who writes, "I cannot tell you how reassuring it is to work with someone of Linda's caliber." She also states, "Linda is professional and courteous in all her dealings with my customers and myself." (P. Ex. 52).

9. I ranked in the top 15-20% of the FMG organization in 1996 and the last 4 years I was ranked in the top 10% of the company for closed loans. This ranking would not be possible without having strong work ethics, being customer focused and professional.

10. The Defendant alleges that I was **only a** "meets expectations" employee and "unprofessional" yet Mr. Kevin Inkley, who was the former Director of Operations of FMG hired me for a position as loan officer after Fleet. He is the Vice President of Citizens Bank Mortgage Division. Mr. Inkley supervised Moran, my sales manager, Frazza, the Regional Manager and Paquin, Human Resources. He was their manager as well as the entire headquarters. He even stated in an email to me he states, "rest assure if anything comes up about Fleet." (P. Ex. 67).

11. I sustained an injury on the job lifting a 55 lb suitcase given to me at a computer training class. Repetitive lifting and carrying of heavy equipment daily ended up limiting my lifting and carrying permanently to 5 lbs (P. Ex. 3) Although this isn't a wheelchair situation, it does mean that I won't be able to lift a Grandchild out of a crib or playpen. I won't be able to play golf with my husband which was

one of our favorite activities together and even pulling laundry out of a dryer is extremely painful. I have pain every day and all day.

12. I am a 5'1" female, petite and weighed 108 lbs. At the time. The suitcase was Half of my size.

13. My insurance carrier denied my medical payments because they said my injury was "work related."

14. I was receiving Physical therapy and Chiropractic care.

15. I asked human resources for assistance and they instructed me to file a claim with their workmen's compensation insurer.

16. I filed the claim and it was denied.

17. I asked Moran and human resources as to what I should do and they told me to hire an Attorney.

18. I hired an Attorney. The Workmen's Compensation Commissioner ordered me to be examined by a Neurosurgeon who determined that the repetitive nature of the lifting and carrying of equipment in my Fleet position and that I would probably need continual treatment. (P. Ex. 4).

19. The claim was settled in 2002.

20. My back problem required a simple accommodation. I wasn't asking Fleet Mortgage Group to build me a ramp. I simply needed a PC at my workstation so that I could leave my laptop in my home for weeknight and weekend work. Customers requested calls in the evenings and weekends.

21. The request for a PC did not seem to be a nuisance request to me as all of the processors, underwriters, telephone loan telemarking staff working on mortgage origination, processing and servicing had a PC at their desk.

22. Defendant claimed that I never asked them for a PC; however, an email on February 14, 2000 from Dailey of Human Resources to Paquin of Human Resources states, "she is coming to management **AGAIN,** regarding what she would like them to do for her on this." (P. Ex.24).

23. At one point, I was asked to contact the building and maintenance Dept. regarding an outside mortgage banner that was faded for replacement. I asked the crew if they had any PC's available and I was told, "we have PC's collecting dust."

3

24. In 1999 for the first half of the year, I received "4", exceeds expectation quarterly reviews from Moran. When I returned from disability leave, the fourth quarter, Moran gave me a "2" which is "needs improvement" as well as a "2" on the end of year performance appraisal for 1999. This review was subjectively given in complete disregard of the mostly superior or excellent branch assessments he received in 1999. (P. Ex. 20 & 21).

25. Moran also gave me a "1" which is defined as "poor" for loan quality (which is computer input) apparently forgetting a "note of congratulations" he sent to me for successfully completing 100% of my mortgage applications into the computer system. The process is called DU, which is defined as desktop underwriting. The loan officer inputs the mortgage applicant's information that is uniform in the industry and within minutes receives a status of their loan approval. The note was from 6/99 which was just a few weeks prior to my leave of absence. (P. Ex. 51).

26. In addition, he removed two branch responsibilities from me for a new hire. He also removed a branch from another loan officer, named Pierce Downey. Downey had asked for a volunteer to take the branch that was ultimately removed because he didn't want to service it. He made this request at a sales meeting.

27. The significance of the reduction in the rating on the end of the year performance appraisal is that the rating determines the bonus for the following year. The commission plan 2000 states, "participants will only be eligible for the bonus if their performance is rated "3" or better. (P. Ex. 22, page 2, section V.B.).

28. A customer's interest rate has to be locked into the system by inputting the loan into the computer system. Only on exception cases were the loan officers allowed to call in a loan into the processing center, so that the processing center could lock the rate for the customer. This was only done if the customer insisted on filling out their own application if privacy was a concern and they were more comfortable filling in their own information.

29. At some point in the fall of 1999, the computer system apparently had a systems issue. The credit reports would not merge into the mortgage application so that the application downloaded incompletely to the processing center. I thought that I was doing something wrong. I thought that I didn't know how to do it and

4

indicated this concern in an email to Moran. It wasn't until April 2000 that I learned that it was a universal problem. Moran never let on that it was a systems problem.

30. The Defendant submitted in summary an alleged input of a loan application with an address of 123 I hate this company, Worthless, CT. I have the "Instructions" for the fields of input needed to register and downloan a loan. It is completely impossible for the DU system to accept a felonious City. It will boot or reject the submission and it will not download. An error message would pop up on the screen. In addition, it will not upload without a zipcode and the zipcode in the system matches all cities and towns. Worthless, CT would be impossible. This was a falsified submission. (P. Ex. 53).

31. On or about July 1999, I woke up with severe back pain. I went out on disability leave as directed for approximately 6-8 weeks.

32. Dr. Galena asked to see my daily equipment use that I carried and weighted the equipment, which was 33 lbs.

33. It was suggested that I try using a roller cart; however, that only added more weight when lifting it in and out of my car.

34. The Doctors caring for my back problem wrote that a PC would be helpful and that I must avoid heavy lifting and carrying. (P. Ex. 43 & 44).

35. I asked Moran and later Paquin for a PC.

36. I never received a response.

37. In January 2000, I had an acute attack once again but the condition worsened.

38. The CORE, Fleet's Disability Insurer Administrator stated in their documentation that they allowed me to return to work, "I was not to carry more than 5 lbs permanently." The return to work date was "April 10, 2000." (P. Ex. 23).

39. On April 10, 2000, I was called by Moran to report to his office in the morning.

40. I was excited about getting back to work. I was missing out on the refinance boom and having a son about to enter private college and my family was looking forward to me bringing home good paychecks again. We also had a high mortgage balance that was approved by FMG. We were approved based on both of our incomes. We owned the home for only 4.5 years. The loss of my job

required us to immediately move and we moved from Orange, the suburbs where we lived for nearly 20 years and where our son was raised. We moved to the city of West Haven. We did what we had to do and moved on in life.

41. I expected my meeting with Moran on April 10, 2000 to be a discussion about the PC and an update of what I had missed.

42. Instead, Moran handed me a "Written Formal Counsel". I looked at it completely stunned. I saw alleged dates of missed meetings and trainings that dated as far back as 1998. It stated that I was unprofessional. It listed 3 employees. It stated that my loan quality was an issue.

43. At the same time, as I was looking at the warning in shock, Moran told me that he was also removing me from the Fleet Bank branch in Orange, CT where my office was located for 7 years.

44. The Orange branch was my primary source for referral business and as a 100% commissioned employee, this was obviously a major loss of income.

45. I obtained most of my referrals from the Orange branch not only because I lived, worked and was active in my community.

46. The Orange branch was 1.9 miles from my home which was so convenient and I was very lucky.

47. My first response when I reviewed the warning was to ask Moran, "Why??!"

48. I literally remember the feeling as though I lost all my blood and was weakened and I could hardly stand up.

49. Moran stated that if I didn't correct my chronic problems that I would be terminated. Thus from April 10, 2000, I was threatened termination at least once a day from Moran either by voice mail or email.

50. He began his "written threats of termination" four days after my return from leave in his April 14, 200 Memorandum to me. He stated on the second page of this exhibit that if I didn't improve these issues, "I would be terminated."(P. Ex. 25).

51. I asked him "how could I improve these issues that didn't exist such as missing meetings and trainings that I did in fact attend?"

52. In this memorandum that acknowledges that he gave me the written warning on April 10, 2000, I recognized that I did know that I attended 10 out of 11 listed dates alleged missed.
53. I began aggressively locating the documents to prove this to Moran and later to Human Resources.
54. The first proof of exoneration was an email from Judith Marshall, the Corporate Trainer about my attending the "Fleet One training." She sent an email to Moran and a copy to Paquin that said, "I did attend the Fleet One training and received a "95" (P. Ex. 26).
55. The next dates to exonerate were the five (5) dates listed as Compass LX Trainings. Moran finally sent a memorandum on 4/26/00 ( 4th or 5th paragraph) acknowledging that I was in fact, out on disability leave the five days he claimed I didn't attend. He never corrected the warning and admitted not correcting it for me in his deposition. (P. Ex. 28).
56. I pursued the situation tirelessly, which was unproductive as a loan officer but necessary. I made up the trainings for CLX and I showed Moran the Agenda I was received when I attended the make up session that I missed. (P. Ex. 27).
57. The only date that I did not attend out of the 11 dates issued was the date of 12/17/98. He had gone back 2 years on this warning. This was a Cohen Brown Training session, which was held on Hanukkah. The trainer excused me. It was being held in E. Providence and was over at 5pm. I would not have made it home for family festivities.
58. Moran also listed "floor duty" two days missed in 1999.
59. This was shocking because floor duty was strictly voluntary. It was an opportunity to get customer calls. Loan officers exchanged dates often. I exchanged one date and the other date was not scheduled for me.
60. Moran admits in his deposition that there "were exceptions for floor duty." (P. Ex.29  Moran Dep. 7/22/03, Pgs. 31 & 32).
61. The next trumped up issue stated in the warning that I had to deal with was "loan quality."

7

62. I called the Senior Technical Analyst, Robert Brogdan and asked him if he could follow my procedures while I was inputting a mortgage loan so that I could find out what Moran had issue with about my loan quality.
63. Brogdan sent a letter to Moran in which it indicated, "Linda knew the system very well and didn't skip a step and was user knowledgeable and that he saw no problem with my input." (P. Ex. 37).

64. The next issue was regarding an incident with an employee Evans.
65. In 1997 there was an incident at the Orange branch with a Richard Evans.
66. At the time, Evans was the computer trainer and held a salaried position.
67. Evans came into the Orange Branch unannounced.
68. I was on the telephone taking a mortgage application and I signaled to him that I had about 15 more minutes to complete the loan with my customer.
69. After about that time, Evans came over to my desk, pulled the phone from my hand and hung up on my customer.
70. I was stunned. I looked at him with disgust. I got up out of my chair and like a mother scolding their child for doing something very wrong, I ordered him to come into the closed conference room with me. I called his supervisor and reported the incident. I also called the Branch manager that referred the customer to me. I called the customer after Evans left the building.
71. Evans was removed from his position shortly thereafter.
72. He became a loan officer working for Moran and back to a 100% commission job. Evans is listed as a loan officer for Moran in a 2000 list. (P. Ex. 31).
73. Moran did not confront me first about this incident. Instead, he wrote up a formal counsel about the incident. Moran was made aware that I was the employee that reported an unprofessional incident about Evans who was noted to have a short fuse. However, Moran states that he investigated the incident and found Evans report to be credible.
74. Moran listed Sandra Ruff and Carmela as other employee's names on the warning.

75. There was never an incident with either employee that I was made aware of nor was their a verbal or written warning.
76. Sandra Ruff went through quite a few loan officers per her request. She had Pierce Downey at some point previous to me. The branch assessments would have been the opportunity to rate or comment if there had been any problems as well.
77. It was the responsibility of the branch manager to make their goals in various areas. One of their goals was to establish business relationships to attempt to get business accounts. Sandra found her own community to be a good source for networking apparently. Sandra was Afro-American and she felt that having an Afro-American loan officer to service her community would be more affective.
78. Moran made an even exchange to accommodate her needs. He gave Ken Reid who is also Afro-American her branch and I took Ken's branch in Amity (Woodbridge). Had Moran thought that there was an issue of bias, he would not have given me Amity because Linda Randolph, the Branch manager in Amity was Afro-American.
79. The employee "Carmela" that he mentions is a mystery. I think the only conversation that I had with Carmela was greetings. I do recall her telling me to try out her daughter or son's restaurant that they opened in Orange. It was spectacular and I shared my enthusiasm with her afterwards. That was it.
80. Moran's issue; however in the April 10, 2000 warning stated "unprofessional conduct" in Orange. This was completely trumped up.
81. Tartaglia, an employee in that branch, he states claimed to have had a telephone conversation with me about a customer named Buckens and the sale of his home.
82. Tartaglia called me while I was out on disability leave. Tartaglia claims that Buckens never told me that he sold his home.
83. I told Tartaglia that Buckens indicated that he sold his home because of the fact that Buckens filled out his own application. (He filled out his own application when he refinanced his home six months prior with FMG and used a James Morton. These records as well would be in archives.) Buckens completed the application by hand and on the second page, top section, called "Real Estate

9

Owned" Buckens indicated that his home on Waverly Road was "S" which indicates sold status as one of the three choices. PS is pending sale and R is rented. (P. Ex. 54).

84. The application was sent up to Processing. I did meet Buckens on a Saturday to accommodate his schedule and he dropped off his tax returns and other papers.

85. At this Saturday meeting he again stated that he sold his home himself without a Realtor. As a licensed Realtor since 1978, I recommended that he get an executed sales contract. Always trying to help people. Always being conscientious and a lot of good it has done me. Buckens gave himself 3 1/2 weeks from the sale of his home to the purchase of his new home.

86. Buckens did call me very stressed out and indicated that he couldn't possibly get everything done. He rambled. He said that he didn't know "how would he travel back and forth to Russia for his business, buy all the appliances and carpet and get all the paperwork together that Fleet was requesting. I offered my help and asked if there was any family member that could help. I was trying to calm him down.

87. Moran was not part of the conversation with Tartaglia but once again, he concluded that I must have been "unprofessional." This was a trumped up plan to sabotage my personnel file, which was otherwise spotless.

88. In addition to receiving a trumped up Written warning upon return from disability, Moran failed to give me an "Achievement Award and American Express check" that I had been awarded at a sales conference while I was out on disability. He didn't recall me getting it. I did not receive it until one month after Fleet. Paquin sends a "note of apology" and the award. (P. Ex. 39).

89. I requested my personnel file to see if there were complaints that I was never informed about. I did not get my personnel file per my request until about a month after I left Fleet. A letter from Paquin "as you requested." (P. Ex. 47).

90. As it states in the Fleet Employee Handbook, written formal counsels lead to termination of the employee.

91. I realized that my efforts with Moran were futile and I read the next step I needed to take from the Fleet's Employee Handbook." (P. Ex. 32).

92. There was an opportunity for "Conflict Resolution Procedure." (P. Ex. 32, page 34).
93. The next step that I was expected to follow was to take my issues to human resources and Moran's manager. I made an appointment and drove to E. Providence to meet with Paquin of Human Resources and John Frazza, the Regional Vice President and Moran's manager.
94. I brought the Written formal counsel, the April 14, 2000 Memorandum from Moran identifying the issues and the documents that exonerated the issues.
95. I also discussed with them the information I learned about another incident involving Tartaglia and another employee in the Orange Branch and asked them if they would investigate the other alleged incident to see if perhaps Tartaglia was having a bad day or week having so many employee incidences as it appeared.
96. Paquin submits an investigation of my issues and her investigation of the other Tartaglia employee issue and she states, "There was in fact, a situation within the branch where an employee was talking back to Barbara (Tartaglia). What Barbara did was tell that employee to lunch at that time. There was additional corrective action that had followed with this associate because of a comment that was made to someone but at a later time and done privately." (P. Ex. 56 second page top).
97. I also discussed further that I still had the issue of needing a PC especially due to the torment when I climbed the steps to the new location.
98. Even with exonerating evidence of the alleged missed trainings and meetings and the fact that they did discover learn that Tartaglia did have another employee incident, they did nothing to correct or discard the false written formal counsel and it's damage to my professional standing with FMG.
99. Tartaglia caused the other employee to vomit and develop a migraine headache due to Tartaglia's treatment. She transferred out of the Orange Branch.
100. Moran wanted me out of the Orange branch immediately; however, he offered no assistance in moving my office files and cabinets.
101. Fleet being a retail operation, customer expected to meet the loan officer in an office. Fleet Customers did not want loan officers coming into there homes.

On the rare occasion if someone were elderly, disabled or ill, we would certainly accommodate them.

102.  My family utilized a small bedroom upstairs as an office. It certainly was not an option to bring customers into my home to conduct mortgage business nor would a customer be expected to drop off checks and paperwork to my home.

103.  On Page 25 and 26 of the Employee Handbook it indicates "Fleet makes every effort to provide an employee with safe working conditions. However, a safe and healthy work environment is everyone's responsibility and are encouraged to practice safe working habits and to notify your manager of any potential health hazard, unsafe conditions, equipment or practices. (P. Ex. 32 P. 25 and 26).

104.  It would seem that a manager allowing a back injured employee to have to carry 33 lbs of equipment up 32 wide planked (2 1/2 story) steps when they are restricted to only carry 5 lbs would seem unsafe, unhealthy and against FMG's own policy.  (P. Ex 55).

105.  Even after more than 4 months of request for a simple PC accommodation by May 24, 2000, there was no communication to me about getting a PC. The only response I ever got from Moran about getting a PC was Moran stating in an email, "your laptop is functional and you are required to utilize it." (P. Ex. 36).

106.  Not too long after I started working under Moran he made a statement that was not typical.

107.  After I returned from a Jewish holiday, Rosh Hashonna and Yom Kipper, Moran said to me, I didn't know you were Jewish."

108.  I didn't understand what difference it made.

109.  From that point on I endured derogatory slurs, innuendos and statements in front of other colleagues.

110.  In particular, Moran referred to a Jewish customer at a staff meeting as "a Johnny Maneschevitz." Although he thought it was funny, I noted my colleagues with expressions that were sympathetic to my embarrassment.

12

111. At one point, FMG decided to remain open on Good Friday. Moran asked for volunteers to work and I offered. Moran referred to me as an "atheist" as his response to my offer.

112. One instance, I was in his office dropping off paperwork on his desk and he coldly looks at me and states, "You know, My grandfather served in the German War as an SS." I truly didn't believe this statement about his Grandfather to even be true yet I couldn't believe how cruel Moran could be.

113. Half the time, I didn't even think Moran realized his actions. At Christmas parties held annually, Moran would drink several cocktails and become very nice. I even got a hug and thank you for all my hard work as he did the other loan officers reporting to him. I recall very well how I had wished so much that he treated me that way all the time.

114. I endured the treatment because I chalked it up to possibly a bad experience Moran had or maybe he was brought up in a household that taught prejudice and I dealt with it and moved on with my job. I loved my job and I did well.

115. At one point, I could not tolerate the derogatory statement of "Jew them down" and I sent an email to him to ask if it could end. At my age, I certainly heard this expression used but not tolerated in a workplace and I don't think I have even heard it anywhere else for decades. ((P. Exh. 40).

116. There was no response from Moran.

117. Comment were made by Tartaglia about a miniature Christmas tree that was given to me from a sweet customer that I placed on my desk each season. Tartaglia asked me why I would have a Christmas tree.

118. In addition, delicious Italian shoppe pastry trays that I brought in for the holidays for the branch staff were tossed into the garbage unwrapped for two consecutive years by Tartaglia. It was very strange to me as all my other branches and staff colleagues were appreciative and great to work with. I miss them all.

119. What was unusual for a large corporation such as Fleet and FMG is that they did not recognize nationally recognized Jewish holidays on their calendars at

that time. All other nationally recognized holidays were on the calendars. FMG had their own printing department.

120. The only other Jewish person that I knew employed by FMG was Howard Ackerman who was upper management and Moran referred to him at staff meetings as "our spiritual leader." Ackerman was fired.

121. Two consecutive years, Fleet held "employee giveaway contests." The winning dates to use Red Sox World Series Box seats was on Rosh Hoshanna and then 10 days later on Yom Kipper. I thought the first time it was a mistake; however, the Jewish holidays fall different days each year and they were held again on the Jewish Holidays. (P.Ex. 60).

122. I was called to refinance a mortgage for a Rabbi Herbert Brockman. He had his mortgage with Fleet for about 16 years he indicated. As he states in his letter, "Initially Fleet suggested that since the Synagogue employs me held a second mortgage" they could not approve the mortgage unless it was subordinated. This was accomplished but my mortgage was still rejected. I immediately called New Haven Savings Bank. The process took 48 hours and I was accepted." Although I went to Moran with Rabbi Brockman's documents per his loan condition for approval, Moran denied the loan and told me to call the Rabbi and inform him that his loan was denied. (P. Ex. 41).

123. I worked with a couple named Edinger for a preapproval mortgage. They were approved for a 30-year fixed rate mortgage. Their mortgage application revealed information that revealed their affiliation with the Jewish faith. They worked at Yale New Haven Hospital and were qualified for the Fleet/Yale interest rate program which is only available on the 30 year fixed rate mortgage program. The mortgage was pre-approved for 6 months. Within 30 days from the approval they found a home. The price of the home the bought was even lower then the requested loan amount and down payment and the interest rates had dropped slightly more and Moran insisted that they would have to be switch to an adjustable mortgage which was not as desirable as they wanted a fixed rate and it also did not give them the opportunity for the Yale program. Based on HUD-903.1 Moran denied the Edingers their rights. (P. Ex. 62).

124. Kevin Moran's anti-Semitic treatment was upsetting to say the least. As importantly, if he is allowed to continue to act upon his bias, others will continue to be hurt, possibly emotionally as I, and ultimately forced out of a job. Or financially hurt as my customers Brockman and Edinger.

125. I was not given equal Mortgage products by Moran.

126. There was a mortgage loan product called ACORN for low-income customers. The program was a State program and only certain Banks were authorized to service it. The ACORN product had pre-determined territories for availability. It was not up to Moran to choose the territories. Moran sent me an email or memo that stated that I couldn't have it. My territory included West Haven, Orange and Woodbridge (Amity). (P. Ex. 57).

127. Moran and Tartaglia would not let me go into the Orange branch to retrieve customer paperwork being dropped off daily.

128. I had a daily airborne express automatic pickup at 3pm. It took 4-6 weeks for FMG to arrange another pickup because of billing systems I was told and the only way we were allowed to send out customer's paperwork to the Providence center is through this airborne system and through "our designated branch billing office location."

129. My customers were dropping off their paperwork per the request of the processor. Moran would not let me retrieve the paperwork to send to my processor. Although I placed calls to all my customers they continued to drop things off and asked other employees in the Orange Branch to call me. It was most convenient for them as I said, most of my customers were from that area. I attempted to explain the inconvenience to my customers to Moran and Paquin and they ignored my plea. They did nothing to help accommodate the customers or me.

130. My family was even denied access into the Orange branch where we had our safe deposit box. We needed our son's birth certificate for a senior trip abroad for a passport.

131. The stress and frustration was horrible and I started to develop nightmares, I felt like I was losing my sanity and I ultimately ended up developing ulcerative bleeding colitis.

132. The Gastrologist stated "it was a condition made worse by stress." I didn't have bleeding colitis and ulcers were never found in my colon prior to the incident starting April 10, 2000. In addition, I developed high blood pressure and prior to that time, my pressure was normal. (P. Ex. 61).

133. It was necessary to use nightly steroid enemas. It was horrible for two years to heal. I still have episodes often.

134. Just two days prior to leaving Fleet I continued to try to get my records corrected and a PC. I did not want to leave a six-digit income position and I didn't have a job offer that was even close to this income. Two days before I was forced to resign as nothing was being done to help me, I emailed Frazza begging him to let me report to Greg Snow who worked from the Hartford office and the only other Manager.

135. On May 24, 2000, Frazza and Paquin asked to meet with in Seymour. Once again, I actually thought they were coming down to give me good news. I wouldn't have expected them to drive down to Seymour CT otherwise.

136. Once again, I was shocked when Frazza hands me a letter indicating, "My issues remain as given." And that they accepted my resignation. (P. Ex. 59).

137. Their intention was to force me out. To make it so impossible to do my job that I would not be able to tolerate one more day. To sabotage my file that otherwise had no negative reports. They made working conditions intolerable, the inability to do my job and the risk of further injury to my back.

138. I knew just from the pain in my back that if I continued one more day carrying the equipment up the steps that I would end up under a surgeons knife for my back disc problems.

139. It was suggested to file a claim with the CHRO.

140. I filed without an Attorney because I just wanted to be reinstated with a PC and treated fairly.

141. My allegations were found to have merit and the case was retained for further investigation.

142. To this date, I would rather get reinstated, with a PC and move back to my position if my records were corrected. I would be able to pick up where I left off and move on. I am not a slacker. I even asked Mr. Murphy at the settlement hearing to ask for this as a settlement. Fleet said, "It was impossible."

143. All I have done since leaving Fleet is that I've tried to move on with my life and job. Just when I start to get up and running Moran has interfered with slanderous statements about me or Fleet subpoenas the company I'm with which makes the company naturally ask what it's all about and so on. It's been a living nightmare.

144. Even after I left Fleet, they harassed me to date.

145. I was able to get a job with New Haven Savings Bank. I was placed in the Madison and Guilford territory. Although it was approximately one hour from my home with traffic, I was very happy with the position.

146. They had a PC at my desk.

147. I was doing well. It would take a lot of time to build up a business in a small community and a territory not that big but I liked it there.

148. On or about 9 months after I started working for NHSB, they hired a new sales manager, Bob Coloumbe. He was formerly with Fleet in Stratford and worked with Moran.

149. Coloumbe called me into his office. He indicated that he ran into Moran at a Business Expo at the New Haven Coliseum and that Moran had a few things to say about me."

150. Soon after that statement, maybe two weeks, my territory was changed to a less favorable territory as it was hard to be successful it in. It included East Haven, Branford, New Haven and Fair Haven. A primary reason was that the territory was divided across the bridge.

151. Fleet deposed the Vice President Joe Traester. I was unable to attend the deposition. Traester apparently did not remember me. He even states in his deposition "It's hard to recall I go through so many loan officer." He had me

confused with a loan officer named "Charlene" who was fired and Traester did have public outbursts with her. He also didn't recall that my territory was switched. An email from my branch manager in Branford where I had my office for the remaining time at NHSB states, "Wish you were still here." The branch manager of Branford where the switched territory was Angela Magna (P. Ex. 62).

152. If I can have the opportunity for trial, I will be able to have the Attorney question Traester and he will then recall when we ask him about my office in Branford and new reporting locations.

153. I had earned less than $28,000 for the year.

154. I was offered a job at Washington Mutual in Hamden, closer to home and a company with more mortgage opportunities.

155. Unfortunately, Fleet merged within the two weeks before I was to start.

156. I took a distant study program with Madison University and obtained a BS in Marketing at age 50 to attempt to find a position that would be successful and financially help relieve our financial obligations.

157. I was offered a job with Laurel Gardens of Woodbridge, an assisted care and Alzheimer's facility. The salary was $34,000. I was named the Director of Marketing and Sales.

158. After a short 6 weeks, I was fired.

159. Again, I was shocked. No warning.

160. I was not able to attend the deposition of the Executive Director but he claimed, "I was fired for not making my goals."

161. In the short six weeks, I brought in more tenants then they had brought in after almost 6 months. I also re-decorated all three of their model apartments on my own time and they loved it. I also brought in two trustees as networking partners named Michael Covel and Mitch Johnson who I met at New Haven Savings Bank (NHSB).

162. I called a long time friend who worked at the Laurel Gardens for about 10 years and she told me that they were anxious to replace the Director of Sales position as that they had fired "Barbara" before I was hired and they didn't wait

for my Fleet reference. They decided to get rid of me after the received the reference from Fleet.

163. I wasn't fired from American Mortgage, I resigned with excellent referrals which is how I got my sales manager's job that I have now; however, my salary was taken away after my manager James Burton spoke with Moran almost 8 months after I worked at American Mortgage Company. American Mortgage Company is owned by William Raveis of Raveis Realty. Mr. Raveis can be used as a reference as his Director of Operations and the manager of the Westport office where I worked. Unfortunately, Mr. Burton left the company soon after I left. However, Burton spoke with Moran about another loan officer who gave Moran as s reference. Burton called me into his office and told me that he had a conversation with Moran. Burton stated, "he had some things to say about you. It didn't sound like the same Linda Ungerleider that I know."

164. The commute was 1 1/2 to 2 hours each way from home and I earned less than $23,000.

165. I went across the street to Wells Fargo Home Mortgage. Only two weeks into the position, Wells management was served with a subpoena from Fleet.

166. Fleet even served Personas Mortgage in Milford where I went for a job interview.

167. A perspective employer wants at least the last ten years of work experience and it's impossible to eliminate Fleet.

168. I went back to college. I took two jobs. I am trying. All of these years of courts and Attorney's, the costs, waste of productive time, could have been avoided if they simply got me a PC and corrected the trumped report and reprimanded Moran. Fleet didn't because they didn't want me on their payroll as they saw me as a possible future long-term disability employee as were several others under Moran so they retaliated and they did everything possible with the hopes that I would give up from the intolerable working conditions and resign.

169. I am currently working in the capacity of a sales manager but my income is approximately $35,000 including base salary and it is unlikely that I will be able to have the successful career that I earned while working hard and diligently at Fleet.

170.     I also teach Continuing Education part-time for the State of CT. My income is $225 per class and I teach 10 classes a year.

Dated:

_____
Linda Ungerleider

Subscribed and sworn to, before me, this    26th day of February, 2004

_____
Ellen M. Telker
COMMISSIONER OF THE SUPERIOR COURT