UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LINDA UNGERLEIDER, | : | |
| | : | CIVIL ACTION NO.: |
| Plaintiff | : | 3:02CV659(AVC) |
| | : | |
| v. | : | |
| | : | |
| FLEET MORTGAGE GROUP OF FLEET BANK [sic], | : | |
| | : | |
| Defendant | : | APRIL 2, 2004 |

## DEFENDANT'S REPLY MEMORANDUM

Defendant Washington Mutual Bank FA, as successor in interest by operation of law to Washington Mutual Home Loans, Inc., the successor by merger to Fleet Mortgage Corporation ("FMG"), hereby submits its Reply Memorandum to Plaintiff's Opposition to Motion for Summary Judgment (the "Opposition") filed by plaintiff Linda Ungerleider. Plaintiff has failed to demonstrate that there are issues of material facts in dispute as to each of her claims. Thus, on the basis of the undisputed facts set forth in FMG's Local Rule 56(a)(1) Statement[1] and in light of the absence of any material facts in dispute identified by plaintiff and supported by competent evidence,[2] summary judgment should enter for FMG on each of these claims.

### I.   PLAINTIFF'S CONSTRUCTIVE DISCHARGE CLAIM FAILS AS A MATTER OF LAW

In support of her constructive discharge claim, plaintiff asserts that upon returning from medical leave in April 2000, she was issued a Step #2 written counsel (the "2000 Counsel"),

---

[1] As discussed in Defendant's Motion for Sanctions Under Local Rule 56(a)(3) and in its Reply to Part One of Plaintiff's Local Rule 56(a)(2) Statement, attached hereto as Exhibit A, each fact set forth in FMG's Local Rule 56(a)(2) Statement should be deemed admitted due to plaintiff's failure to comply with Local Rule 56(a)(2).

[2] See Defendant's Response to Part Two of Plaintiff's Local Rule 56(a)(2) Statement, attached hereto as Exhibit B.

transferred from her central branch and was not provided with a desktop computer.[3] (Pl. Opp. at 1-2). Plaintiff may have disagreed with FMG's actions. However, based upon the undisputed facts, these actions do not support a finding that FMG deliberately made conditions so intolerable for plaintiff that she would have felt compelled to resign or that a reasonable person would have felt compelled to resign.

### A.   An Alleged Failure to Accommodate Does Not Support Plaintiff's Claim

Plaintiff testified that she would not have tendered her resignation when she did had FMG merely provided her with a desktop computer in addition to her company-issued laptop as an accommodation for her alleged disability.[4] (Facts, ¶ 89). In its Memorandum of Law in Support of Summary Judgment ("Summary Judgment Brief"), FMG cited case law holding that, prior to resigning, employees desirous of further or different accommodations must first explore less drastic alternatives and, moreover, that a mere failure to accommodate does constitute a constructive discharge. Plaintiff has cited no cases to the contrary.

Even if a failure to accommodate could under certain circumstances create conditions so intolerable that a reasonable person would feel compelled to resign, the undisputed facts in this case would not permit such a finding. While FMG endeavored to secure a desktop computer for plaintiff,[5] plaintiff had returned from disability leave on April 11, 2000, having accepted in writing as an interim accommodation a "home office" alternative (also approved by her doctor)

---

[3] Plaintiff also alleges in conclusory fashion, without citation to admissible evidence, that FMG did "everything it could to make it impossible for plaintiff to be a productive worker." Because plaintiff has failed to cite to admissible evidence to support this bald assertion and the "facts" she relies upon in support of same, they should be ignored. (Pl. Op. at 2). In any event, even considering said "facts," they do not support a constructive discharge claim.
[4] See Exhibit A, FMG's reply at ¶ 89.
[5] Plaintiff does not deny that by March 16, 2000, FMG was working to procure a desktop computer to house for plaintiff in her central branch office, that installing a desktop would involve connecting it to the FMG, not Fleet Bank, computer system at an estimated cost of $2400, that on March 21, 2000, Moran informed Laura Mclendon via e-mail that "[w]e will need to order one" and "asking for a tentative time frame" or that she, in turn, advised Moran that it would take approximately one month. (Facts, ¶ 56). Plaintiff was thereafter transferred to a new central branch and resigned soon thereafter. (Facts, ¶ 62). As discussed in FMG's Summary Judgment Brief, a delay of mere weeks in providing an accommodation does not violate the ADA, much less result in a constructive discharge.

unless "hopefully a PC is available at a future date."[6] (Facts, ¶ 55, 61). Moran advised plaintiff that she could take paper mortgage applications from customers and then upload them onto her FMG-issued laptop at home obviating the need for her to carry her laptop.[7] (Facts, ¶ 58). Although plaintiff now speculates that this interim accommodation would not have worked, she has not presented any admissible evidence that she was, in fact, unable to perform the essential functions of her job during this period, that she lost any mortgage applications as a result, that she was disciplined for taking paper applications, etc.

It is also undisputed that on April 25, 2000, just two weeks after plaintiff's return from medical leave, she left a message for Rachel Paquin stating that she guessed she was "going to have to quit" and then three weeks later sent an e-mail tendering her resignation, which FMG accepted on May 25, 2000. (Facts, ¶¶ 83-86). Plaintiff, thus, resigned her employment before giving this interim accommodation a chance and before a desktop could be installed at her new office location. Under these circumstances, this alleged failure to accommodate cannot support a finding of constructive discharge.

### B. The Counsel and Transfer Do Not Support Plaintiff's Claim

Although in light of plaintiff's testimony described above the Court need not consider the other bases for plaintiff's constructive discharge claim, FMG will nonetheless address them. It is critical to note that the issue before the Court on summary judgment is not whether Moran was ultimately right or wrong in his assessment of the events that led to issuance of the 2000

---

[6] Although plaintiff attempted to recant, plaintiff did authenticate her handwriting on the facsimile during her deposition. (P. Dep. at 323-24). In addition, plaintiff never responded to a request for admission seeking her to admit that she had authored that facsimile and, accordingly, such request is deemed admitted. Fed. R. Civ. P. 36(a).

[7] Although plaintiff now purports to deny this, she did not do so during her deposition. See Exhibit A, FMG's reply at ¶ 58. "[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that contradicts the affiant's previous deposition testimony." Bruson v. Bayer Corp., 237 F. Supp. 2d 192, 204 (D. Conn. 2002), quoting Bickerstaff v. Vassar Coll., 196 F.3d 435, 455 (2d Cir. 1999). Plaintiff also has not provided any admissible evidence to dispute the sworn affidavits of Moran and Paquin on this issue. (Moran Aff., ¶ 23; Paquin Aff., ¶¶ 14-15). Indeed, if the proposed interim accommodation had been unacceptable, per her physician's statement, plaintiff should not have even returned to work. (Facts, ¶ 55).

3

Counsel, but whether there is an issue of material fact permitting an inference that Moran was motivated by unlawful discrimination. In escalating the previously planned oral counsel to a written counsel,[8] Moran reacted to unsolicited complaints from Fleet Bank employee Barbara Tartaglio and a Fleet Bank customer concerning plaintiff's conduct while she was supposed to have been on disability leave. After speaking with each of them, Moran concluded that their version of events was credible. (Facts, ¶¶ 40-42, 44-47).[9] Moran had previously issued plaintiff a Step #2 - Counsel in 1997 (the "1997 Counsel") following another confrontation with a co-worker in which she had similarly denied any culpability whatsoever. (Facts, ¶¶ 14, 16).

As to other issues referenced in the 2000 Counsel, such as loan quality and attendance, which plaintiff so vehemently denies, there is ample evidence in the record that Moran similarly was reasonably responding to information he had personally observed or that had been provided by others. For example, plaintiff's struggles mastering FMG's new computer platform are evident in Pl. Exhibit 36, which is an e-mail dated November 21, 1999 to Kevin Moran wherein plaintiff stated:

> I am unable to input two loans and still do not know what I'm doing. I have read the manual, I have read the shortcuts and have gone down the list . . . and I still can't figure out what I am doing. With the 5 different attempts to train me, I have not yet been able to train with a real loan to input which seems to be the answer. . . I am very happy for all the those who can do this but I can't take anymore loans until I can do this." (Pl. Ex. 36).

Then, by e-mail dated December 9, 1999, Odette Marra outlined ongoing problems the processors were experiencing with plaintiff, including identifying numerous incomplete loan applications plaintiff had uploaded. Ms. Marra also stated that plaintiff had referred to Moran as

---

[8] Plaintiff does not deny that Moran had been prepared to issue her verbal counsel on "professionalism/communication/work relations/attendance@meetings" but that before he could do so she unexpectedly commenced her second January 2000 medical leave. (Facts, ¶ 33, 34). That verbal counsel had been initiated following a directive from Moran's superior (Facts, ¶ 27).

[9] Plaintiff has not denied FMG's undisputed facts describing what these individuals told Moran about their interactions with plaintiff. (Facts, ¶¶ 39-42).

4

the "worst sales manager." (Facts, ¶ 28). Ava Simonelli forwarded an e-mail to Moran in which she too identified several incomplete areas in an application that plaintiff had electronically uploaded and requested that Ungerleider do her job correctly so she could do hers. (Facts, ¶ 29). The fact that Moran identified this as an area in need of improvement can hardly give rise to an inference of discriminatory animus.

As for the attendance issue, Moran readily rescinded some of the dates of missed trainings he had originally provided once plaintiff pointed out that she had been on leave on those dates. (Facts, ¶ 76). However, as Moran explained to her, the remaining dates stood.[10] (Id.) Without belaboring the issue, while plaintiff may have ultimately made up sessions, she did not necessarily do so on the make-up dates originally scheduled. As for her assertion that not all loan officers were scheduled for floor duty, that is accurate, but it begs the issue. If a loan officer is scheduled for floor duty, she is expected to show up.

Throughout plaintiff's employment, she never acknowledged any wrongdoing nor accepted criticism. (Facts, ¶¶ 10, 12, 15, 16, 22, 32, 43, 45, 46, 87). Thus, the mere fact that she has denied the circumstances that led to the 2000 Counsel was and is par for the course. Moreover, even if plaintiff could create issues of fact as to the validity of some of Moran's criticisms, it would not create an issue of fact as to Moran's motivation in issuing the counsel nor, most importantly, could it ever serve to elevate that disciplinary action into a constructive discharge. Indeed, the 2000 Counsel merely provided that, in the future, plaintiff needed to adhere to the company's code of ethics and professional standards, that her electronic applications must adhere to company standards, that she had to attend required meetings and

---

[10] In this same memo, Moran had to address with plaintiff her inappropriate reference to a branch manager as an "Afro. American" who, according to plaintiff, preferred an "Afro. American" loan officer as well as her actions in going to the Orange branch in defiance of his directive and, while there, threatening to sue Tartaglio and Norris. (Facts, ¶ 76).

5

training schedules on dates scheduled and to provide coverage for scheduled floor time. (Facts, ¶ 62).[11] An employer must be able to deliver reasonable, tempered warnings such as this without fear of constructive discharge claims.

As to the transfer, plaintiff does not deny that Cindi Norris, branch manager of the Orange branch, requested that plaintiff be removed as the mortgage loan originator assigned to her branch and, that Moran had little choice but to comply. (Facts, ¶¶ 38, 48, 68). Although plaintiff speculates that this transfer would have resulted in a decrease in her commissions, she has not quantified this to any degree[12] and, moreover, she tendered her resignation well before her speculative fears could have been borne out.

When plaintiff complained to Paquin, far from ignoring her concerns, Paquin conducted a thorough investigation that included interviews with seventeen individuals. (Facts, ¶ 82). The investigation did not support plaintiff's contentions. (Facts, ¶ 86). Plaintiff, however, did not even await the results of the investigation before tendering her resignation.[13] (Facts, ¶ 83-84).

The single case cited by plaintiff to support her assertion that these incidents create an issue of fact on her constructive discharge claim is <u>Interdonato v. BAE Systems</u>, 15 Fed. Appx. 25 (2d Cir. 2001). The facts in that case are, however, inapposite. In that age discrimination case, the plaintiff adduced evidence that a manager had been instructed to watch the plaintiff closely and write him up "for everything," that the plaintiff had been transferred for the express purpose of firing him, that he was scrutinized moreso than other similarly-situated employees,

---

[11] Plaintiff repeats that Moran's "constant" threats of termination were harassing. However, during her deposition, plaintiff readily acknowledged that these "threats" occurred just three times during this period and all in connection with progressive discipline, i.e., failure to improve in the identified areas could lead to termination or if she failed to vacate the branch as Moran had directed, her employment would be terminated. (Pl. Dep. at 308-313).

[12] In fact, in an e-mail to a co-worker, plaintiff once stated that each branch only resulted in a few mortgage referrals per year. (Facts, ¶ 23). There is simply no way to predict what level of referrals she would have obtained from the new branch nor has plaintiff presented any admissible evidence regarding same.

[13] Contrary to plaintiff's claims, Paquin did not fail to follow the conflict resolution policy. In light of plaintiff's resignation, there was no need to seek further review of the matter.

6

that management told him he would not make it until his planned retirement date and suggested he resign and that management permitted daily abusive and derogatory comments from co-workers about his age, including comments such as "[y]ou old fuck, why don't you retire."

## II. SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFF'S CLAIM OF RELIGIOUS DISCRIMINATION UNDER TITLE VII

Plaintiff does not even attempt in her Opposition to address FMG's argument that plaintiff's claim of religious discrimination fail as a matter of law and, as such, she should be deemed to have abandoned this claim and summary judgment should enter for FMG.[14]

## III. SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFF'S CLAIM OF DISABILITY DISCRIMINATION/FAILURE TO ACCOMMODATE

Plaintiff claims that FMG "failed in its duty to attempt to accommodate plaintiff" and that "[n]o negative actions were taken against plaintiff until after her return from disability leave." (P. Opp. at 5). As to plaintiff's failure to accommodate claim, that is addressed fully in FMG's Summary Judgment Brief at pp. 13-17 and, supra, at p. 2-3. As to the latter claim, there is no basis in fact or law for this assertion. The undisputed facts reveal that Moran had levied criticisms upon plaintiff long before any medical leave and, indeed, such criticisms were substantially similar to those contained in the 2000 Counsel. (Facts, ¶¶ 4-18). The first performance review Moran ever issued to plaintiff, which arguably was the harshest, was issued before she had even sustained the injury that she claims gave rise to her disability. (Facts, ¶¶ 5-6, 9). Moran then issued plaintiff two relatively positive annual reviews after she allegedly

---

[14] Plaintiff attaches to her statement of disputed facts one e-mail she sent to Moran concerning an inappropriate comment made by an administrative assistant on one occasion and refers, without citing to admissible evidence, to some unspecified "anti-semitic slurs, innuendos and different treatment." (P. Facts, ¶ 37). This "disputed fact" falls far short of creating an issue of material fact sufficient to defeat summary judgment.

7

became disabled.[15] (Facts, ¶¶ 19, 20). Based on this record, no reasonable juror could find a nexus between plaintiff's alleged disability and Moran's treatment of her.

In fact, it is undisputed that various events happened following plaintiff's first medical leave in June 1999 that warranted disciplinary action, such as plaintiff's violation of company policy relating to marketing materials and her snide comments to Moran when he attempted to discuss same with her, the e-mail critical of Moran that she sent to a co-worker who, in turn, forwarded it to Moran, her reference to another employee as "Miss Born Again" in an e-mail to Moran, her unprofessional criticisms of the loan processing staff, the information concerning plaintiff's loan quality and the directive from Moran's superior that he counsel plaintiff.[16] (Facts, ¶¶ 22-33). It is also undisputed that, while plaintiff was on her second medical leave in early 2000, Moran received the unsolicited complaints from Tartaglio and the customer and Norris' request that plaintiff be replaced. Then, upon plaintiff's return, she continued to create issues, including referring to a branch manager in an e-mail as an "Afro. American," making unprofessional statements in the Orange branch, and disobeying Moran's express directive that she return her branch keys to him and not return to the Orange branch. (Facts, ¶¶ 70-74).

In light of these compelling undisputed facts, the mere proximity in time between plaintiff's medical leaves and the 2000 Counsel and her branch transfer do not give rise to an

---

[15] As Moran described in his affidavit, after the tumult caused by his initial efforts to address plaintiff's performance and conduct issues, and in light of plaintiff's solid loan production, he chose the "path of least resistance" so to speak for a period of time. (Facts, ¶¶ 10, 12, 15; Moran Aff. ¶ 10).

[16] Plaintiff points to the fact that her quarterly review ratings dropped upon her return from her first medical leave. This is, however, during the period that plaintiff was acknowledging her struggle with the new computer system and processors were expressing frustration over plaintiff's applications. Moreover, as plaintiff testified about the reviews, "[t]he information [Moran] would put down came back to him from other sources like how much production I did, if there were customer service complaints. So his reviews would be based not necessarily on his opinion but coming back from the other part of the company, the back room or what they call processing." (Pl. Dep. at 193).

inference of discrimination on the basis of plaintiff's alleged disability.[17] This is particularly so in light of plaintiff's own testimony that five other loan officers with back and neck injuries similar to plaintiff's had been treated quite favorably by Moran. (Facts, ¶ 96).

Once again, plaintiff has failed to offer any admissible evidence creating an issue of fact as to Moran's motivation for the 2000 Counsel or the transfer from the Orange branch. Plaintiff's self-serving disagreement with those actions, which is essentially all she has offered, do not serve to create an issue of fact as to FMG's legitimate reasons for taking those actions. Even if plaintiff could create an issue of fact, plaintiff still cannot show that any of this amounted to an adverse employment action within the meaning of the law.

## IV. PLAINTIFF'S FMLA CLAIM FAILS AS A MATTER OF LAW

Relying again solely on temporal proximity, plaintiff contends there is sufficient evidence to avoid summary judgment on her claim that FMG willfully violated the FMLA. Contrary to plaintiff's assertions, the Amended Complaint did not even allege a willful violation of the FMLA and, thus, this claim should not be considered. Even if it had, just as with the ADA claim, any possible inference of retaliation resulting from temporal proximity is dispelled by the undisputed facts concerning the circumstances that led to the allegedly adverse action of which plaintiff complains.[18] In issuing the 2000 Counsel and removing the Orange branch, Moran was merely responding to issues plaintiff had created. The anti-retaliation provisions of the FMLA were not intended to provide employees with a safe harbor from the consequences of their own misdeeds or poor performance. See 29 U.S.C. 2614(a)(3). In light of his superior's directive to commence the disciplinary process and after receiving complaints about plaintiff from several

---

[17]  Similarly, the fact that Moran's concerns would be included in reviews issued during this period does not create an inference of discrimination. For example, in the review for 1999 attached to Plaintiff's Local Rule 56(a)(2) Statement as Pl. Ex. 21, Moran merely echoed the concerns identified in the 2000 Counsel.

[18]  As discussed above, FMG does not believe that plaintiff was ever subjected to an adverse employment action within the meaning of the law.

9

others -- none of which can be tied to plaintiff's alleged disability or FMLA leave -- Moran had no choice but to begin addressing these issues with plaintiff. Indeed, he could have jeopardized his job and relationship with Fleet Bank not to mention the processing staff had he had continued to ignore plaintiff's performance and conduct issues.

As if that were not compelling enough, plaintiff then candidly admits that Moran had accorded very favorable treatment to five other loan originators whom she believed had taken FMLA leave and that, in contrast to them, she had been singled out for different treatment. (Facts, ¶ 96). While plaintiff purports not to understand the significance of this testimony, it is obvious. Moran had no axe to grind against employees who went out on FMLA leave. Plaintiff herself acknowledged that she <u>never</u> enjoyed a good or friendly working relationship with Moran. (Facts, ¶ 4). Overwhelmingly, the undisputed evidence points to the reasons for that, which had absolutely nothing to do with plaintiff's membership in any protected class.

          THE DEFENDANT
          WASHINGTON MUTUAL BANK, FA as
          successor in interest by operation of law to
          Washington Mutual Home Loans, Inc., the
          successor by merger to Fleet Mortgage Corporation

By: _____
     Beverly W. Garofalo (ct11439)
     Brown Raysman Millstein Felder
      & Steiner, LLP
     CityPlace II, 10th Floor
     185 Asylum Street
     Hartford, CT 06103
     (860) 275.6400

## CERTIFICATION

This is to certify that on April 2, 2004, a true copy of the foregoing Reply Memorandum was sent via first-class mail, postage prepaid, to:

Ellen M. Telker, Esq.
564 Boston Post Road
Milford, CT  06460

_____
Beverly W. Garofalo