1   and working from your home was never an accommodation that
2   your treaters would have recommended or accepted; is that
3   correct?
4       A    The treater -- I don't know what the treaters
5   would have recommended, but it wouldn't -- I wouldn't have
6   been able to do my job that way.
7       Q    Did you ever accept from Fleet the accommodation
8   that you would work from a home office --
9       A    No.
10      Q    -- and leave your laptop at home?
11      A    No, because it wouldn't work.
12      Q    Is the answer yes or no?
13      A    No.
14      Q    So it's your testimony that you didn't return to
15  Fleet Bank on April 10th, 2000, accepting the alternative
16  that you would work from home?
17      A    No.
18           MS. GAROFALO:  Can we mark this as Exhibit
19  25.
20           (Exhibit 25, 4/5/00 fax, marked.)
21      Q    I'm showing you what's been marked as Exhibit 25,
22  and can you tell me if you recognize any of the handwriting
23  on there?
24           MS. TELKER:  What is it?
25           THE WITNESS:  It's a fax to Kevin; it says,

Page 324

1    "Remarks."

2        Q    (By Ms. Garofalo)  Why don't you read it into the
3    record.  Wait.  First answer the question:  Is that your
4    handwriting?

5        A    Looks like it.

6        Q    Do you recognize your own handwriting, Ms.
7    Ungerleider?

8        A    It looks like it.

9        Q    Is that your handwriting or isn't it?

10       A    Yes, I'm assuming it is.

11             MS. TELKER:  She says it looks like it.

12             MS. GAROFALO:  Who doesn't recognize their
13   own handwriting?

14       Q    (By Ms. Garofalo)  Is it your handwriting or is it
15   not your handwriting?

16       A    It looks like my handwriting.

17       Q    Do you have any reason to believe that this isn't
18   your handwriting?

19       A    No.

20       Q    So can we say that this is your handwriting?

21       A    Yes.

22       Q    Can you please read what is in the remarks section
23   into the record?

24       A    Number 1 --

25             MS. TELKER:  What's the date of it?

Page 308

1    A    What was the question again?

2    Q    How many face-to-face conversations do you believe
3 you had with Kevin Moran from April 10th, 2000, until your
4 resignation?

5           MS. TELKER: That wasn't the last question.

6    A    You're changing your question.

7    Q    I thought that's the one that you wanted. I said
8 so you don't remember a single conversation face to face
9 where he threatened to terminate you?

10    A    Yes, I do remember. I don't remember how many
11 times, but there were more than one.

12    Q    So how many times did he threaten to terminate
13 you, and to the best of your recollection, please tell me
14 exactly what or as much as you can remember about what he
15 told you.

16    A    Face to face --

17    Q    Yes.

18    A    -- is the question? Threatening to terminate me,
19 face to face, the first time was the April 10th, 2000. Ten
20 o'clock in the morning. At his office when he handed me
21 the written warning. I believe that was the time; I
22 remember it was early in the day. And threatened to
23 terminate me. From that point on, I would be coming into
24 the -- his office location, the headquarters, showing him
25 the evidence and documentation encountering his written

Page 309

1   warning, false written warnings, and every time I would
2   come in with them, he would threaten to terminate me.
3       Q   Okay.
4       A   So I don't remember how many times I came in, but
5   I kept coming in. I kept trying to fix the problem.
6       Q   Let's go back. What did he say to you in the
7   April 10th, 2000 meeting that was threatening to terminate
8   you?
9       A   What did he say?
10      Q   Yes.
11      A   He said that he was -- that if I didn't --
12  something -- I don't know exactly verbatim, but something
13  that if I didn't correct the -- if I didn't correct what I
14  was doing wrong, I would be terminated.
15      Q   Is there anything else that he said that you
16  deemed to be a threat to terminate you?
17      A   The written warning.
18      Q   Just the written warning and him telling you that
19  if you didn't improve your performance, what -- it could
20  lead to further disciplinary action, up to and including
21  termination?
22      A   Yes. And also if I didn't get out of the Orange
23  branch right away, he would terminate me.
24      Q   When did he say that to you?
25      A   From the --

Page 310

1   Q   Did he tell you that on April 10th?

2   A   Yes.  No.  Actually, I don't remember him saying
3   specifically getting out, if I didn't get on out that day,
4   he would terminate me.  It was more general.  If I didn't
5   correct these things in the warning.

6   Q   So that's what he told you on the 10th, which was
7   you need to correct your performance, and if you don't,
8   your employment could be terminated?

9   A   "You have to correct your computer; you have to
10  correct how you -- you have to -- you can't continue to
11  miss meetings."  We went over the warning.

12  Q   But he didn't tell you that if you don't get out
13  of the Orange branch right away, you're going to be fired
14  on April 10th?

15  A   Not on April 10th.

16  Q   Okay.  How many times did you go to him to show
17  him evidence?

18  A   I don't remember how many times, but --

19  Q   Can you -- more than once?

20  A   Yes.

21  Q   More than twice?

22  A   I believe so.

23  Q   More than three times?

24  A   I don't remember.

25  Q   So it could have been as little as two times?

1     A     I don't remember.

2     Q     And what do you recall him saying to you that was

3     a threat to terminate your employment?

4     A     He just generally threatened to terminate my

5     employment.

6     Q     Tell me what he -- what you can recall him saying.

7     A     That's what I recall, that he threatened to

8     terminate my employment.

9     Q     Out of the blue he said, "I'm going to fire you"?

10    A     He used the word "terminate."

11    Q     Out of the blue he said, "I'm going to terminate

12    your employment" --

13    A     If I didn't do things.

14    Q     What things?

15    A     I don't recall. He just threatened to terminate

16    me. And I don't recall.

17    Q     So you don't recall anything about the words that

18    he spoke to you that you took to be a threat to terminate

19    your employment?

20    A     I think I said that already, I don't.

21    Q     Was anybody else ever present when he threatened

22    to terminate your employment?

23    A     Well, the HR people were aware of this threat.

24    Q     Was anybody else ever present when he threatened

25    to terminate your employment?

Page 312

```
 1      A      His office door was open, and there might have
 2   been people that might have heard.
 3      Q      Do you know who might have heard?
 4      A      There were -- there might have been anybody that
 5   worked in that office at any time.
 6      Q      Do you have any knowledge that some -- that
 7   somebody heard him threaten to terminate your employment?
 8      A      Nobody that I can name specifically.
 9      Q      Is there anything that you can think of that he
10   said to you other than that if you don't improve the
11   performance and conduct issues that were documented in the
12   written warning given to you on April 10th, that you
13   considered -- withdraw that.  Let me change that.
14             Other than Kevin Moran telling you that if you did
15   not improve the performance and conduct issues outlined in
16   the April 10th, 2000 written warning, that you would be
17   subject to further discipline up to and including
18   termination, are there any other circumstances under which
19   you believe Mr. Moran was threatening to terminate your
20   employment?
21      A      I remember that he -- they were looking for
22   documents to process applications, and they were on my desk
23   in the Orange branch, and he threatened me that if I didn't
24   process -- if I didn't process my -- if I didn't get my
25   documents in, I would be terminated because I wasn't doing
```

Page 313

1   my job, even though he wouldn't let me go into the Orange

2   branch.  So there was a time -- there was a time when he

3   said that as well.

4       Q    Anything else that you can remember?

5       A    No.

6       Q    Did you make any notes of any of these threats at

7   the time?

8       A    At the time, it would only have been what Fleet

9   has in their -- what Fleet would have in their records

10  would be e-mails back and forth with Paquin regarding the

11  whole incident, all of them.

12      Q    Other than that --

13      A    No.

14      Q    -- you did not maintain any notes?

15      A    No.

16      Q    You did not make any records yourself of any words

17  that he used or --

18      A    No.

19      Q    Okay.  Is there anything that you can think of

20  that could refresh your recollection as to the content of

21  any discussions that you had with Mr. Moran face to face or

22  via telephone from April 10th, 2000, through May 24th,

23  2000?

24      A    No.  That was -- I was very distressed and frantic

25  because I had --

Page 193

1      kind of person where people find me extremely
2      sweet and kind and compassionate so I'm not
3      used to having somebody hate me so much.  So it
4      just was horrible.
5
6                  (A short break was taken.)
7
8   BY MS. GAROFALO:
9   Q   You mentioned that the only times during the
10      years that you worked for Kevin Moran that he
11      would look at you instead of through you and
12      that he would be genuine and complimentary of
13      you was when he had been drinking at the
14      holiday parties; is that correct?
15  A   Well, in the face-to-face -- like he did
16      excellent reviews of me.  He gave me good
17      reviews.  The information that he would put
18      down would come back to him from other sources
19      like how much production I did, if there was
20      any customer service complaints.  So his
21      reviews would be based not necessarily on his
22      opinion but coming from the other part of the
23      company, the back room or what they call
24      processing, but if we were passing each other
25      down the hallway or when I came in to ask for