provided.[7]  It is undisputed that FMG was in the process of

procuring a desktop PC for Ungerleider when it accepted her

resignation.  Ungerleider only worked from April 10, 2000, until

May 25, 2000 without her desired accommodation; until a PC could

be procured, Moran permitted her to use an interim accommodation,

a home office.  The court concludes that FMG's failure to

immediately provide Ungerleider with the specific accommodation

that she sought does not constitute a refusal to provide a

reasonable accommodation, particularly when FMG was working to

provide that accommodation and provided her with an interim

accommodation.

Fourth, if Ungerleider needed a first-floor office because

of a difficulty climbing stairs due to her injured back, then,

again, it was her responsibility to inform FMG that an

accommodation was needed.  See Rodal v. Anesthesia Group of

Onondaga, P.C., No. 03-7341, 2004 U.S. App. LEXIS 10170, at *13

(2d Cir. May 24, 2004).  While it is undisputed that

Ungerleider's physicians limited her to lifting no more than five

pounds, she has introduced no evidence that they had limited her

---

[7] See Terrell v. USAIR, 132 F.3d 621, 628 (11th Cir. 1998)
(three-month delay in providing accommodation reasonable when
interim accommodation provided); Hartsfield v. Miami-Dade County,
90 F. Supp. 2d 1363, 1373 (S.D. Fla. 2000) (plaintiff failed to
establish an ADA violation due to a ten-month delay in receiving
an accommodation when interim accommodations provided); compare
Worthington v. City of New Haven, 994 F. Supp. 111, 114 (D. Conn.
1997) (sixteen-month delay in providing an accommodation may give
rise to a claim).

ability to climb stairs.  Additionally, Ungerleider has introduced no evidence that she notified FMG of a difficulty climbing stairs.  Further, she has introduced no evidence that she sought an additional accommodation from FMG in light of a difficulty climbing stairs.  While she did complain that she had difficulty carrying her laptop up the stairs to her office, FMG had accommodated this problem by permitting her to keep her laptop at home.  Ungerleider has failed to show that FMG denied a request for a first-floor office or even had knowledge that she needed such an accommodation to function.  Therefore, the court concludes that Ungerleider's dissatisfaction with her second-story office does not constitute a refusal to accommodate, particularly in light of FMG's ignorance of any additional required accommodation.

Accordingly, summary judgment is granted with respect to the ADA cause of action for refusal to make a reasonable accommodation.

**B.  Title VII and ADA Disparate Treatment:**

FMG next moves for summary judgment on Ungerleider's claim of Title VII and ADA disparate treatment.  Specifically, FMG maintains that: "Fleet is entitled to judgment on [Ungerleider's] . . . discrimination claim[s] as a matter of law . . . [because] . . . FMG has offered legitimate non-discriminatory reasons for its actions."  Further, FMG argues that: "No rational trier of

23

fact could find that [FMG's] proffered reasons were false, much less that the real reason was intentional discrimination."

In response, Ungerleider maintains that FMG is not entitled to judgment as a matter of law. Specifically, Ungerleider argues that summary judgment is inappropriate because "there are numerous facts in dispute." Ungerleider does not address specifically whether FMG's reasons for their actions are merely a pretext for discriminatory conduct.

### i. Discriminatory Adverse Job Actions

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e 2(a), states: "It shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion. . . ."

The Americans with Disabilities Act, 42 U.S.C. §12112(a), states: "No covered entity shall discriminate against a qualified individual because of the disability of such individual in regard to . . . discharge of employees, employee compensation . . . and other terms, conditions, and privileges of employment."

A Title VII cause of action alleging employment discrimination proceeds under the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Likewise, "[c]laims of intentional discrimination under the ADA area are

24

analyzed using the framework developed under Title VII." Bonura
v. Sears Roebuck & Co., 62 Fed. Appx. 399, 399 n.4 (2d Cir.
2003). Under the McDonnell Douglas framework, the plaintiff must
first establish a prima facie case of discrimination. Terry v.
Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003). This requires that
"the claimant . . . show that: 1) he belonged to a protected
class; 2) he was qualified for the position; 3) he suffered an
adverse employment action; and 4) the adverse employment action
occurred under circumstances giving rise to an inference of
discriminatory intent." Id.

The plaintiff's burden at the prima facie stage is de
minimis. See Dister v. Continental Group, Inc., 859 F.2d 1108,
1114 (2d Cir. 1988). "Once a plaintiff has established a prima
facie case, the burden shifts to the defendant, which is required
to offer a legitimate, non-discriminatory rationale for its
actions." Terry, 336 F.3d at 138. Finally, "if the defendant
proffers such a [legitimate, nondiscriminatory] reason, the
presumption of discrimination created by the prima facie case
drops out of the analysis, and the defendant will be entitled to
summary judgment . . . unless the plaintiff can point to evidence
that reasonably supports a finding of prohibited discrimination.
. . . The plaintiff must be afforded the opportunity to prove by
a preponderance of the evidence that the legitimate reasons
offered by the defendant were not its true reasons but were a

pretext for discrimination." Mario v. P & C Food Markets, Inc.,
313 F.3d 758, 767 (2d Cir. 2002) (internal quotation marks and
citations omitted).  In other words, "to defeat summary judgment
. . . the plaintiff's admissible evidence must show
circumstances that would be sufficient to permit a rational
finder of fact to infer that the defendant's employment decision
was more likely than not based in whole or in part on
discrimination."  Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir.
2003) (internal quotation marks omitted).  Applying these
principles and finding no material facts in dispute, the court
concludes that summary judgment should be granted in favor of
FMG.

Although there is a considerable question whether
Ungerleider can establish a prima facie case[8], summary judgment
is nevertheless proper because Ungerleider has failed to present

_____

[8] Specifically, with regard to Ungerleider's prima facie
case, the claim that she suffered an adverse employment action is
doubtful.  See Weeks v. New York State (Div. of Parole), 273 F.3d
76, 85 (2d Cir. 2001) (Neither "criticism of an employee which is
part of training and necessary to allow employees to develop,
improve and avoid discipline" nor a change in office assignment
that is not a demotion is an adverse employment action.)  While
Ungerleider also argues that she suffered an adverse employment
action because FMG constructively discharged her, this argument
too is in doubt.  See Stetson v. NYNEX Service Co., 995 F.2d 355,
360 (2d Cir. 1993) ("A constructive discharge generally cannot be
established, however, simply through evidence that an employee
was dissatisfied with the nature of his assignments...Nor is it
sufficient that the employee feels that the quality of his work
has been unfairly criticized...Nor is the standard for
constructive discharge merely whether the employee's working
conditions were difficult or unpleasant.").  Nevertheless, as
discussed above, the court does not address this issue.

any evidence that would be sufficient to permit a rational finder
of fact to infer that the FMG's legitimate, nondiscriminatory
reasons for its actions were a pretext for discrimination.
Ungerleider contends that FMG counseled, reassigned and
constructively discharged her because of her religion and
disability.  FMG, however, asserts that it took its actions as a
matter of routine personnel management and because of
Ungerleider's history of unprofessional conduct and poor work
record.[9]

A review of the record indicates considerable support for
the FMG's assertion.  There is ample evidence that Ungerleider
was not a model employee.  It is undisputed that while
Ungerleider may have excelled in some areas of employment, her
supervisors frequently documented deficiencies in her
communication skills, judgment, and professionalism.  There is
evidence that she was at times insubordinate.  Further, it is
well documented that she was a party to a number of
confrontations with a number of co-workers, requiring police
involvement in one instance.  Additionally, there is evidence
that her supervisors received complaints from customers about her
tone, attitude, and the level of service she provided.  FMG has
submitted evidence that she lacked discretion in her use of e-
mail.  Specifically: she used e-mail to bypass her supervisor to

---

[9] FMG disputes that it constructively discharged
Ungerleider.

27

bring complaints about daily operations to senior management; she
used e-mail to bring complaints about her supervisor to her
peers; she has admitted that she referred to co-workers in
various e-mails as "Miss Born Again" and "Afro-Amer."  Further,
she admitted that in her final days at FMG her actions were
"unproductive as a loan officer."  As such, the court concludes
that FMG substantially established legitimate, non-discriminatory
reasons for its actions.

    Moreover, the court concludes that Ungerleider has failed to
satisfy the burden of proving pretextual discrimination.
Ungerleider appears to argue that FMG's reasons for its actions
are pretextual because she did not suffer any adverse actions
until she took disability leave.  Specifically, she states:
"[T]here were no performance issues before she went out on
disability.  Her ratings were all satisfactory and no adverse job
actions were taken until she returned from her leaves."  To the
contrary, the legitimacy and non-discriminatory nature of FMG
reasons for their actions are only bolstered by the timing of
Ungerleider's leaves, evaluations, and counseling.  It is
undisputed that Moran issued his most negative annual assessment
of Ungerleider's work in February 1996, before Ungerleider
injured her back and before Ungerleider believes Moran learned
that she was Jewish.  Further, Moran issued Ungerleider's first
"Counsel - Step #2" in May 1997, two years before she took her

28

first medical leave of absence, in June 1999. Likewise, in 1997
and 1998, prior to Ungerleider taking medical leave, her
evaluations by various branch managers and Moran were critical of
her communication skills, work relations, judgment,
professionalism, and attendance at meetings. Moran's annual
assessments of Ungerleider only improved after she was injured
and after he learned that she was Jewish.

Additionally, Ungerleider's theory temporally linking FMG's
actions to her medical leaves is further weakened by her own
deposition testimony regarding Moran's treatment of other
employees. She testified that five other employees supervised by
Moran took medical leave due to back or neck injuries without
repercussions, indicating that FMG bore no animus toward the
disabled. Further, with regard to Moran's reallocation of
branches in November, 1999, three months after Ungerleider
returned from her first medical leave, she testified that, like
her, fellow loan officer Downey also lost a branch. Ungerleider
has introduced no evidence that Downey is either Jewish or
disabled. She did testify, however, that Downey is Moran's
personal friend, only bolstering the legitimacy of Moran's reason
for the reallocation of branches, creating a market for a newly
hired loan officer.

Ungerleider appears to argue next that FMG's reasons for its
actions are pretextual because its assessments of her abilities

29

are incorrect. Specifically, when confronted with evidence of
her poor work habits, Ungerleider denies responsibility,
asserting that FMG is mistaken in its evaluation of her. But
even if she is correct, and FMG misjudged her abilities, FMG's
reasons proffered for its actions are not necessarily
illegitimate nor discriminatory. "The fact that a court may
think that the employer misjudged the qualifications of the
[employee] does not in itself expose him to Title VII liability.
. . ." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248,
259 (1981). "[I]t is not the function of a fact-finder to
second-guess business decisions. . . . A business decision need
not be good or even wise. It simply has to be nondiscriminatory.
. . . Thus, the reasons tendered need not be well-advised, but
merely truthful." Dister v. Continental Group, Inc., 859 F.2d
1108, 1116 (2d Cir. 1988). Ungerleider has not presented any
evidence upon which a reasonable jury could find that FMG did not
genuinely believe that the actions taken were appropriate in the
circumstances.

Ungerleider appears to argue next that FMG's reasons for its
actions are pretextual because FMG employees were motivated by
anti-Semitic beliefs. Her most serious charge is that both Moran
and Tartaglio have engaged in anti-Semitic conduct.
Specifically, Ungerleider argues that Moran failed to assist
Ungerleider service two Jewish customers. Assuming without

30

deciding that Ungerleider's allegation is true, Moran's conduct
does not establish that FMG's reasons for its actions are
pretextual.  Ungerleider has offered no evidence that Moran
assisted Ungerleider with only non-Jewish customers.  Further,
although "[a] showing that similarly situated employees belonging
to a different. . . group received more favorable treatment can
also serve as evidence that the employer's proffered legitimate,
non-discriminatory reason for the adverse job action was a
pretext for [unlawful] discrimination," <u>Graham v. Long Island
R.R.</u>, 230 F.3d 34, 43 (2d Cir. 2000), Ungerleider has failed to
make such a showing.   Ungerleider has not introduced any
evidence that Moran assisted the customers of similarly situated
loan officers, that unlike Ungerleider, were neither disabled nor
Jewish.

Ungerleider further argues that Moran made anti-Semitic
remarks on four occasions, and that Tartaglio made an anti-
Semitic remark on one occasion.  Five stray remarks in more than
five years, however, are not sufficient to show that FMG's
reasons are pretextual.  "Stray remarks. . .are rarely given
weight, particularly if they were made temporally remote from the
date of decision." <u>Ezold v. Wolf, Block, Schorr, and
Solis-Cohen</u>, 983 F.2d 509, 545 (3d Cir. 1992); <u>O'Connor v. Viacom
Int'l Inc.</u>, 93 Civ. 2399 (LMM), 1996 U.S. Dist. LEXIS 5289 at *13
(S.D.N.Y. Apr. 23, 1996).  It is unclear whether these alleged

31

remarks were made temporally proximate to the conduct about which
Ungerleider complains because she can not approximate when the
remarks were made; nor has she deposed any witnesses who
approximate when the remarks were made; nor, has FMG any record
of when the remarks were made, because Ungerleider is unsure
whether she ever complained about them to FMG Human Resources.

    Because neither Moran nor Tartaglio were decision-makers in
most of events about which Ungerleider complains, the court
affords their alleged remarks little weight.  See Siino v. New
York City Bd. of Educ., 99-9327, 2000 U.S. App. LEXIS 8602 at *4
(2d Cir. May 1, 2000) ("even if [an official] did make the
alleged statements, they do not give rise to an inference of
discrimination because she did not make hiring decisions"); Ezold
v. Wolf, Block, Schorr, and Solis-Cohen, 983 F.2d 509, 545 (3d
Cir. 1992) ("Stray remarks by non-decisionmakers or by
decisionmakers unrelated to the decision process are rarely given
great weight"); compare Ferrell v. Leake & Watts Services, Inc.,
83 Fed. Appx. 342, 346 (2d Cir. 2003) (decision-makers remarks,
taken together with other circumstances, may lead to inference of
discrimination).  The decision to counsel Ungerleider in 2000 was
made not by Moran, but rather by FMG senior management.
Likewise, the decision to maintain the written record of the
counseling in 2000 and accept Ungerleider's resignation was made
not by Moran, but rather by Frazza, as a result of Paquin's

32

investigation.  Further, the decision to remove Ungerleider from the Orange branch was made not by Moran, but rather by Norris. Additionally, annual evaluations critical of Ungerleider were submitted not just by Moran, but also by various branch managers. Ungerleider has introduced no evidence from which a rational finder of fact could infer animus toward the disabled or those of the Jewish faith on the part of senior management, Frazza, Paquin, Norris, or the other branch managers.

Further, Ungerleider has failed to introduce any direct evidence that Moran was motivated by discriminatory animus.  To the contrary, her deposition indicates that she did not think Moran realized his actions were objectionable.  Further, in her testimony, Ungerleider offered several possible non-discriminatory justifications to explain Moran's decision-making: her relationship with Moran had been never friendly; he did not like her; she had a propensity for going over his head to senior management; unlike him, she had a customer-focus.

Ungerleider has failed to present sufficient evidence to raise a genuine issue of material fact.  Through her affidavits, Ungerleider has supplied some evidence of possible discrimination.  "But some evidence is not sufficient to withstand a properly supported motion for summary judgment; a plaintiff opposing such a motion must produce sufficient evidence to support a rational finding that the legitimate,

nondiscriminatory reasons proffered by the employer were false. .
. ." Woroski v. Nashua Corp., 31 F.3d 105, 109-110 (2d Cir.
1994). Further, "[t]he fact that [an employer does] not merely
articulate -- but substantially establishe[s] -- legitimate,
nondiscriminatory reasons for her discharge render[s] more
difficult [a former employee's] task of proving pretext. . . .The
reasonableness of the employer's reasons for discharge is, of
course, probative of the question whether they are pretexts."
Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir. 1985).

Viewing the evidence presented by Ungerleider in its
totality, the court concludes that Ungerleider has failed to
satisfy the burden of proving pretextual discrimination where, as
here, there is overwhelming evidence to support the FMG's
legitimate business reasons for its actions. Accordingly,
summary judgment is granted with respect to the Title VII and ADA
causes of action for discriminatory adverse job actions.[10]

ii. **Hostile Work Environment Claim**

Addressing Ungerleider's ADA and Title VII claims, FMG does
not specifically address a potential hostile work environment
action in its Memoranda of Law in Support of Motion for Summary

---

[10]    FMG also contends that summary judgment should be granted
because: 1) "Ungerleider did not suffer an adverse employment
action."; 2) "Any 'adverse action' did not occur under
circumstances giving rise to an inference of. . . discrimination"
Having concluded that judgment is warranted on other grounds, the
court need not reach these issues.

Judgment.  This is presumably because the Amended Complaint does

not specifically assert such a claim, only more general

violations of law.  Ungerleider does refer to the creation of a

hostile work environment in her Memorandum of Law in Opposition

to Motion for Summary Judgment, but only in passing.

Nevertheless, the court addresses this issue.

     "A plaintiff may establish a claim of disparate treatment

under Title VII . . . by demonstrating that harassment  . . . [on

the basis of religion] . . . amounted to a hostile work

environment."  Feingold v. New York, 366 F.3d 138, 149 (2d Cir.

2004).[11]  In order to prevail on a hostile work environment claim

under Title VII, a plaintiff must show that "the harassment was

sufficiently severe or pervasive to alter the conditions of the

victim's employment and create an abusive working environment."

Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002)(internal

quotation marks and citations omitted); see also Oncale v.

Sundowner Offshore Servs., 523 U.S. 75, 78 (1998) (stating that a

hostile work environment is created "when the workplace is

permeated with discriminatory intimidation, ridicule, and insult

that is sufficiently severe or pervasive to alter the conditions

of the victim's employment and create an abusive working

_____

     [11] Because "[t]he Second Circuit has yet to determine whether
the ADA gives rise to a cause of action for hostile work
environments. . .", Bonura v. Sears Roebuck & Co., 62 Fed. Appx.
399, 399 n.3 (2d Cir. 2003), the court does not address this
issue.

environment"). The Second Circuit has explained that "this test
has objective and subjective elements: the misconduct must be
severe or pervasive enough to create an objectively hostile or
abusive work environment, and the victim must also subjectively
perceive that environment to be abusive." Terry v. Ashcroft, 336
F.3d 128,147-148 (2d Cir. 2003) (internal quotation marks and
citations omitted). "[W]hether an environment is 'hostile' or
'abusive' can be determined only by looking at all the
circumstances." Harris v. Forklift Systems, Inc., 510 U.S. 17,
23 (1993). "These may include the frequency of the
discriminatory conduct; its severity; whether it is physically
threatening or humiliating, or a mere offensive utterance; and
whether it unreasonably interferes with an employee's work
performance." Id. "As a general rule, incidents must be more
than episodic; they must be sufficiently continuous and concerted
in order to be deemed pervasive." Terry v. Ashcroft, 336 F.3d
128, 148 (2d Cir. 2003). Applying these principles and finding
no material facts in dispute, the court concludes that summary
judgment should be granted in favor of FMG.

Ungerleider has failed to substantiate a hostile environment
claim. Ungerleider argues that between April 10 and May 25,
"Moran continuously berated and harassed" her. Specifically: FMG
did not deliver in a timely manner a service award and cash prize
that she had been awarded at a sales conference; she did not find

36

that leaving her laptop at home was a feasible alternative to

having a PC at her desk; Moran removed her from the Orange branch

and did not assign a replacement branch; she was not permitted to

pick up documents dropped off by her customers at the Orange

branch; Moran counseled her; Moran threatened to fire her; there

were errors in her compensation; her family was denied access to

Orange branch for personal banking.  In recent hostile work

environment cases, however, claims have been dismissed for

insufficiency of evidence even though, compared to what was

argued here, they involve a similar or greater number of

incidents, that were more severe and had more pronounced

discriminatory overtones.[12]  Conversely, recent hostile work

environment cases have found triable issues of fact only where

the harassment was of greater frequency and severity than

---

[12] See Alfano v. Costello, 294 F.3d 365, 370 (2d Cir. 2002)
(plaintiff subjected to sexually suggestive gifts, public
notices, and messages, and warned by supervisor not to eat
carrots, bananas, hot dogs, or ice cream in a seductive manner);
Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir.
1998) (an appreciative comment about the plaintiff's buttocks and
a deliberate touching of her breasts); Celestine v. Petroleos de
Venez., SA, 266 F.3d 343, 354 (5th Cir. 2001) (in a twenty-five-
month period, eight incidents of alleged racial harassment);
Shepherd v. Comptroller of Pub. Accounts, 168 F.3d 871, 872-875
(5th Cir. 1999) (in a two-year period, co-worker made impertinent
and intimate observations about plaintiff's anatomy, attempted to
look down her shirt, and touched her multiple times); Penry v.
Fed. Home Loan Bank of Topeka, 155 F.3d 1257, 1261-63 (10th cir.
1998) (in a three-year period, harasser made remarks concerning
plaintiff's undergarments, and whether she had sexual dreams;
claimed sexual conquest of another woman employee; made
pornographic architectural analogies; and six times took the
plaintiff to a Hooter's restaurant on business travel).

37

anything Ungerleider has alleged.[13]

Assuming without deciding that Ungerleider subjectively perceived that her environment was abusive, the court concludes that FMG's actions, when viewed in the totality of the circumstances, were neither severe nor pervasive enough to create an objectively hostile or abusive work environment. Accordingly, summary judgment is granted with respect to the Title VII cause of action for creation of a hostile work environment.

**C.  Retaliation for Taking Medical Leave Pursuant to FMLA:**

FMG next moves for summary judgment on Ungerleider's claim that FMG retaliated against her for taking a medical leave of absence. Specifically: "Fleet is entitled to judgment on [Ungerleider's] FMLA claim as a matter of law because the claim is time barred. . . .  Generally, claims under the FMLA must be

---

[13] See Feingold v. State of New York, 366 F.3d at 150 (plaintiff subjected to anti-Semitic remarks routinely, and "singled out...on an 'almost daily' basis on account of his religion."; his supervisor "had been aware of anti-Semitism in the office for years."); Holtz v. Rockefeller & Co., 258 F.3d 62, 70, 75-76 (2d Cir. 2001) (harasser touched plaintiff in an unwelcome manner on a daily basis, made "obscene leers at her," "tried to peer down her blouse and up her skirt," and made "approximately ten or twenty" insinuating remarks about her sex life); Cruz v. Coach Stores, Inc., 202 F.3d 560, 571 (2d Cir. 2000) (supervisor subjected plaintiff and others to "blatant racial epithets on a regular if not constant basis," made repeated remarks to the effect that women should not work, and physically harassed women by standing very close, backing them into a wall, and looking them "up and down" when he spoke with them); Raniola v. Bratton, 243 F.3d 610, 621 (2d Cir. 2001) (plaintiff subjected to "offensive, sex-based remarks, disproportionately burdensome work assignments, workplace sabotage, and one serious public threat of physical harm.")

brought with two years of the alleged actionable event."

In response, Ungerleider maintains that FMG is not entitled to judgment as a matter of law.  Specifically: "[W]hen the conduct alleged constitutes a 'willful' violation of the FMLA, the statute of limitations increases to three years."

The Family and Medical Leave Act, 29 U.S.C. § 2615(a)(1), states: "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  The regulations promulgated pursuant to the FMLA explain that "'interfering with' the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave," 29 C.F.R. § 825.220(b), and that "an employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave." 29 C.F.R. § 825.220(c).  Applying these principles and finding no material facts in dispute, the court concludes that summary judgment should be granted in favor of FMG.

Ungerleider is time barred from bringing a claim that FMG retaliated against her for taking leave pursuant to the FMLA. The FMLA requires that "an action . . . be brought under this section not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought."  29 U.S.C. § 2617(c)(1).  The statute of limitations

39

period began running at the very latest when FMG accepted

Ungerleider's resignation on May 24, 2000.  She did not amend her

complaint to add a FMLA claim until May 5, 2003, nearly a year

after the statute of limitation had run.

To preserve a FMLA claim, Ungerleider would have to bring an

action for a willful violation.  The FMLA permits employees to

bring claims within three years of an alleged violation "[i]n the

case of such action brought for a willful violation. . . ."  29

U.S.C. § 2617(c)(2).  "Where . . . a plaintiff sufficiently

alleges facts supporting the claimed violation of the FMLA, a

general averment as to willfulness should be sufficient to

trigger the three-year limitation period."  <u>Settle v. S.W.

Rodgers Co.</u>, 998 F. Supp. 657, 664 (E.D. Va. 1998), aff'd, 182

F.3d 909 (4th Cir. 1999) (unpublished table decision).

When considering actions under the FMLA, courts often have

looked to the Fair Labor Standards Act of 1938, as amended 29

U.S.C. §§ 201 <u>et seq.</u>, ("FLSA"). [14] Like the FMLA, the FLSA has

---

[14] <u>See</u> <u>Frizzell v. Southwest Motor Freight</u>, 154 F.3d 641, 644
(6th Cir. 1998) ("The legislative history of the FMLA reveals
that Congress intended the remedial provisions of the FMLA to
mirror those in the FLSA.");  <u>Nero v. Industrial Molding Corp.</u>,
167 F.3d 921, 928 (5th Cir. 1999) ("the remedial provision in the
FLSA can aid in interpreting the similar remedial provision in
the FMLA.");  <u>Palma v. Pharmedica Communications, Inc.</u>, CIV. NO.
3:00CV1128 (HBF), 2003 U.S. Dist. LEXIS 21227 at *3 (D. Conn.
Sept. 30, 2003) ("Other courts considering liquidated damages
under the FMLA have looked at cases under the Fair Labor
Standards Act of 1938. . . .);  <u>Thorson v. Gemini Inc.</u>, 96 F.
Supp. 2d 882, 890 (N. D. Iowa 1999) (" The remedies provisions of
the Family and Medical Leave Act were intended by Congress to

a two-year statute of limitations that increases to three years when a willful violation is alleged. 29 U.S.C. § 255(a). Under the FLSA, "[t]he standard of willfulness [is] . . . that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute. . . ." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1987).

Ungerleider has failed to trigger the three-year limitation period. As FMG notes, the Ungerleider's Amended Complaint does not contain a general averment as to willfulness on the part of FMG.[15] Nor does the Amended Complaint allege any facts supporting the claimed willful violation of the FMLA. Nor has Ungerleider subsequently provided any evidence that FMG either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FMLA. The court concludes that because Ungerleider failed to aver, allege, or submit evidence of a willful violation, the two-year statute of limitations applies and the claim is time barred. Accordingly, summary judgment is

---

mirror those of the Fair Labor Standards Act. It is therefore appropriate to rely on cases interpreting. . . FLSA when interpreting the FMLA").

[15] The court refers to the pleading presently before the court, labeled "FIRST AMENDED COMPLAINT," filed June 27, 2003. Ungerleider asserts that "[i]n her Amended Complaint, the plaintiff alleged that 'The defendant intentionally and willfully violated the FMLA.'" No doubt she refers to paragraph 57 of a previous pleading also labeled "FIRST AMENDED COMPLAINT," filed May 5, 2003. The pleading to which she appears to refer, however, is superseded by her most recent complaint and is no longer before the court.

41

granted with respect to the FMLA cause of action for retaliatory discrimination.[16]

## 2. Motion for Sanctions

FMG next moves to sanction Ungerleider due to her failure to comply with local rules. Specifically: "[Ungerleider] has not even attempted to comply with Local Rule 56(a)3. Although [she] submitted a statement . . . in which she admitted, denied and/or pleaded insufficient knowledge as to each fact, she did not include citations to affidavits nor admissible evidence to support any of her conclusory denials."

In response, Ungerleider objects to the defendant's motion. Specifically: "Although [Ungerleider] did not provide specific citations to each denial, the second section, stating the disputed fact[,] has citations." Further, "It is in the court's discretion whether . . . to grant sanctions. . . . [I]f [Ungerleider's] counsel inadvertently misunderstood the requirements of the rule, an injustice to her client will be

---

[16] FMG also contends that summary judgment should be granted because Ungerleider "cannot establish retaliation." FMG made this argument without the benefit of the 2nd Circuit's most recent FMLA retaliation holding, Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004) ("it would be appropriate to apply the McDonnell Douglas analysis to claims of [FMLA] retaliation"). As Ungerleider's Title VII and ADA claims failed to survive summary judgment under McDonnell Douglas analysis, it seems unlikely that a FMLA claim would have merit, given the facts presently in the record. Having concluded that judgment is warranted on other grounds, however, the court does not reach this issue.

42

wrought if the motion is granted."

"[B]ecause nothing in the federal rules mandates that district courts conduct an exhaustive search of the entire record before ruling on a motion for summary judgment, district courts are entitled to order litigants to provide specific record citations.  Amnesty America v. Town of West Hartford, 288 F.3d 467, 470-71 (2d Cir. 2002).  Through Local Rule 56, the court requires that litigants provide specific record citations in support of or opposition to motions for summary judgment.  D. Conn. Local R. 56(a)(2)-(3).  Specifically:

> The papers opposing a motion for summary judgment shall include a document entitled "Local Rule 56(a)2 Statement," which states...whether each of the facts asserted by the moving party is admitted or denied. The Local Rule 56(a)2 Statement must also include in a separate section entitled "Disputed Issues of Material Fact" a list of each issue of material fact as to which it is contended there is a genuine issue to be tried. . . .

> [E]ach denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial. . . . Counsel . . . are hereby notified that failure to provide specific citations to evidence in the record as require by this Local Rule may result in sanctions, including . . . when the opponent fails to comply, an order granting the motion [for summary judgment].

D. Conn. Local R. 56(a)(2)-(3)

"The purpose of Rule 56 is to aid the court, by directing it to the material facts that the movant claims are undisputed and

that the party opposing the motion claims are undisputed." <u>Coger</u>
<u>v. State of Connecticut</u>, No. 3:98-VC-1593(EBB), 2004 U.S. Dist.
LEXIS 4293, *3 (D. Conn. March 2004). Without such a statement,
"the court is left to dig through a voluminous record, searching
for material issues of fact without the aid of the parties." <u>Id.</u>
at *3 (internal quotation marks and citations omitted).

Ungerleider's Local Rule 56(a)2 Statement fails to comply
with Local Rule 56(a)3, by including citations only in the
"Disputed Issues of Material Fact" section of her Local Rule
56(a)2 Statement. As a result of this omission, Ungerleider left
the court digging through the record in search of material issues
of fact. As FMG properly notes, it is well within the courts
discretion to grant summary judgment on this basis of this
violation of the rule. <u>See</u> D. Conn. Local Rule 56(a)3. In the
alternative, the court could deem those facts that were not
denied in compliance with Local Rule 56 to be admitted. <u>See</u>
<u>Sanchez v. Univ. of Conn. Health Care</u>, 292 F. Supp. 2d 385, 390
(D. Conn. 2003).

In the unique facts and circumstances of this case, however,
sanctions are not warranted. The court's search of the record,
guided by citations provided by both Ungerleider and FMG, was
sufficient in this particular case.[17] Any failure by future

_____

[17]  Ungerleider also argues: "If it is necessary to provide
documentation for each denial, one could simply go though the
paragraphs and tailor the affidavits to provide documentation for
denials." Further, "[FMG's] counsel does not comply with the

44

litigants to comply most strictly with the rules, however, may result in sanctions.

### CONCLUSION

For the foregoing reasons, FMG's motion for summary judgment is GRANTED (document no. 50), and motion for sanctions is DENIED (document no. 74).  It is so ordered, this 12th day of August, 2004, at Hartford, Connecticut.

Alfred V. Covello
United States District Judge

---

rule."  Having concluded that the motion is denied on other grounds, the court need not reach these issues.