UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LINDA UNGERLEIDER

V.                                    CASE NO. 3:02CV00659(AVC)

FLEET MORTGAGE GROUP
OF FLEET BANK

## JUDGMENT

This action having been commenced by a complaint and having been assigned to the

Honorable Alfred V. Covello, United States District Judge; and

The defendant having filed its motion for summary judgment and the Court having

considered the full record of the case, including applicable principles of law, on August 12, 2004

having granted the motion, it is hereby

ORDERED, ADJUDGED and DECREED that judgment be and is hereby entered in

favor of the defendant and against the plaintiff.

Dated at Hartford, Connecticut, this 12th day of August, 2004.

KEVIN F. ROWE, Clerk

By:_____
Jo-Ann Walker
Deputy Clerk

EOD: _____

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

LINDA UNGERLEIDER,                    :        2004 AUG 12  A 9: 21
    Plaintiff                         :
                                      :        U.S. DISTRICT COURT
    v.                                :        Civil No. 3:02CV659(AVC)
                                      :
FLEET MORTGAGE GROUP OF               :
FLEET BANK,                           :
    Defendant.                        :

**RULING ON THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION
FOR SANCTIONS**

This is an action for damages and equitable relief brought
pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.
§ 2000e, as amended by the Civil Rights Act of 1991 ("Title
VII"), the Americans with Disabilities Act, 42 U.S.C. § 12112
("ADA"), and the Family and Medical Leave Act, 29 U.S.C. §
2615(a) ("FMLA").  The plaintiff, Linda Ungerleider, alleges that
the defendant, her former employer, Fleet Mortgage Group
("FMG")[1], refused to accommodate her disability, and subjected
her to various adverse employment actions, including harassment
and constructive discharge from employment, because of her
religion and disability, and in retaliation for her taking
medical leaves of absence.

FMG now moves pursuant to Rule 56 of the Federal Rules of
Civil Procedure for summary judgment, arguing that there are no

---

[1] Washington Mutual Bank, FA, notes that it is the successor
in interest by operation of law to Washington Mutual Home Loans,
Inc., who is the successor by merger to Fleet Mortgage
Corporation.

genuine issues of material fact and that it is entitled to judgment as a matter of law.

The issues presented are: 1) whether Ungerleider has raised a genuine issue of material fact as to whether FMG refused to accommodate her disability; 2) whether Ungerleider has raised a genuine issue of material fact as to whether FMG's reasons for its action were a pretext for discrimination; 3) whether Ungerleider is time barred from bringing an action alleging retaliation by FMG for engaging in a protected activity. For the reasons hereinafter set forth, the court concludes that the plaintiff has failed to raise any genuine issue of material fact and, accordingly, FMG's motion for summary judgment is granted.

FMG further moves pursuant to Local Rule 56 of the Federal District Court, District of Connecticut, for sanctions, arguing that Ungerleider failed to comply with local rules and therefore should be subject to sanctions. For the reasons hereinafter set forth, the court concludes that the Ungerleider is not subject to sanctions and, accordingly, FMG's motion for sanctions is denied.

### FACTS

Examination of the complaint, affidavits, pleadings, Rule 56(a) statements, and exhibits accompanying the motion for summary judgment, and the responses thereto, disclose the following undisputed, material facts.

On December 5, 1994, FMG hired Ungerleider as a loan

officer.  Loan officers seek prospective loan applicants through
referrals from Fleet Bank branch offices and established business
relationships outside of FMG.  Further, they assist in the
processing of loan applications.  Loan officers work exclusively
for commission.  The loan officer's supervisor, a FMG sales
manager, assigns to each loan officer a number of Fleet Bank
branch offices from which to generate business.

On December 1, 1995, Ungerleider began reporting to a FMG
sales manager, one Kevin Moran.  On February 15, 1996, Moran
issued his first annual performance appraisal of Ungerleider
giving her an overall performance rating of "needs improvement."
Using seventeen standard evaluation criteria, Moran graded
Ungerleider as "needs improvement," in eight areas, including
communication, judgment, and work relations.  Moran graded
Ungerleider as "meets expectations," in the remaining nine
criteria.  Moran specifically noted that Ungerleider had been
"very critical of policies and procedures at FMG which has been
disruptive to team building."  Further, he recommended that she
"come to terms with her own need to become more knowledgeable of
the fundamentals of her chosen profession. . . ."  In response,
Ungerleider submitted a memorandum defending her performance, but
admitted that she had erred in being too comfortable calling and
writing FMG officers beyond her immediate chain of command.

On or about April 1, 1996, Ungerleider injured her back
lifting computer equipment used at a FMG training session.  She

subsequently sought workers' compensation for the injury. The parties settled the claim in 2002.

In October 1996, Ungerleider took three days off to observe Rosh Hoshanna and Yom Kipper. She asserts that after she returned to work, Moran expressed surprise when he learned that Ungerleider was Jewish.

Ungerleider testified at her deposition that subsequently, Moran made anti-Semitic remarks on four occasions. Specifically, Moran: 1) commented that anyone willing to volunteer to work on Good Friday must be an atheist; 2) referred to a Jewish customer as "Johnny Manishevitz"; 3) remarked at a holiday party, "Look at the Jewish girl singing the Christmas carols," referring to Ungerleider; and 4) told Ungerleider that his grandfather was proud to have served with the German S.S. during World War II. Moran denies that he made the remarks. Further, in her affidavit, she noted that on two occasions Moran did not assist her with the service of Jewish customers. Additionally, she stated that one Barbara Tartaglia once questioned why Ungerleider would have a miniature Christmas tree on her desk. Ungerleider could not recall when the alleged remarks were made in her five years of employment by FMG. Nor could she recall whether she reported the incidents to FMG Human Resources department.

In her affidavit, Ungerleider noted: "I didn't think Moran realized his actions." Additionally, in her deposition, she testified that she and Moran never had a friendly relationship.

4

Further, she testified that he treated her differently than other employees because "I would do whatever I needed to do to get a customer's needs satisfied, [even] if it meant calling [his] supervisors...."

On February 17, 1997, Moran issued his next annual performance appraisal of Ungerleider. He gave her an overall performance rating of "meets expectations," an improvement over her previous appraisal. Using sixteen standard evaluation criteria, Moran graded Ungerleider as "needs improvement," in six areas, again including communication, judgment, and work relations. In the remaining ten areas, Moran graded Ungerleider as either "meets expectations," or "exceeds expectations." Moran specifically noted that Ungerleider was in the top 20% of loan officers in production, and had a strong work ethic; he further noted that Ungerleider's weaknesses were product knowledge and understanding of FMG policies, procedures, and standards. In response, Ungerleider again submitted a memorandum defending her performance. In her deposition, however, Ungerleider agreed that Moran's review had been fair.

On May 22, 1997, Ungerleider had a confrontation with a co-worker, initially in the presence of customers. In response, Moran issued Ungerleider a written "Counsel - Step #2" advisement, a formal step in FMG's progressive disciplinary process that precedes "Reprimand - Step #3," and termination of employment. In Moran's view, the purpose of such counseling was

5

to get an employee "back on track."  The counseling included a
"Developmental Action Plan," detailing steps to be taken to
improve her performance.  Specifically, Moran recommended that
Ungerleider improve relations with fellow employees and
management.  The "Counsel - Step #2" standardized form does warn
that the employee's performance must show immediate and sustained
improvement, or further action, including possible termination,
will be taken by the employer.

In August 1997, Ungerleider was the top producer in her
region for the month.  The FMG Regional Vice-President sent her a
letter recognizing this feat, and thanking her for her hard work
and dedication.

In February of 1998 and 1999, Moran issued annual
performance appraisals of Ungerleider for calender years 1997 and
1998.  In both evaluations, Moran gave Ungerleider an overall
performance rating of "exceeds expectations."  Among the criteria
in which Ungerleider received the lowest scores were again
communication, judgment, and work relations, which Moran graded
as "meets expectations."  During this period, Moran's quarterly
assessments of Ungerleider were of a similar, generally positive
nature.

Fleet Bank branch managers also assessed Ungerleider's
performance annually, submitting evaluations to Moran.  For the
years 1997, 1998, and 1999, Ungerleider generally received
positive evaluations from branch managers.  During this time

6

period, however, various managers gave her low marks for professionalism, and the regularity with which she visited branches and attended meetings.  Further, managers noted Ungerleider's propensity to complain to bank staff, her inappropriate manner of dress, and complaints from customers about her tone and attitude.

On June 19, 1999, Ungerleider began a medical leave of absence due to her back injury.  On August 11, 1999, she returned to work.  In her deposition, Ungerleider testified that five other employees supervised by Moran took medical leave due to back or neck injuries without repercussions.

In September, 1999, FMG conducted an employee contest, in which the winner was awarded tickets to Boston Red Sox games. Ungerleider notes in her affidavit that the games fell, for the second year in a row, on Jewish holidays.  Further, she notes that it was "unusual" that FMG did not print the dates of Jewish holidays on its corporate calenders.

On October 6, 1999, Ungerleider sent Moran an e-mail complaining about FMG scheduling procedures.  Further, the e-mail requested that no one in the office use the expression, "JEW THEM DOWN."

On November 24, 1999, Moran reallocated various branches to which loan officers were assigned.  As a result of the reallocation, Ungerleider and a fellow loan officer, one Pierce Downey, lost territory from which to generate business.

Ungerleider believed Downey to be one of Moran's best friends.
Moran told Ungerleider the purpose of the reallocation was to
create a territory for a newly hired loan officer.   Downey
forwarded to Moran an e-mail that he had received from
Ungerleider complaining about the matter.   The e-mail read in
part:

> Is it me, or does it extra suck (excuse the language)
> that Kevin [Moran] took money out of our pockets and
> then e-mails a copy of it to us with Happy Thanksgiving
> attached?  Even though we probably all get only a few
> deals a year from each branch; it still doesn't help
> matters.  I guess that's all the thanks we get for
> working 14 hour days for 2 ½ years so he can swim in
> his new pool.  I'm not too bitter!!!...Sorry for
> venting, but I am curious how you took the news.

On December 6, 1999, Ungerleider sent an e-mail to a FMG
senior officer at least two management levels above Moran
complaining about a conflict with another co-worker.   Senior
management solicited Moran's assessment of Ungerleider, and then
directed him to formally counsel her.   After consulting with
Moran, FMG Human Resources staff concurred that Moran should
prepare to verbally counsel Ungerleider.   Further, at senior
management's behest, FMG computer support staff assembled
documentation of Ungerleider's numerous problems processing loan
applications.

On January 3, 2000, Ungerleider e-mailed Moran regarding a
dispute with yet another co-worker.   She referred in the e-mail
to this co-worker, a Christian, as "Ms. Born again."   When Moran
replied that he was concerned about the message's content and

8

tone, Ungerleider answered that her message contained "no tone,
just facts." During her deposition, she asserted that "Ms. Born
Again" was an appropriate manner in which to refer to this co-
worker.

On January 11, 2000, one Rachel Paquin of FMG Human
Resources and Moran agreed that Ungerleider needed to be verbally
counseled regarding her professionalism, communications, work
relations, and attendance at meetings. That very day Ungerleider
began a medical leave of absence pursuant to the Family Medical
Leave Act. She notified Moran that she could not work due to
neck and back pain, a sore throat, earache and "extremely rapid
heart rate."

On January 26, 2000, Moran e-mailed Ungerleider to inform
her that he was denying her request to market a particular FMG
loan product. He explained that he was constrained by another
FMG department as to the number of loan officers that could
market the product. Further, he reminded her that FMG policy did
not permit loan officers on medical leave to take loan
applications from customers.

In February 2000, while on still medical leave, Ungerleider
took an application from a customer referred to her by one
Barbara Tartaglio. Ungerleider took the application at the Fleet

Bank branch in Orange, CT.[2]

Soon after, Tartaglio informed Moran that the customer had complained about the service he had received.  Further, Tartaglio informed Moran that when she attempted to address Ungerleider about the complaint, Ungerleider accused her of taking the customer's side due to a personal relationship.  When the customer spoke with Moran, he reiterated his complaints about the service that Ungerleider had provided.  Ungerleider believes Tartaglio lied to Moran about the incident because she bore a personal grudge against Ungerleider resulting from a previous dispute.  She does concede, however, that she might have told Moran that Tartaglio was taking the customer's side because of a personal relationship.

Following this incident, one Cindi Norris, the manager of the Fleet Bank branch in Orange, requested that Moran remove Ungerleider from her position as loan officer for that branch. Because at that time FMG and Fleet Bank were separate business entities, loan officers serviced banks at the discretion of the branch manager.  When a branch manager requested that a loan officer be removed from the branch, the sales manager generally had little choice but to defer to the branch manager.  As such,

---

[2] Although Ungerleider was assigned seven Fleet branches at the time, she maintained a desk at the Orange branch, from which she conducted most of her business.  Conveniently, the Orange branch was only 1.9 miles from her home.

Moran removed Ungerleider from the Orange branch, as requested by Norris.  This was not the first time that Ungerleider had been removed from a branch office at the request of a branch manager.

Following this latest incident, Moran worked with Human Resources staff to prepare Ungerleider's second written "Counsel – Step #2" advisement.  Moran sought to make Ungerleider aware of the areas in need of improvement, and develop a plan to encourage her to be successful.  Moran planned to counsel Ungerleider once she returned from medical leave.

While still on her medical leave, Ungerleider submitted notes from her medical providers restricting her ability to lift more than five pounds; one specifically stated, "Ms. Ungerleider cannot return to work until she has her PC on her desk or home office is available so she does not have to carry her computer."  In response, Moran's assistant began arranging for a PC to be put on a desk at one of Ungerleider's assigned branches.  Moran informed Ungerleider that until a PC could be installed, she could leave her FMG laptop at home, take paper mortgage applications, and then enter them into her computer at home.

On April 5, 2000, Ungerleider sent FMG Human Resources a facsimile proposing a date on which to return to work, writing "[t]he letter from Medical Doctor & Chiropractor accept home office to keep laptop w/ desk position as alternative unless, hopefully a PC is available at a future date."  FMG's Managed Disability Administrator approved Ungerleider's return to work on

11

April 10, 2000, with a permanent job modification that she not lift more than five pounds.

Upon her return, Moran informed Ungerleider of her removal from the Orange branch and issued her second "Counsel - Step #2" advisement.  The document stated that the reason for the counseling was loan quality, meeting attendance, and unprofessional conduct, citing four specific confrontations with co-workers.  Further, the document listed specific actions to be taken to improve performance.  Ungerleider refused to sign the document.  Further, the following day, she submitted a rebuttal that disputed every facet of the counseling, and requested specific details of poor performance.

On April 14, 2000, Moran responded with two memoranda.  In the first, he notified Ungerleider that his attempt to reinstate her at the Orange branch had failed, as he was unable to convince Norris to take her back.  Further, he noted that even without the Orange branch, she still had six branches from which to generate business.  In the second memorandum, he provided the specific details of poor performance that Ungerleider had requested, and warned that if her performance did not improve then ". . . disciplinary action will be taken, up to and including termination."  In both memoranda, Moran concluded by offering his hopes for a positive future for her with FMG.

Ungerleider labored to locate documentation to exonerate herself, which she admits "was unproductive as a loan officer. .

12

. ."  She replied to Moran with an e-mail attempting to refute some, but not all of Moran's specific criticisms.  Specifically, she offered explanations for her loan processing problems and confrontations with co-workers, and accounted for some, but not all of the meetings that she had missed.  With regard to one dispute with one of her former branch managers, she wrote, ". . . the Afro-Amer.branch manager his [sic] obviously happier with her Afro-Amer. Loan Officer.  Let's leave it at that."

On April 17, 2000, FMG senior management notified Moran that Ungerleider went to the Orange branch, made unprofessional comments to branch personnel and threatened to sue Tartaglio and Norris.  On April 19, 2000, Moran told Ungerleider to give to him her keys to the Orange branch, and to not return to that branch without instructions from him.

Nevertheless, the following day, Ungerleider returned to the Orange branch to turn in her keys and retrieve her belongings.  When the branch staff refused to give her a receipt for the keys, she called the town police.  It was only after FMG Human Resources interceded that the parties resolved the conflict.

On April 26, 2000, Moran sent Ungerleider a memorandum in which he reminded her that he had directed her previously not to return to the Orange office.  Further, he requested a meeting in which he could hear her version of the Orange branch confrontation, and determine her employment status.  Additionally, he acknowledged some of her replies to his specific

13

complaints in the counseling, but stood by most of his assertions.  He also notified her that term "Afro-Amer branch manager," could be perceived as discriminatory, and warned her keep all communication professional and free of personal commentary.  Finally, because she no longer had her desk at the Orange branch, he offered to arrange for assistance for her in establishing a work space at the Milford Green branch.

On or about May 1, 2000, Ungerleider met with Moran's supervisor, John Frazza, and Rachel Paquin of FMG Human Resources to contest the "Counsel - Step #2" complaints about her attendance and loan quality.  Further, she complained that she had difficulty carrying her laptop up the stairs to her new second-story office at the Milford Green branch.  Additionally, she complained that Moran was always threatening to fire her and harassing her, although she would not discuss the harassment without her attorney present.

In her Amended Complaint, Ungerleider now alleges that from April 10, 2000, until May 24, 2000, "Moran continuously berated and harassed Ms. Ungerleider."  In addition to the written counseling and removal from the Orange branch, the court's review of the record reveals the following allegations: FMG did not deliver in a timely manner a service award and prize that she had been awarded at a sales conference; Ungerleider did not find that leaving her laptop at home was a feasible alternative to having a PC at her desk; she was not permitted to pick up documents

14

dropped off by her customers at the Orange branch; Moran did not assign a new branch to her to replace the Orange branch; Moran threatened to fire her; there were errors in her compensation; her family was denied access to Orange branch for personal banking.  Ungerleider notes in her affidavit that during this period, "[t]he stress and frustration was horrible and I started to develop nightmares, I felt like I was losing my sanity...."

On or about April 25, 2000, Ungerleider left Paquin a voice mail message.  She stated, "I guess I am going to have to quit, but I really don't want to" and that she wanted to "resolve this dispute before I leave the company."  Further, on May 17, 2000, Ungerleider sent Paquin an e-mail stating that she would be resigning as soon as she knew the status of her professional record ". . . because I cannot tolerate one more day of this.  It causes me chest pains, nausea and the inability to do my job." Additionally, on May 19, 2000, Ungerleider e-mailed Frazza to request a transfer, stating "I have otherwise been forced to resign because I will not work one more minute under Kevin [Moran]."

On May 24, 2000, Frazza and Paquin met again with Ungerleider.  They told her that they found no support for her accusations that Moran harassed her or treated her unprofessionally.  Paquin had investigated Ungerleider's complaints regarding the counseling, interviewing seventeen people.  In Paquin's view, each individual substantiated the

15

basis for the counseling.  Frazza and Paquin told Ungerleider
that they had concluded that the events that led to her recent
counseling were valid, and that FMG would maintain the record of
the counseling.  Finally, they advised her that FMG was accepting
her resignation effective immediately.  Ungerleider then abruptly
left the meeting, only to return to state that she hated the
company and was glad that this had happened.

On May 30, 2000, Ungerleider dual-filed an administrative
complaint with the Connecticut Commission on Human Rights and
Opportunities, and the U.S. Equal Employment Opportunity
Commission.  She alleged that FMG had given her warnings and poor
evaluations, and discriminated against her in terms and
conditions of employment.  Further, she indicated that she
believed that her sex, age, religion, and physical disability
were in part factors in these actions.  On April 12, 2002, after
obtaining a release to sue, Ungerleider filed this action in
federal district court.[3]

### STANDARD

Summary judgment is appropriately granted when the
evidentiary record shows that there are no genuine issues of

---

[3] Title VII states: "[I]f within one hundred and eighty days
from the filing of [a] charge . . . the [EEOC] has not filed a
civil action . . . or has not entered into a conciliation
agreement to which the person aggrieved is a party, the [EEOC]. .
. shall so notify the person aggrieved and within ninety days
after the giving of such notice a civil action may be brought
against the respondent named in the charge . . . by the person
claiming to be aggrieved...."  42 U.S.C. § 2000e-5(f)(1).

material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In determining whether the record presents genuine issues for trial, the court must view all inferences and ambiguities in a light most favorable to the non-moving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991), cert. denied, 502 U.S. 849 (1991). A plaintiff raises a genuine issue of material fact if "the jury could reasonably find for the plaintiff."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Rule 56 "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Id. at 247-48.  The Supreme Court has noted that:

> Rule 56 must be construed with due regard not only for
> the rights of persons asserting claims and defenses
> that are adequately based in fact to have those claims
> and defenses tried to a jury, but also for the rights
> of persons opposing such claims and defenses to
> demonstrate in the manner provided by the Rule, prior
> to trial, that the claims and defenses have no factual
> basis.

Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims . . .  [and] it should be interpreted in a way that allows it to accomplish this purpose." Id. at 323-324.

17

## DISCUSSION

**1.  Motion for Summary Judgment**

**A.  Refusal to Make a Reasonable Accommodation:**

FMG first moves for summary judgment on Ungerleider's claim that, in violation of the ADA, FMG refused to accommodate Ungerleider's neck and back injury by providing a PC at her desk, and a first-floor office.  Specifically, FMG argues that: "[Ungerleider] has failed to present evidence that FMG failed to provide her with a reasonable accommodation to enable her to perform the essential functions of her job.  As such, her claim fails as a matter of law."[4]

In response, Ungerleider maintains that FMG is not entitled to judgment as a matter of law.  Specifically, Ungerleider argues that: "[T]here are numerous facts in dispute."  Further, "[w]hether a home office could have been feasible . . . should be decided by a jury."

The Americans with Disabilities Act prohibits discrimination against disabled employees.  42 U.S.C. § 12112(a).  Among the prohibited acts of discrimination is "not making reasonable accommodations to the known physical . . . limitations of an

_____

[4] FMG states,". . . for the purpose of this motion for summary judgment only FMG will assume that plaintiff is disabled within the meaning of the ADA."  FMG additionally appears to concede that it is an employer covered by the ADA and that with reasonable accommodation, Ungerleider could perform the essential functions of her job.

otherwise qualified individual with a disability. . . ."  42

U.S.C. § 12112(b)(5)(A).

A plaintiff suing for disability discrimination under the

ADA bears the initial burden of establishing a prima facie case.

Rodal v. Anesthesia Group of Onondaga, P.C., No. 03-7341, 2004

U.S. App. LEXIS 10170, at *8 (2d Cir. May 24, 2004).

> Where . . . a disabled plaintiff claims that he can
> perform a particular job with a reasonable
> accommodation, the prima facie burden requires a
> showing that (1) plaintiff is a person with a
> disability under the meaning of the ADA; (2) an
> employer covered by the statute had notice of his
> disability; (3) with reasonable accommodation,
> plaintiff could perform the essential functions of the
> job at issue; and (4) the employer has refused to make
> such accommodations.

Id. (internal quotation marks and citations omitted).[5]  Applying

these principles and finding no material facts in dispute, the

court concludes that summary judgment should be granted in favor

of FMG.

Ungerleider has failed to establish a prima facie case of

disability discrimination based upon FMG's alleged refusal

provide her with a PC at her desk to accommodate her neck and

---

[5] If the plaintiff establishes a prima facie case, the
burden of production shifts to defendant, who must articulate a
legitimate nondiscriminatory reason for its challenged actions.
If defendant carries this burden, the presumption of
discrimination created by the plaintiff's prima facie showing
drops out of the case, and plaintiff must then prove that
defendant's actions were motivated by impermissible
discrimination. See Reg'l Econ. Cmty. Action Program, Inc. v.
City of Middletown, 294 F.3d 35, 48-49 (2d Cir. 2002) (citing
McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).

back disability.  First, FMG had the ultimate discretion to
choose between possible accommodations.  The regulations
promulgated pursuant to the ADA explain that "No specific form of
accommodation is guaranteed for all individuals with a particular
disability."  29 C.F.R. § 1630 app.  "The employer providing the
accommodation has the ultimate discretion to choose between
effective accommodations, and may choose the less expensive
accommodation or the accommodation that is easier for it to
provide."  29 C.F.R. § 1630 app. § 1630.9.  It is undisputed that
Ungerleider arranged to return to work, notifying FMG that her
physicians' required that she either have one of two
accommodations: a PC at her desk, or a home office.  Further, it
is undisputed that Moran told her that FMG chose to accommodate
her by permitting her to leave her laptop at home, take paper
applications, and enter them from a home office, until a PC could
be procured.  FMG exercised its discretion and chose between two
accommodations.  The court therefore concludes that Ungerleider's
dissatisfaction with FMG's choice of a home office as an
accommodation does not constitute a refusal to accommodate on the
part of FMG.

Second, if the accommodation FMG provided did not meet
Ungerleider's needs, it was her responsibility to inform FMG that
a different accommodation was needed.  See Rodal v. Anesthesia
Group of Onondaga, P.C., No. 03-7341, 2004 U.S. App. LEXIS 10170,
at *13 (2d Cir. May 24, 2004).  "In general . . . it is the

responsibility of the individual with a disability to inform the employer that an accommodation is needed." Rodal v. Anesthesia Group of Onondaga, P.C., No. 03-7341, 2004 U.S. App. LEXIS 10170, at *13 (2d Cir. May 24, 2004) (quoting 29 C.F.R. § 1630 app. § 1630.9). Again, it is undisputed that Ungerleider had notified FMG that her physicians required that she have either a PC at her desk, or a home office. Further, it is undisputed that Moran told her that FMG chose to accommodate her by permitting her to leave her laptop at home. Ungerleider has submitted no documentation, however, indicating that a home office was insufficient. To the contrary, she notified FMG that her physicians considered a home office a suitable alternative to a PC at her desk. Therefore, the court concludes that Ungerleider's dissatisfaction with the medically-approved alternative of a home office does not constitute a refusal to accommodate on the part of FMG, particularly in light of FMG's professed ignorance of her dissatisfaction.[6]

Third, assuming without finding that Ungerleider eventually notified FMG orally that a home office was insufficient, a delay in providing her with a PC does not constitute a refusal to accommodate, particularly when an interim accommodation was

---

[6] The court does not conclude whether a home office is a reasonable accommodation for Ungerleider, but only that FMG did not refuse to make a reasonable accommodation.

21

ability to climb stairs.  Additionally, Ungerleider has

introduced no evidence that she notified FMG of a difficulty

climbing stairs.  Further, she has introduced no evidence that

she sought an additional accommodation from FMG in light of a

difficulty climbing stairs. ⌈While she did complain that she had

difficulty carrying her laptop up the stairs to her office, FMG

had accommodated this problem by permitting her to keep her

laptop at home.⌋ Ungerleider has failed to show that FMG denied a

request for a first-floor office or even had knowledge that she

needed such an accommodation to function.  Therefore, the court

concludes that Ungerleider's dissatisfaction with her second-

story office does not constitute a refusal to accommodate,

particularly in light of FMG's ignorance of any additional

required accommodation.

Accordingly, summary judgment is granted with respect to the

ADA cause of action for refusal to make a reasonable

accommodation.

**B.  Title VII and ADA Disparate Treatment:**

FMG next moves for summary judgment on Ungerleider's claim

of Title VII and ADA disparate treatment.  Specifically, FMG

maintains that: "Fleet is entitled to judgment on [Ungerleider's]

. . . discrimination claim[s] as a matter of law . . . [because]

. . . FMG has offered legitimate non-discriminatory reasons for

its actions."  Further, FMG argues that: "No rational trier of

23

provided.[7]  It is undisputed that FMG was in the process of
procuring a desktop PC for Ungerleider when it accepted her
resignation.  Ungerleider only worked from April 10, 2000, until
May 25, 2000 without her desired accommodation; until a PC could
be procured, Moran permitted her to use an interim accommodation,
a home office.  The court concludes that FMG's failure to
immediately provide Ungerleider with the specific accommodation
that she sought does not constitute a refusal to provide a
reasonable accommodation, particularly when FMG was working to
provide that accommodation and provided her with an interim
accommodation.

Fourth, if Ungerleider needed a first-floor office because
of a difficulty climbing stairs due to her injured back, then,
again, it was her responsibility to inform FMG that an
accommodation was needed.  See Rodal v. Anesthesia Group of
Onondaga, P.C., No. 03-7341, 2004 U.S. App. LEXIS 10170, at *13
(2d Cir. May 24, 2004).  While it is undisputed that
Ungerleider's physicians limited her to lifting no more than five
pounds, she has introduced no evidence that they had limited her

_____

[7] See Terrell v. USAIR, 132 F.3d 621, 628 (11th Cir. 1998)
(three-month delay in providing accommodation reasonable when
interim accommodation provided); Hartsfield v. Miami-Dade County,
90 F. Supp. 2d 1363, 1373 (S.D. Fla. 2000) (plaintiff failed to
establish an ADA violation due to a ten-month delay in receiving
an accommodation when interim accommodations provided); compare
Worthington v. City of New Haven, 994 F. Supp. 111, 114 (D. Conn.
1997) (sixteen-month delay in providing an accommodation may give
rise to a claim).

22

fact could find that [FMG's] proffered reasons were false, much less that the real reason was intentional discrimination."

In response, Ungerleider maintains that FMG is not entitled to judgment as a matter of law.  Specifically, Ungerleider argues that summary judgment is inappropriate because "there are numerous facts in dispute."  Ungerleider does not address specifically whether FMG's reasons for their actions are merely a pretext for discriminatory conduct.

**i. Discriminatory Adverse Job Actions**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e 2(a), states: "It shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion. . . . ."

The Americans with Disabilities Act, 42 U.S.C. §12112(a), states: "No covered entity shall discriminate against a qualified individual because of the disability of such individual in regard to . . . discharge of employees, employee compensation . . . and other terms, conditions, and privileges of employment."

A Title VII cause of action alleging employment discrimination proceeds under the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Likewise, "[c]laims of intentional discrimination under the ADA area are

24

analyzed using the framework developed under Title VII." <u>Bonura</u>
<u>v. Sears Roebuck & Co.</u>, 62 Fed. Appx. 399, 399 n.4 (2d Cir.
2003). Under the <u>McDonnell Douglas</u> framework, the plaintiff must
first establish a prima facie case of discrimination. <u>Terry v.</u>
<u>Ashcroft</u>, 336 F.3d 128, 138 (2d Cir. 2003). This requires that
"the claimant . . . show that: 1) he belonged to a protected
class; 2) he was qualified for the position; 3) he suffered an
adverse employment action; and 4) the adverse employment action
occurred under circumstances giving rise to an inference of
discriminatory intent." <u>Id.</u>

The plaintiff's burden at the prima facie stage is de
minimis. <u>See</u> <u>Dister v. Continental Group, Inc.</u>, 859 F.2d 1108,
1114 (2d Cir. 1988). "Once a plaintiff has established a prima
facie case, the burden shifts to the defendant, which is required
to offer a legitimate, non-discriminatory rationale for its
actions." <u>Terry</u>, 336 F.3d at 138. Finally, "if the defendant
proffers such a [legitimate, nondiscriminatory] reason, the
presumption of discrimination created by the prima facie case
drops out of the analysis, and the defendant will be entitled to
summary judgment . . . unless the plaintiff can point to evidence
that reasonably supports a finding of prohibited discrimination.
. . . The plaintiff must be afforded the opportunity to prove by
a preponderance of the evidence that the legitimate reasons
offered by the defendant were not its true reasons but were a