pretext for discrimination." Mario v. P & C Food Markets, Inc., 313 F.3d 758, 767 (2d Cir. 2002) (internal quotation marks and citations omitted). In other words, "to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotation marks omitted). Applying these principles and finding no material facts in dispute, the court concludes that summary judgment should be granted in favor of FMG.

Although there is a considerable question whether Ungerleider can establish a prima facie case[8], summary judgment is nevertheless proper because Ungerleider has failed to present

---

[8] Specifically, with regard to Ungerleider's prima facie case, the claim that she suffered an adverse employment action is doubtful. See Weeks v. New York State (Div. of Parole), 273 F.3d 76, 85 (2d Cir. 2001) (Neither "criticism of an employee which is part of training and necessary to allow employees to develop, improve and avoid discipline" nor a change in office assignment that is not a demotion is an adverse employment action.) While Ungerleider also argues that she suffered an adverse employment action because FMG constructively discharged her, this argument too is in doubt. See Stetson v. NYNEX Service Co., 995 F.2d 355, 360 (2d Cir. 1993) ("A constructive discharge generally cannot be established, however, simply through evidence that an employee was dissatisfied with the nature of his assignments...Nor is it sufficient that the employee feels that the quality of his work has been unfairly criticized...Nor is the standard for constructive discharge merely whether the employee's working conditions were difficult or unpleasant."). Nevertheless, as discussed above, the court does not address this issue.

26

any evidence that would be sufficient to permit a rational finder of fact to infer that the FMG's legitimate, nondiscriminatory reasons for its actions were a pretext for discrimination. Ungerleider contends that FMG counseled, reassigned and constructively discharged her because of her religion and disability. FMG, however, asserts that it took its actions as a matter of routine personnel management and because of Ungerleider's history of unprofessional conduct and poor work record.[9]

A review of the record indicates considerable support for the FMG's assertion. There is ample evidence that Ungerleider was not a model employee. It is undisputed that while Ungerleider may have excelled in some areas of employment, her supervisors frequently documented deficiencies in her communication skills, judgment, and professionalism. There is evidence that she was at times insubordinate. Further, it is well documented that she was a party to a number of confrontations with a number of co-workers, requiring police involvement in one instance. Additionally, there is evidence that her supervisors received complaints from customers about her tone, attitude, and the level of service she provided. FMG has submitted evidence that she lacked discretion in her use of e-mail. Specifically: she used e-mail to bypass her supervisor to

---

[9] FMG disputes that it constructively discharged Ungerleider.

bring complaints about daily operations to senior management; she used e-mail to bring complaints about her supervisor to her peers; she has admitted that she referred to co-workers in various e-mails as "Miss Born Again" and "Afro-Amer." Further, she admitted that in her final days at FMG her actions were "unproductive as a loan officer." As such, the court concludes that FMG substantially established legitimate, non-discriminatory reasons for its actions.

Moreover, the court concludes that Ungerleider has failed to satisfy the burden of proving pretextual discrimination. Ungerleider appears to argue that FMG's reasons for its actions are pretextual because she did not suffer any adverse actions until she took disability leave. Specifically, she states: "[T]here were no performance issues before she went out on disability. Her ratings were all satisfactory and no adverse job actions were taken until she returned from her leaves." To the contrary, the legitimacy and non-discriminatory nature of FMG reasons for their actions are only bolstered by the timing of Ungerleider's leaves, evaluations, and counseling. It is undisputed that Moran issued his most negative annual assessment of Ungerleider's work in February 1996, before Ungerleider injured her back and before Ungerleider believes Moran learned that she was Jewish. Further, Moran issued Ungerleider's first "Counsel - Step #2" in May 1997, two years before she took her

first medical leave of absence, in June 1999. Likewise, in 1997 and 1998, prior to Ungerleider taking medical leave, her evaluations by various branch managers and Moran were critical of her communication skills, work relations, judgment, professionalism, and attendance at meetings. Moran's annual assessments of Ungerleider only improved after she was injured and after he learned that she was Jewish.

Additionally, Ungerleider's theory temporally linking FMG's actions to her medical leaves is further weakened by her own deposition testimony regarding Moran's treatment of other employees. She testified that five other employees supervised by Moran took medical leave due to back or neck injuries without repercussions, indicating that FMG bore no animus toward the disabled. Further, with regard to Moran's reallocation of branches in November, 1999, three months after Ungerleider returned from her first medical leave, she testified that, like her, fellow loan officer Downey also lost a branch. Ungerleider has introduced no evidence that Downey is either Jewish or disabled. She did testify, however, that Downey is Moran's personal friend, only bolstering the legitimacy of Moran's reason for the reallocation of branches, creating a market for a newly hired loan officer.

Ungerleider appears to argue next that FMG's reasons for its actions are pretextual because its assessments of her abilities

29

are incorrect. Specifically, when confronted with evidence of her poor work habits, Ungerleider denies responsibility, asserting that FMG is mistaken in its evaluation of her. But even if she is correct, and FMG misjudged her abilities, FMG's reasons proffered for its actions are not necessarily illegitimate nor discriminatory. "The fact that a court may think that the employer misjudged the qualifications of the [employee] does not in itself expose him to Title VII liability. . . ." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 259 (1981). "[I]t is not the function of a fact-finder to second-guess business decisions. . . . A business decision need not be good or even wise. It simply has to be nondiscriminatory. . . . Thus, the reasons tendered need not be well-advised, but merely truthful." Dister v. Continental Group, Inc., 859 F.2d 1108, 1116 (2d Cir. 1988). Ungerleider has not presented any evidence upon which a reasonable jury could find that FMG did not genuinely believe that the actions taken were appropriate in the circumstances.

Ungerleider appears to argue next that FMG's reasons for its actions are pretextual because FMG employees were motivated by anti-Semitic beliefs. Her most serious charge is that both Moran and Tartaglio have engaged in anti-Semitic conduct. Specifically, Ungerleider argues that Moran failed to assist Ungerleider service two Jewish customers. Assuming without

30

deciding that Ungerleider's allegation is true, Moran's conduct does not establish that FMG's reasons for its actions are pretextual. Ungerleider has offered no evidence that Moran assisted Ungerleider with only non-Jewish customers. Further, although "[a] showing that similarly situated employees belonging to a different. . . group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for [unlawful] discrimination," Graham v. Long Island R.R., 230 F.3d 34, 43 (2d Cir. 2000), Ungerleider has failed to make such a showing. Ungerleider has not introduced any evidence that Moran assisted the customers of similarly situated loan officers, that unlike Ungerleider, were neither disabled nor Jewish.

Ungerleider further argues that Moran made anti-Semitic remarks on four occasions, and that Tartaglio made an anti-Semitic remark on one occasion. Five stray remarks in more than five years, however, are not sufficient to show that FMG's reasons are pretextual. "Stray remarks. . .are rarely given weight, particularly if they were made temporally remote from the date of decision." Ezold v. Wolf, Block, Schorr, and Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992); O'Connor v. Viacom Int'l Inc., 93 Civ. 2399 (LMM), 1996 U.S. Dist. LEXIS 5289 at *13 (S.D.N.Y. Apr. 23, 1996). It is unclear whether these alleged

31

remarks were made temporally proximate to the conduct about which Ungerleider complains because she can not approximate when the remarks were made; nor has she deposed any witnesses who approximate when the remarks were made; nor, has FMG any record of when the remarks were made, because Ungerleider is unsure whether she ever complained about them to FMG Human Resources.

Because neither Moran nor Tartaglio were decision-makers in most of events about which Ungerleider complains, the court affords their alleged remarks little weight. See Siino v. New York City Bd. of Educ., 99-9327, 2000 U.S. App. LEXIS 8602 at *4 (2d Cir. May 1, 2000) ("even if [an official] did make the alleged statements, they do not give rise to an inference of discrimination because she did not make hiring decisions"); Ezold v. Wolf, Block, Schorr, and Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight"); compare Ferrell v. Leake & Watts Services, Inc., 83 Fed. Appx. 342, 346 (2d Cir. 2003) (decision-makers remarks, taken together with other circumstances, may lead to inference of discrimination). The decision to counsel Ungerleider in 2000 was made not by Moran, but rather by FMG senior management. Likewise, the decision to maintain the written record of the counseling in 2000 and accept Ungerleider's resignation was made not by Moran, but rather by Frazza, as a result of Paquin's

32

investigation. Further, the decision to remove Ungerleider from the Orange branch was made not by Moran, but rather by Norris. Additionally, annual evaluations critical of Ungerleider were submitted not just by Moran, but also by various branch managers. Ungerleider has introduced no evidence from which a rational finder of fact could infer animus toward the disabled or those of the Jewish faith on the part of senior management, Frazza, Paquin, Norris, or the other branch managers.

Further, Ungerleider has failed to introduce any direct evidence that Moran was motivated by discriminatory animus. To the contrary, her deposition indicates that she did not think Moran realized his actions were objectionable. Further, in her testimony, Ungerleider offered several possible non-discriminatory justifications to explain Moran's decision-making: her relationship with Moran had been never friendly; he did not like her; she had a propensity for going over his head to senior management; unlike him, she had a customer-focus.

Ungerleider has failed to present sufficient evidence to raise a genuine issue of material fact. Through her affidavits, Ungerleider has supplied some evidence of possible discrimination. "But some evidence is not sufficient to withstand a properly supported motion for summary judgment; a plaintiff opposing such a motion must produce sufficient evidence to support a rational finding that the legitimate,

33

nondiscriminatory reasons proffered by the employer were false. . . ." Woroski v. Nashua Corp., 31 F.3d 105, 109-110 (2d Cir. 1994). Further, "[t]he fact that [an employer does] not merely articulate -- but substantially establishe[s] -- legitimate, nondiscriminatory reasons for her discharge render[s] more difficult [a former employee's] task of proving pretext. . . .The reasonableness of the employer's reasons for discharge is, of course, probative of the question whether they are pretexts." Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir. 1985).

Viewing the evidence presented by Ungerleider in its totality, the court concludes that Ungerleider has failed to satisfy the burden of proving pretextual discrimination where, as here, there is overwhelming evidence to support the FMG's legitimate business reasons for its actions. Accordingly, summary judgment is granted with respect to the Title VII and ADA causes of action for discriminatory adverse job actions.[10]

ii. **Hostile Work Environment Claim**

Addressing Ungerleider's ADA and Title VII claims, FMG does not specifically address a potential hostile work environment action in its Memoranda of Law in Support of Motion for Summary

---

[10] FMG also contends that summary judgment should be granted because: 1) "Ungerleider did not suffer an adverse employment action."; 2) "Any 'adverse action' did not occur under circumstances giving rise to an inference of. . . discrimination" Having concluded that judgment is warranted on other grounds, the court need not reach these issues.

34

Judgment. This is presumably because the Amended Complaint does not specifically assert such a claim, only more general violations of law. Ungerleider does refer to the creation of a hostile work environment in her Memorandum of Law in Opposition to Motion for Summary Judgment, but only in passing. Nevertheless, the court addresses this issue.

"A plaintiff may establish a claim of disparate treatment under Title VII . . . by demonstrating that harassment . . . [on the basis of religion] . . . amounted to a hostile work environment." Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004).[11] In order to prevail on a hostile work environment claim under Title VII, a plaintiff must show that "the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002)(internal quotation marks and citations omitted); see also Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 78 (1998) (stating that a hostile work environment is created "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

---

[11] Because "[t]he Second Circuit has yet to determine whether the ADA gives rise to a cause of action for hostile work environments. . .", Bonura v. Sears Roebuck & Co., 62 Fed. Appx. 399, 399 n.3 (2d Cir. 2003), the court does not address this issue.

35

that leaving her laptop at home was a feasible alternative to having a PC at her desk; Moran removed her from the Orange branch and did not assign a replacement branch; she was not permitted to pick up documents dropped off by her customers at the Orange branch; Moran counseled her; Moran threatened to fire her; there were errors in her compensation; her family was denied access to Orange branch for personal banking. In recent hostile work environment cases, however, claims have been dismissed for insufficiency of evidence even though, compared to what was argued here, they involve a similar or greater number of incidents, that were more severe and had more pronounced discriminatory overtones.[12] Conversely, recent hostile work environment cases have found triable issues of fact only where the harassment was of greater frequency and severity than

---

[12] See Alfano v. Costello, 294 F.3d 365, 370 (2d Cir. 2002) (plaintiff subjected to sexually suggestive gifts, public notices, and messages, and warned by supervisor not to eat carrots, bananas, hot dogs, or ice cream in a seductive manner); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998) (an appreciative comment about the plaintiff's buttocks and a deliberate touching of her breasts); Celestine v. Petroleos de Venez., SA, 266 F.3d 343, 354 (5th Cir. 2001) (in a twenty-five-month period, eight incidents of alleged racial harassment); Shepherd v. Comptroller of Pub. Accounts, 168 F.3d 871, 872-875 (5th Cir. 1999) (in a two-year period, co-worker made impertinent and intimate observations about plaintiff's anatomy, attempted to look down her shirt, and touched her multiple times); Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257, 1261-63 (10th cir. 1998) (in a three-year period, harasser made remarks concerning plaintiff's undergarments, and whether she had sexual dreams; claimed sexual conquest of another woman employee; made pornographic architectural analogies; and six times took the plaintiff to a Hooter's restaurant on business travel).

37

environment"). The Second Circuit has explained that "this test has objective and subjective elements: the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." Terry v. Ashcroft, 336 F.3d 128, 147-148 (2d Cir. 2003) (internal quotation marks and citations omitted). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993). "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003). Applying these principles and finding no material facts in dispute, the court concludes that summary judgment should be granted in favor of FMG.

Ungerleider has failed to substantiate a hostile environment claim. Ungerleider argues that between April 10 and May 25, "Moran continuously berated and harassed" her. Specifically: FMG did not deliver in a timely manner a service award and cash prize that she had been awarded at a sales conference; she did not find

36

anything Ungerleider has alleged.[13]

Assuming without deciding that Ungerleider subjectively perceived that her environment was abusive, the court concludes that FMG's actions, when viewed in the totality of the circumstances, were neither severe nor pervasive enough to create an objectively hostile or abusive work environment. Accordingly, summary judgment is granted with respect to the Title VII cause of action for creation of a hostile work environment.

C. **Retaliation for Taking Medical Leave Pursuant to FMLA:**

FMG next moves for summary judgment on Ungerleider's claim that FMG retaliated against her for taking a medical leave of absence. Specifically: "Fleet is entitled to judgment on [Ungerleider's] FMLA claim as a matter of law because the claim is time barred. . . . Generally, claims under the FMLA must be

---

[13] See Feingold v. State of New York, 366 F.3d at 150 (plaintiff subjected to anti-Semitic remarks routinely, and "singled out...on an 'almost daily' basis on account of his religion."; his supervisor "had been aware of anti-Semitism in the office for years."); Holtz v. Rockefeller & Co., 258 F.3d 62, 70, 75-76 (2d Cir. 2001) (harasser touched plaintiff in an unwelcome manner on a daily basis, made "obscene leers at her," "tried to peer down her blouse and up her skirt," and made "approximately ten or twenty" insinuating remarks about her sex life); Cruz v. Coach Stores, Inc., 202 F.3d 560, 571 (2d Cir. 2000) (supervisor subjected plaintiff and others to "blatant racial epithets on a regular if not constant basis," made repeated remarks to the effect that women should not work, and physically harassed women by standing very close, backing them into a wall, and looking them "up and down" when he spoke with them); Raniola v. Bratton, 243 F.3d 610, 621 (2d Cir. 2001) (plaintiff subjected to "offensive, sex-based remarks, disproportionately burdensome work assignments, workplace sabotage, and one serious public threat of physical harm.")

brought with two years of the alleged actionable event."

In response, Ungerleider maintains that FMG is not entitled to judgment as a matter of law. Specifically: "[W]hen the conduct alleged constitutes a 'willful' violation of the FMLA, the statute of limitations increases to three years."

The Family and Medical Leave Act, 29 U.S.C. § 2615(a)(1), states: "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." The regulations promulgated pursuant to the FMLA explain that "'interfering with' the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave," 29 C.F.R. § 825.220(b), and that "an employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave." 29 C.F.R. § 825.220(c). Applying these principles and finding no material facts in dispute, the court concludes that summary judgment should be granted in favor of FMG.

Ungerleider is time barred from bringing a claim that FMG retaliated against her for taking leave pursuant to the FMLA. The FMLA requires that "an action . . . be brought under this section not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought." 29 U.S.C. § 2617(c)(1). The statute of limitations

period began running at the very latest when FMG accepted Ungerleider's resignation on May 24, 2000. She did not amend her complaint to add a FMLA claim until May 5, 2003, nearly a year after the statute of limitation had run.

To preserve a FMLA claim, Ungerleider would have to bring an action for a willful violation. The FMLA permits employees to bring claims within three years of an alleged violation "[i]n the case of such action brought for a willful violation. . . ." 29 U.S.C. § 2617(c)(2). "Where . . . a plaintiff sufficiently alleges facts supporting the claimed violation of the FMLA, a general averment as to willfulness should be sufficient to trigger the three-year limitation period." Settle v. S.W. Rodgers Co., 998 F. Supp. 657, 664 (E.D. Va. 1998), aff'd, 182 F.3d 909 (4th Cir. 1999) (unpublished table decision).

When considering actions under the FMLA, courts often have looked to the Fair Labor Standards Act of 1938, as amended 29 U.S.C. §§ 201 et seq., ("FLSA").[14] Like the FMLA, the FLSA has

---

[14] See Frizzell v. Southwest Motor Freight, 154 F.3d 641, 644 (6th Cir. 1998) ("The legislative history of the FMLA reveals that Congress intended the remedial provisions of the FMLA to mirror those in the FLSA."); Nero v. Industrial Molding Corp., 167 F.3d 921, 928 (5th Cir. 1999) ("the remedial provision in the FLSA can aid in interpreting the similar remedial provision in the FMLA."); Palma v. Pharmedica Communications, Inc., CIV. NO. 3:00CV1128 (HBF), 2003 U.S. Dist. LEXIS 21227 at *3 (D. Conn. Sept. 30, 2003) ("Other courts considering liquidated damages under the FMLA have looked at cases under the Fair Labor Standards Act of 1938. . . ."); Thorson v. Gemini Inc., 96 F. Supp. 2d 882, 890 (N. D. Iowa 1999) (" The remedies provisions of the Family and Medical Leave Act were intended by Congress to

a two-year statute of limitations that increases to three years when a willful violation is alleged. 29 U.S.C. § 255(a). Under the FLSA, "[t]he standard of willfulness [is] . . . that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute. . . ." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1987).

Ungerleider has failed to trigger the three-year limitation period. As FMG notes, the Ungerleider's Amended Complaint does not contain a general averment as to willfulness on the part of FMG.[15] Nor does the Amended Complaint allege any facts supporting the claimed willful violation of the FMLA. Nor has Ungerleider subsequently provided any evidence that FMG either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FMLA. The court concludes that because Ungerleider failed to aver, allege, or submit evidence of a willful violation, the two-year statute of limitations applies and the claim is time barred. Accordingly, summary judgment is

---

mirror those of the Fair Labor Standards Act. It is therefore appropriate to rely on cases interpreting. . . FLSA when interpreting the FMLA").

[15] The court refers to the pleading presently before the court, labeled "FIRST AMENDED COMPLAINT," filed June 27, 2003. Ungerleider asserts that "[i]n her Amended Complaint, the plaintiff alleged that 'The defendant intentionally and willfully violated the FMLA.'" No doubt she refers to paragraph 57 of a previous pleading also labeled "FIRST AMENDED COMPLAINT," filed May 5, 2003. The pleading to which she appears to refer, however, is superseded by her most recent complaint and is no longer before the court.

41

granted with respect to the FMLA cause of action for retaliatory discrimination.[16]

2. **Motion for Sanctions**

FMG next moves to sanction Ungerleider due to her failure to comply with local rules. Specifically: "[Ungerleider] has not even attempted to comply with Local Rule 56(a)3. Although [she] submitted a statement . . . in which she admitted, denied and/or pleaded insufficient knowledge as to each fact, she did not include citations to affidavits nor admissible evidence to support any of her conclusory denials."

In response, Ungerleider objects to the defendant's motion. Specifically: "Although [Ungerleider] did not provide specific citations to each denial, the second section, stating the disputed fact[,] has citations." Further, "It is in the court's discretion whether . . . to grant sanctions. . . . [I]f [Ungerleider's] counsel inadvertently misunderstood the requirements of the rule, an injustice to her client will be

---

[16] FMG also contends that summary judgment should be granted because Ungerleider "cannot establish retaliation." FMG made this argument without the benefit of the 2nd Circuit's most recent FMLA retaliation holding, Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004) ("it would be appropriate to apply the McDonnell Douglas analysis to claims of [FMLA] retaliation"). As Ungerleider's Title VII and ADA claims failed to survive summary judgment under McDonnell Douglas analysis, it seems unlikely that a FMLA claim would have merit, given the facts presently in the record. Having concluded that judgment is warranted on other grounds, however, the court does not reach this issue.

wrought if the motion is granted."

"[B]ecause nothing in the federal rules mandates that district courts conduct an exhaustive search of the entire record before ruling on a motion for summary judgment, district courts are entitled to order litigants to provide specific record citations. Amnesty America v. Town of West Hartford, 288 F.3d 467, 470-71 (2d Cir. 2002). Through Local Rule 56, the court requires that litigants provide specific record citations in support of or opposition to motions for summary judgment. D. Conn. Local R. 56(a)(2)-(3). Specifically:

> The papers opposing a motion for summary judgment shall include a document entitled "Local Rule 56(a)2 Statement," which states...whether each of the facts asserted by the moving party is admitted or denied. The Local Rule 56(a)2 Statement must also include in a separate section entitled "Disputed Issues of Material Fact" a list of each issue of material fact as to which it is contended there is a genuine issue to be tried. . . .
>
> [E]ach denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial. . . . Counsel . . . are hereby notified that failure to provide specific citations to evidence in the record as require by this Local Rule may result in sanctions, including . . . when the opponent fails to comply, an order granting the motion [for summary judgment].

D. Conn. Local R. 56(a)(2)-(3)

"The purpose of Rule 56 is to aid the court, by directing it to the material facts that the movant claims are undisputed and

43

that the party opposing the motion claims are undisputed." Coger v. State of Connecticut, No. 3:98-VC-1593(EBB), 2004 U.S. Dist. LEXIS 4293, *3 (D. Conn. March 2004). Without such a statement, "the court is left to dig through a voluminous record, searching for material issues of fact without the aid of the parties." Id. at *3 (internal quotation marks and citations omitted).

Ungerleider's Local Rule 56(a)2 Statement fails to comply with Local Rule 56(a)3, by including citations only in the "Disputed Issues of Material Fact" section of her Local Rule 56(a)2 Statement. As a result of this omission, Ungerleider left the court digging through the record in search of material issues of fact. As FMG properly notes, it is well within the courts discretion to grant summary judgment on this basis of this violation of the rule. See D. Conn. Local Rule 56(a)3. In the alternative, the court could deem those facts that were not denied in compliance with Local Rule 56 to be admitted. See Sanchez v. Univ. of Conn. Health Care, 292 F. Supp. 2d 385, 390 (D. Conn. 2003).

In the unique facts and circumstances of this case, however, sanctions are not warranted. The court's search of the record, guided by citations provided by both Ungerleider and FMG, was sufficient in this particular case.[17] Any failure by future

---

[17] Ungerleider also argues: "If it is necessary to provide documentation for each denial, one could simply go though the paragraphs and tailor the affidavits to provide documentation for denials." Further, "[FMG's] counsel does not comply with the

44

litigants to comply most strictly with the rules, however, may result in sanctions.

## CONCLUSION

For the foregoing reasons, FMG's motion for summary judgment is GRANTED (document no. 50), and motion for sanctions is DENIED (document no. 74). It is so ordered, this 12th day of August, 2004, at Hartford, Connecticut.

_____
Alfred V. Covello
United States District Judge

---

rule." Having concluded that the motion is denied on other grounds, the court need not reach these issues.