UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
------------------------------------------------- X
LINDA UNGERLEIDER,                                :
                                                  :   CIVIL ACTION NO.:
              Plaintiff                           :   3:02CV659(AVC)
                                                  :
        v.                                        :
                                                  :
FLEET MORTGAGE GROUP OF                           :
FLEET BANK [sic],                                 :
                                                  :
              Defendant                           :   OCTOBER 1, 2004
------------------------------------------------- X
```

## DEFENDANT'S REPLY TO PLAINTIFF'S MOTION TO DENY BILL OF COSTS

Defendant Washington Mutual Bank FA, as successor in interest by operation of law to Washington Mutual Home Loans, Inc., the successor by merger to Fleet Mortgage Corporation ("FMG"), hereby replies to Plaintiff Linda Ungerleider's Motion to Deny Bill of Costs.

On August 12, 2004, the Court entered judgment in favor of FMG. On September 3, 2004, in accordance with Federal Rules of Civil Procedure 54(d)(1), FMG filed its Bill of Costs. On or about September 20, 2004, Plaintiff filed a "Motion to Deny Bill of Costs" citing the financial difficulties she alleges her now former counsel is facing and the fact that she did not make plaintiff aware of the fees involved in filing a claim. Plaintiff's reasons, even if true, fail to overcome the presumption in favor of allowing costs to a prevailing party pursuant to the federal rules. As such, her motion should be denied and FMG should be awarded its costs.

The taxation of costs against an unsuccessful litigant in federal district court is governed by Federal Rules of Civil Procedure 54(d). This Rule provides that "costs other than attorneys' fees shall be allowed *as of course* to the prevailing party unless the court otherwise directs ..." (emphasis added). Because the Rule allows costs "as of course," such an award against the

losing party is the normal rule and not the exception. See, e.g., Whitfield v. Scully, et al., 241 F.3d 264, 270 (2d Cir. 2001); Mercy v. County of Suffolk, 748 F.2d 52, 54 (2d Cir. 1984). For this reason, the losing party bears the burden of showing that costs should not be imposed. Whitfield, 241 F.3d at 270. To meet such a burden the losing party must set forth evidence of extenuating circumstances that would render payment of costs under Rule 54(d) unjust, "for example ... [by showing] misconduct by the prevailing party, the public importance of the case, the difficulty of the issues, or the losing party's limited financial resources." Id., citing Ass'n of Mexican-Am. Educators v. California, 231 F.3d 572, 592-93 & n.15 (9th Cir. 2000) (en banc).

Plaintiff has not even come close to meeting this burden. She has failed to articulate extenuating circumstances that would render payment of costs "unjust," much less provide evidence of same. She has offered no evidence of misconduct by FMG or its counsel. Nor, in this garden-variety single plaintiff employment discrimination case, were there any matters of public importance. Indeed, as noted by the Court in its decision granting summary judgment in FMG's favor, plaintiff failed to provide *any* evidence that would be sufficient to permit a rational fact finder to infer that FMG's legitimate, nondiscriminatory reasons for its actions were a pretext for discrimination. Ungerleider v. Fleet Mortg. Group of Fleet Bank, 329 F. Supp. 2d 343, ___, 2004 U.S. Dist. LEXIS 15760 at *33 (D. Conn. 2004). Plaintiff failed to establish even so much as a prima facie case of disability discrimination. Id. at * 25. Finally, plaintiff does not claim indigence or provide evidence that she is so destitute as to be unable to afford to pay FMG's Bill of Costs.[1] In fact, she testified in her deposition that she and her husband own a home valued at the time at $500,000, and that she had $250,000 in equity from the sale of her former home that went in to the purchase of her new home. (See excerpts of the July 14, 2003

---

[1] Although there has been no showing of plaintiff's indigence in this case, such a showing, per se, still would not automatically preclude an award of costs. Whitfield, 241 F.3d at 270.

2

deposition of Plaintiff, p. 506, 509-10, attached as Exhibit A).  Plaintiff merely relies upon the fact that her former attorney (not Plaintiff) is now purportedly on a payment plan with certain court reporters that plaintiff utilized during the course of the case, had difficulty conducting depositions, and did not inform plaintiff of the costs associated with filing a lawsuit.  Issues between Plaintiff and her attorney do not constitute a basis to deny costs FMG incurred in the course of defending Plaintiff's meritless claims nor to which it is entitled pursuant to Rule 54(d).

In sum, plaintiff has failed to set forth valid reasons why this Court should make an exception to the normal application of Rule 54(d).  Therefore, FMG respectfully requests that this Court deny Plaintiff's Motion to Deny Bill of Costs, and allow FMG to recover the costs to which it is entitled as the prevailing party.

THE DEFENDANT
WASHINGTON MUTUAL BANK, FA as
successor in interest by operation of law to
Washington Mutual Home Loans, Inc., the
successor by merger to Fleet Mortgage Corporation

By: _____
Beverly W. Garofalo (ct11439)
Kristi E. Mackin (ct23394)
Brown Raysman Millstein Felder
 & Steiner, LLP
CityPlace II, 10th Floor
185 Asylum Street
Hartford, CT  06103
(860) 275-6400

## CERTIFICATION

  This is to certify that on October 1, 2004, a true copy of the foregoing was sent via first-class mail, postage prepaid, to:

Ellen M. Telker, Esq.
564 Boston Post Road
Milford, CT 06460

                _____
                Kristi E. Mackin

# EXHIBIT A

```
00235
 1            UNITED STATES DISTRICT COURT
              DISTRICT OF CONNECTICUT
 2

 3  - - - - - - - - - - - - - - - x
    LINDA UNGERLEIDER,          |
 4    Plaintiff,
                                |
 5  VS.                  CIVIL ACTION NO.
                     |  3:02CV659(AVC)
 6  FLEET MORTGAGE GROUP OF
    FLEET BANK [sic],          |
 7    Defendant.
    - - - - - - - - - - - - - - - x  Volume 2
 8

 9

10
   ---------------------------------------------
11       CONTINUED DEPOSITION OF:  LINDA UNGERLEIDER
   ---------------------------------------------
12

13

14

15       Taken before James A. Scally, Registered
    Professional Reporter, a Notary Public in and for the State
16  of Connecticut, pursuant to the Federal Rules of Civil
    Procedure, at the offices of Brown Raysman Millstein Felder
17  & Steiner, CityPlace II, 185 Asylum Street, Hartford,
    Connecticut, on July 14, 2003, commencing at 10:03 a.m.
18

19

20

21

22

23
              BRANDON SMITH REPORTING SERVICE
24                  (860) 549-1850
                  44 Capitol Avenue
25            Hartford, Connecticut 06106
```

00506
```
 1   Q   So you put down how much money on the house?
 2   A   I forget, but we have a $156,000 mortgage, and we
 3  paid four oh nine, nine.
 4   Q   So you put down a considerable amount?
 5   A   The proceeds of the sales we put down.
 6   Q   So you recouped $250,000 approximately from the
 7  sale of your house?
 8   A   Uh-huh.
 9   Q   That's how much equity you had in your house that
10  you got to take away?
11   A   Uh-huh.
12   Q   So how much could your mortgage --
13   A   We remodeled a complete home.
14   Q   So how much could your mortgage payments have been
15  on your old home?
16   A   Well, the interest rate was higher --
17   Q   You could have refinanced, correct?
18   A   Oh, do you mean why -- no.  There were a lot of
19  reasons.  It was a reduction in the size of the home.  This
20  is a much smaller home.  It's actually -- almost would be
21  considered two bedroom at this point, and then we have the
22  potential of renting out another part of the house.  So we
23  have potential for income.
24   Q   Have you been renting out?
25   A   We're fixing it up to get it rented out.
```

00509
1  been higher on your first house than on your second house.
2     A   Well, we had a first and second mortgage that are
3  greater than 156,000 and an interest rate at 156 that's
4  lower.  So how could that not be understood?  We lowered
5  our -- I mean we lowered our mortgage by about 80,000.
6  That's not earth shattering, but it was helpful.
7     Q   But you're saying the total amount that you owed
8  on the house was approximately $396,000 on your first
9  house?
10    A   No.  No.  What we owed --
11    Q   How much did you owe?  How much was your mortgage,
12 first mortgage, second mortgage, on your first house?
13    A   I'm not sure, I would have to ask Alex, but I
14 think -- I think with the first and second, about 245.  I'm
15 not sure.  All I can be sure about is how much we lowered
16 our mortgage total by about 80,000.  Total by first and
17 second mortgage.
18    Q   But you made a huge profit when you sold the
19 house?
20    A   Which went into the one we bought.
21    Q   Okay.
22    A   It was all transfer, you know.  Prices have gone
23 up, even more so since we sold.
24    Q   Okay.  Do you know how much your new house is
25 worth now?

00510
1   A   The house we live in now?
2   Q   Yes.
3   A   We refinanced recently and they said 500,000.
4   Because we improved it. My husband --
5   Q   Did you take out any more mortgages on your second
6   home?
7   A   No. We weren't approved to do that. We tried.
8   Q   Do you like your new home?
9   A   I liked living in Orange better.
10  Q   Do you like your new home?
11  A   I'm very adaptable.
12  Q   You indicated that you -- the emotional distress
13  has affected you sexually. Can you please explain that if
14  that's something that you're relying upon in this case?
15  A   Well, physically, it's painful because of my back;
16  and emotionally, it's -- I'm just, when I'm depressed, it's
17  like it's tiring. I'm just, a very tired feeling.
18  Q   And has this been ever since you left Fleet? When
19  did it start?
20  A   It started real bad when I came home and said, "I
21  got a written warning April 10th." That's when it really
22  got bad. Prior to that, I had a lot of pain, so I wasn't
23  in great shape, you know, with my back problem. And then I
24  developed ulcerative colitis from taking all the Motrin for
25  my back pain and the stress. So I had ulcers of the colon.